IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

J. LEE,

      Plaintiff,

                                    No. 1:17-CV-01230 JB/LF

v.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO, and
GARNETT S. STOKES, in her official capacity
as the President of the University of New Mexico,

      Defendants.

## <u>MEMORANDUM BRIEF IN SUPPORT OF<br>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

### <u>Introduction</u>

Plaintiff, J. Lee, was a graduate student of the University of New Mexico ("UNM") who was expelled following a finding that he engaged in sexual misconduct. This Court has already dismissed all of the claims brought in this lawsuit,[1] except the Court has allowed a claim for injunctive and declaratory relief against Defendants Board of Regents of UNM and Garnett S. Stokes, in her official capacity as the President of UNM, to proceed beyond the pleadings. Plaintiff's only remaining claim for injunctive and declaratory relief is for alleged violations of his federal constitutional right to due process arising from the investigative and sanctioning process that resulted in his expulsion from UNM for sexual misconduct. The undisputed facts show that Plaintiff was entitled to no greater procedural safeguards than he received prior to his expulsion, and, thus, his due process theories fail as a matter of law and the Court should grant summary judgment in favor of Defendants.

---

[1] By Amended Order [Doc. 53], the Court has already dismissed Plaintiff's damages claims for violation of Title IX of the Education Amendments Act of 1972 ("Title IX"), for violation of his federal and state constitutional rights to due process, and for breach of contract and breach of the implied covenant of good faith and fair dealing.

<u>**Statement of Undisputed Facts ("UFs")**</u>

***The Alleged Sexual Assault on September 18, 2015***

1.      In the fall semester of 2015, Plaintiff was a 31-year-old graduate student of UNM living in Lobo Village, which is student housing at UNM. Plaintiff had three freshman roommates, including John Goodnight, who was 19 years old. [Pl. Depo. at 14:1-21, 15:9 to 17:23, **Ex. A**].

2.      On September 18, 2015, Plaintiff drove Mr. Goodnight to his job at the Maxwell Museum at UNM. Mr. Goodnight had previously arranged to meet Jane Roe[2]—who was a 19-year-old freshman at UNM—at Maxwell Museum that evening. Plaintiff stayed at Maxwell Museum to help out with a special event. Afterward, the three students (Plaintiff, Mr. Goodnight, and Ms. Roe) all went to the men's dorm room at Lobo Village. [Pl. Depo. at 23:19 to 24:25, 27:1-17, **Ex. A**].

3.      Later that night, the UNM Police Department ("UNMPD") responded to a 911 call from Ms. Roe, who was locked in her car in the parking lot of Lobo Village. When a UNMPD Officer, Michael Fisher, arrived on scene at 10:21 p.m., he interviewed both Mr. Goodnight and Plaintiff. Officer Fisher audio-recorded those interviews and documented them in a written police report. [Pl. Depo. at 70:5-24, 74:10 to 77:19, **Ex. A**; State of New Mexico Supplemental Report ("Fisher Supp. Rpt."), September 18, 2015, at p. 1, **Ex. B**].

4.      At the scene at Lobo Village, Mr. Goodnight told Officer Fisher that he had only known Ms. Roe for a few hours. Mr. Goodnight said Ms. Roe drove to Lobo Village to meet him at his dorm room where they began playing cards and drinking alcohol. In his Supplemental Report, Officer Fisher wrote: "Goodnight said they had about two shoots [sic] and he got up to use the restroom. While he was in the bathroom he stated [Ms. Roe] must have drank more alcohol because

---

[2] To protect the privacy of the young woman who was the victim of an alleged sexual assault, Defendants will refer to her in this brief as "Jane Roe," "Ms. Roe," or "Complainant." Defendants have also redacted her name in the attached exhibits.

when he returned she was very intoxicated." Mr. Goodnight did not disclose during that interview that he had engaged in sexual activity with Ms. Roe. [Fisher Supp. Rpt., at p. 1, **Ex. B**].

5.     Officer Fisher then interviewed Plaintiff at the scene. According to his written report, Plaintiff told Officer Fisher that Ms. Roe and Mr. Goodnight were "playing Blackjack and taking shoots [sic]" and "that at first everything seemed fine but then [Ms. Roe] became very intoxicated."[3] Plaintiff said he saw Mr. Goodnight and Ms. Roe have sex. Plaintiff described Ms. Roe during the period of time before the sex, though, as "really drunk and staggering" and said that Mr. Goodnight was "holding her so that she didn't fall over." Plaintiff said that he went in the room after the sex and that Ms. Roe "was very incoherent of what was happening and they decided to take her to her car." [Pl. Depo. at 77:21 to 83:20, **Ex. A**; Fisher Supp. Rpt., at p. 1, **Ex. B**].

6.     According to his written report, when Officer Fisher asked Plaintiff if he himself had sex with Ms. Roe, Plaintiff "looked away for a few seconds and said 'well I tried to get a blow-job.'" After then being read his Miranda rights, Plaintiff made the following admissions:

> Lee told me he was actually in the bedroom the whole time that Goodnight was having sex with [Ms. Roe]. Lee told me that Goodnight was having vaginal sex with [Ms. Roe] while he was trying to insert his penis into her mouth. Lee insisted he never succeeded in this act because [Ms. Roe] would not open her mouth and let him.[4]

[Pl. Depo. at 84:14 to 86:24, **Ex. A**; Fisher Supp. Rpt., at p. 2, **Ex. B**].

---

[3] Plaintiff testified at his deposition that he did not recall whether he said Ms. Roe was "very intoxicated" or whether he made other statements attributed to him in the police report, but Plaintiff acknowledged that the audio-recording of the interview would be the best evidence of what he said. The recording reveals exactly what Plaintiff told Officer Fisher. Plaintiff said Ms. Roe "started freaking out" after 3 or 4 shots of Jack Daniel's whiskey. Plaintiff said that Mr. Goodnight needed help from him when he was "carrying" Ms. Roe to her car. Plaintiff said that Ms. Roe was "stumbling" when she walked into Mr. Goodnight's bedroom. Plaintiff also affirmed that that Ms. Roe was "drunk" and "intoxicated." Plaintiff also said that Ms. Roe had trouble breathing, that he dressed her, and that she was saying that she wanted to go home. [Audio-Recording of Lobo Village Interview of Jong Lee, at 11:00 – 20:00, separately filed under seal as **Ex. B-1**].

[4] At his deposition, Plaintiff disputed this characterization of what he told Officer Fisher. The recording reveals that what Plaintiff actually said was far worse than what was described in the written report. When asked by Officer Fisher if he had sex with Ms. Roe, Plaintiff admitted that he tried to put his penis in Ms. Roe's mouth "but she wasn't opening it." Plaintiff said several times that Ms. Roe was "resisting" when he was trying to put his penis in her mouth and that Ms. Roe actually said the word "no." [Audio-Recording of Lobo Village Interview of Jong Lee, at 20:00 to 24:00, **Ex. B-1**].

7.      Both Mr. Goodnight and Plaintiff agreed to be transported to UNMPD. During another interview at UNMPD, which was audio-recorded and documented in another written police report, Plaintiff said "he saw [Ms. Roe] drink three shots of whiskey." Plaintiff admitted that Ms. Roe was "intoxicated." He reportedly stated: "On a scale of 1-10, 1 not being intoxicated and 10 being highly intoxicated, Lee thought [Ms. Roe] would rate a 6 or 7." Plaintiff further admitted that, while they were in the common area, "he attempted to get a 'blowjob' from [Ms. Roe] but she did not open her mouth."[5] [Pl. Depo. at 89:11 to 90:9, 92:24 to 96:15, 97:17-24, **Ex. A**; UNMPD Felony Supplemental Report, October 5, 2015, at p. 4, attached as **Ex. C**].

8.      During his UNMPD interview, Plaintiff said that the three of them (Plaintiff, Mr. Goodnight, and Ms. Roe) went into Mr. Goodnight's bedroom where Mr. Goodnight proceeded to have sex with Ms. Roe. According to the police report, Plaintiff made the following admissions:

> Lee advised that he again attempted to place his penis in [Ms. Roe's] mouth but she did not open her mouth. Lee advised that his penis may have touched her lips but he did not place it in her mouth. Lee attempted to put his penis in [Ms. Roe's] mouth for approximately one minute.[6]

Plaintiff stated that, after his failed attempt to receive oral sex, "[Ms. Roe] got out of bed and sat on the floor naked and she told them that she was having trouble breathing." Plaintiff then described how

---

[5] Plaintiff has testified that he did not recall make these statements, but the recording of his UNMPD station interview reveals that he did make them. Plaintiff said that Ms. Roe poured shots of Jack Daniels whiskey for herself "at least three times" but she could have drank more. Plaintiff said Ms. Roe was "intoxicated." When asked how "drunk" he thought she was, Plaintiff said Ms. Roe was "6 or 7" on scale of 1 through 10 with 10 being "completely." Plaintiff said that he "tried to go for the blow job, too, but, like, her mouth wasn't opening too wide enough for me to." Upon further questioning, Plaintiff said "mine wasn't going in, like, it wasn't going in, she didn't have her mouth open too, so I was just like ok." [Audio-Recording of UNMPD Station Interview of Jong Lee, at 9:00 to 17:40, separately filed under seal as **Ex. C-1**].

[6] Again, Plaintiff has testified that he did not recall whether he made these statements, but the recording of his interview reveals that he did make them. When asked what he was doing while Mr. Goodnight and Ms. Roe were having sex, Plaintiff said, "I was trying to go for the oral." When asked if he put his penis in her mouth, Plaintiff said, "I may have touched her lips or her cheeks. No deep throat action or nothing. In terms of timeframe. . . it was maybe a minute, and that might be longer, I attempted, you know." [Audio-Recording of UNMPD Station Interview of Jong Lee, at 23:36 to 26:43, **Ex. C-1**]. Moreover, Plaintiff has consistently admitted that he attempted to receive oral sex from Ms. Roe, but she would not open her mouth. He testified at his deposition that, when he attempted to receive oral sex, Ms. Roe's mouth "wasn't opened enough for me to go and force it in." [Pl. Depo. at 45:15 to 46:14, **Ex. A**].

Ms. Roe made it from the floor of the bedroom to calling 911 from her locked car. Finally, Plaintiff admitted to UNMPD "that he purchased the alcohol that was consumed by Goodnight and [Ms. Roe] both of whom he knew to [be] under the legal drinking age of 21." [Pl. Depo. at 98:4-16, 99:24 to 102:23, **Ex. A**; UNMPD Felony Supplemental Report, at pp. 4-5, attached as **Ex. C**].

***The Investigation by the UNM Office of Equal Opportunity***

9.      On September 21, 2015, Plaintiff was notified by an email from a UNM Student Conduct Officer, Lydia Wolberg, that she had received information from UNMPD that he was involved in an alleged sexual assault and that he was being emergency banned from the UNM campus. The email also informed Plaintiff that the UNM Office of Equal Opportunity ("OEO") "will investigate the actual incident that occurred on campus and they will be in contact with you regarding the investigation." [Pl. Depo. at 105:20 to 107:4, **Ex. A**; Email from Dean of Students Office to Jong Lee re: "Emergency Campus Ban Letter," September 21, 2015, attached as **Ex. D**].

10.      Plaintiff met with Ms. Wolberg either that same day or the next day. After that meeting, Plaintiff was informed by email that the campus ban was lifted but there would still be some restrictions on him while OEO was conducting its investigation. Plaintiff was allowed to continue attending his classes and living in Lobo Village while he was under investigation. [Pl. Depo. at 107:5 to 108:1, 110:19 to 112:20, **Ex. A**; Email from Dean of Students Office to Jong Lee re: "Update on Campus Ban," September 22, 2015, attached as **Ex. E**].

11.      On September 24, 2015, Plaintiff had an initial meeting at OEO with the Director of OEO, Francie Cordova, and the Title IX Coordinator, Heather Cowan. Although Plaintiff does not remember much about that meeting, he did sign an acknowledgment that he received handouts titled "OEO Claims Procedure" and "Analysis of Claims." Plaintiff agrees this was an "informational meeting where [he was] provided information about what to expect," and Plaintiff did not have any

concern that either Ms. Cordova or Ms. Cowan would be biased. Following that meeting, Plaintiff

sent Ms. Cowan an email in which he wrote: "It did not take long for you to convince me that you

would be neutral and fair to me throughout this whole process." [Pl. Depo. at 114:1 to 119:8, 120:9

to 121:21, **Ex. A**; Handout Acknowledgment, September 24, 2015, attached as **Ex. F**; Email from

Jong Lee to Heather Cowan re: "Thank You," dated September 25, 2015, attached as **Ex. G**].

12.     On October 16, 2015, the assigned OEO Investigator, Laura Vele Buchs, met with

Plaintiff where she gave him a document with the detailed allegations of sexual misconduct made by

Ms. Roe against Mr. Goodnight and Plaintiff. The cover letter stated the following: "Please respond

in writing to this Office to each of the specific allegations advanced by Complainant as outlined below

no later than seven (7) working days of receipt of this letter." Plaintiff has admitted that he understood

from the letter that he was accused of engaging in non-consensual sexual conduct with Ms. Roe and

that OEO would be investigating those allegations of sexual misconduct. [Pl. Depo. at 122:16 to

123:23, 125:3-17, 128:5 to 130:10, **Ex. A**; Letter from Laura Vele Buchs to Jong Lee re:

"Investigative Issues (OEO# I-2015-09-33)," October 16, 2015, attached as **Ex. H**].

13.     Plaintiff met with Ms. Vele Buchs on October 27, 2015, to provide her with his written

response to Complainant's statement, in which he had the opportunity to point out any errors or

inconsistencies in her statement and to provide his version of what happened on the night of the

alleged sexual assault. [Pl. Depo. at 130:11-13, 131:7-12, 132:23 to 134:4, **Ex. A**].

14.     In his written response that he gave to Ms. Vele Buchs on October 27, 2015, Plaintiff

made numerous claims that he never made in either interview that he gave to UNMPD officers on the

night of the alleged sexual assault, such as that Ms. Roe said "yes" when asked if she wanted a

threesome, that Ms. Roe gave him a hand job while she gave Mr. Goodnight oral sex, that Ms. Roe

continued to give him a hand job when she was in the bed with Mr. Goodnight, and that Ms. Roe

"proceeded to give me oral sex, but I saw that John had stopped and went into the bathroom." [Pl. Depo. at 134:5 to 139:10, **Ex. A**; Typewritten Statement by Jong Lee, attached as **Ex. I**].

15.     At the meeting on October 27, 2015, Ms. Vele Buchs asked Plaintiff questions, but Plaintiff does not recall any of the specific questions that she asked him. Plaintiff alleges that Ms. Vele Buchs was "aggressive" and "argumentative." When asked to explain how Ms. Vele Buchs was argumentative, Plaintiff vaguely referenced her facial expression and tone, but he could not provide any specific example or reason to believe that Ms. Vele Buchs held any kind of actual bias against him during the process. [Pl. Depo. at 141:21 to 144:17, **Ex. A**].

16.     On January 20, 2016, Plaintiff received a Preliminary Letter of Determination ("PLOD") from the OEO, which stated: "The Office of Equal Opportunity (hereinafter OEO) is prepared to issue findings of **PROBABLE CAUSE** with regard to Complainant's assertion of non-consensual sexual activity against both [Mr. Goodnight] and [Plaintiff]." Plaintiff does not dispute any of the following statements of UNM policy found in the PLOD:

- "Sexual activity, including kissing, oral sex, and sexual intercourse, if unwelcome and/or non-consensual, is considered sufficiently severe by a reasonable person to constitute sexual misconduct in violation of University policy."

- "The use of alcohol or drugs can limit or prevent a person's ability to freely and clearly give consent."

- "OEO examines the record for behavior like stumbling or otherwise exhibiting loss of equilibrium; slurred speech or word confusion; bloodshot, glassy or unfocused eyes; vomiting, especially repeatedly; being disoriented or confused as to time or place; or loss of consciousness."

[Pl. Depo. at 146:16 to 148:11, 153:12-24, 157:4-18, **Ex. A**; Preliminary Letter of Determination ("PLOD"), January 20, 2016, at pp. 1, 15-16, attached as **Ex. J**].

17.     In reaching the preliminary determination set forth in the PLOD, the OEO relied extensively on admissions made by Mr. Goodnight and Plaintiff to the UNMPD. Specifically, the PLOD contains the following language regarding the specific admissions made by Plaintiff to UNMPD and the resulting conclusions made based on those admissions:

- "At the time of the incident, on or about September 18, 2015, both [Mr. Goodnight and Plaintiff] confirmed to UNMPD that Complainant was 'very intoxicated.'"

- "[Plaintiff] confirmed to UNMPD [that] Complainant was 'very intoxicated' when [Mr. Goodnight] asked if she wanted to go the bedroom and [Mr. Goodnight] held Complainant up 'so she wouldn't fall over when they walked to the bedroom.'"

- "[Plaintiff] confirmed to UNMPD that when they were in [Mr. Goodnight's] room, [Plaintiff] tried to get a 'blow job' from Complainant, was 'trying to insert his penis into Complainant's mouth,' but he was not successful because Complainant 'would not open her mouth.'"

- "Complainant not opening her mouth is a clear demonstration that she did not consent to [Plaintiff] trying to put his penis in her mouth and a reasonable person in the same or similar circumstances would have understood that Complainant did not want [Plaintiff's] penis in her mouth."

- "[Plaintiff] also confirmed to UNMPD [that] Complainant was having trouble breathing after the sexual activities stopped, she had a 'medical episode,' and [Mr. Goodnight] dressed Complainant and 'held her up.'"

- "OEO finds [Mr. Goodnight's and Plaintiff's] statements to UNMPD . . . demonstrate Complainant was intoxicated to the point of incapacitation, and a reasonable person, in the same or similar circumstances, would understand that Complainant was intoxicated to the point of incapacitation."

- "OEO further finds the preponderance of evidence shows [Plaintiff] knew or reasonably should have known, Complainant did not consent to him trying to put his penis in her mouth while she laid on [Mr. Goodnight's] bed because he confirmed to UNMPD she would not open her mouth for him to do so."

[Pl. Depo. at 160:5 to 164:4, **Ex. A**; PLOD, at pp. 17-18, **Ex. J**].

18.     After he received the PLOD, Plaintiff was given two weeks to provide additional information to OEO. Through his legal counsel, on February 22, 2016, Plaintiff submitted a letter with a document titled "Supplemental Information." Nowhere in his written submission did Plaintiff contest that he made the statements to UNMPD attributed to him in the PLOD. Instead, Plaintiff asserted that he did not know Ms. Roe was taking antidepressant medication at the time of the alleged sexual assault and, thus, it was not intoxication that caused her medical issues on the night of the incident. Plaintiff has since agreed that, if a person does not have their faculties enough to form meaningful consent, it does not matter whether that is the result of alcohol or a prescription drug. [Pl. Depo. at 164:5 to 167:21, 169:24 to 170:8, **Ex. A**; Letter from Arlyn G. Crow to Laura Vele Buchs re: "Jong Hoon Lee, OEO # I-2015-09-33, February 22, 2016, attached as **Ex. K**].

19.     On February 25, 2016, Plaintiff received a Final Letter of Determination ("FLOD") from OEO, which set forth several bullet points of evidence on which OEO based its determination "that it is more likely than not that [Plaintiff] engaged in non-consensual sexual contact with Complainant in violation of policy." Plaintiff has admitted that <u>none</u> of the bullet points listed in the FLOD "have anything to do with anything that [Ms. Roe] said or reported to OEO." [Pl. Depo. at 170:19 to 173:18; Final Letter of Determination ("FLOD"), February 25, 2016, at pp. 1-2, attached as **Ex. L**].

20.     Plaintiff had the opportunity to appeal the FLOD to the President of UNM, Robert G. Frank, and to the UNM Board of Regents. On March 10, 2016, Plaintiff submitted a Notice of Appeal to the UNM President. Nowhere in the Notice of Appeal did Plaintiff contest that he made the statements to UNMPD attributed to him in the PLOD and FLOD. On March 24, 2016, President Frank denied Plaintiff's appeal of the FLOD, and, on May 13, 2016, the UNM Board of Regents voted unanimously to deny Plaintiff's appeal of the FLOD. [Pl. Depo. at 173:20 to 174:8, 174:19 to 177:24,

**Ex. A**; Letter from Arlyn G. Crow to Amy Wohlert re: "Jong Hoon Lee, OEO# I-2015-09-33, March 10, 2016, attached as **Ex. M**; Letter from UNM Office of the President to Arlyn G. Crow re: "Appeal of OEO finding by Jong Hoon Lee," March 24, 2016, attached as **Ex. N**; Minutes of the Regular Meeting of the Board of Regents of the University of New Mexico, May 13, 2016, attached as **Ex. O**].

*The Sanctioning of Plaintiff by the UNM Dean of Students Office*

21.     After President Frank denied his appeal of the OEO determination, Plaintiff was referred to the UNM Dean of Students Office ("DOSO") for sanctioning. On April 22, 2016, a Student Conduct Officer from the DOSO, Megan Chibanga, sent an email to Plaintiff requesting to schedule a meeting with him to discuss his "options and possible sanctions regarding OEO's probable cause findings by Friday, May 06, 2016." [Pl. Depo. at 178:4 to 179:13, **Ex. A**; Email from Megan Chibanga to Jong Lee re: "Sanction Meeting for Policy Violation," April 22, 2016, attached as **Ex. P**].

22.     With his legal counsel present, Plaintiff met with Ms. Chibanga on May 19, 2016. At that meeting, Plaintiff was presented with the options of either proceeding with an administrative hearing with a Student Conduct Officer (which would be Ms. Chibanga) or a more formal hearing before a Student Conduct Committee. After having the opportunity to consult with legal counsel, Plaintiff elected to proceed with an administrative hearing with Ms. Chibanga. The administrative hearing with Ms. Chibanga was set for June 15, 2016, and Plaintiff was informed by Ms. Chibanga that "the outcome determined by OEO is not up for debate in this portion of the process" but that "portions of the [PLOD] and [FLOD] issued by the [OEO] may be discussed as they contribute to the severity of sanctions." [Pl. Depo. at 180:9 to 184:5, **Ex. A**; Emails Between Jong Lee and Megan Chibanga re: "Meeting Schedule/Availability," May 20, 2016 to June 8, 2016, attached as **Ex. Q**].

23.    On June 15, 2016, the sanctions hearing was held before Ms. Chibanga. Plaintiff had his legal counsel present for that hearing. Plaintiff understood the purpose of the hearing was for Ms. Chibanga to determine the sanctions he would receive based on the OEO finding that he engaged in non-consensual sexual conduct in violation of UNM policy. Plaintiff does not have any reason to believe that Ms. Chibanga had any bias against him. Plaintiff does not have any recollection of any question that Ms. Chibanga asked him at the hearing except that he thinks she asked him about the alcohol consumed by Mr. Goodnight and Ms. Roe on September 18, 2015. [Pl. Depo. at 184:8-15, 206:18 to 207:11, 208:11 to 209:14, 212:18 to 213:25, **Ex. A**].

24.    A week after the sanctions hearing, on June 22, 2016, Plaintiff sent a letter to Ms. Chibanga. In that letter, Plaintiff wrote the following regarding the interview he gave UNMPD: "Though I did state during the interview that the Complainant was 'buzzed,' I also stated that I did not 'recall her having trouble [getting up from the couch]' and further stated that the Complainant was cognizant of what was occurring." The audio-recording that Plaintiff references actually shows that Plaintiff said that Ms. Roe was "extremely buzzed," and, when he was asked what he meant by "extremely buzzed," Plaintiff affirmed that he meant "drunk." [Pl. Depo. at 236:21 to 238:1, 240:6-15, 244:8-19, **Ex. A**; Audio-Recording of UNMPD Station Interview, at 22:20 to 22:48, **Ex. C-1**; Email from Jong Lee to Megan Chibanga, June 22, 2016, attached as **Ex. R**].

25.    On July 6, 2016, Ms. Chibanga sent a letter to Plaintiff by email informing him of the DOSO's sanctioning decision for the OEO finding of sexual misconduct in "in violation of UNM Policy 2740: Sexual Violence and Sexual Misconduct and UNM Policy 2730: Sexual Harassment." In her letter, Ms. Chibanga wrote: "**This office has determined that the appropriate level of sanction for these findings is expulsion.**" Ms. Chibanga also included bullet points listing the information on which she based her decision. In addition to the evidence and finding of sexual

misconduct, Ms. Chibanga included the following bullet point: "Your admission of purchasing alcohol and subsequently providing it to minors on the date of the incident." Nowhere in the letter, though, does it state Plaintiff is actually being sanctioned for a violation of UNM's alcohol policy. [Pl. Depo. at 245:16-22, 246:22 to 250:5, to **Ex. A**; Email from DOSO to Jong Lee re: "Conduct Hearing Outcome," July 6, 2016, **Ex. S**].

26.     Plaintiff had the opportunity to appeal the sanctioning decision to President Frank. On July 15, 2016, Plaintiff submitted Respondent's Appellate Brief to the UNM President. The basis of his appeal as set forth in that brief was as follows:

> [Plaintiff] disputes [the contention that he subjected Complainant to non-consensual sexual activity] and further disputes the decision by the Student Conduct Officer to expel and bar [Plaintiff] from the UNM Campus, stating that the sanction is grossly disproportionate and is unsupported by the facts. Further, [Plaintiff] argues that the sanction and the hearing process is violative of his due process rights when [Plaintiff's] counsel could not represent him at the hearing and when the complained of conduct is tenuously ties [sic] to the University due process rights.

Regarding the issue of legal counsel participation, Plaintiff has testified that his legal counsel was present for the sanctions hearing and that he was <u>never</u> denied legal counsel during the OEO process. On August 23, 2016, President Frank denied Plaintiff's appeal of his expulsion. [Pl. Depo. at 256:4 to 258:4, 259:11 to 261:5, 263:13 to 265:12, **Ex. A**; Letter from Arlyn G. Crow to Amy Wohlert re: "Jong Hoon Lee, OEO# I-2015-09-33, July 15, 2016, attached as **Ex. T**; Letter from UNM Office of the President to Jong Lee re: "Your July 15, 2016 Appeal of Sanctions Issued by Dean of Students Office on July 6, 2016," August 23, 2016, attached as **Ex. U**].

***Plaintiff's Claim of Violations of Due Process***

27.     On December 14, 2017, Plaintiff filed his "Complaint for Injunctive and Declaratory Relief and Damages" ("Complaint" or "Cmplt") [Doc. 1-1]. In his Complaint, Plaintiff alleges he was expelled from UNM without being afforded due process. Although he provides a laundry list of

alleged due process violations, Plaintiff's claim boils down to three broad assertions: (a) Plaintiff was entitled to an adversarial hearing with the opportunity to cross-examine witnesses (including his accuser), presentation of evidence, and active representation of counsel; (b) the OEO investigation was biased; and (c) Plaintiff failed to receive adequate notice of the grounds upon which he would be disciplined. [Cmplt. ¶ 154(a)-(l)].

28.     By Order [Doc. 36] dated September 20, 2018, and Amended Order [Doc. 53] dated May 30, 2019, the Court has dismissed all claims that Plaintiff has brought in the Complaint with the exception of Plaintiff's claim for injunctive and declaratory relief for alleged violations of his federal right to due process. In its Amended Order, the Court found:

> The Court concludes that Lee has alleged facts sufficient to state a plausible Fourteenth Amendment due process claim for injunctive and declaratory relief against the Board of Regents of UNM and [UNM President] in his official capacity as president of UNM, because Lee has a protected property interest in his continued enrollment at UNM and a protected property interest in his good reputation, and Lee's allegations plausibly support a finding that his sexual misconduct investigation resolved into a problem of credibility such that formal or evidentiary hearing, to include the cross-examination of witnesses and presentation of evidence in his defense, is essential to basic fairness . . . In addition, Lee did not receive notice that he faced sanctions for allegations related to underage drinking until his sanctions hearing when it was too late to prepare an adequate defense.

[Amended Order, at pp. 2-3].

29.     In the original Order [Doc. 36], the Court also found "that preponderance of the evidence is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion, given the significant consequences of having a permanent notation such as the one UNM placed on Lee's transcript." [Order, at p. 3]. Although Plaintiff never pled in the Complaint that "preponderance of the evidence" was an improper standard to be applied and the Court removed that sentence from its Amended Order, Plaintiff has since claimed in a written discovery response that

"the preponderance of the evidence standard was too low to afford him due process given the liberty and property interests at stake." [*See* Answer to Interrogatory No. 20, attached as **Ex. V**].

### Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(a). The movant has the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 316, 323 (1986). This burden is met by pointing to "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). If met, the burden shifts to the nonmoving party to contradict the facts the movant avers. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990).

"The nonmoving party must go beyond the pleadings and establish, through admissible evidence, that there is a genuine issue of material fact that must be resolved by the trier of fact." *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995). The nonmoving party cannot rest on allegations or denials, *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004), and the Court must disregard statements of belief, *Tavery v. U.S.*, 32 F.3d 1423, 1426 n.4 (10th Cir. 1994). Finally, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### Overview of Due Process Analysis
### in Student Disciplinary Proceedings

"The Fourteenth Amendment [of the United States Constitution] provides that a state shall 'not deprive any person of life, liberty, or property, without due process of law.'" *Lauck v. Campbell Cnty.*, 627 F.3d 805, 811 (10th Cir. 2010) (quoting U.S. Const. amend. XIV, § 1). In analyzing a

procedural due process claim, the Court must address two questions: "The first is whether a liberty or property interest exists. The second is whether the State provided sufficient procedures." *Brown v. Univ. of Kan.*, 599 F. App'x 833, 837 (D. Kan.) (2015) (unpublished); *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) ("We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (internal citations omitted). Defendants will concede that Plaintiff likely had a property interest in his continued enrollment at UNM; therefore, the key issue before this Court is whether UNM provided Plaintiff with sufficient procedures prior to his expulsion.

As for that issue, in the seminal case of *Goss v. Lopez*, 419 U.S. 565, 581 (1975), the Supreme Court set the following standard for the level of procedural due process owed to primary school students facing short-term suspension:

> Due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

The Supreme Court explained that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* at 584. The Supreme Court further explained that "the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved." *Id.* at 579. Specifically, the accused student's interest in "unfair or mistaken exclusion from the educational process" must be balanced against the school's interest in "discipline and order." *Id.* The Supreme Court emphasized that "the risk of error should be guarded against if that may be done without prohibitive costs or interference with the educational process." *Id.* at 580.

In considering cases of long-term suspension or expulsion, the Tenth Circuit Court of Appeals has applied the balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine if additional process was required. *See Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001). "Under *Mathews*, a court must balance three factors: (1) the private interest that will be affected by the official action, (2) the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the fiscal or administrative burden, that the additional or substitute procedural requirements would entail." *Id.*; *see also Plummer v. Univ. of Houston*, 860 F.3d 767, 773 (5th Cir. 2017) ("[T]he amount of process due in university disciplinary proceedings is based on a sliding scale that considers three factors: (a) the student's interests that will be affected; (b) the risk of erroneous deprivation of such interests through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (c) the university's interest, including the burden that additional procedures would entail.").

In a public university disciplinary setting, the first and third factors of the *Mathews* balancing test are easily identified. On one hand, the student's private interest in avoiding expulsion is substantial. *See Siblerud v. Colo. State Bd. of Agri.*, 896 F. Supp. 1506, 1516 (D. Colo. 1995). On the other hand, the public university "has a strong interest in the 'educational process,' including maintaining a safe learning environment for all of its students, while preserving its limited administrative resources." *Plummer*, 860 F.3d at 773 (citing *Goss*, 419 U.S. at 583); *see also Gorman v. Univ. of R.I.*, 837 F.2d 7, 14-15 (1st Cir. 1988) ("Although the protection of such a vital interest would require all possible safeguards, it must be balanced against the need to promote and protect the primary function of institutions that exist to provide education."). In balancing these interests, the Supreme Court has emphasized that "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion," *Wood v.*

*Strickland*, 420 U.S. 308, 326 (1975), and that "courts should refrain from second-guessing the disciplinary decisions made by school administrators," *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).

As for the second factor of the *Mathews* balancing test, *i.e.*, the probable value, if any, of additional or substitute procedural safeguards, in considering each of the procedural deficiencies alleged by Plaintiff in this case, the Court should consider as a whole whether Plaintiff received adequate notice and an opportunity to be heard. *See Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005) ("Notice and an opportunity to be heard remain the most basic requirements of due process."); *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016) (unpublished) ("The focus of our [due process] analysis . . . is not whether each procedural protection is required, but rather what protections as a whole, were required in this case."). It is against this backdrop that the Court should evaluate the alleged procedural deficiencies—including the lack of an adversarial hearing with cross-examination of witnesses, the alleged bias of the OEO investigator, the application of the preponderance of evidence standard in determining that Plaintiff engaged in sexual misconduct, and the consideration of Plaintiff's provision of alcohol to minors as a factor in the sanctioning of him for sexual misconduct—that Plaintiff relies on for his constitutional due process claim.

<u>**Argument**</u>

I.    **PLAINTIFF'S DUE PROCESS RIGHTS WERE <u>NOT</u> VIOLATED BY UNM'S FAILURE TO PROVIDE HIM WITH AN ADVERSARIAL HEARING WITH AN OPPORTUNITY TO CROSS-EXAMINE WITNESSES.**

The first (and foremost) alleged due process violation that Plaintiff claims is that, prior to being expelled from UNM for sexual misconduct, he should have been afforded an adversarial hearing with the opportunity to cross-examine witnesses (including his accuser), presentation of evidence, and active representation of counsel. **[UF 27]**. As a general principle, though, "[a] university is not a

court of law, and it is neither practical nor desirable that it be one." *Plummer*, 860 F.3d at 773 (quoting *Flaim*, 418 F.3d at 635 n.1 (6th Cir. 2005)); *see also Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 88 (1978) ("A school is an academic institution, not a courtroom or administrative hearing."). Consistent with this principle, the Tenth Circuit has rejected the argument that a student facing expulsion or long-term suspension must always be afforded an adversarial hearing with the right to cross-examine witnesses, present evidence, and be actively represented by legal counsel. *See Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1242-43 (10th Cir. 2001) (rejecting argument that "the student must be afforded written notice specifying the charges, legal counsel, the presentation of evidence, the right to cross-examine witnesses, an impartial board, a transcript of the hearing, independent review of the decision," because "precedent indicate[s] that due process does not require all of these rights").

> **A.    Plaintiff <u>Cannot</u> Show the Inquisitorial Model of Fact-Finding Employed by UNM Violated His Due Process Rights.**

Last year, in *Haidak v. University of Massachusetts-Amherst*, 933 F.3d 56 (1st Cir. 2019), the First Circuit Court of Appeals rejected the argument that due process requires that a university student accused of sexual misconduct be afforded an adversarial hearing with the right to cross-examine witnesses. In that case, "the university employed a non-adversarial model of truth seeking," in which "[i]t was the university's responsibility, rather than the parties', to investigate the facts and develop the arguments for and against a finding of responsibility." *Id.* at 68. The First Circuit described this system of adjudication employed by the university as "inquisitorial" and noted that our Supreme Court has "consider[ed] the inquisitorial model as fair enough for critical administrative decisions like whether to terminate disability benefits." *Id.* (citing *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) (explaining that Social Security proceedings are inquisitorial rather than adversarial)).

The focus in determining whether any particular procedural safeguard, like cross-examination, is mandated by due process is the extent to which that procedural safeguard would result in a more accurate finding, or, as delineated as the second factor in the *Mathews* balancing test, the extent to which it would decrease the "risk of an erroneous deprivation." However, in *Haidak*, the First Circuit flatly rejected the plaintiff's argument that an adversarial proceeding with the cross-examination of witnesses will necessarily produce a more accurate result:

> [W]e have no reason to believe that questioning of a complaining witness by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation. We also take seriously the admonition that student disciplinary proceedings need not mirror common law trials. If we were to insist on a right to party-conducted cross-examination, it would be a short slide to insist on the participation of counsel able to conduct such examination, and at that point the mandated mimicry of a jury-waived trial would be near complete.

*Id.* at 69-70 (internal citations omitted). The First Circuit then went on to find that the inquisitorial model of questioning the accuser in that case was constitutionally adequate because the accuser was "questioned . . . at length on matters central to the charges" and the questioning "probed for detail and required her to clarify ambiguities in her responses," which included inquiry into relevant matters such as "her level of intoxication, asking for an estimate of the number of drinks she had consumed and if it was true that she had fallen down earlier in the night." *Id.* at 70.

Here, the OEO Investigator, Ms. Vele Buchs, questioned Ms. Roe at length regarding her allegations against Mr. Goodnight and Plaintiff, and Plaintiff was provided a document with Ms. Roe's detailed allegations of sexual misconduct against him. **[UF 12]**. Plaintiff was able to provide Ms. Vele Buchs with a response, both in writing and orally, in which he could point out any errors or inconsistencies in her statement and provide his version of what happened the night of the alleged sexual assault. **[UFs 13-15]**. While the questioning of Ms. Roe and Plaintiff were not done in the live

presence of each other,[7] there is <u>no</u> reason to believe that conducting questioning in such a manner would have resulted in a more accurate result than the one ultimately reached by OEO. Since "the weight of authority is against representation of counsel at disciplinary proceedings," *see Gorman*, 837 F.2d at 16, this Court should be especially reticent to find a right to party-conducted cross-examination that would potentially result in the questioning of the accuser by her alleged assailant. As the First Circuit recognized in *Haidak*, 933 F.3d at 69, "schools may reasonably fear that student-conducted cross-examination will lead to displays of acrimony or worse."

In short, this Court should find that the inquisitorial model of fact-finding that was utilized by UNM in this case—which was consistent with the United States Department of Education guidance in effect at the time[8]—was constitutionally adequate as a matter of law. There is <u>no</u> dispute that, prior to the OEO finding of sexual misconduct and his expulsion, Plaintiff received a process that contained the two hallmarks of due process; that is, (1) notice and (2) a meaningful opportunity to be heard. He was provided notice of the charges against him in the form of a document with the detailed allegations

---

[7] In *Haidak*, 933 F.3d at 69, the First Circuit stated that it agreed with a position taken by the plaintiff "that due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, even if only through a hearing panel.'" This apparent focus on "real time" questioning, though, is misplaced. The key is whether the accuser's version of events was tested by questioning, and, as the First Circuit went on to state, "we have no reason to believe that questioning of a complaining witness by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation." *Id.* The fact that Ms. Roe was not questioned in real time in the presence of Plaintiff does not render the process so fundamentally flawed as to violate due process.

[8] On April 4, 2011, the Office for Civil Rights ("OCR") in the United States Department of Education issued a Dear Colleague Letter, which stated:

> While <u>OCR does not require schools to permit parties to have lawyers at any stage of the proceedings</u>, if a school chooses to allow the parties to have their lawyers participate in the proceedings, it must do so equally for both parties. Additionally, any school-imposed restrictions on the ability of lawyers to speak or otherwise participate in the proceedings should apply equally. <u>OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment.</u>

(Dear Colleague Letter, dated April 4, 2011, at p. 12, at https://www.2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html) (emphases added).

of sexual misconduct made against him **[UF 12]**, and he had the opportunity to respond in writing and verbally prior to the issuance of the PLOD **[UFs 13-15]**. Then, after he received the PLOD, which detailed all of the evidence against him **[16-17]**, Plaintiff was given yet another opportunity to provide additional information to the OEO **[UF 18]**. While the inquisitorial model utilized by UNM is admittedly "not the one our founders chose for criminal trials," *Haidak*, 933 F.3d at 68, this Court should find that the process that Plaintiff received prior to his expulsion met the minimum requirements of due process for student discipline.

**B.      Alternatively, Plaintiff Did <u>Not</u> Have Any Constitutional Due Process Right to an Adversarial Hearing Because His Accuser's Credibility was <u>Not</u> at Issue.**

Although the Tenth Circuit has <u>never</u> recognized that a university student being expelled for sexual misconduct is entitled to an adversarial hearing that includes the opportunity for cross-examination of witnesses, in just the last few years, the Sixth Circuit Court of Appeals has recognized that cross-examination may be required in non-consensual sexual misconduct cases where critical fact issues turn on witness credibility. In *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018), the Sixth Circuit held that "if a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination to satisfy due process." However, that holding comes with a significant caveat—an adversarial hearing with cross-examination of witnesses is <u>not</u> required when there is <u>no</u> credibility determination to be made,[9] or, as the Sixth Circuit stated: "This court has long held that cross-examination is <u>unnecessary</u> if a student admits to engaging in

---

[9] The Tenth Circuit has signaled that, if it ever does find that a student being expelled for misconduct is entitled to an adversarial hearing that includes the opportunity for cross-examination of witnesses, that finding would be limited to instances in which there is a credibility determination to be made. In *Watson ex rel. Watson*, 242 F.3d at 1242, the Tenth Circuit found it significant that the plaintiff had admitted the alleged misconduct: "In order to establish a denial of due process, a student must show substantial prejudice from the allegedly inadequate procedure . . . . Because Mr. Watson candidly admitted his guilt, Mr. Watson was not prejudiced by a lack of notice." The Tenth Circuit also favorably cited the case of *Boster v. Philpot*, 645 F. Supp. 798, 804 (D. Kan. 1986), which had held that, "[b]y admitting their guilt, the plaintiffs waived their right to a hearing."

misconduct. After all, there is little to be gained by subjecting witnesses to adversarial questioning when the accused student has already confessed." *Id.* at 584 (emphasis added); *see also Flaim*, 418 F.3d at 641 (holding that "cross-examination would have been a fruitless exercise" and, thus, not required by due process, when plaintiff admitted to the key fact that resulted in his expulsion) (quoted authority omitted).

Here, the OEO finding that Plaintiff engaged in sexual misconduct was <u>not</u> based on the credibility of Ms. Roe. Instead, in reaching its preliminary determination as set forth in the PLOD, the OEO relied extensively on the following incriminating admissions made by Plaintiff to UNMPD:

- Plaintiff made admissions to the UNMPD Officer on the scene the night of the alleged sexual assault that demonstrated that Ms. Roe was "very intoxicated;" that is, she took 3-4 shots of whiskey, she had to be carried to her car, she was "stumbling" into the bedroom where the sexual assault occurred, and she was "drunk" and "intoxicated." **[UFs 5].**

- Plaintiff also made admissions to the UNMPD Officer on the scene that night to the effect that he had tried to put his penis into Ms. Roe's mouth, but she would not open her mouth. (In fact, the audio-recording of that interview reveals that Plaintiff admitted that, when he was trying to put his penis in her mouth, Ms. Roe was "resisting" him and actually said the word "no.") **[UF 6].**

Based on these admissions, the OEO found that Plaintiff's own statements to UNMPD "demonstrate Complainant was intoxicated to the point of incapacitation, and a reasonable person, in the same or similar circumstances, would understand that Complainant was intoxicated to the point of incapacitation" and that Plaintiff "knew or reasonably should have known [that] Complainant did not consent to him trying to put his penis in her mouth while she laid on [Mr. Goodnight's] bed because he confirmed to UNMPD she would not open her mouth for him to do so." **[UF 17]**.

When the OEO issued the FLOD—in which it made its final determination "that it is more likely than not that [Plaintiff] engaged in non-consensual sexual contact with Complainant in violation of policy"—the OEO did <u>not</u> base its finding in any way on the credibility of Ms. Roe.

**[UF 19]**. The finding was based almost exclusively on Plaintiff's own admissions to UNMPD, such as that Ms. Roe was "very intoxicated" prior to going into the bedroom, that Plaintiff was "trying to insert his penis into Complainant's mouth" but he was not successful because she "would not open her mouth," and that Mr. Goodnight and Plaintiff "carried Complainant" to her car because she was "unable to walk on her own." [*See* FLOD, at pp. 1-2, **Ex. L**]. There was only one other witness whose statements were referenced in the FLOD and that was a roommate who heard Ms. Roe say in the common area (before she went in the bedroom) in a slurred voice that she "want[ed] to go home." [*See* FLOD, at p. 2, **Ex. L**]. However, the damning admissions and statements made by Plaintiff himself were more than sufficient to establish that Plaintiff had engaged in the sexual misconduct for which he was expelled from UNM.

The Sixth Circuit's assertion in *Doe v. Baum*, 903 F.3d at 584, that "there is little to be gained by subjecting witnesses to adversarial questioning when the accused student has already confessed," *Doe v. Baum*, 903 F.3d at 584, should be heeded in the instant case. Not only was "little to be gained" by UNM affording Plaintiff an adversarial hearing that included the opportunity to cross-examine his victim, there was potentially "much to be lost." UNM certainly has an interest in preserving its limited administrative resources, but, even more importantly, UNM has a heightened interest in the safety and emotional well-being of its students, especially those who are the victims of sexual assault. While there may be cases in which the credibility of the accuser will be critical to the outcome and, thus, due process would warrant the accuser and other witnesses being subjected to an adversarial cross-examination, this is emphatically not one of those cases. The Court should find that, based on Plaintiff's own admissions that establish his sexual misconduct, the failure by UNM to provide Plaintiff with an adversarial proceeding and the opportunity to cross-examine witnesses did not violate his federal due process rights.

II.     **PLAINTIFF <u>CANNOT</u> SHOW THAT THE INVESTIGATIVE OR SANCTIONING PROCESS THAT RESULTED IN HIS EXPULSION FROM UNM WAS INFECTED BY ACTUAL BIAS IN VIOLATION OF HIS DUE PROCESS RIGHTS.**

For his next alleged due process violation, Plaintiff claims that the OEO investigation that resulted in a finding he engaged in sexual misconduct was biased. Although the Supreme Court has held that biased decision-making violates due process, *see Withrow v. Larkin*, 421 U.S. 35, 47 (1975), this Court's analysis of Plaintiff's claim of bias must start from the presumption that student disciplinary proceedings are impartial and unbiased. The Tenth Circuit has stated: "Because honesty and integrity are presumed on the part of a tribunal, there must be some countervailing reason to conclude that the decisionmaker is actually biased with respect to the factual issues being adjudicated." *Mangels v. Pena*, 789 F.2d 836, 838 (10th Cir. 1986) (internal citations omitted); *accord Riggins v. Goodman*, 572 F.3d 1101, 1112 (10th Cir. 2009) ("[A] person claiming bias on the part of an administrative tribunal 'must overcome a presumption of honesty and integrity in those serving as adjudicators.'") (quoting *Withrow*, 421 U.S. at 47). As the Seventh Circuit Court of Appeals has noted: "The presumption [of impartiality] is a rebuttable one, but the burden of rebuttal is heavy indeed: To carry that burden, the party claiming bias must lay a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable." *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 675 (7th Cir. 2016).

The only UNM official involved in the investigation and sanctioning of Plaintiff for sexual misconduct whom he alleges was biased against him was the OEO investigator, Laura Vele Buchs.[10] However, the basis of Plaintiff's belief that Ms. Vele Buchs was biased is razor thin. Plaintiff asserts that, when she interviewed him, Ms. Vele Buchs was "aggressive" and argumentative." When asked

---

[10] Plaintiff has conceded that he has <u>no</u> reason to believe the Director of OEO (Francie Cordova), the Title IX Coordinator (Heather Cowan), or the Student Conduct Officer (Megan Chibanga) were biased against him. **[UFs 11, 23]**.

to explain, Plaintiff vaguely referenced her facial expression and tone, but he could not provide <u>any</u> specific example or reason to believe that Ms. Vele Buchs held any kind of actual bias against him during the process. **[UF 15]**. Such oblique allegations of bias fall woefully short of overcoming the presumption of impartiality the Court must afford to Ms. Vele Buchs, especially when Plaintiff cannot present any evidence that Ms. Vele Buchs knew him before the investigation or that she had any reason to dislike him. *See Hess*, 839 F.3d at 676-77 (finding plaintiff's claim of bias based on assertion that school official was smiling when she informed him of his interim suspension was "insufficient to overcome the presumption of impartiality," because "there is no suggestion that [her] facial expressions . . . were in fact the product of bad faith" and she "did not know [plaintiff] before their December 2013 meeting and, thus, had no reason to dislike him"); *Doe v. Occidental Coll.* 40 Cal. App. 5th 208, 226 (Cal. Ct. App. 2019) ("A disciplinary decision may not be invalidated solely on the basis of an inference or appearance of bias.") (quoted authority omitted).

Finally, even if Plaintiff's allegations were somehow demonstrative of actual bias on the part of Ms. Vele Buchs, his claim still suffers from a fatal flaw; that is, the initial finding of a policy violation made by Ms. Vele Buchs was separately reviewed and affirmed on appeal by both the UNM President and the UNM Board of Regents. **[UF 20]**. The undisputed fact that Plaintiff was able (and did) appeal the finding made by Ms. Vele Buchs to other unbiased decisionmakers defeats his due process claim based on the alleged bias of Ms. Vele Buchs. *See Hess*, 893 F.3d at 677 (holding plaintiff's claim of bias by initial decisionmaker failed because he was able to (and did) appeal that decision to unbiased individuals); *Davis v. Mann*, 721 F. Supp. 796, 801 (S.D. Miss. 1988) ("[W]here there is an adequate appeal process, bias on the part of the initial decisionmaker is not a denial of procedural due process."). The Court should find that Plaintiff's claim of bias is insufficient as a matter of law to establish a violation of his federal constitutional right to due process.

III.   **PLAINTIFF'S DUE PROCESS RIGHTS WERE <u>NOT</u> VIOLATED BY UNM APPLYING "PREPONDERANCE OF THE EVIDENCE" AS THE EVIDENTIARY STANDARD FOR DETERMINING HE ENGAGED IN SEXUAL MISCONDUCT.**

Although not pled in the Complaint, for his next alleged due process violation, Plaintiff claims that OEO's application of the "preponderance of the evidence" standard to find that he engaged in sexual misconduct was too low and that OEO presumably should have applied a higher evidentiary standard like "clear and convincing" or "beyond a reasonable doubt." **[UF 29]**. As was recently alluded to in *Messeri v. University of Colorado*, 2019 U.S. Dist. LEXIS 162010, *48 (D. Colo.) (unpublished), there is "no Supreme Court or Tenth Circuit case establishing a right to a standard greater than 'preponderance of the evidence.'" In fact, despite diligent search, undersigned counsel has <u>not</u> found a single federal case that has found that the use of the preponderance standard in school disciplinary proceedings—even those involving sexual misconduct—is violative of due process. The only federal circuit court that appears to have addressed the issue found that the university's application of the preponderance standard in a school disciplinary proceeding was "constitutionally sound and does not give rise to a due-process violation." *Doe v. Cummins*, 662 F. App'x 437, 449 (6th Cir. 2016) (unpublished).

Although some commentators have apparently advocated that the preponderance standard weakens due process for accused students, *see Plummer*, 860 F.3d at 782 n.11, to date, the federal courts have consistently rejected the argument that due process requires any higher standard in school disciplinary proceedings involving claims of sexual misconduct. Two district court cases in the last year have correctly concluded that the preponderance standard satisfies due process:

In *Doe v. University of Arkansas-Fayetteville*, 2019 U.S. Dist. LEXIS 57889, *34 (W.D. Ark.) (unpublished), the plaintiff—who was a university student expelled after he was found to have sexually assault another student—alleged the school violated his due process rights by employing the

26

preponderance standard to determine that he violated university policy. In rejecting that argument, the court noted that a higher standard than preponderance is not even required in civil proceedings:

> School disciplinary proceedings are not criminal trials. Standards such [as] clear and convincing evidence and beyond a reasonable doubt are not required in such a civil proceeding. In sex discrimination cases in the Title VII context, the Supreme Court has typically applied the preponderance of the evidence standard in resolving claims. The Department of Education and courts have determined that case law interpreting Title VII of the Civil Rights Act of 1964 is the appropriate guide to resolution of Title IX claims. Preponderance of the evidence is the prevailing standard used in Title IX student-on-student harassment claims.

*Id.* at *34-35. The district court was dismissive of the argument that due process requires a higher standard than preponderance of the evidence because of the heightened liberty interest at stake in sexual assault investigations. While acknowledging that "[a]dverse sexual assault adjudications certainly may result in expulsion from school and a severely impugned character that could substantially alter a student's future career plans,"[11] the court noted that "such adjudications do not

---

[11] The Dear Colleague Letter issued by the OCR on April 4, 2011, which was in place at the time that Plaintiff was investigated and disciplined for engaging in sexual misconduct, stated:

> In addressing complaints filed with OCR under Title IX, OCR reviews a school's procedures to determine whether the school is using a preponderance of the evidence standard to evaluate complaints. The Supreme Court has applied a preponderance of the evidence standard in civil litigation involving discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C §§ 2000e *et seq.* Like Title IX, Title VII prohibits discrimination on the basis of sex. OCR also use a preponderance of the evidence standard when it resolves complaints against recipients. For instance, OCR's Case Processing Manual requires that a noncompliance determination be supported by the preponderance of the evidence when resolving allegations of discrimination under all the statutes enforced by OCR, including Title IX. OCR also use a preponderance of the evidence standard in its fund termination administrative hearings. Thus, in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (*i.e.*, it is more likely than not that sexual harassment or violence occurred). The "clear and convincing" standard (*i.e.*, it is highly probable or reasonably certain that the sexual harassment or violence occurred), currently used by some schools, is a higher standard of proof. Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX. Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.

(Dear Colleague Letter, dated April 4, 2011, at pp. 10-11, at https://www.2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html) (emphases added). While this guidance was subsequently withdrawn by the OCR in September 2017, the currently-proposed regulation would still permit schools to apply the preponderance of the evidence standard and, in fact, the proposed regulation would only allow schools to apply the clear and convincing standard if the school used that same standard for conduct violations other than sexual harassment that carry the same maximum disciplinary penalty. *See*

result in deprivations of physical liberty or fundamental rights." *Id.* at *35. The court concluded: "Sexual assault adjudications, like sexual harassment claims under Title VII and state law sexual battery claims, do not require courts to elevate the governing evidentiary standard from preponderance of the evidence." *Id.*

More recently, in *Doe v. Haas*, 2019 U.S. Dist. LEXIS 211575, *26 (E.D.N.Y.) (unpublished), the plaintiff—who was a university student who was suspended, placed on disciplinary probation, stripped of his scholarship, and had his transcript permanently marked with a notation demonstrating a sexual misconduct violation—contended that "due process required that the university apply a standard more stringent than a preponderance of the evidence." The district court disagreed and, instead, found that preponderance of the evidence "is the accepted standard in the vast majority of civil litigations and, as noted above, courts have rejected the notion that safeguards applicable to criminal proceedings should be applied in the school disciplinary context." *Id.*

This Court should reach the same conclusion that has been reached by every other federal court to have considered the issue and find that UNM's application of the preponderance of the evidence standard as the evidentiary standard for determining that Plaintiff engaged in sexual misconduct did <u>not</u> violate his federal constitutional due process rights.

## IV.    PLAINTIFF'S DUE PROCESS RIGHTS WERE <u>NOT</u> VIOLATED BY UNM CONSIDERING HIS PROVISION OF ALCOHOL TO MINORS AS A FACTOR IN DETERMINING HIS SANCTION FOR SEXUAL MISCONDUCT.

As his final alleged due process violation, Plaintiff claims that he failed to receive adequate notice that allegations of underage drinking would be considered as a factor in the sanctioning decision. **[UFs 27-28]**. To be clear, there is <u>no</u> evidence that Plaintiff was sanctioned by UNM for an

---

Nondiscrimination on the Basis of Sex, 83 Fed. Reg. at 61,499 (proposed 34 C.F.R. § 106.45(b)(4)). Clearly, at the time that Plaintiff was expelled for sexual misconduct, UNM had a substantial interest in applying the preponderance of the evidence standard—if UNM had applied a higher standard, it would have risked being stripped of federal funding.

alcohol violation—the sanctioning letter issued by the DOSO stated in no uncertain terms that Plaintiff was being expelled for "violation of UNM Policy 2740: Sexual Violence and Sexual Misconduct and UNM Policy 2730: Sexual Harassment." The letter contained six bullet points listing the information on which the expulsion decision was based and one of those bullet points stated: "Your admission of purchasing alcohol and providing it to minors on the date of the incident." But, nowhere in that letter does it state that Plaintiff is being sanctioned for a violation of UNM's alcohol policy. **[UF 26]**. In short, the <u>undisputed</u> fact that Plaintiff (who was a 31-year-old man) was the one who provided the alcohol consumed by Mr. Goodnight and Ms. Roe (who were each 19 years old)[12] was, at most, an aggravating factor considered by the Student Conduct Officer when determining the appropriate level of sanctioning that would be meted out to Plaintiff.

The Sixth Circuit has stated that, in the context of student disciplinary proceedings, "[n]otice satisfies due process if the student 'had sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing.'" *Flaim*, 418 F.3d at 638 (quoting *Jaksa v. Regents of the Univ. of Mich.*, 597 F.Supp. 1245, 1250 (E.D. Mich. 1984)). Here, there can be no doubt that Plaintiff received constitutionally-adequate notice of the charges against him and for which he was expelled. On September 21, 2015, Plaintiff was notified by a Student Conduct Officer that she had received information from UNMPD that he was involved in an alleged sexual assault and that OEO would be investigating that incident **[UF 9]**; on September 24, 2015, Plaintiff had a meeting with the Director of OEO and the Title IX Coordinator where he was provided information about what to expect during the investigation **[UF 11]**; on October 16, 2015, Plaintiff was given a document with the detailed

---

[12] While Plaintiff asserted his constitutional right against self-incrimination to avoid admitting at his deposition that he had purchased the alcohol that was consumed by Ms. Roe on the night of the alleged sexual assault, Plaintiff had admitted to UNMPD "that he purchased the alcohol that was consumed by Goodnight and [Ms. Roe] both of whom he knew to [be] under the legal drinking age of 21." **[UF 8]**.

allegations of sexual misconduct made against him by Ms. Roe **[UF 12]**; and, on January 20, 2016, Plaintiff received the PLOD, which contained the charges against him and the evidence gathered by OEO during its investigation **[UFs 16-17]**.

Although he received notice of the sexual misconduct charges for which he was expelled, Plaintiff appears to claim that due process would also require that he receive notice of all possible factors that may be considered by the UNM Student Conduct Officer in setting his sanction for sexual misconduct and, particularly, he should have been notified that his provision of alcohol to minors on the night of the alleged sexual assault would be considered in the expulsion decision. This argument is <u>not</u> supportable by any caselaw. To the contrary, Tenth Circuit precedent suggests that due process does not require notice of all potential considerations for the level of discipline that a student will receive upon a finding of sexual misconduct. In *Watson ex rel. Watson*, 242 F.3d at 1241, the plaintiff argued the notice he received "was insufficient because he was not told that he was charged with racism" in connection with the assault. In rejecting that argument, the Tenth Circuit stated:

> The board's finding that the motive for the assault was racism does not constitute an independent charge against Mr. Watson. The record does not indicate that the board expelled Mr. Watson because he was racist, but that he was expelled for the assault. Mr. Watson does not cite, and the court does not find, any precedent for the proposition that notice must include all suspected motives for a student's actions. Such extensive notice is not even due in a criminal trial.

*Id.* Here, just like in *Watson*, the finding that Plaintiff provided alcohol to minors did <u>not</u> constitute an independent charge against him. The record also does not indicate that Plaintiff was expelled for providing alcohol to minors; rather, he was expelled for sexual misconduct.

Moreover, to the extent the Court might be inclined to find that notice should have been provided to Plaintiff that his provision of alcohol to minors might be a consideration in the sanctioning decision, the Tenth Circuit has stated that, "[i]n order to establish a denial of due process, a student

must show substantial prejudice from the allegedly inadequate proceeding," and, when "[the student] candidly admitted his guilt, [the student] was not prejudiced by a lack of notice." *Id.*; *accord Judeh v. La. State Univ. Sys.*, 2013 U.S. Dist. LEXIS 146842, *18-19 (E.D. La.) (unpublished) ("The Court also notes that there is a line of cases in this circuit and elsewhere holding that a plaintiff must demonstrate substantial prejudice in order to mount a successful due process claim and that a student's admission to the charges against him is relevant to determine whether such prejudice exists."). In this case, Plaintiff candidly admitted to UNMPD that he purchased and provided the alcohol consumed by Mr. Goodnight and Ms. Roe on the night of the alleged sexual assault. **[UF 8]**. Additional notice would not have allowed him to better defend the charges of sexual misconduct against him, and, therefore, he cannot establish a due process violation based on UNM's failure to provide him with advance notice that his provision of alcohol to minors would be considered as a factor in determining his sanction for sexual misconduct.

## <u>Conclusion</u>

For the foregoing reasons, Defendants request that the Court dismiss Plaintiff's claim for injunctive and declaratory relief for alleged violations of his federal constitutional right to due process and enter final judgment in their favor.

STELZNER, WINTER, WARBURTON,
  FLORES, SANCHEZ & DAWES, P.A.
*Attorneys for Defendants UNM and President Stokes*
P.O. Box 528
Albuquerque, NM 87103
(505) 938-7770; (505) 938-7781 (fax)
qsmith@stelznerlaw.com

/s/ Quentin Smith
By: _____
Quentin Smith

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Memorandum Brief in Support of Defendants' Motion for Summary Judgment was electronically filed using the CM/ECF system, which caused a copy to be sent by email to all other parties of record on this 6th day of February, 2020.

/s/ Quentin Smith

_____

Quentin Smith

S:\TXTLIB\17193SS\PLDG\20200206 MEMO re MSJ (QS).docx