# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

J. LEE,

      Plaintiff,

vs.                                                   No. CIV 17-1230 JB\LF

THE UNIVERSITY OF NEW MEXICO,
a public university, THE BOARD OF
REGENTS OF THE UNIVERSITY OF
NEW MEXICO, individually and in their
official capacities, ROBERT G. FRANK,
individually and in his official capacity,
LAURA VELE BUCHS, individually and in
her official capacity, HEATHER COWAN,
individually and in her official capacity,
FRANCIE CORDOVA, individually and in
her official capacity, MEGAN CHIBANGA,
individually and in her official capacity,

      Defendants.

## MEMORANDUM OPINION[1] AND SECOND AMENDED ORDER[2]

---

[1]On May 30, 2019, the Court entered an order granting in part and denying in part (i) the Defendants' Motion to Dismiss Plaintiff's Due Process Claims, filed December 21, 2017 (Doc. 9); (ii) the Defendants' Motion to Dismiss Plaintiff's Title IX Claim, filed December 21, 2017 (Doc. 7); and (iii) the Defendants' Motion to Dismiss Plaintiff's Contract Claims, filed December 21, 2017 (Doc. 8). See Amended Order at 1 n.1, filed May 30, 2019 (Doc. 53). In the Amended Order, the Court stated that it would "issue a Memorandum Opinion at a later date more fully detailing its rationale for this decision." Amended Order at 1 n.1. This Memorandum Opinion and Second Amended Order is the promised opinion.

[2]The Court amends its Amended Order, filed May 30, 2019 (Doc. 53). The Court previously concluded that "Lee's Title IX claims are not pled with sufficient specificity to infer that UNM treated Lee differently on account of his gender," but, after reviewing recent opinions from Courts of Appeals and giving the matter more intense study, the Court concludes that Lee's Title IX claims are sufficient to state a claim for relief. Further, the Court concludes that, contrary to the Amended Order, because Lee has not alleged that UNM published or disseminated any false statement against him, he does not have a "protected liberty interest in his good reputation." Amended Order at 3.

**THIS MATTER** comes before the Court on: (i) Defendant University of New Mexico's Motion to Dismiss Plaintiff's Due Process Claims, filed December 21, 2017 (Doc. 9)("Due Process Motion"); (ii) Defendants' Motion to Dismiss Plaintiff's Title IX Claim, filed December 21, 2017 (Doc. 7)("Title IX Motion"); and (iii) Defendants' Motion to Dismiss Plaintiff's Contract Claims, filed December 21, 2017 (Doc. 8)("Contract Motion").  The Court held a hearing on July 3, 2018.  The primary issues are: (i) whether Defendant University of New Mexico and Defendant Board of Regents of the University of New Mexico (collectively, "UNM") properly may be sued for damages under 42 U.S.C. § 1983 ("§ 1983"); (ii) whether Defendants Robert G. Frank, Laura Vele Buchs, Heather Cowan, Francie Cordova, and Megan Chibanga (collectively, "Individual Defendants") properly may be sued for damages under § 1983; (iii)  whether not permitting Lee any form of cross-examination, not providing witness statements, forbidding new evidence and arguments, and not providing notice of separate charges before an administrative hearing is sufficient to show a deprivation of liberty or property without due process of law; (iv) whether Lee's claim for damages for violation of the Constitution of the State of New Mexico fails as a matter of law; (v) whether the UNM policies and procedures handbook created contractual obligations to enrolled students accused of sexual misconduct; (vii) whether the Individual Defendants can be held individually liable for violations of Title IX of the Educational Amendments Act of 1972 ("Title IX"); and (viii) whether Lee has pled facts sufficient to show gender bias in violation of Title IX.  The Court concludes that: (i) UNM is not a "person" for § 1983's purposes, so Lee cannot successfully sue it for damages under that statute; (ii) the Individual Defendants are entitled to qualified immunity, so Lee cannot successfully sue them for damages under § 1983; (iii) Lee has pled facts sufficient to show that the Defendants failed to provide him a meaningful opportunity to be heard in violation of his  constitutional right to due

process of law, (iv) the Defendants are entitled to governmental immunity under the New Mexico

Tort Claims Act, N.M. Stat. Ann. § 41-4-1 to -30, and so cannot be sued for damages for violation

of the Constitution of the State of New Mexico; (v) UNM policies and procedures do not create

contractual obligations; (vi) individuals cannot be held liable for violations of Title IX, so the

Individual Defendants are not liable under Title IX; and (vii) Lee alleges facts sufficient to create

an inference of gender bias.  The Court, accordingly, grants in part and denies in part the requests

in the Due Process Motion, and grants the requests in the Title IX Motion, and the Contract Motion.

Lee's Complaint alleges a cognizable claim against UNM under Title IX, and it alleges cognizable

Due Process claims against UNM and its current president.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint.  The Court accepts the factual allegations as

true for the purposes of a motion to dismiss.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)("Twombly").  The Court does not, however,

accept as true the legal conclusions within the Complaint.  See Ashcroft v. Iqbal, 556 U.S. at 678

("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions.").

### 1.      UNM Student Misconduct Policies and Procedures.

UNM has two separate disciplinary procedures, one procedure for students accused of

sexual misconduct and another procedure for students accused of non-sexual misconduct.  See Lee

v. Univ. of N.M., D-202-CV-2017-07891 (Second Judicial Court, County of Bernalillo, State of

New Mexico), filed in federal court on December 14, 2017 (Doc. 1-1)("Complaint") ¶¶ 33-35, at

5-6.  In matters of non-sexual misconduct, UNM's "Student Grievance Procedure" provides that a

Student Conduct Officer must conduct and prepare an investigation report, which includes

"summaries of interviews with the complainant, the accused student and third-party witnesses; photographs of the relevant site(s); other relevant evidence; and a detailed analysis of the events in question."   Complaint ¶ 34, at 5-6.   The accused student, the complainant, and the Student Conduct Committee receive a copy of this report before a "formal" hearing.   Complaint ¶ 34, at 6. At the hearing, both the accused student and the complainant may present and question witnesses and evidence, after which the Student Conduct Committee then decides whether there was a violation of the policy at issue and, if so, the appropriate sanction.   See Complaint ¶¶ 33-35, at 5-6.

For allegations of sexual misconduct, students are subject to an alternate procedure, the "Discrimination Claims Procedure," which is "fundamentally different, and less formal." Complaint ¶¶ 35-36, at 6.   Under this procedure, UNM's Office of Equal Opportunity ("OEO") assigns an investigator to interview the complaining student, draft a statement of the allegations, and then provide the statement to the accused student.   See Complaint ¶¶ 39-41, at 7.   The OEO investigator has complete discretion to determine the investigation's scope, and to identify and to analyze the relevant documents and witnesses necessary to determine whether a policy violation occurred.   See Complaint ¶¶ 42-43, at 7-8.   During the investigation that follows, the accused student is neither aware of the identified witnesses, nor provided an opportunity to test the credibility and weight of the evidence that OEO receives.   See Complaint ¶¶ 44-46, at 8.

If OEO finds it "more likely than not," that is, "by a mere preponderance of the evidence," that the accused student committed an act of sexual violence or misconduct in violation of UNM policy, UNM OEO issues a Preliminary Letter of Determination ("PLD").   Complaint ¶ 47, at 8. In response to the PLD, the accused student is permitted to provide only "new" information that the OEO has not previously considered, although the accused student "does not know, specifically,

what information would be deemed 'new,'" because the accused student "does not have *all* of the information relied upon by UNM OEO, specifically the identity of witnesses."  Complaint ¶¶ 48-49, at 8 (emphasis in original).  If new evidence is unpersuasive, then the OEO issues a Final Letter of Determination ("FLD").  See Complaint ¶ 50, at 9.

The only recourse an accused student has to contest the OEO's Probable Cause[3] finding is to appeal to the Office of the UNM President and UNM's Board of Regents, who have "discretionary authority" to review OEO final determinations in "extraordinary cases."  Complaint ¶ 52, at 9.  If the UNM President or Board of Regents refuse the accused student's request to appeal the FLD, then the UNM OEO's "Probable Cause" decision is referred to the Dean of Student's Office for a sanctions determination.  Complaint ¶ 53, at 9.

In cases of alleged sexual misconduct, the only hearing that occurs is a sanctions hearing held after OEO issues a FLD.  See Complaint ¶ 54, at 9.  Any additional evidence presented at the sanctions hearing may go only to "determine the sanction to be imposed."  Complaint ¶ 54, at 9. During the sanctions hearing, a Student Conduct Officer or the Student Conduct Committee assumes that the FLD is correct and does not determine anew whether a policy violation occurred. See Complaint ¶ 55, at 10.  Although UNM allows an accused student to have an advisor present at the sanctions proceeding, the advisor is "not authorized to speak on behalf of the individual they are advising."  Complaint ¶ 56, at 10.

---

[3]The University of New Mexico's Student Handbook defines "probable cause" to mean preponderance of the evidence.  See The Pathfinder -- UNM Student Handbook, filed December 21, 2017 (Doc. 11-1)("'Probable Cause' means that the evidence submitted during the OEO investigation supports a finding that it is more likely than not that the acts alleged are in violation of University policy prohibiting discrimination.").

2.    **Lee's Investigation and Sanction Hearing**.

Lee is a former graduate student at UNM, where he pursued Ph.D. studies from August, 2012, to May, 2016.  See Complaint ¶ 21, at 4.  Before his enrollment at UNM, Lee signed a graduate program application that included policies and procedures that Lee and UNM agreed to follow in disciplinary actions.  See Complaint ¶ 25, at 4; Application Questions and Answers (dated January 31, 2012), filed June 29, 2018 (Doc. 30-1)("Application").  The Complaint alleges that the Application "identified and explained the agreement between UNM and Plaintiff and included the policies and procedures the parties shall follow in disciplinary actions."  Complaint ¶ 25, at 4.  The Application's Question 27 states that, "[i]f I am accepted as a student at the University of New Mexico, I agree to conform and abide by the letter and spirit of all rules, regulations, and procedures of the University."  Application at 15.  Lee marked "Yes" in response.  Application at 14.

In September, 2015, the UNM OEO received a report from the UNM Police Department regarding an alleged sexual incident involving Lee and C.H. ("Complainant").  Complaint ¶ 62, at 11.  Following the allegation of sexual misconduct, UNM informed Lee that he was "banned" from campus, although UNM permitted Lee to continue his graduate studies until July, 2016.  Complaint ¶ 63, at 11.  Within several days of the allegation, Cordova, the UNM OEO Director, and Cowan, the UNM Title IX Coordinator, met with Lee to "discuss OEO processes and procedure, [Lee's] rights and responsibilities, confidentiality and the University's anti-retaliation policy."  Complaint ¶¶ 13-14, 65, at 3, 12.  The following day, the Complainant provided a "verbal complaint" to Cordova and Buchs, who took notes and then transcribed a summary of the conversation, which became the Complainant's statement.  Complaint ¶¶ 12, 67-68, at 3, 12.

In October, 2015, Buchs asked Lee to respond to the Complainant's statement.  <u>See</u> Complaint ¶ 69, at 12   Buchs did not advise Lee that the OEO was going to conduct an investigation to make a "probable cause" determination, that the investigator's findings would be final and could not be challenged at a hearing, that Lee could face expulsion if Buchs, Cordova, or Cowan unilaterally determined that it was more likely than not that Lee committed sexual misconduct, or that Lee's only recourse in the event of a "probable cause" finding would be an appeal to the Board of Regents and the President of UNM.  Complaint ¶¶ 69-71, at 12-13.

Buchs interviewed Lee regarding the allegations in Complainant's Statement.  <u>See</u> Complaint ¶ 72, at 13.  During the interview, and in written statements to the OEO and Buchs, Lee denied -- and continues to deny -- the sexual misconduct accusations.  <u>See</u> Complaint ¶ 74, at 13. Lee identified a number of inconsistencies in Complainant's statement, denied that any physical contact between himself and Complainant was non-consensual, and presented documents, including screenshots of text messages from Complainant to Lee, which contradicted Complainant's allegations.  <u>See</u> Complaint ¶¶ 72-76, at 13.

The OEO determined that Lee violated the sexual misconduct policy and issued a PLD. <u>See</u> Complaint ¶ 77, at 14.  The PLD states that the OEO will "move forward with the [Probable Cause] determinations unless additional new factual information c[ould] be provided.  The additional information must reveal facts not yet discovered during the course of the investigation." Complaint ¶ 100, at 16.  Because Buchs disallowed Lee's involvement in the investigative process, he "was not wholly certain what was, or was not, discovered by the investigation."  Complaint ¶ 101, at 17.  Therefore, Lee did not know what defendants would consider "new evidence." Complaint ¶ 101, at 17.  Likewise, Lee did not know whether there were "new facts" to glean from witnesses, because he did not know with whom Buchs had spoken.  Complaint ¶ 101, at 17.

Lee retained counsel in January, 2016, and thereafter presented the OEO with what he believed was "new" information.  Complaint ¶¶ 103-04, at 17.  The Defendants required Lee to present this evidence in "bullet points" and denied him the opportunity to place this new information in context or present "a theory of the case based on these facts."  Complaint ¶ 105, at 17.  Unconvinced by the new evidence, the OEO issued a FLD finding that Lee "subjected Complainant to non-consensual sexual activity because she was too incapacitated, pursuant to Policy No. 2740, to consent to sexual activity."  Complaint ¶ 106, at 17.

Lee appealed the OEO's findings to the UNM President's Office and the UNM Board of Regents.  See Complaint ¶ 110, at 18.  In his denial of Lee's request, Frank, the UNM President, stated that his office would review the underlying investigation only when compelled by "extraordinary circumstances," and that there were "sufficient facts in the record to support OEO's decision."  Complaint ¶¶ 110-12, at 18.  The Board of Regents did not respond to Lee's request for an appeal of the OEO's findings.  See Complaint ¶ 105, at 18.

The OEO subsequently referred Lee's case to the Dean of Students Office to begin the sanctions process.  See Complaint ¶¶ 114-15, at 18-19.  Chibanga, the Student Conduct Officer for UNM's Office of the Dean of Students, advised Lee of his options: he could refuse to hold a sanctions hearing, have a "formal" sanctions hearing in front of a panel, or a have an "administrative" sanctions hearing over which Chibanga alone would preside.  Complaint ¶¶ 15, 115, at 3, 19.  Chibanga cautioned Lee that, at the sanctions hearing, he could neither present evidence nor speak with his attorney, but that his attorney could "pass notes" or "whisper" in his ear.  Complaint ¶ 117, at 19.  Chibanga further advised Lee that the sanctions hearing "was not 'an evidentiary hearing,' and that the 'Probable Cause' finding 'was not up for debate' and would not be 'challenged.'"  Complaint ¶ 117, at 19.  Thus informed, Lee chose an administrative hearing.

See Complaint ¶ 118, at 19.  At the hearing, Chibanga asked Lee questions regarding misconduct involving underage drinking.  See Complaint ¶ 119, at 19.

In July, 2016, Chibanga issued a sanctions letter that expelled Lee from UNM.  See Complaint ¶ 123, at 20.  As justification for the sanction, the letter identified the PLD, the FLD, and Lee's answers regarding underage drinking.  See Complaint ¶¶ 119-123, at 19-20.  Based on representations from Chibanga, Cowan, and Buchs, Lee believed that the sanction "calculus" would not include the allegations of underage drinking; underage drinking was not listed as a violation of policy in either the PLD or the FLD.  Complaint ¶¶ 120-23, at 20.  Lee appealed the sanctions decision to Frank and the Board of Regents, and both found that the facts supported Lee's expulsion.  See Complaint ¶ 124, at 20.  Lee has not "set foot" on the UNM campus since August 23, 2016, and he has not completed his doctoral program.  Complaint ¶ 106, at 17-18.  Because of the expulsion, Lee suffered damages to his academic and professional reputation, and he "will likely be unable to be admitted to any other university given his status."  Complaint ¶¶ 132-33, at 21.

## PROCEDURAL BACKGROUND

Lee filed suit in the Second Judicial District Court, County of Bernalillo, State of New Mexico, alleging in Count I that UNM's sexual misconduct investigation procedures violate his federal and state constitutional rights to due process as protected by the Fourteenth Amendment to the Constitution of the United States of America and Article II, § 18 of the Constitution of the State of New Mexico.  See Complaint ¶¶ 146-171, at 24-28.  Lee alleges that he "has a protected liberty interest in his good name, reputation, honor, and integrity," and "a protected property interest in continuing his education at the University of New Mexico."  Complaint ¶¶ 150-52, at 25.  He alleges that the Defendants deprived him of those interests by expelling him from UNM

without providing him certain procedural safeguards, including adequate notice of the allegations,

an opportunity to respond, the opportunity to cross-examine his accuser, the identification of all of

the evidence and witnesses on which UNM relied during the investigation, a thorough and

impartial investigation, and the active participation of legal counsel during the disciplinary

proceedings.  See Complaint ¶ 154, at 25-26.  Because of these alleged constitutional violations,

Lee seeks monetary relief for damages.  See Complaint ¶¶ 170-71, at 28.  In Count II, Lee argues

that the Defendants' Due Process violations entitle him to injunctive relief, specifically

> a reversal of the outcome and findings of the UNM investigation, expungement of
> [his] educational records reflecting the improper discipline/sanction and production
> of verification of such expungement . . . , prohibiting UNM from disclosing [Lee's]
> education records reflecting discipline during the pendency of this action, and
> readmittance to UNM to complete his graduate program.

Complaint ¶ 174, at 28-29.  In Count III, Lee requests a determination pursuant to the Declaratory

Judgment Act, 28 U.S.C. § 2201, and the New Mexico Declaratory Judgment Act, N.M. Stat. Ann.

§ 44-6-1 to -15 that "the investigative and sanctioning processes utilized by Defendants are

unconstitutional, improper, and violative of [his] rights, and, as such, inadequate and invalid as a

matter of law."  Complaint ¶ 178, at 29.

     In Count IV, Lee pleads a claim for violation of Title IX, 20 U.S.C. § 1681(a).  See

Complaint ¶¶ 183-212, at 30-33.  Lee alleges that the "Defendants failed to provide [him with] the

full benefits and services of and excluded him from participation in and discriminated against him

with regards to programs, services and/or activities at the University of New Mexico because of

his sex."  Complaint ¶ 189, at 30.  He alleges that the "Defendants treated [him] differently and

less favorably on the basis of his sex with regard to the 'Probable Cause' finding made by UNM

OEO."  Complaint ¶ 204, at 32.  He further alleges that the "Defendants intentionally treated

Complainant preferentially on the basis of her sex by adopting her statements as true, even though

the statements were illogical, inconsistent, or contrary to other witnesses, and ignoring all evidence exculpatory to Plaintiff."  Complaint ¶ 207, at 33.  Finally, Lee alleges that the "Defendants were motivated by gender bias in initiating, adjudicating, and implementing the disciplinary proceeding and sanctions against [him] based upon his sex as a male student accused of sexual misconduct because of the increasing public attention and controversy of sexual assault on campuses and at UNM specifically."  Complaint ¶ 209, at 33.

In Count V, Lee pleads a claim against UNM for breach of contract.  See Complaint ¶¶ 213-217, at 33-34.  Lee alleges that he had "the reasonable expectation[] that UNM would fairly and without bias implement and enforce the provisions and [policies] set forth in its official publications."  Complaint ¶ 214, at 34.  Lee then alleges that UNM breached its agreements by "failing to abide by its policies and procedures," "failing to conduct a fair and impartial investigation and hearing," "failing to provide [a] fair and impartial sanctioning process," "failing to provide adequate due process, to include the right to confront witnesses and one's accuser," "failing to adequately and properly consider and weigh evidence," and "failing to allow adequate representation during the investigative and sanctioning processes."  Complaint ¶ 215, at 34.  In Count VI, Lee pleads a claim for breach of the implied covenant of good faith and fair dealing. See Complaint ¶¶ 218-222, at 34-35.  Lee alleges that his contracts with UNM "implicitly guaranteed that any investigatory and disciplinary proceedings would be conducted with basic fairness."  Complaint ¶ 219, at 35.  He further alleges that "UNM acted in bad faith when it failed to provide adequate due process to safeguard [his] interests in his education."  Complaint ¶ 220, at 35.  The Defendants removed the case to federal court based on federal question jurisdiction.  See Notice of Removal ¶ 4, at 2, filed December 14, 2016 (Doc. 1)("Notice of Removal").

1.      **The Due Process Motion.**

The Defendants move to dismiss Lee's claims for violation of his federal and state constitutional rights to due process.  See Due Process Motion at 2.  At the outset, the Defendants argue that "the federal constitutional claim for damages against UNM fails as a matter of law because UNM is 'considered an arm of the state of New Mexico' and therefore not a 'person' within the meaning of § 1983."  Memorandum Brief in Support of Defendants' Motion to Dismiss Plaintiff's Due Process Claims at 6-7, filed December 21, 2017 (Doc.12)("Due Process Memo.")(citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 65 (1989)).  Moreover, the Defendants argue that Lee cannot sue the Individual Defendants in their official capacities, because such a claim is "in reality another claim against UNM."  Due Process Memo. at 6 (citing Porro v. Barnes, 624 F.3d 1322, 1328 (10th Cir. 2010)("[S]uing individual defendants in their official capacities under § 1983 . . . is essentially another way of pleading an action against the [governmental entity] they represent.")).  The Defendants add that there is no basis to hold UNM liable under a vicarious liability theory, because the Supreme Court of the United States "has unequivocally stated that vicarious liability is inapplicable to a Section 1983 claim."  Due Process Memo. at 7 (citing Ashcroft v. Iqbal, 556 U.S. at 676).  Finally, the Defendants argue that any allegation intended to invoke municipal liability as the Supreme Court established in Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), fails, because UNM, as a state agency, is not amenable to suit under a municipal liability theory.  Due Process Memo. at 8 (citing Will v. Mich. Dep't of State Police, 491 U.S. at 70).

The Defendants next assert that the Individual Defendants are entitled to qualified immunity from Lee's § 1983 claim against them in their individual capacities, because Lee does not have a constitutionally protected liberty or property interest in receiving an education at UNM.

See Due Process Memo. at 14.  Moreover, the Defendants argue, even if the Court assumes that Lee's expulsion implicates a protected liberty or property interest, Lee's own allegations "make clear that he received notice of his alleged sexual misconduct and an adequate opportunity to present his version of events." Due Process Memo. at 24.  The Defendants contend that the notice that Lee received -- his initial meeting with Cordova and Cowan, and his receipt of C.H.'s statement -- "is more than adequate to meet the minimum requirements of due process."  Due Process Memo. at 17.  The Defendants further assert that Buchs' interview of Lee, and his submission of written statements to UNM OEO "demonstrate that he was given an opportunity to respond that meets or exceeds" what the Fourteenth Amendment requires.  Due Process Memo. at 18.  Regarding Lee's contentions that he was entitled to an adjudicatory hearing where he could confront and challenge the witnesses and evidence against him, the Defendants aver that, in the context of on-campus sexual assault allegations, the Fourteenth Amendment does not require such a hearing.  See Due Process Memo. at 20 (citing Doe v. Univ. of S. Cal., 246 Cal. App. 4th 221, 245 (Cal. Ct. App. 2016)("In administrative cases addressing sexual assault involving students who live, work and study on a shared college campus, cross-examination is especially fraught with potential drawbacks.")).  Moreover, the Defendants assert that Lee's unsupported allegations that UNM denied him an unbiased investigation -- to preserve its federal funding -- lack sufficient factual pleading to overcome the presumption that the investigation was honest and impartial.  See Due Process Memo. at 20 (citing Mangels v. Pena, 789 F.2d 836, 838 (10th Cir. 1986)("Because honesty and integrity are presumed on the part of a tribunal, there must be some substantial countervailing reason to conclude that the decisionmaker is actually biased with respect to the factual issues being adjudicated.")).

The Defendants argue that UNM's alleged failure to follow its own procedures does not

implicate the Fourteenth Amendment, and that UNM was not required to adopt procedures that would have better protected Lee's interests as a student accused of committing sexual assault. See Due Process Memo. at 23. As to Lee's contention that he was entitled to active assistance from legal counsel throughout the investigation and disciplinary proceedings, the Defendants counter that "[t]he [United States Court of Appeals for the] Tenth Circuit has already recognized that the right to due process does not include the right to legal counsel during student disciplinary proceedings." Due Process Memo. at 24 (citing Watson ex rel. Watson v. Beckel, 242 F.3d 1237, 1242-43 (10th Cir. 2001)). The Defendants conclude that, "although perhaps not perfect, the process [Lee] received from UNM prior to his expulsion comported with the minimum requirements of due process and there is certainly no clearly established law that guaranteed him any additional procedural safeguards." Due Process Memo. at 24-25.

The Defendants next turn to Lee's claim for damages for violation of the Constitution of the State of New Mexico, which they argue fails as a matter of law because the state constitution "establishes UNM as a 'state educational institution,'" and, therefore, UNM qualifies as a "governmental entity" entitled to the immunity afforded by the NMTCA. Due Process Memo. at 25-26 (citing N.M. Stat. Ann. § 41-4-3(F)). Moreover, the Individual Defendants are entitled to immunity given their status as "public employees" as the NMTCA defines that phrase. Due Process Memo. at 26 (citing N.M. Stat. Ann. § 41-4-3(F)). Under an alternate theory, the Defendants argue that the Court should not reach Lee's claim for violation of the Constitution of the State of New Mexico, because the state constitution provides Lee no greater due process protections than the federal constitution, and the Supreme Court of New Mexico has advised that courts should reach state constitutional claims only "when the federal analysis is flawed, or there is a meaningful structural difference between federal and state government, or there are distinctive

state characteristics warranting a departure." Due Process Memo. at 27 (citing State v. Gomez, 1997-NMSC-006, ¶ 19, 932 P.2d 1).

Finally, the Defendants argue that the Court should dismiss Lee's requests for injunctive and declaratory relief for alleged violations of the federal constitution, "because UNM is still not a 'person' that can be sued under Section 1983." Due Process Memo. at 28. The Defendants concede, however, that § 1983 does not preclude Lee's claim against the Individual Defendants in their official capacities. See Due Process Memo. at 29. Nevertheless, the Defendants state that Lee's claim for injunctive relief must fail, because Lee has not alleged that any of the named Individual Defendants have the authority to provide the injunctive relief that he seeks, specifically "reversal of the UNM OEO findings, expungement of his disciplinary records, and reinstatement to UNM." Due Process Memo. at 29. The Defendants add that, should the Court conclude that Lee has failed to plead facts sufficient to show a violation of either his federal or state constitutional right to due process, then his requests for injunctive and declaratory relief necessarily fail, because such requests are remedies and not causes of action. See Due Process Memo. at 29-30.

### 2. Lee's Response to the Due Process Motion.

Lee responds that the Defendants' arguments fail, because "receiving limited 'notice' and a limited 'opportunity to be heard' do not equate to adequate due process." Response to Defendants' Motion to Dismiss Plaintiff's Due Process Claims at 2, filed May 25, 2018 (Doc. 24)("Due Process Response"). Lee argues that "fundamental fairness requires that a person receive enough notice and opportunity to be heard to give them the opportunity to adequately and fairly protect the interest," and that his expulsion for sexual misconduct with nothing more than an investigation was "fundamentally unfair." Due Process Response at 2. Lee further contends that the Defendants' Due Process Memo. focuses only on "very limited and specific factual

allegations," and "otherwise ignore[s] the numerous other relevant facts" that the Complaint alleges that show that the process used to expel Lee was "fundamentally unfair and inadequate." Due Process Response at 2. Lee highlights a number of "key facts" that the Defendants do not reference, including that UNM has two different disciplinary procedures; that the procedures for non-sexual misconduct permit students to present and question witnesses at a hearing; that students accused of sexual misconduct are not afforded a hearing before a determination of probable cause; that the UNM President and Board of Regents review only probable cause findings and recommendations in extraordinary cases; and that an important distinction between cases of sexual and non-sexual misconduct is the opportunity to rebut the investigative report, and to identify and examine witnesses. See Due Process Response at 2-4. Lee then reiterates a number of flaws in his own investigation: UNM did not formally notify him of the investigation; he could not challenge the investigator's findings and faced expulsion; he was not afforded an opportunity to confront and examine witnesses; and that at his sanctions hearing Chibanga asked him questions regarding underage drinking, which violated UNM policies and guidelines. See Due Process Response at 4. Lee alleges that the Department of Justice's report of its UNM investigation[4] indicates that UNM's sexual-misconduct investigation procedure was inadequate. See Due Process Response at 4-5. Lee further alleges that, contrary to the Defendants' contentions that Lee

---

[4]The Department of Justice's Civil Rights Division conducted a sixteen-month investigation into UNM's sexual assault policies which culminated in an April, 2016, report. See Chris Quintana, DOJ criticizes UNM's response to sexual assaults, Albuquerque, J., April 22, 2016, https://www.abqjournal.com/761833/doj-report-unm-must-improve-sexual-assault-policies.html (last accessed March 25, 2020); Press Release, Department of Justice, Justice Department Reaches Agreement with University of New Mexico to Protect Students from Sexual Assault and Harassment (October 17, 2016)(https://www.justice.gov/opa/pr/justice-department-reaches-agreement-university-new-mexico-protect-students-sexual-assault)(last accessed March 25, 2020).

seeks only to expunge his record and readmittance to UNM, he also requests "a reversal of outcome and findings of the UNM investigation, [and] a finding that the sanctioning process[es] utilized by Defendants are improper and violative of the law." Due Process Response at 5.

Lee asserts that he has pled sufficient facts to state a due process claim against the Individual Defendants under § 1983. See Due Process Response at 5. Lee abandons his claim, however, that "UNM -- as a state entity -- or the Individual Defendants acting in their official capacities are subject to money damages." Response at 7 n.3. Lee argues that the Defendants cannot assert immunity under the Eleventh Amendment to the Constitution of the United States when Lee seeks equitable relief but concedes that the Defendants have not invoked Eleventh Amendment immunity. See Due Process Response at 7; id. at 7 n.3.

Lee also argues that the Individual Defendants cannot assert -- in their official capacities -- an immunity defense to his claims for prospective injunctive relief. See Due Process Response at 8. As support, Lee also invokes "the *Ex Parte Young*[5] exception," which he argues entitles him, as an expelled student, "to seek prospective relief against UNM to protect against continuing constitutional violations." Due Process Response at 9 (citing Trant v. Oklahoma, 754 F.3d 1158, 1172 (10th Cir. 2014)("[A] state may waive immunity from suit while retaining immunity from liability for monetary damages.")).

Lee also contends that the named Individual Defendants have the authority to provide the relief that he seeks, and he notes that the "Defendants . . . do not deny that the current President of UNM has authority to expunge records." Due Process Response at 9. Lee further asserts that the "Defendants disregard the fact that 'when officials sued in [their official] capacity in federal court

---

[5]In Ex parte Young, 209 U.S. 123 (1908), the Supreme Court held that the Eleventh Amendment bar generally does not apply in federal court to state officials defending suits for prospective relief from violations of federal law.

die or leave office, their successors automatically assume their roles in the litigation.'"  Response at 10 (quoting Hafer v. Melo, 502 U.S. 21, 25 (1991)).  It follows, according to Lee, that, because Frank and the Board of Regents are sued in their official capacity, "their successor in office is automatically substituted as a party."  Due Process Response at 10.  Lee requests that, should the Court conclude that he must plead an individual defendant with present authority to expunge records and reinstate expelled students, the Court grant him leave to amend his Complaint.  See Due Process Response at 10.

Lee argues that, contrary to the Defendants' assertion, he has adequately pled a Due Process violation to support a § 1983 claim, because he possessed a recognized liberty and property interest.  See Due Process Response at 11.  Regarding his property interest, Lee asserts that "the Tenth Circuit recognized that a state resident's entitlement to post-secondary education through the legislature creates a property right."  Due Process Response at 12 (citing Harris v. Blake, 798 F.2d 419, 422 (10th Cir. 1986)).  It follows, Lee argues, that, because the New Mexico legislature established UNM to provide all state citizens with post-secondary education, he has a property interest in his continued education at UNM, "and more prominently so" because he had paid a separate fee to enroll and attend classes.  Due Process Response at 12.

Turning to his liberty interest, Lee reasserts that "his reputation has been harmed because his educational [record], which was impeccable, now shows an expulsion for alleged sexual misconduct."  Due Process Response at 12-13.  Moreover, Lee continues, "[a]s recognized by the [Supreme] Court in Goss [v. Lopez, 419 U.S. 565, 574-75 (1975)], any notations on educational records identifying misconduct or expulsion clearly deprive a student of liberty interests protected by the Fourteenth Amendment . . . ."  Due Process Response at 13.  Thus, Lee concludes, he has sufficiently pled a recognized liberty interest.  See Due Process Response at 13.

Lee analyzes the UNM sexual assault disciplinary procedures under the three-factor balancing test that the Supreme Court established in Mathews v. Eldridge, 424 U.S. 319 (1976), and he concludes that the factors weigh in favor of affording him greater process than he received from the Defendants.  See Due Process Response at 13.  As to the first factor -- the importance of the private interest affected -- Lee concurs with the Defendants that his interest in continued enrollment at UNM is "substantial" and adds that "the quasi-criminal nature of the expulsion has lifelong ramifications that will affect everything from future education to job prospects, to include the ability to further his education in his field of interest -- or any other academic field."  Due Process Response at 13-14.  Regarding the second factor -- the probable value of any additional procedural safeguards -- Lee argues that "[a] meaningful hearing, in the context of a claim of sexual assault, should be procedurally more stringent than your standard expulsion case because of the stigma associated with being characterized as a 'sexual predator.'"  Due Process Response at 14.  It follows, according to Lee, that Due Process in such cases requires an opportunity to present evidence and to confront witnesses before an impartial tribunal.  See Due Process Response at 15.  Lee reasserts his allegation that the investigator was biased against him but states that such bias "can easily be remedied by instituting a procedure similar to those applied by UNM in non-sexual misconduct cases, *i.e.*, an actual hearing."  Due Process Response at 17.  With respect to the third factor -- the government's interest, including the added burden that substitute procedures would effect -- Lee states that "[c]onsideration of the 'fiscal and administrative' burdens associated with greater procedural protections does not tilt the scales in UNM's favor," because UNM permits a more formal procedure in cases of alleged non-sexual misconduct, and this fact "supports a finding that additional procedural protections in sexual misconduct claims, similar to those it

already employs in other disciplinary matters, would not burden UNM." Due Process Response at 21.

Lee then argues that the Individual Defendants are not entitled to qualified immunity from claims against them in their individual capacities, because the weight of Tenth Circuit precedent supports Lee's claim that his liberty and property rights were clearly established before UNM expelled him without adequate process. See Due Process Response at 22 (citing Lee v. Kan. State Univ., No. 12-CV-2638-JAR-DJW, 2013 WL 2476702, at *7 (D. Kan. June 7, 2013)(Robinson, J.)("[T]he constitutional right to due process before a student can be deprived of her property interest in her continued graduate education . . . is clearly established, and a reasonable official would have known that the conduct alleged by Plaintiff was unconstitutional")).

### 3.    The Defendants' Reply in Support of the Motion.

The Defendants reply that, in his Response, Lee "concedes that he cannot pursue a claim for damages under § 1983 against UNM or the Individual Defendants in their official capacities." Reply Brief in Support of Defendants' Motion to Dismiss Plaintiff's Due Process Claims at 2, filed June 29, 2018 (Doc. 31)("Due Process Reply"). The Defendants repeat their argument that Lee fails to satisfy the "heavy two-part burden" to overcome an assertion of qualified immunity. Due Process Reply at 2 (citing Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001)). The Defendants assert that Lee "spills much ink in attempting to make a showing on the first prong, i.e., that the Individual Defendants violated his federal constitutional right to due process," but he "gives far less attention to attempting to make a showing on the second prong, i.e., that the constitutional due process rights at issue in this case were clearly established at the time of his expulsion from UNM." Due Process Reply at 2. The Defendants argue that Lee's failure to address this prong should indicate to the Court that he cannot "carry his heavy burden in showing that the contours of the

due process right at issue were sufficiently clear that reasonable officials in the shoes of the Individual Defendants would have known they were violating that right." Due Process Reply at 2-3. The Defendants aver that, even if Lee's expulsion from UNM implicates a protected property interest, the issue whether the Individual Defendants violated Lee's right to due process is "debatable" given that "the scope of due process rights of students accused of sexual misconduct in a university setting is far from being clearly defined," and there is no existing on-point precedent from the Supreme Court or the Tenth Circuit that establishes that Lee is entitled to greater procedural safeguards than he received before his expulsion from UNM. Due Process Reply at 3-4.

The Defendants next reply to Lee's application of the three-part, Mathews v. Eldridge balancing test by first alleging that Lee "cannot truly deny that UNM has a strong interest in 'maintaining a safe learning environment for all of its students, while preserving its limited administrative resources.'" Due Process Reply at 4 (quoting Plummer v. Univ. of Houston, 860 F.3d 767, 773 (5th Cir. 2017)). The Defendants argue that existing Supreme Court and Tenth Circuit precedent does not require that a student "receive more robust process than [Lee] allegedly received prior to his expulsion." Due Process Reply at 5. Specifically, the Defendants assert that the Tenth Circuit has rejected Lee's alleged right to a "formalistic notice requirement," which includes written notice of the charged policy violations, and has held that oral and "constructive notice," i.e., notice of the underlying allegations, is all that the Constitution requires. Due Process Reply at 6 (citing Watson ex rel. Watson v. Beckel, 242 F.3d at 1241). Turning to Lee's assertion that UNM denied him an adequate opportunity to respond, the Defendants counter that there is a "paucity" of existing precedent to inform schools of what they must do in student disciplinary proceedings. Due Process Reply at 7. The Defendants note that the only clarity from the Supreme

Court comes from "dictum" that suggests that "[l]onger suspension or expulsions . . . may require more formal procedures."  Due Process Reply at 8 (citing Goss v. Lopez, 419 U.S. 565, 584 (1975)(emphasis added in Reply)).  The Defendants stress that other federal Courts of Appeals have held that "schools are not required to turn their classrooms into courtrooms by providing students facing even long-term suspension or expulsion with full-scale adversarial proceedings similar to those afforded to criminal defendants."  Due Process Reply at 8 (citing Flaim v. Med. Sch. of Ohio, 418 F.3d 629, 635 (6th Cir. 2005)("[D]isciplinary hearings against students . . . are not criminal trials, and therefore need not take on many of those formalities.")).  The Defendants reassert that Lee's own allegations -- his statements to the UNM OEO investigator, his presentation of new information after the PLD, and his appeal -- establish that he "had a more than adequate opportunity to respond in a meaningful manner to the allegations against him."  Due Process Reply at 9.

The Defendants reassert that the Constitution of the State of New Mexico provides no greater rights than the United States Constitution, and so it follows that, because Lee has failed to plead a valid federal constitutional claim, his claim for damages for violation of the state constitution fails as well.  See Due Process Reply at 10.  Alternatively, the Defendants argue, Lee's state constitutional claim fails, because he has not – and cannot -- refute the Defendant's argument that no applicable waiver exists under the NMTCA that would permit Lee to sue UNM or the Individual Defendants for money damages.  See Due Process Reply at 9-10 (citing Valdez v. State, 2002-NMSC-028, ¶ 12, 54 P.3d 71, 78)("[I]t is well established that 'absent a waiver of immunity under the Tort Claims Act, a person may not sue the state for damages for violation of a state constitutional right.'")(quoting Ford v. Dep't of Pub. Safety, 1994-NMCA-154, ¶ 26, 891 P.2d 546)).

The Defendants argue for dismissal of all of Lee's § 1983 claims against UNM for injunctive and declaratory relief, because "an arm of the state -- like UNM -- . . . is still not a 'person' that can be sued under Section 1983." Due Process Reply at 11 (citing McLaughlin v. Bd. of Trs. of State Colls. of Colo., 215 F.3d 1168, 1172 (10th Cir. 2000)). The Defendants further argue for dismissal of these claims, because the underlying Due Process claim is not viable. See Due Process Reply at 11 (citing Romstad v. City of Colo. Springs, 650 F. App'x 576, 585 n.7 (10th Cir. 2016)(unpublished)("An injunction is not an independent cause of action; it is a remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed -- if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise.")). The Defendants concede, however, that Lee's claim for prospective injunctive relief against the Individual Defendants in their official capacities is "theoretically viable," albeit only against the one named individual defendant who has the authority to provide the relief, i.e., the current UNM President. Due Process Reply at 11-12.

### 4.     The Title IX Memo.

The Defendants move to dismiss Lee's claims for violation of Title IX. See Title IX Motion at 2. At the outset, the Defendants argue that the claim against the Individual Defendants fails as a matter of law, because, "[a]s a threshold matter, 'Title IX does not authorize a cause of action against individuals; rather, it creates a right enforceable against educational institutions only." Memorandum Brief in Support of Defendants' Motion to Dismiss Plaintiff's Title IX Claim at 7, filed December 21, 2017 (Doc.10)("Title IX Memo.")(citing Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1068 (D.N.M. 2010)(Browning, J.)).

The Defendants next assert that Lee's claims against UNM fail, because he has not alleged sufficient facts that, if true, would establish gender bias. See Title IX Memo. at 8. While the

Defendants acknowledge that Lee "devotes substantial portions of his Complaint to alleging facts that he contends cast doubt on the accuracy of the UNM OEO's finding that he engaged in sexual misconduct," they argue that these "allegations standing alone, though, do not establish a viable Title IX claim, because they do not suggest the supposed erroneous outcome was reached because of gender bias." Title IX Memo. at 9 (citing Doe v. Purdue Univ., 2017 WL 5483362, *14 (N.D. Ind. Nov. 15, 2017)(Cherry, M.J.)(reversed by Doe v. Purdue Univ., 928 F.3d 652 (7th Cir. 2019)); Doe v. Univ. of Mass.-Amherst, 2015 WL 4306521, at *8 (D. Mass. July 14, 2015)(Mastroianni, J.)).  They argue that "'numerous courts have held that 'even if a university treated a female student more favorably than a plaintiff, during the disciplinary process, the mere fact that plaintiff is male and the alleged victim is female does not suggest that the disparate treatment was because of plaintiff's sex.'" Title IX Memo. at 10 (quoting Doe v. Univ. of St. Thomas, 240 F. Supp. 3d 984, 991 (D. Minn. 2017)(Tunheim, C.J.))(citing Sahm v. Miami Univ., 110 F. Supp. 3d 774, 778-79 (S.D. Ohio 2015)(Dlott, J.)).  Even allegations that "'may support an inference of a lawful pro-victim bias . . . do not support an inference of unlawful gender bias.'"  Title IX Memo. at 10 (quoting Ruff v. Bd. of Regents of the Univ. of N.M., 272 F. Supp. 3d 1289, 1302 (D.N.M. 2017)(Armijo, C.J.)).  The Defendants also argue that, regardless whether the federal government pressured universities like UNM to pursue aggressively sexual assault investigations, "federal courts have overwhelmingly concluded that pressure from the federal government to investigate sexual assault claims does not show gender bias." Title IX Memo. at 11 (citing Doe v. Univ. of Colo., Boulder, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017)(Martinez, J.); Doe v. Coll. of Wooster, 243 F. Supp. 3d 875, 877 (N.D. Ohio 2017)(Lioi, J.); Doe v. Univ. of St. Thomas, 240 F. Supp. 3d at 992; Austin v. Univ. of Or., 205 F. Supp. 3d 1214, 1226-27 (D. Or. 2016)(McShane, J.); Doe v. Univ. of Cincinnati, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016)(Beckwith, J.)).

The Defendants then note that courts in the District of New Mexico already have ruled against the Lee's position in similar cases.  They first cite <u>Ruff v. Board of Regents of the University of New Mexico</u>, in which the Honorable Judge M. Christina Armijo, then-Chief United States District Judge for the District of New Mexico, ruled that the plaintiff's allegations that UNM felt pressure from the federal government to pursue aggressively sexual assault cases was insufficient to create an inference of gender bias.  <u>See</u> Title IX Motion at 12 (citing 272 F. Supp. 3d at 1302).  The Defendants then note that Lee already filed a similar case before, <u>John Doe v. The University of New Mexico and The Board of Regents of the University of New Mexico</u>, No. CIV. 17-0635 RJ/WPL, filed June 9, 2017  <u>See</u> Title IX Motion at 13.  In that case, the Honorable Robert Junell, Senior United States District Judge for the United States District Court for the Western District of Texas, denied Lee's motion for a preliminary injunction, because Lee had not alleged facts supporting gender bias.  <u>See</u> Title IX Motion at 13.  The Defendants argue that, in this case, "the same pleading deficiencies exist and the Court should now proceed with dismissing the fatally-flawed Title IX claim that Plaintiff has pled against the Defendants."  Title IX Memo. at 14.

> ### 5.  <u>**The Contract Memo.**</u>

The Defendants move to dismiss Lee's claims for breach of contract, and breach of the implied covenant of good faith and fair dealing.  <u>See</u> Contract Motion at 1-2.  In support of the Contract Motion, the Defendants filed the Memorandum Brief in Support of Defendant's Motion to Dismiss Plaintiff's Contract Claims, filed December 21, 2017 (Doc. 11)("Contract Memo."). The Defendants first argue that Lee's implied contract claims against UNM fail as a matter of law, because UNM is entitled to sovereign immunity.  <u>See</u> Contract Memo at 10.  They turn first to Lee's breach-of-contract claim, and assert that, under N.M. Stat. Ann. § 37-1-23(A), government

entities have immunity from actions based on contract -- except those based on a valid written contract.  See Contract Memo at 10.  The Defendants note that, while the Supreme Court of New Mexico has held that this requirement may be satisfied by some implied-in-fact employment contracts, such as a written employee handbook, see Contract Memo. at 11 (citing Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 19, 918 P.2d 7), the Court of Appeals of New Mexico has expressed "'grave reservations'" about expanding this principle, Contract Memo. at 11 (quoting Avalos v. Bd. of N.M. State Univ., 2017-NMCA-082, ¶ 12, 406 P.3d 551, 555; Campos de Suenos, Ltd. v. Cty. of Bernalillo, 2001-NMCA-043, ¶ 26, 28 P.3d 1104, 1111).  See Quarrie v. N.M. Inst. of Mining & Tech., No. CIV. 13-0349 MV/SMV, 2014 WL 11456616 (D.N.M. Feb. 25, 2014)(Vidmar, M.J.).  The Defendants further argue that New Mexico courts' reluctance to override governmental immunity claims "is supported by sound public policy." Contract Memo. at 11-12.

The Defendants then address Lee's claim for breach of the implied covenant of good faith and fair dealing.  See Contract Memo. at 12. They assert that New Mexico appellate courts have held on multiple occasions that § 37-1-23(A) provides immunity to state governmental entities from implied-in-law contract claims.  See Contract Memo. at 12 (citing Eaton, Martinez & Hart, P.C. v. Univ. of N.M. Hosp., 1997-NMSC-015, ¶ 12, 934 P.2d 270, 273).  They argue that while the "New Mexico Supreme Court and Court of Appeals have yet to explicitly consider whether Section 37-1-23(A) provides governmental entities like UNM with immunity from claims for breach of the implied covenant of good faith and fair dealing," Contract Memo. at 13, the Honorable Alan C. Torgerson, United States Magistrate Judge for the United States District Court for the District of New Mexico, held that governmental entities are immune from these claims, see

Contract Memo. at 13 (citing Martinez v. Romero, No. CIV. 11-0785 ACT/WDS, 2012 WL 13076174 (D.N.M. May 4, 2012)(Torgerson, M.J.)).

Alternatively, the Defendants argue that Lee's claims fail as a matter of law, because the policies at issue do not create any contractual obligations.  See Contract Memo. at 13.  They assert that an implied contract may be created where an employee handbook creates a "'reasonable expectation' that the employer will follow specified procedures,"  Contract Memo. at 14 (quoting Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 14, 857 P.2d 776, 783), and discuss cases that apply this principle, see Contract Memo. at 14-16 (citing Sanchez v. The New Mexican, 1987-NMSC-059, ¶ 12, 738 P.3d 1321, 1324; Ruegsegger v. Bd. of Regents of W.N.M. Univ., 2007-NMCA-030, 154 P.3d 681; Stieber v. J. Publ'n Co., 1995-NMCA-068, 901 P.3d 201).   The Defendants then discuss a previous Court opinion, Gerald v. Locksley, 785 F. Supp. 2d 1074, 1084 (D.N.M 2011)(Browning, J.), which concludes that the plaintiff's contract claims failed as a matter of law, because the UNM's Whistleblower and Campus Violence Provisions "'do not contain language specific enough to raise a reasonable expectation that UNM would provide a particular response to [the plaintiff's] grievance.'"  Contract Memo. at 19 (quoting Gerald v. Locksley, 785 F. Supp. 2d at 1145).

The Defendants argue that, like the cases cited above, the policies and procedures which Lee cites for his breach-of-contract claim are "merely declarations of UNM's general approach to reports of student sexual misconduct and do not create any contractual obligations on the part of UNM toward students accused of sexual misconduct."  Contract Memo. at 19.  They argue that these documents' "aspirational goals" do not create a breach-of-contract basis.  Contract Memo. at 19 (citing Stieber v. J. Publ'n Co., 1995-NMCA-068, 901 P.3d 201; Clayton v. Vanguard Car Rental U.S.A., Inc., 761 F. Supp. 2d 1210, 1277-80 (D.N.M. 2010)(Browning, J.)).   The

Defendants argue that, compared to documents in similar cases, there is "not more promissory language in the Student Discipline Process, Policy 2730 (Sexual Harassment), Policy 2740 (Sexual Violence and Sexual Misconduct), and OEO Discrimination Claims Procedure" at issue in this case.  Contract Memo. at 20.  The Defendants also state that the Court "should consider the negative policy ramifications likely to flow from allowing accused students to seek contractual recovery for the alleged violation of campus sexual misconduct policies," Contract Memo. at 21, and argue that Universities should be encouraged to develop policies addressing sexual assault without fear that students can recover damages when they fail to follow their own procedures, <u>see</u> Contract Memo. at 21-22.

Finally, the Defendants argue that Lee's claim for breach of implied covenant of good faith and fair dealing fails, because of the absence of an underlying contract.  <u>See</u> Contract Memo. at 22.  They argue that, "[i]n the absence of an underlying contractual relationship, there is no freestanding cause of action for breach of the implied covenant of good faith and fair dealing and such a claim must be dismissed as a matter of law."  Contract Memo. at 22.

### 6. **The Contract Response.**

Lee responds to the Contract Motion.  <u>See</u> Plaintiff's Response in Opposition to Defendants' Motion to Dismiss Plaintiff's Contract Claims, filed May 29, 2018 (Doc. 25)("Contract Response").  Lee argues first that his breach-of-contract claim is not barred, because he has a valid written contract with UNM; he filled out an application to attend graduate school, and the application "incorporated language regarding compliance with UNM's policies and guidelines."  Contract Response at 5.  Lee argues that, because he signed a document referencing these policies and procedures, they are "incorporated into the agreement between the parties."  Contract Response at 6.

Alternatively, Lee argues that an implied contract exists between the parties.  See Contract Response at 6-10.  He asserts that the Student Grievance Procedure's terms "clearly contain language that would support a reasonable expectation that UNM would perform certain tasks and follow a certain procedure."  Contract Response at 7.  Lee also disagrees with the Defendant's interpretation of Ruegsegger v. Board of Regents of Western New Mexico University, 2007-NMCA-030, 154 P.3d 681, stating that, in that case, "there was nothing specific creating a contractual right to impose a specific sanction," while, here, "the policies and procedures are very specific as to the type of procedures that will be instituted against a student for disciplinary misconduct."  Contract Response at 8.

Lee then states that, although New Mexico courts have not expanded the implied breach of contract beyond the employment context, "the facts surrounding the case at bar supports expansion of the implied contract doctrine."  Contract Response at 9.  He argues that the Court should expand the doctrine, because UNM wrote the contract unilaterally, see Contract Response at 9 (citing Campos de Suenos, Ltd. v. Cty. of Bernalillo, 2001-NMCA-043, ¶ 27, 28 P.3d at 1112), and because "New Mexico has created a statutory right to due process through its statutory entitlement to a public university upon payment of tuition," Contract Response at 9 (citing Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172, 1181 (10th Cir. 2001); Harris v. Blake, 798 F.2d at 422; Gaspar v. Bruton, 513 F.2d 843, 850 (10th Cir. 1975); Brown v. Univ. of Kan., 16 F. Supp. 3d 1275, 1288 (D. Kan. 2014)(Melgren, J.); Lee v. Kan. State Univ., 2013 WL 2476702 at *6; Siblerud v. Colo. State Bd. of Agric., 896 F. Supp. 1506, 1512-13 (D. Colo. 1995)(Kane, J.); Assenov v. Univ. of Utah, 553 F. Supp. 2d 1319, 1327 (D. Utah 2008)(Campbell, C.J.)).  Finally, Lee argues that UNM breached its duty of good faith and fair dealing.  See Contract Response at 10-11.  He asserts that the Complaint states that

> Defendant UNM failed to properly train investigators on how to investigate sexual misconduct cases, failed to properly staff UNM's Office of Equal Opportunity, failed to conduct appropriate evidence gathering, failed to conduct proper credibility determinations of witnesses, and failed to properly conduct an investigation.  These allegations establish a claim on the basis that Defendants deprived Plaintiff of the benefit of the bargain through evasion of the spirit of the bargain, lack of diligence or slacking off, willful rendering of imperfect performance, or abuse of a power to specify terms.

Contract Response at 11.

### 7.     The Contract Reply.

The Defendants argue in reply to the Contract Response.  See Reply Brief in Support of Defendants' Motion to Dismiss Plaintiff's Contract Claims, filed June 29, 2018 (Doc. 30)("Contract Reply").  The Defendants first argue against Lee's express contract claim and assert that, "[e]ven if the Application created an explicit written contract, it does not bind UNM to comply with its own policies and procedures."  Contract Reply at 3.  The Defendants cite similar language in Ruegsegger v. Board of Regents of Western New Mexico University, 2007-NMCA-030, 154 P.3d 681, and assert that the "Plaintiff's contract claim based on UNM's policies and procedures is not salvaged merely because his school application mentioned his obligation to comply with UNM policies and procedures."  Contract Reply at 3 (emphasis in original).  The Defendants bolster their argument by citing cases from the Court of Appeals of New Mexico that have "repeatedly rejected attempts by plaintiffs to show a waiver of the immunity from contract claims afforded by Section 37-1-23(A) by reading multiple written documents in tandem with each other."  Contract Reply at 3 (citing Avalos v. Bd. of Regents of N.M. State Univ., 2017-NMCA-082, ¶ 14, 406 P.3d at 556-57; Campos de Suenos, Ltd. v. Cty. of Bernalillo, 2001-NMCA-043, ¶ 18, 28 P.3d at 1110).  The Defendants then state that Lee fails to address cases suggesting that New Mexico governmental entities are immune from claims for breaches of the implied covenant of good faith and fair dealing.  See Contract Reply at 4-5.

The Defendants next argue that Lee's contract claims fail, because the policies do not create any contractual obligations.  See Contract Reply at 5.  The Defendants discuss the Court's decision in Clayton v. Vanguard Car Rental, U.S.A., and analogize that case's facts to the facts in this case. See Contract Reply at 6-7.  The Defendants also reiterate that a ruling for Lee would have harmful public policy effects, because universities either would have to lose federal funding, or would follow strictly their own policies and procedures not to give students a private cause of action.  See Contract Reply at 7.  Next, the Defendants' argue that, although Lee relies heavily on the word "will" in Article 4 of the Student Grievance Process, "New Mexico courts have never given any heightened importance to whether the policy uses the word 'will' in describing the actions of the employer or school."  Contract Reply at 8 (citing Gerald v. Locksley, 785 F. Supp. 2d 1074).  The Defendants also argue that the Complaint establishes UNM's compliance with Article 4.  See Contract Reply at 9.  The Defendants conclude by reiterating that the Court must dismiss Lee's claim for breach of the implied covenant of good faith and fair dealing.  See Contract Reply at 9 (citing Azar v. Prudential Co. of Am., 2003-NMCA-062, ¶ 53, 68 P.3d 909, 925).

**8.      The Hearing.**

The Court held a hearing on the Due Process Motion, the Title IX Motion, and the Contract Motion on July 3, 2018.  See Clerk's Minutes at 1, filed July 3, 2018 (Doc. 35).  The Court first took up the Title IX Motion and asked Lee whether, because he did not file a response, the Court should grant the Title IX Motion.  See Draft Transcript of Hearing at 2:7-14 (taken July 3, 2018)(Court)("Tr.").[6]  Lee responded that "[w]e're not necessarily contesting the Title IX claim.

_____

[6]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

We're not going to make any arguments about that."  Tr. at 2:18-20 (Crow).  The Court replied

that it would "just go ahead and grant that one."  Tr. at 2:21-22 (Court).

a.      <strong><u>Argument Regarding the Due Process Motion.</u></strong>

The Defendants then argued the Due Process Motion.  <u>See</u> Tr. at 3:12 (Smith).  They

asserted that briefing had narrowed the issue to "whether plaintiff has overcome the individual

defendants' assertion of qualified immunity."  Tr. at 5:22-24 (Smith).  After laying out their

argument's outline, the Defendants "t[ook] a step back" and discussed Lee's § 1983 claims.  Tr.

at 6:20 (Smith).  They asserted that Lee has conceded in briefing "that he cannot bring a section

1983 claim against UNM or the individual defendants in their official capacities."  Tr. at 6:22-25

(Smith).  Lee agreed with this characterization "in part."  Tr. at 8:4 (Crow).  He noted that he could

not win money damages against the Defendants under § 1983, but he could state a claim for

injunctive relief.  <u>See</u> Tr. at 8:5-20 (Crow).  Asked whether there was any injunctive relief that Lee

seeks against individuals which he is not seeking against UNM, Lee responded that he was "asking

this Court to really enjoin all parties from the Board of Regents down to the EO investigators."

Tr. at 11:12-13 (Crow).  The Court then noted that it looked "like you have a concession on the

money damages against the University and the individuals in their official [capacities]."  Tr. at

11:18-20 (Court).  Lee responded that, because he was not sure that he could seek an action against

UNM, he sued other defendants in their individual capacity.  <u>See</u> Tr. at 11:24-12:6 (Crow).  After

the Defendants stated that Lee could not sue UNM under § 1983, the Court stated that it "seems

like there is an agreement that the claim against the University, be it for injunctive relief or be it

for damages, should be dismissed under [§] 1983."  Tr. at 12:20-23 (Court).

With this issue clarified, the Court directed the Defendants to address the "violation prong

of the . . . alleged due process violation."  Tr. at 14:19-21 (Court).  The Defendants discussed the

- 32 -

standard for academic suspensions in <u>Goss v. Lopez</u> and said that "we're out into the area that the Supreme Court has not spoken, but they have suggested that it may require more formal procedure." Tr. at 16:17-20 (Smith). The Court suggested that the procedure in <u>Goss v. Lopez</u> is "at least th[e] minimum" UNM has to satisfy, Tr. at 18:3-4 (Court), but the Defendants argued that the Supreme Court held that "you have to look at the process that was actually provided" and asserted that this analysis is highly fact-specific, Tr. at 18:17-18 (Smith). Anything less than the procedure in <u>Goss v. Lopez</u>, the Defendants conceded, "runs the risk" that it does not meet Due Process's minimum standards. Tr. at 19:14 (Smith). The Defendants argued that students in disciplinary proceedings "regularly" receive less Due Process. Tr. at 20:9 (Smith). The Defendants also encouraged the Court to abandon its "formalistic view" of Due Process, because "courts have consistently said that there is not a formalistic hearing requirement." Tr. at 22:20-21 (Smith). The Court then expressed surprise that Due Process does not require necessarily witness confrontation and cross-examination in this case. <u>See</u> Tr. at 23:8-11 (Court); <u>id.</u> at 23:17-20 (Court). The Court asked whether any information used against Lee was given under oath, and the Defendants stated that no witness made any statement under oath. <u>See</u> Tr. at 24:20-25:14 (Court, Smith). The Defendants asserted, however, that they "have not seen a case from the Supreme Court or the Tenth Circuit that requires student disciplinary decisions to be based on sworn statements." Tr. at 25:25-26:3 (Smith).

The Defendants then argued that Lee received notice and a meaningful opportunity to respond, which are the two requirements "[a]t the heart of due process." Tr. at 26:8 (Smith). The Defendants stated that they "don't think there is any real strong argument that the plaintiff was entitled [to] greater notice than what was provided" in <u>Watson ex rel. Watson v. Beckel</u>, Tr. at 27:12-14 (Smith), and that the "allegations in the complaint show that he received a meaningful

opportunity to present his case," Tr. at 28:3-5 (Smith).  The Defendants argue that no cases from the Supreme Court or the Tenth Circuit "has held that more process is [required] other than what is alleged in the complaint."  Tr. at 29:15-16 (Smith).

The Defendants then argued that no Tenth Circuit case has held that a student facing expulsion for sexual misconduct has a Due Process right to confront his or her accuser.  See Tr. at 30:5-14 (Smith).  The Defendants noted that Watson ex rel. Watson v. Beckel similarly was an expulsion case that did not require cross-examination and, while it concerned high-school students, the Defendants do not think this fact made a difference.  See Tr. at 30:15-32:12 (Smith, Court).  They also stated that, under Mathews v. Eldridge's balancing test, UNM has a strong interest "in protecting its students who are alleged to have been victimized by sexual assault . . . from further trauma as a result of cross-examination."  Tr. at 33:8-12 (Smith).  They also noted that the United States Department of Education's "Dear Colleague"[7] letter discourages universities from allowing cross-examination in sexual misconduct proceedings.  Tr. at 33:21 (Smith); id. at 33:20-24 (Smith).

Lee then responded.  See Tr. at 34:19 (Crow).  Lee discussed Goss v. Lopez, and argued that it suggests that students are entitled to counsel, witnesses, and cross-examination when facing suspensions longer than ten days.  See Tr. at 36:7-21 (Crow).  He then discussed Watson ex rel. Watson v. Beckel, and argued that it suggests that accused students are entitled to cross-examination.  See Tr. at 38:10-25 (Crow).  Lee argued that his notice is far less than the notice that the Tenth Circuit approved in Watson ex rel. Watson v. Beckel.  See Tr. at 38:25-39:22 (Crow).  The Court expressed its concern that Lee was asking for more notice than a defendant receives in

---

[7]On April 4, 2011, the Office of Civil Rights in the United States Department of Education issued what came to be known as the "Dear Colleague" letter.  The Letter interpreted Title IX of the Education Amendments of 1972 to require colleges and universities to use certain procedures in adjudicating sexual misconduct allegations.  See Tamara Rice Lave, Ready, Fire, Aim: How Universities are Failing the Constitution in Sexual Assault Cases, 48 Ariz. St. L.J. at 652-654.

a criminal or civil case.  See Tr. at 39:23-40:8 (Court).  Lee argued that, in terms of notice, "[e]ssentially all they're doing is conducting an investigation."  Tr. at 41:13-14 (Crow).  Asked how he specifically thought UNM's notice is flawed, Lee responded that "there is nothing given to the plaintiff in this case regarding what type of sanction he could be exposed to based [on the] information that he received."  Tr. at 42:10-13 (Crow).  Lee stated that he did not know that he could be expelled, and this lack of notice affected how he approached the hearing.  See Tr. at 42:15-43:5 (Court, Crow).  Lee also asserted that investigators brought up underage drinking at the sanctions hearing even though he was advised that it would not be raised, and he was also told that he could not bring in any new evidence at the sanctions hearing.  See Tr. at 43:6-21 (Crow). This last notice flaw, Lee asserted, is an inaccurate representation of UNM's policies.  See Tr. at 45:15-17 (Crow).

Lee then discussed Siblerud v. Colorado State Board of Agriculture.  See Tr. at 48:23-50:1 (Crow).  The Court asked Lee how he could distinguish Watson ex rel. Watson v. Beckel, which cites other Courts of Appeals that reject the argument that due process requires cross-examination. See Tr. at 50:6-12 (Court).  Lee responded that Watson ex rel. Watson v. Beckel, is a "unique" case, because there was no need to cross-examine the witness, Tr. at 51:1 (Crow), and asserted: "I don't think Watson says you can't have cross-examination[.]  I think it says we didn't need it here," Tr. at 52:1-3 (Crow).  Lee argued that "this situation is: we never had a hearing, so we don't know at this point what the totality of the circumstances would give us as far as whether or not there was adequate due process."  Tr. at 52:25-53:4 (Crow).  The Court asked for Lee's response to the Defendants' argument that Lee chose the least formal hearing, see Tr. at 53:5-9 (Court), and Lee stated that "the question isn't whether the process that he chose was right or wrong, the question is whether or not it was adequate," Tr. at 53:13-15 (Crow).

The Defendants then argued that the burden is on the plaintiff to show that the Defendants are not entitled to qualified immunity.  See Tr. at 54:23-55:6 (Smith).  The Court asked the Defendants to discuss Mathews v. Eldridge's balancing test, and the Defendants admitted that Lee's interest is "substantial."  Tr. at 56:11 (Smith).  The Court asked: "So if we're going to provide Due Process in the school context this is probably where our antenna[e] should be heightened the very most?"  Tr. at 56:12-14 (Court), and the Defendants said that they "don't disagree with that," Tr. at 56:15 (Smith).  The Defendants defended their argument that more process was unnecessary by saying that Tenth Circuit precedent and Watson ex rel. Watson v. Beckel in particular do not require more.  See Tr. at 56:23-58:13 (Court, Smith).  They stated that "all indications that we received from the Tenth Circuit is that there is no right to cross-examination even in expulsion proceedings," Tr. at 58:22-24 (Smith), and represented that the same was true in other circuits, see Tr. at 61:2-11 (Smith).

The Court then asked the Defendants about the three notice flaws which Lee identified earlier, see Tr. at 62:19-23 (Court), and whether it troubled them that Lee did not have notice that he could be expelled, see Tr. at 63:13-17 (Court).  The Defendants stated that the Tenth Circuit has not said that the notice must include notice of potential consequences.  See Tr. at 63:21-64:4 (Smith).  The Defendants said that it is "important that neither the Supreme Court nor the Tenth Circuit nor any case that I'm aware of" has held that a student is entitled to notice of expulsion, Tr. at 66:12-13 (Smith), and that notice is solely about getting a meaningful opportunity to respond, see Tr. at 66:14-24 (Smith).  The Defendants also noted that the UNM policies on which Lee relies for his contract claims "specifically spell out that expulsion is a potential consequence of a finding of sexual misconduct."  Tr. at 67:17-19 (Smith).  Regarding the underage drinking accusation, the Defendants assert that, as in Watson ex rel. Watson v. Beckel, there are an "unlimited number of

potential considerations that [] may go into imposing a [sanction] that you couldn't expect the government to provide [notice for] every possible aggravating or mitigating circumstance." Tr. at 69:22-25 (Smith).  The Defendants also stated that the right to be heard does not include the right to have counsel, cross-examine witnesses, or "the right to the identification of all the specific evidence that may be [relied] upon." Tr. at 70:23-25 (Smith).  The Defendants reasserted that Lee received constitutionally sufficient process.  See Tr. at 72:10-13 (Smith).

Lee responded that the defendant in  Watson ex rel. Watson v. Beckel lacked standing to request more extensive procedures, because he did not demonstrate that he would be subject to future disciplinary procedures.  See Tr. at 73:24-22 (Crow).  Lee also noted that the fact that the school in Watson ex rel. Watson v. Beckel was a military institute was important to the Tenth Circuit, because students and parents often pick these schools for their disciplinary systems, see Tr. at 74:23-76:1 (Crow), although later the Defendants argued that this point concerns an Equal Protection Clause argument whether there was a rational basis for treating military schools differently, see Tr. at 84:10-85:9 (Smith).  Lee also argued that the Tenth Circuit found notice was not necessary in Watson ex rel. Watson v. Beckel, because the defendant had already received "a full-fledged hearing." Tr. at 76:7 (Crow).  Lee cited Goldberg v. Kelly, 397 U.S. 254, 269 (1970), and argued that "cross-examination is critical," Tr. at 77:24 (Crow), as "a matter of fundamental fairness," Tr. at 77:20-21 (Crow), in cases where students could be expelled.

Lee then argued that the law is clearly established that "at a minimum a hearing is required." Tr. at 78:10 (Crow).  See id. at 79:17 (Crow).  He stated that Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78 (1978), most supports his case.  See Tr. at 79:25-80:1 (Crow)(citing Bd. of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. at 88-90).  In addition

to cases mentioned in the brief, Lee also cited Flaim v. Medical College of Ohio, to suggest that UNM's procedures violated his clearly established rights.  See Tr. at 83:3-12 (Crow).

The Defendants then argued in response and first noted that Siblerud v. Colorado State Board of Agriculture, is not a Tenth Circuit or Supreme Court case, see Tr.  85:14-15 (Smith), and that numerous cases they cite in their brief have held that students are not entitled to the procedures Lee seeks, see Tr. at 85:18-86:6 (Smith).  The Defendants also cited Wilk v. St. Vrain Valley School District, 2017 WL 3190443, *8 (D. Colo. July 27, 2017)(Matsch, J.), which notes that there is little law describing the procedures required in these situations.  See Tr. at 87:10-88:2 (Smith). The Defendants concluded that "I think it's pretty clear that this area is evolving quickly, rapidly, and there is certainly no clearly established law from either [] the Supreme Court or the Tenth Circuit."  Tr. at 88:7-10 (Smith).  As for whether Lee had a property interest, the Defendants conceded that there is some Tenth Circuit caselaw regarding property interests in state university attendance and declined to argue the issue further.  See Tr. at 88:24-89:21 (Smith).

The Defendants then addressed Lee's claims based on the Constitution of New Mexico and argued that the Supreme Court of New Mexico has repeatedly held that there is no waiver under the New Mexico Tort Claims Act for suits against the New Mexico or its employees for state constitutional right violations.  See Tr. at 89:24-90:17 (Smith).  The Defendants stated that Lee has not fully responded to this argument.  See Tr. at 90:22-91:1 (Smith).  Although the Defendants conceded that Lee could sue for injunctive relief, see Tr. at 91:9-12 (Smith), they argued that Lee has not demonstrated that New Mexico's Constitution affords broader rights than the United States Constitution, see Tr. at 91:15-92:1 (Smith). With both parties finished, the Court stated that it was "inclined to pull out the federal claims, dismiss those, and remand [] it back to state court for a determination of the state claims."  Tr. at 94:19-22 (Court).

### b.    Argument Regarding the Contract Motion.

The Defendants then argued in support of the Contract Motion.  See Tr. at 95:8 (Smith).

They asserted that New Mexico courts have allowed suits based on implied-in-fact contracts to

overcome sovereign immunity only for employment contracts.  See Tr. at 96:12-91:1 (Smith).  The

Defendants then argued that Lee's UNM Application imposed no contractual obligations on UNM.

See Tr. at 97:1-99:12 (Smith)(citing Avalos v. Bd. of N.M. State Univ., 2017-NMCA-082, 406

P.3d 551).  Next, the Defendants argued that sovereign immunity also bars Lee's breach of the

implied covenant of good faith and fair dealing.  See Tr. at 99:13-100:21 (Smith)(citing Martinez

v. Romero, 2012 WL 13076174; Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, 793 P.2d

855).

The Defendants argued alternatively that the policies and procedures at issue do not create

any contractual obligations, because "New Mexico appellate courts have long upheld the dismissal

of implied contract claims that are based on general guidelines for operation as opposed to specific

promissory language."  Tr. at 101:2-6 (Smith).  See id. at 101:6-102:11 (Smith)(discussing

Ruegsegger v. Bd. of Regents of W.N.M. Univ., 2007-NMCA-030, 154 P.3d 681); Tr. at 102:11-

103:13 (Smith)(discussing Gerald v. Locksley, 785 F. Supp. 2d 1074).  They argued that the

language at issue here is "no more promissory than the policies" in the cited case's language.  Tr.

at 103:15 (Smith).  See id. at 103:13-103:25 (Smith).  The Defendants also stated that it was

important to note that federal law requires UNM to adopt policies and procedures for these

circumstances, and that, in an analogous circumstance, the Court concluded that policies adopted

to comply with federal law did not create an implied contract.  See Tr. at 104:19-106:6

(Smith)(discussing Clayton v. Vanguard Car Rental U.S.A., Inc.).  The Defendants concluded by

stating that, if Lee's claim for breach of contract fails, then his claim for breach of the good faith

and fair dealing covenant also fails, because this latter claim requires an underlying contractual relationship.  See Tr. at 106:11-21 (Smith).

Lee responded after recess and argued that Ruegsegger v. Board of Regents of Western New Mexico University's facts are not "fundamentally different from the situation we have here." Tr. at 108:4-5 (Crow).  Lee then directed the Court to specific language in § 4.4 of UNM's Student Grievance Process which he argued creates a contract.  See Tr. at 108:19-109:9 (Crow).  Lee argued that, "when the application states that you're going to follow the policies and procedures and then in turn it identifies very specific detailed policies and procedures, that is the type of case that the [Ruegsegger] case applies to."  Tr. at 109:17-22 (Crow).  The language, Lee argued, "is almost identical to "[Ruegsegger]."  Tr. at 110:14-15 (Crow).  Lee then distinguished Avalos v. Board of New Mexico State University as providing guidelines rather than contractually guaranteed rights.  See Tr. at 111:4-19 (Crow).

The Defendants responded that, if the Court extended Lee's logic, students could potentially turn small grievances into breach of contract claims in federal court.  See Tr. at 114:2-20 (Smith).  They concluded by stating that "if the New Mexico appellate courts have been reluctant to recognize breach of contract claimants, I just don't think that's a road that the New Mexico Supreme Court or the Court of Appeals is willing to go down," Tr. at 115:12-16 (Smith).  As the hearing ended, the Court asked whether it could analyze the Due Process "clearly established" prong without deciding the constitutional issue, Tr. at 118:10 (Court), and the Defendants stated that it could not, and that the Court would have to decide whether there was a Due Process violation to resolve Lee's injunctive claims, see Tr. at 117:17-118:22 (Court, Smith).

9.     **The Sept. 2018 Order.**

The Court issued an Order disposing of the Due Process Motion, the Title IX Motion and the Contract Motion.  See Order, filed September 20, 2018 (Doc. 36)("Sept. 2018 Order").  In the Order, the Court concluded that Lee "alleged facts sufficient to state a plausible Fourteenth Amendment procedural due process claim for injunctive and declaratory relief against the Board of Regents of UNM and Frank in his official capacity as president of UNM."  Sept. 2018 Order at 2.  The Court concluded that Lee has a protected property interest in continued enrollment at UNM and a protected property interest in "his good reputation."  Sept. 2018 Order at 2.  The Court further held

> that preponderance of the evidence is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion, given the significant consequences of having a permanent notation such as the one UNM placed on Lee's transcript.  That UNM provides an evidentiary hearing in cases of alleged non-sexual misconduct but not in cases of alleged sexual misconduct supports Lee's claim that the process he received was constitutionally inadequate.  In addition, Lee did not receive notice that he faced sanctions for allegations related to underage drinking until his sanctions hearing, when it was too late to prepare an adequate defense.  The Court concludes, however, that Lee cannot successfully sue Defendants for damages pursuant to § 1983, because (i) UNM is not a "person" under § 1983; and (ii) given that the contours of Lee's due process rights were not clearly established, the Individual Defendants are entitled to qualified immunity.  The Court also concludes that the Defendants are entitled to governmental immunity under the New Mexico Tort Claims Act, NMSA 1978, § 41-4, so Lee cannot properly sue the Defendants for damages for violation of the Constitution of the State of New Mexico.  The Court concludes that the UNM policies and procedures for students accused of sexual misconduct are guidelines for operation and lack specific promissory language necessary to create contractual obligations, so Lee cannot properly sue Defendants for breach of contract or breach of the implied covenant of good faith and fair dealing.  At the hearing, Lee conceded his claims pursuant to Title IX, and the Court dismissed them at the time. The Court nevertheless finds that Lee's Title IX claims are not pled with sufficient specificity to infer that UNM treated Lee differently on account of his gender.

Sept. 2018 Order at 3.  The Court dismissed Lee's claims for damages against UNM, the Board of Regents of the University of New Mexico, Frank, Buchs, Cowan, Cordova, and Chibanga.  See

Sept. 2018 Order at 4.  The Court also granted the Title IX Motion and the Contract Motion.  See Sept. 2018 Order at 4.  The Court also dismissed with prejudice the Complaint's Counts I and II as pled against Buchs, Cowan, Cordova, and Chibanga.  See Sept. 2018 Order at 4.  Finally, the Court dismissed with prejudice the Complaint's Counts IV, V, and VI.  See Sept. 2018 Order at 4.

10.     **The May 6, 2019, Rule 16 Scheduling Conference.**

The Court held a scheduling conference pursuant to rule 16 of the Federal Rules of Civil Procedure on May 6, 2019.  See Clerk's Minutes at 1, filed May 6, 2019 (Doc. 50).  The Court stated that "I have thought a little bit about the order and there was one little sentence or phrase in there that I, after reflecting on it, I thought I probably would delete."  Draft Transcript of Hearing at 3:22-25 (taken May 6, 2019)(Court)("May Tr.").[8]  The Court said: "I may change slightly what I say as far as what I think due process requires.  It's a little more narrow than what I said in the opinion after reflecting on it and thinking about it some more."  May Tr. at 4:5-9 (Court).  The Defendants stated that "it might potentially be helpful to get a revised order on that issue,"  May Tr. at 13:8-9 (Smith), and the Court promised to issue an amended order, see May Tr. at 13:13-17 (Court).

11.     **The May 2019 Order.**

The Court amended its Sept. 2018 Order in May, 2019.  See Amended Order, filed May 30, 2019 ("Amended Order").  The only change the Court made was to remove the sentence: "Moreover, the Court concludes that preponderance of the evidence is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion, given the significant

---

[8]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

consequences of having a permanent notation such as the one UNM placed on Lee's transcript."

Amended Order n.1 at 1.

12.     **The August 13, 2019 Email.**

The Court received an email on August 13, 2019, from William Kidder, a research associate at UCLA's Civil Rights Project.  See Email from William Kidder to Judge Browning (dated Aug. 13, 2019), filed August 27, 2019 (Doc. 59)("Email").  The email read, in its entirety:

> I noticed Judge Browning's unpublished ruling in Lee v. University of New Mexico (Sept. 2018) in which he concluded "that preponderance of the evidence is not the proper standard for disciplinary investigations" such as campus Title IX matters.  I have had no contact with either party in this case, and my intent in this email is to simply to share my new research article in the peer-reviewed Journal of College and University Law that looks broadly at the standard of evidence in Title IX campus proceedings as well as other civil rights and administrative contexts including physician misconduct license cases and research misconduct cases linked to federal grants: https://jcul.law.rutgers.edu/category//journal-articles/  Thank you for your consideration.

Email at 1.

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss.");  Smith v. United States, 561 F.3d 1090, 1098 (10th Cir.

2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555.

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Twombly, 550 U.S. at 570).  See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1258-59 (D.N.M. 2017)(Browning, J.).

"When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)).  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d at 941; and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]."  627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the

court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).[9] In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." 167 F. App'x at 704-05.

        The Court previously has ruled that, when a plaintiff references and summarizes the

_____

        [9]Nard v. City of Oklahoma City, is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

              In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that Nard v. City of Oklahoma City, Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished); Johnston v. Hunter Douglas Window Fashions, Inc., 715 F. App'x 827 (10th Cir. 2017)(unpublished; Doe No. 1 v. Boulder Valley School District No. RE-2, 523 F. App'x 514 (10th Cir. 2013)(unpublished); and Lobozzo v. Colorado Deparment of Corrections, 429 F. App'x 707 (10th Cir. 2011), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the Defendant's attach in their briefing. See Mocek v. City of Albuquerque, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the Defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court, in Crabtree, determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. See 2012 WL 3656500, at *22-23. See also Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims"). On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer to in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cty. Emps.' Retirement Sys. v. Thornburg Mortg. Secs. Trust 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the

complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute"); S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge).

## LAW REGARDING § 1983 LIABILITY

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("'The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their]

constitutional rights.'")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).   The

Supreme Court has stated that there is no respondeat superior liability under § 1983.  See Ashcroft

v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to *Bivens*[ v. Six Unknown

Fed. Narcotics Agents, 403 U.S. 388 (1971)("Bivens")[10]] and § 1983 suits, a plaintiff must plead

that each Government-official defendant, through the official's own individual actions, has

violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity

cannot be held liable solely on the basis of the existence of an employer-employee relationship

with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at

*25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell, 436 U.S. at 689).  Supervisors can be

held liable only for their own unconstitutional or illegal policies, and not for the employees'

tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

### 1.    Color of State Law.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'"

Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-

of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the

fundamental goals of preserving an area of individual freedom by limiting the reach of federal

law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for

which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).  "The

traditional definition of acting under color of state law requires that the defendant in a § 1983

action have exercised power 'possessed by virtue of state law and made possible only because the

wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at 49 (quoting

---

[10]In Bivens, the Supreme Court held that a violation of the Fourth Amendment of the
Constitution "by a federal agent acting under color of his authority gives rise to a cause of action
for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."   Jojola v. Chavez, 55 F.3d at 493. Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"   Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the public-employee context, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"   Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

2.      **Individual Liability.**

Government actors may be liable for the constitutional violations that another actor committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d at 1046.  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell, 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations.  The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).[11]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there

---

[11]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit." 41 F. Supp. 3d at 1273. The Court applied a traditional proximate cause analysis and left open the possibility that there might be some greater, undefined causation requirement. See 41 F. Supp. 3d at 1281.

is not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220

(10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers
> only "would be liable for the harm 'proximately' or 'legally' caused by their
> tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).  "They
> would not, however, necessarily be liable for all of the harm caused in the
> 'philosophic' or but-for sense by the illegal entry."  Id.  In civil rights cases, a
> superseding cause, as we traditionally understand it in tort law, relieves a defendant
> of liability.  See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071
> (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated
> on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment

of the Constitution of the United States of America, the Tenth Circuit has held that government

actors "may be held liable if the further unlawful detention and arrest would not have occurred but

for their conduct and if there were no unforeseeable intervening acts superseding their liability."

Martinez v. Carson, 697 F.3d at 1255.  The Tenth Circuit gave an example of a superseding-

intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the

United States Court of Appeals for the Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest
> warrant and that they improperly enter without knocking and announcing their
> presence.  Once inside, they encounter the suspect, identify themselves, show him
> the warrant, and tell him that they are placing him under arrest. The suspect,
> however, breaks away, shoots and kills two of the officers, and is preparing to shoot
> the third officer when that officer disarms the suspect and in the process injures
> him.  Is the third officer necessarily liable for the harm caused to the suspect on the
> theory that the illegal entry without knocking and announcing rendered any
> subsequent use of force unlawful?  The obvious answer is "no." The suspect's
> conduct would constitute a "superseding" cause, see Restatement (Second) of Torts
> § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., <u>Prosser and Keeton on Torts</u> § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

<u>Trask v. Franco</u>, 446 F.3d at 1047 (citing <u>Restatement (Second) of Torts</u> § 453 cmt. b (1965)).

### 3. **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'"   <u>Gallagher v. Shelton</u>, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting <u>Green v. Branson</u>, 108 F.3d 1296, 1302 (10th Cir. 1997))(internal alterations omitted).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice." <u>Barney v. Pulsipher</u>, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted). <u>Cf</u>. <u>Bd. of Cty. Comm'rs v. Brown</u>, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its <u>deliberate</u> conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that <u>Ashcroft v. Iqbal</u> limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  <u>See</u> <u>Garcia v. Casuas</u>, 2011 WL 7444745, at *25-26 (citing <u>Dodds v. Richardson</u>, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in <u>Ashcroft v. Iqbal</u> is: "Because vicarious liability is inapplicable to

Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676. The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199. The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but it stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200. It concluded that Ashcroft v. Iqbal does not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200. The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined." Dodds v. Richardson, 614 F.3d at 1200 n.8. Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.  Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right.  In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.  Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.  Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4.  **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers

adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978).  See Bivens, 403 U.S. at 392.  "The qualified immunity analysis is the same whether the claims are brought under *Bivens* or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized by Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 and Bivens, a plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights.   To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. at 818.

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "'hazy border[s]'" of the law.  Saucier v. Katz, 533 U.S. 194, 206 (2001)(quoting Priester v. Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000)). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

**1.     Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, Saucier v. Katz' protocol -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often

be beneficial.  See Pearson v. Callahan, 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted).  See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[12] the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for

---

[12]In Camreta v. Greene, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707.  In Kerns v. Bader, the Tenth Circuit interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances.  See Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011).  The Supreme Court, however, has not stressed the seven circumstances as mandatory.  Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018).  This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-707. See Kerns v. Bader, 663 F.3d at 1181.[13] "Courts should think carefully before expending 'scarce judicial

---

[13]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their

resources' to resolve difficult and novel questions of constitutional or statutory interpretation that

will 'have no effect on the outcome of the case.'"   Ashcroft v. al-Kidd, 563 U.S. 731, 735

_____

conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

(2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[14]  See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182.  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

### 2.  Clearly Established Rights.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  "In determining whether the right was 'clearly established,' the court assesses the objective legal

---

[14]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz worked better.

reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"   Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).   A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."   Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741.   "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"   Reichle v. Howards, 556 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741).   "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639.   "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."   Ashcroft v. al-Kidd, 563 U.S. at 742.   The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.   Saucier v. Katz, 533 U.S. at 205.

"[A] case on point isn't required if the impropriety of the defendant's conduct is clear from

existing case law," but the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188.  In Kerns v. Bader, the Tenth Circuit explained that the relevant question concerning a police search of a home "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added). Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning," Hope v. Pelzer, 536 U.S. 730, 741 (2002), "but 'in light of pre-existing law the unlawfulness must be apparent,'" White v. Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. at  640)

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, see Casey v. City of Federal Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit has since walked back its holding that a sliding-scale is the appropriate analysis, see Aldaba v. Pickens, 844 F.3d 870, 876 (10th Cir. 2016)("Aldaba II").  In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba I") that officers were entitled to qualified immunity after the Supreme Court vacated its decision in light of Mullenix v. Luna, 136 S. Ct. 305 (2015)(per curiam).  In concluding that they had previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from this one. Although we cited *Graham v. Connor*, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it.  Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity.  We also relied on several cases resolving excessive-force claims.  But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876.  The Tenth Circuit further noted that its sliding-scale approach may

have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S. at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that case.  See Aldaba II, 844 F.3d at 874 n.1.  See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10 (10th Cir. 2017).  The Tenth Circuit explained:

> To show clearly established law, the *Hope* Court did not require earlier cases with "fundamentally similar" facts, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741[]. This calls to mind our sliding-scale approach measuring the egregiousness of conduct. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).  But the Supreme Court has vacated our opinion here and remanded for us to reconsider our opinion in view of *Mullenix*, which reversed the Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here." 136 S. Ct. at 312.  We also note that the majority opinion in *Mullenix* does not cite *Hope v. Pelzer*, 536 U.S. 730, [] (2002).  As can happen over time, the Supreme Court might be emphasizing different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1.  Since Aldaba II, the Supreme Court has reversed, per curiam, another Tenth Circuit qualified immunity decision.  See White v. Pauly, 137 S. Ct. at 551.  In concluding that police officers were entitled to qualified immunity, the Supreme Court emphasized: "As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case."  White v. Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. at 640).  With that principle in mind, the Supreme Court explained that the Tenth Circuit "panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment."  White v. Pauly, 137 S. Ct. at 552.  See District of Columbia v. Wesby, 138 S. Ct. at 591 ("Tellingly, neither the panel majority nor the partygoers have identified a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation under similar circumstances.").  Although the Supreme Court noted that "we have held that [Tennessee v.] *Garner*[, 471 U.S. 1 (1985)] and *Graham* do not by themselves create

clearly established law outside 'an obvious case,'" it concluded "[t]his is not a case where it is obvious that there was a violation of clearly established law under *Garner* and *Graham*."  137 S. Ct. at 552.[15]

_____

[15]If the Court is trying -- as it does diligently and faithfully -- to receive and read the unwritten signs of its superior courts, it would appear that the Supreme Court has signaled through its per curiam qualified immunity reversals that a nigh identical case must exist for the law to be clearly established.  As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).  Although still stating that there might be an obvious case under Graham that would make the law clearly established without a Supreme Court or Circuit Court case on point, see White v. Pauly, 137 S. Ct. at 552, the Supreme Court has sent unwritten signals to the lower courts that a factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those unwritten signals to the district courts, see Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 2017 WL 3951706, at *3 (10th Cir. Sept. 8, 2017)(unpublished)(reversing the Court's judgment that the case should proceed where a deceased plaintiff was backing away from the police and was not raising his gun when shot, because "the parties do not cite, nor could we find, any Supreme Court or Tenth Circuit case that is sufficiently close factually to the circumstances presented here to establish clearly the Fourth Amendment law that applies").

Factually identical or highly similar factual cases are not, however, the way the real world works.  Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?"  Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).  The Court concludes that the Supreme Court is

doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, (U.S. Supreme Court, filed Mar. 2, 2018)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as Justice Clarence Thomas has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act." Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017)(Thomas, J., concurring)(internal quotation marks omitted). "Our qualified immunity precedents instead represent precisely the sort of freewheeling policy choice[s] that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(internal quotation marks omitted). The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g, Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba II, 844 F.3d at 874; Rife v. Jefferson, 2018 WL 3660248, at *4-10 (10th Cir. 2018)(unpublished); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 2017 WL 3951706, at *3; Brown v. City of Colo. Springs, 2017 WL 4511355, at *8, and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and

## RELEVANT NEW MEXICO LAW REGARDING IMPLIED EMPLOYMENT CONTRACTS

In New Mexico, "an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise." Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 857 P.2d 776, 779 (citation omitted). At-will employment relationships "can be terminated by either party at any time for any reason or no reason, without liability." Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 857 P.2d at 779. "New Mexico courts have recognized two additional exceptions to the general rule of at-will employment: wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge." Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 857 P.2d at 779.

A promise, or offer, that supports an implied contract might be found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct. See Newberry v. Allied Stores, Inc., 1989-NMSC-024, ¶¶ 6-7, 773 P.2d 1231, 1233 (citation omitted). "Under New Mexico law, a personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlined." See Newberry v. Allied Stores, Inc., 1989-NMSC-024, ¶ 7, 773 P.2d at 1234. The question whether an employment relationship has been modified is a question of fact. See Lukoski

---

neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

v. Sandia Indian Mgmt. Co., 1988-NMSC-002, ¶ 7, 748 P.2d 507, 509.  "An implied contract is created only where an employer creates a reasonable expectation.  The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon."  Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 857 P.2d at 783. If the alleged employer's promise is not sufficiently explicit, the courts will not find an implied contract.  See Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 857 P.2d at 780.

> "Evidence relevant to this factual decision includes the language used in the personnel manual as well as the employer's course of conduct and oral representations regarding it.  We do not mean to imply that all personnel manual[s] will become part of employment contracts.  Employers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason.  Such actions instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual.  However, if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it.  Having announced a policy, the employer may not treat it as illusory."

Lukoski v. Sandia Indian Mgmt. Co., 1988-NMSC-002, ¶ 7, 748 P.2d at 509-10 (quoting Leikvold v. Valley View Community Hosp., 141 Ariz. 544, 548, 688 P.2d 170, 174 (1984)).

"Whether an employer's words and conduct support a reasonable expectation on the part of employees that they will be dismissed only in accordance with specified procedures or for specified reasons generally is a question of fact for the jury."  Mealand v. E. N.M. Med. Ctr., 2001-NMCA-089, ¶ 9, 33 P.3d 285, 289.  "[B]ecause an employee's expectation based on an employer's words or conduct must meet a certain threshold of objectivity, an employer may be entitled to judgment as a matter of law if the employee's expectations are not objectively reasonable."  West v. Wash. Tru Solutions, LLC, 2010-NMCA-001, ¶ 7, 224 P.3d 651, 653.  In deciding whether to grant summary judgment, the question is whether a reasonable jury could find that the words and

conduct support an objectively reasonable expectation that the employees would be dismissed only in accordance with specified procedures and for specified reasons.  See Mealand v. E. N.M. Med. Ctr., 2001-NMCA-089, ¶ 9, 33 P.3d at 289.  "[E]ven where a personnel manual purports to disclaim any intentions of forming contractual obligations enforceable against an employer, a fact finder may still look to the totality of the parties' statements and actions, including the contents of a personnel manual, to determine whether contractual obligations were created."  Beggs v. City of Portales, 2009-NMSC-023, ¶ 20, 210 P.3d 798, 803.

In Gerald v. Locksley, the Court reviewed whether the plaintiff, an assistant football coach for the University of New Mexico, had a contract that the University's Athletics Policies and Procedures covered.  See 785 F. Supp. 2d at 1140.  His contract with UNM stated that his "appointment is governed by applicable policies as stated in the University's Intercollegiate Policies and Procedures Manual."  785 F. Supp. 2d at 1140.  The Court concluded that the University's policies and procedures, in comparison to those in Ruegsegger v. Western New Mexico University Board of Regents, were "similarly broad, suggestive, and 'of a non-promissory nature and merely a declaration of defendant's general approach.'"  735 F. Supp. 2d at 1143 (quoting Ruegsegger v. Bd. of Regents of W.N.M. Univ., 154 P.3d at 688).

**RELEVANT NEW MEXICO LAW REGARDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

"Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement."  Watson Truck & Supply Co., Inc. v. Males, 1990-NMSC-105, ¶12, 801 P.2d 639, 642 (1990)(citations omitted).  "Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶12, 801 P.2d at 642 (internal quotation marks omitted).  An implied covenant of good faith and fair dealing breach

arises when "one party wrongfully and intentionally use[s] the contract to the detriment of the other party." Sanders v. FedEx Ground Package Sys., Inc., 2008-NMSC-040, ¶ 7, 188 P.3d 1200. "It is breached only when a party seeks to prevent the contract's performance or to withhold its benefits from the other party." Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062, ¶ 51, 68 P.3d 909. The Supreme Court of New Mexico has expressed reluctance, however, to use the covenant of good faith and fair dealing "under circumstances where . . . it may be argued that from the covenant there is to be implied in fact a term or condition necessary to effect the purpose of a contract." Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 801 P.2d at 642.

New Mexico has recognized a cause of action for breach of the covenant of good faith and fair dealing sounding in contract. See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857. The Supreme Court of New Mexico has imposed restrictions on such claims. See Beaudry v. Farmers Ins. Exch., 2018-NMSC-012, ¶ 23, 412 P.3d 1100, 1107. "Most important is that 'fully integrated, clear, and unambiguous,' termination provisions are legally enforceable and override a claimed breach of the covenant of good faith and fair dealing when there is no showing that the provisions of the contract were arrived at by 'fraud, or unconscionable conduct.'" Beaudry v. Farmers Ins. Exch., 2018-NMSC-012, ¶ 23, 412 P.3d at 1107 (quoting Melnick v. State Farm Mut. Auto. Ins. Co., 1988-NMSC-012, ¶ 17, 749 P.2d 1105, 1110). The Supreme Court of New Mexico also held that tort recovery for breach of the covenant of good faith and fair dealing are not available for reach of the implied covenant in an employment contract. See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857.

## ANALYSIS

The Court concludes that Lee has alleged facts that are sufficient to state a claim under the Fourteenth Amendment's Due Process Clause. The Court will dismiss Lee's contract claims,

however, because language in UNM's policies and procedures does not create contractual duties. Finally, Lee's Title IX claims are pled with sufficient specificity to support a conclusion that UNM treated Lee differently on account of his gender.

## I.   LEE HAS ALLEGED FACTS SUFFICIENT TO STATE A FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS CLAIM.

Lee has alleged facts sufficient to state a claim for relief under the Fourteenth Amendment's Due Process Clause.  Lee has a protected property interest in his continued enrollment at UNM.  Further, Lee's allegations plausibly support a conclusion that the procedures used in UNM's sexual misconduct investigation do not comport with Due Process.  Lee cannot successfully sue the Defendants for damages, however, because several governmental immunities protect them.

### A.   LEE HAS A PROPERTY INTEREST IN HIS CONTINUED ENROLLMENT AT UNM, BUT HIS ALLEGATIONS DO NOT SUPPORT A LIBERTY INTEREST IN HIS REPUTATION.

As the Defendants conceded at the hearing, see Tr. at 88:24-89:21 (Smith), in the Tenth Circuit, "a student's legitimate entitlement to a public education as a property interest . . . is protected by the Due Process Clause."  Gaspar v. Bruton, 513 F.2d at 850 (concluding that a student in a public vocational-technical school's nursing program had a protected property interest).  The Tenth Circuit's reasoning is based on Goss v. Lopez, which similarly recognized a property right in public high-school education.  See 419 U.S. at 573.  The Tenth Circuit and district courts within I  have since recognized property rights in graduate education from public universities.  See, e.g., Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d at 1181; Harris v. Blake, 798 F.2d at 422.  See also Brown v. Univ. of Kan., 16 F. Supp. 3d at 1288; Assenov v. Univ. of Utah, 553 F. Supp. 2d at 1327; Siblerud v. Colo. State Bd. of Agric., 896 F.

Supp. at 1512-13. "The actual payment of tuition secures an individual's claim of entitlement." Harris v. Blake, 798 F.2d at 422.

UNM is a public institution that the New Mexico legislature established to provide its citizens with post-secondary education. See Due Process Response at 12 (citing N.M. Stat. Ann. §§ 21-7-1 to -45). Here, Lee paid tuition to UNM. See Complaint ¶ 26, at 4. Accordingly, the Court concludes that Lee has a property right in his continued education at the UNM. See Gary Pavela & Gregory Pavela, The Ethical and Educational Imperative of Due Process, 38 J. of Coll. & Univ. L. 567, 583-85 (2012)(discussing why courts and commentators believe Goss v. Lopez's analysis extends to higher education).

Lee's allegations do not support a liberty interest in his reputation. The Supreme Court has stated that damage to "reputation alone, apart from some more tangible interest such as employment," is insufficient to invoke the Due Process Clause's protections. Paul v. Davis, 424 U.S. 693, 701 (1976). Instead, a plaintiff "must show that as a result of the defamation, 'a right or status previously recognized by state law was distinctly altered or extinguished.'" Al-Turki v. Tomsic, 926 F.3 610, 617 (10th Cir. 2019)(quoting Paul v. Davis, 424 U.S. at 711). This is the "stigma-plus" claim sufficient to implicate a constitutionally-protected liberty interest. See Gwinn v. Awmiller, 354 F.3 1211, 1216, 1223-24 (10th Cir. 2004). The Tenth Circuit recognizes deprivation "of the right to attend school" as the sufficient "something more" to implicate the Due Process Clause. Al-Turki v. Tomsic, 926 F.3d at 617. Nevertheless, Lee has not alleged that the false statements were publicized. See Brown v. Univ. of Kan., 16 F. Supp. 3d at 1288. The closest he gets is his allegation that he "will likely be unable to be admitted to any other university given his status," of being expelled. Complaint ¶ 132, at 21. See Complaint ¶¶ 129-31, at 21. The Due Process Clause does not protect such situations, where there is no alleged public dissemination of

the reputation-harming statement.   See McDonald v. Wise, 769 F.3 1202, 1212 (10th Cir. 2014)(where the allegedly defamatory statement was made at a press conference); Asbill v. Hous. Auth. of Choctaw Nation of Okla., 726 F.2d 1499, 1503 (10th Cir. 1984)(not finding a protected interest where the statements were only disseminated within the state government).

**B.   LEE'S ALLEGATIONS PLAUSIBLY SUPPORT A CONCLUSION THAT UNM'S SEXUAL MISCONDUCT INVESTIGATION PROCEDURES DID NOT COMPORT WITH DUE PROCESS.**

"The fundamental requisites of due process consist of notice and an opportunity to be heard at a meaningful time and in a meaningful manner."   Turney v. FDIC, 18 F.3d 865, 868 (10th Cir. 1994).   See Goldberg v. Kelly, 397 U.S. at 267.   Lee alleges flaws in both the notice he received and in the procedures surrounding his opportunity to be heard.   See Due Process Response at 13-21.   Courts analyze three factors to determine procedural adequacy under the Due Process Clause:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. at 335.   See Watson ex rel. Watson v. Beckel, 242 F.3d at 1240. The Supreme Court has counseled that "due process is flexible and calls for such procedural protections as the particular situation demands."   Morrissey v. Brewer, 408 U.S. 471, 481 (1972).

**1.   Taking Lee's Alleged Facts As True, UNM's Procedures Surrounding Lee's Hearing Did Not Comply With Due Process.**

Lee argues that he "should have the opportunity to present evidence, and confront witnesses, in front of an impartial tribunal."   Due Process Response at 15 (citing Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 520-21 (10th Cir. 1998).  These rights are especially important, he contends, where "very complex and complicated fact issues, to include issues of credibility,"

surround the alleged sexual contact.  Due Process Response at 15.  He argues that the UNM's investigator made a determination against him without ever holding a formal hearing, and that he was not allowed to learn the witnesses' identities, attend any witness interviews, acquire the interview recordings, question witnesses regarding factual assertions, or get an opportunity to cross-examine.  See Due Process Response at 16.  Applying Mathew v. Eldridge's balancing test, the Court concludes that Lee's Complaint states a claim that UNM's hearing procedures do not comply with Due Process.

The stakes of Lee's interest are high.  The Defendants concede that Lee has a "substantial" interest in his continued education.  Due Process Memo. at 16; Due Process Reply at 4; Tr. at 56:11 (Smith).  See Siblerud v. Colo. State Bd. of Agric., 896 F. Supp. at 1516 ("Siblerud faced expulsion; therefore his private interest was exceptionally robust.").  Lee had worked for four years towards his Ph.D. and "only needed to finish his dissertation to receive his doctoral degree." Complaint ¶ 130, at 21.  He alleges that he "will likely be unable to be admitted to any other university given his status."  Complaint ¶ 132, at 21.

UNM's interests in limiting procedural safeguards related to students' hearing rights are less evident.  The Defendants argue that UNM "has a strong interest in the 'educational process,' including maintaining a safe learning environment for all of its students, while preserving its limited administrative resources."  Due Process Memo. at 16 (citing Plummer v. Univ. of Houston, 860 F.3d at 773).  See Due Process Reply at 4.  In a footnote in their Due Process Reply, the Defendants argue that, even though UNM has a different disciplinary process for non-sexual misconduct cases, they contend that "it cannot be seriously disputed that UNM has a substantial interest in protecting its students from sexual assault and that requiring UNM to provide a quasi-

judicial process to all students accused of sexual misconduct would impose a substantial fiscal and administrative burden on UNM." Due Process Reply at 4-5 n.2.

The Court concludes that, on the record before it, UNM has a limited interest in not providing many of the procedural safeguards of which Lee complains. The Court previously has noted that the fact "[t]hat UNM provides an evidentiary hearing in cases of alleged non-sexual misconduct but not in cases of alleged sexual misconduct supports Lee's claim that the process he received was constitutionally inadequate." Amended Order at 3. That UNM provides additional protections in other contexts weakens its argument that these same procedures in sexual-misconduct proceedings would impose, as UNM argues, a "substantial fiscal and administrative burden." Due Process Reply at 5 n.2. While holding an evidentiary hearing would impose some burden on UNM, the Defendants have not bolstered their administrative resource argument by distinguishing the burden that UNM already assumes in other proceedings from the burden it hypothetically would face here. Likewise, UNM has little interest in not providing other basic procedural safeguards that Lee alleges harmed him, such as allowing Lee to more fully present his defense, giving Lee notes, recordings, or transcripts of witness interviews, and providing Lee the identity of the witnesses against him.

UNM has a stronger, but not overwhelming, interest in preventing cross-examination of purported victims of sexual assault. The Tenth Circuit has, in several cases, stated that schools have a legitimate interest in providing a safe environment for students. See Butler v. Rio Rancho Pub. Sch. Bd. of Educ., 341 F.3d 1197, 1201 (10th Cir. 2003)("There is no doubt the School has a legitimate interest in providing a safe environment for students and staff."); West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1364 (10th Cir. 2000)("[M]aintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures."); Edwards For

and in Behalf of Edwards v. Rees, 883 F.2d 882, 883-84 (10th Cir. 1989).  In a case that the Tenth

Circuit cited in Watson ex rel. Watson v. Beckel, 242 F.3d at 1243, in support of its own contention

that the plaintiff was not entitled to cross-examination, the United States Court of Appeals for the

Sixth Circuit discusses the prevalence of violence and drug crimes in high schools, and notes:

> In this turbulent, sometimes violent, school atmosphere, it is critically important that we protect the anonymity of students who "blow the whistle" on their classmates who engage in drug trafficking and other serious offenses.  Without the cloak of anonymity, students who witness criminal activity on school property will be much less likely to notify school authorities, and those who do will be faced with ostracism at best and perhaps physical reprisals.

Newsome v. Batavia Local Sch. Dist., 842 F.2d 920, 925 (6th Cir. 1988).  Not allowing students

to cross-examine those who accuse them of sexual assault encourages victims to report and to

stand by their accusations by minimizing the ensuing hassles and burdens.  See Sara O'Toole,

Note, Campus Sexual Assault Adjudication, Student Due Process, and a Bar on Direct Cross-

Examination, 79 Univ. of Pitt. L. Rev. 511, 537-38 (2018).  Indeed, the Department of Education's

Dear Colleague letter encourages colleges and universities to limit cross-examination in these

circumstances.  See Tr. at  33:20-24 (Smith); Complaint ¶ 137, at 22; Blair A. Baker, Note, When

Campus Sexual Misconduct Policies Violate Due Process Rights, 26 Cornell J.L. & Pub. Pol'y

533, 541 (2017).

   If Lee's allegations are true, several of UNM's hearing procedures placed Lee at significant

risk of erroneous deprivation.  According to the Complaint, although Lee denied the allegations

and presented evidence against them, see Complaint ¶¶ 74-75, at 13, UNM did not provide Lee

the opportunity to cross-examine witnesses, see Complaint ¶ 88, at 15.  Lee's inability to cross-

examine his accuser hindered both his ability to present evidence and UNM's ability to assess

witness credibility.

The Supreme Court has stated that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," Davis v. Alaska, 415 U.S. 308, 316, (1974), and called it the "'greatest legal engine ever invented for the discovery of truth,'" California v. Green, 399 U.S. 149, 158 (1970)(quoting 5 Wigmore, Evidence § 1367 (3d ed. 1940)). In the context of student disciplinary proceedings, "courts appear to recognize that denial of *any* opportunity to challenge the credibility of adverse witnesses may deprive an accused university student of due process if the witness's credibility is in issue and the witness is testifying on facts critical to the case." Marie Reilly, Due Process in Public University Discipline Cases, 120 Penn. St. L. Rev. 1001, 1014 (2016)(emphasis in original). See Haidak v. Univ. Mass.-Amherst, 933 F.3d 56, 59 (1st Cir. 2019)("[W]e agree with a position taken by the Foundation for Individual Rights in Education, as amicus in support of the appellant -- that due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, even if only through a hearing panel.[16]'"); Doe v. Baum, 903 F.3d 575 (6th Cir. 2018)("Due process requires cross-examination in circumstances like these . . . ."); Winnick v. Manning, 460 F.2d 545, 550 (2d Cir. 1972)("[I]f this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing."); Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 604-05 (D. Mass. 2016)(Saylor, J.). Credibility is an issue here; Lee alleges that he has continued to deny the Complainant's accusations. See Complaint ¶ 74, at 13. Lee's opportunity to point out flaws in the Complainant's statement is not sufficient. See Doe v. Baum,

---

[16]The Court interprets the United States Court of Appeals for the First Circuit as saying that, at a minimum, a hearing panel must cross-examine the accusing student, not that an accused may submit questions that the hearing panel may ask. See Haidak v. Univ. of Mass.-Amherst, 933 F.3d at 69 ("[W]e have not reason to believe that questioning of a complaining witness by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation.").

903 F.3d at 582 ("Without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives.  Nor can the fact-finder observe the witness's demeanor under that questioning. For that reason, written statements cannot substitute for cross-examination.").

What is worse, Lee's only opportunity to present orally was his October 27, 2015, meeting with Buchs.  See Complaint ¶ 72, at 13.  The Complaint alleges that Buchs and Cordova interviewed Lee's accuser.  Complaint ¶¶ 67-68, at 12.  The Complaint also alleges that Cowan -- not just Buchs and Cordova -- determined witness credibility.  See Complaint ¶ 81, at 14.  See also Complaint ¶ 100, at 16 (alleging that Lee was allowed to present new evidence to Buchs and Cowan).  Lee, therefore, alleges that Cowan, Cordova, and Buchs weighed the witnesses' credibility against each other without necessarily interviewing each witness.  In light of Lee's substantial interest and UNM's weaker interests, not permitting any cross-examination violates Due Process.  See Doe v. Purdue Univ., 928 F.3d at 664 ("[I]t is particularly concerning that Sermersheim and the committee concluded that Jane was the more credible witness -- in fact, that she was credible at all -- without ever speaking to her in person."); Doe v. Baum, 903 F.3d at 583 (holding that, for sexual misconduct disciplinary proceedings, Due Process requires the university to have "some form of *live* questioning *in front of* the fact-finder" (emphasis in original)).

UNM's decision to limit the accused's defense presentation also risks erroneous deprivation.  According to the Complaint, Lee gave his side of the story in an interview on October 27, 2019.  See Complaint ¶ 72, at 13.  Lee alleges that, on October 27, 2015, Buchs interviewed him, and "was accusatory and hostile" towards him.  Complaint ¶ 73, at 13.  See Complaint ¶ 72, at 13.  He also presented a written statement on the same day.  See Complaint ¶ 76, at 13.  The

Defendants did not provide Lee with a hearing before issuing its PLD.  See Complaint ¶ 87, at 15. Lee further alleges that, after he was presented with the PLD, he was allowed only to present new evidence in bullet point form, "was not permitted to make any argument or present a theory of the cased based upon these facts," and was not allowed "to place that new information 'in context.'" Complaint ¶ 105, at 17.  Lee was told at his sanctions hearing that he could not challenge UNM's probable cause finding.  See Complaint ¶ 117, at 19.  Lee also alleges that he was never provided any witness statements, see Complaint ¶ 92, at 16, and "he was not wholly certain what was, or was not, discovered by the investigation," Complaint ¶ 101, at 17, and witnesses were not disclosed to him, see Complaint ¶ 101, at 17.  Limiting an accused from presenting any argument after an initial ruling or placing potentially new evidence into context suggests that the Defendants prioritized administrative efficiency over a rigorous fact-finding process.  It is difficult to see even the "rudiments of an adversary proceeding" in the above procedures.  Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 159 (5th Cir. 1961).  While such a course passes constitutional muster in some circumstances, see, e.g., Gilbert v. Homar, 520 U.S. 924 (1997)(upholding the suspension of a police officer employee without a hearing where the officer was charged with a felony), it provides more evidence in favor of concluding that UNM violated Lee's Due Process rights by subjecting him to a heightened risk of erroneous deprivation.

One limit UNM imposed on the proceedings does not implicate the Due Process Clause. UNM "allowed counsel for Plaintiff to be present at meetings between Plaintiff and UNM's OEO, but did not allow counsel to represent Plaintiff at any meeting that he had with the OEO and/or Defendant Vele Buchs."  Complaint ¶ 84, at 15.  Lee alleges that at his sanctions hearing he was told that his counsel was not allowed to "present any evidence or information at the sanctions hearing and could not speak at the sanctions hearing but that he could only 'pass notes' or 'whisper'

in Plaintiff's ear."  Complaint ¶ 117, at 19.  This is similar to the procedure a large majority of American universities use.  See Tamara Rice Lave, A Critical Look at How Top Colleges and Universities Are Adjudicating Sexual Assault, 71 U. Miami L. Rev. 377, 397 (2017)(noting that thirty-one out of thirty-six surveyed universities permit counsel at student disciplinary hearings as a silent advisor).  Courts express less concern about colleges and universities permitting a limited role for attorneys in student disciplinary proceedings, "[b]ecause such hearings are meant to be more relaxed than judicial hearings, due process generally does not require students to have the right to counsel at disciplinary hearings."  Sarah Holman Loy, Reputation & Fair Results: The Case for School-Funded Counsel in College Sexual Assault Disciplinary Proceedings, 48 J.L. & Educ. 349, 355 (2019).  Ostenn v. Henley, 13 F.3d 221, 225 (7th Cir. 1993)(Posner, J.).  Students therefore do not have a right for counsel to "examine or cross-examine witnesses, to submit and object to documents, to address the tribunal, and otherwise to perform the traditional function of a trial lawyer."  Ostenn v. Henley, 13 F.3d at 225.  See Ellen Mossman, Comment, Navigating a Legal Dilemma: A Student's Right to Legal Counsel in Disciplinary Hearings for Criminal Misbehavior, 160 U. Pa. L. Rev. 585 (2012)("Although some courts have suggested that students should have limited assistance of counsel in certain situations, most have avoided requiring counsel in routine disciplinary hearings.").  Courts have recognized a few limited exceptions to this general rule; in Flaim v. Medical College of Ohio, the Sixth Circuit stated that a right to counsel "may exist if 'an attorney presented the University's case, or [] the hearing [was] subject to complex rules of evidence or procedure."  418 F.3d at 640 (quoting Jakso v. Regents of Univ. of Mich., 597 F. Supp. 1245, 1252 (E.D. Mich. 1984)(Feikens, C.J.)).  Students also have a right to attorney representation when they are subject to parallel criminal proceedings.  See Gorman v. Univ. of R.I., 837 F.2d 7, 16 (1st Cir. 1988); Gabrilowitz v. Newman, 582 F.2d 100, 104 (1st Cir.

1978).  Lee does not allege that any of these circumstances are present here.  See generally Complaint ¶¶ 62-133, at 11-21.  Accordingly, UNM's decision to limit attorney participation in its disciplinary process did not violate Lee's rights under the Due Process Clause.

When balanced against each other, the Mathews v. Eldridge factors set forth above suggest that Lee did not receive a "meaningful opportunity to be heard," In re C.W. Mining Co., 625 F.3d 1240, 1244 (10th Cir. 2010), because UNM did not allow for any cross-examination in determining credibility, and because UNM's procedures unreasonably hindered Lee's ability to present a meaningful defense.  That Lee is four years into his Ph.D. studies and has to complete only his dissertation to earn his degree heightens Lee's already substantial interest in avoiding expulsion, see Complaint ¶ 130, at 21, and the Defendants do not articulate particularly weighty interests in limiting the procedural safeguards they offer students.  While UNM has some interest in limiting cross-examination of those who bring sexual misconduct claims, the Court concludes that Lee's erroneous deprivation risk outweighs UNM's interests.  See Doe v. Baum, 903 F.3d at 584 (holding that, for sexual misconduct disciplinary proceedings at a public university, "if credibility is in dispute and material to the outcome, due process requires cross-examination"); Doe v. Allee, 242 Cal. Rptr. 3d 109, 134 (Ct. App. 2019).

The Court's conclusion does not mean that Lee has a right personally to confront witnesses.  The Court has previously ruled that Maryland v. Craig, 497 U.S. 836 (1990), is still controlling law after Crawford v. Washington, 541 U.S. 36 (2004), see United States v. Sandoval, No. CR 04-2362 JB, 2006 WL 1228953 (D.N.M. March 7, 2006)(Browning, J.), as it held that a five-year-old girl was not required to testify against her father in open court regarding his alleged molestation, because "she will suffer emotional trauma" and "will thus be unable to testify."  2006 WL 1228953, at *12.  Where even a criminal defendant protected by the Confrontation Clause does

not have this right, an accused student appearing before a disciplinary committee does not either. Nevertheless, "the answer is not to deny cross-examination altogether." Doe v. Baum, 903 F.3d at 583. See Maryland v. Craig, 497 U.S. at 857 (holding that, where forcing the alleged victim to testify in the physical presence of the defendant may result in trauma, the court could use an alternative procedure that "ensures the reliability of the evidence by subjecting it to rigorous adversarial testing" through "full cross-examination," and ensuring that the alleged victim could be "observed by the judge, jury, and defendant as they testified"). Accurately weighing witness credibility was important for this proceeding, where the Defendants had to choose between competing versions of events, and Lee was entitled to subject the claims that eventually led to his expulsion to adversarial testing. See Tonkovich v. Kan. Bd. of Regents, 159 F.3d at 520. The Due Process Clause requires at a minimum that UNM's factfinder ask the complaining student questions -- in person -- that the accused student or his counsel has submitted. Doe v. Baum, 903 F.3d at 583.

### 2.   Adjudicating Student Disciplinary Proceedings Under a Preponderance-of-the-Evidence Standard Does Not Offend Due Process.

Since the 2011 Dear Colleague Letter, courts and commentators have vigorously debated the proper standard of review for campus sexual assault proceedings. See Deborah L. Brake, Fighting the Rape Culture Wars Through the Preponderance of the Evidence Standard, 78 Mont. L. Rev. 109, 109 (2017). The Dear Colleague Letter asserts that a clear and convincing standard for these charges is too high and is "'inconsistent with the standard of proof established for violations of the civil rights laws, and . . . thus not equitable under Title IX.'" Michelle J. Harnik, Note, University Title IX Compliance: A Work in Progress in the Wake of Reform, 19 Nev. L.J. 647, 664 (2018)(quoting the Dear Colleague Letter at 11). At the time, "most universities were

already using this standard of proof."  Deborah L. Brake, Fighting the Rape Culture Wars Through the Preponderance of the Evidence Standard, 78 Mont. L. Rev. at 128 (citing multiple studies showing that well over half of American colleges and universities used a preponderance of the evidence standard for sexual assault adjudications).  Confronting the issue for the first time, the Court stated in the Order that the "preponderance of the evidence is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion, given the significant consequences of having a permanent notation such as the one UNM placed on Lee's transcript." Sept. 2018 Order at 3.  The Court, after considering the issue further, removed this sentence in the Amended Order.  See Amended Order at 1 n.1.

The executive branch has also changed its position.  In November 2018, the Department of Education's Office of Civil Rights issued a notice of proposed rulemaking on proper evidentiary standards.  See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61462-01 (proposed Nov. 29, 2018).  While not entirely repudiating the preponderance standard, the Department of Education proposed to limit its application, and suggested that,

> in reaching a determination regarding responsibility, the [University] must apply either the preponderance of the evidence standard or the clear and convincing evidence standard.  The recipient may, however, employ the preponderance of the evidence standard only if the recipient uses that standard for conduct code violations that do not involve sexual harassment but carry the same maximum disciplinary sanction.  The recipient must also apply the same standard of evidence for complaints against students as it does for complaints against employees, including faculty.

83 Fed. Reg. 61462-01, 61477.

The Supreme Court has held that the clear-and-convincing evidentiary standard applies "when the individual interests at stake in a state proceedings are both 'particularly important' and 'more substantial than mere loss of money.'"  Santosky v. Kramer, 555 U.S. 745, 756

(1982)(quoting Addington v. Texas, 441 U.S. 418, 424 (1979)).  The extra evidentiary burden is necessary to preserve fairness in "government-initiated proceedings that threaten the individual involved with 'a significant deprivation of liberty' or 'stigma.'"  Santosky v. Kramer, 455 U.S. at 756 (quoting Addington v. Texas, 441 U.S. at 425).  Within this group of cases, the Supreme Court has recognized deportation hearings, see Woodby v. INS, 385 U.S. 276 (1966), defamation involving a public figure, see Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974), civil confinement proceedings, see Addington v. Texas, 441 U.S. 418, parental rights termination proceedings, see Santosky v. Kramer, 555 U.S. 745, and the withdrawal of life support, see Cruzan v. Director, Mo. Dep't of Health, 479 U.S. 261 (1990).  In Cooper v. Oklahoma, the Supreme Court struck down an Oklahoma statute that required a criminal defendant to prove his incompetence to stand trial by clear-and-convincing evidence rather than a preponderance of the evidence.  See 517 U.S. 348, 369.  The Supreme Court reiterated that "the State's power to regulate procedural burdens [is] subject to proscription under the Due Process Clause if it 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  Cooper v. Oklahoma, 517 U.S. at 367 (quoting Patterson v. New York, 432 U.S. 197, 202 (1977)).  The Tenth Circuit has stated that the clear-and-convincing standard "is typically used in civil cases 'involving allegations of fraud or some other quasi-criminal wrongdoing.'"  Century Sur. Co. v. Shayona Inv., LLC, 840 F.3d 1175, 1177 (quoting Addington v. Texas, 441 U.S. at 424).  Thus, for example, the Tenth Circuit requires clear-and-convincing evidence to support a motion under rule 60(b)(3) of the Federal Rules of Civil Procedure, see Anderson v. Dep't of Health and Human Servs., 907 F.2d 936, 952 (10th Cir. 1990), and to prove civil contempt liability, see F.T.C. v. Kuykendall, 371 F.3d 745, 756 (10th Cir. 2004).  See also Assman v. Fleming, 159 F.2d 332, 336 (8th Cir. 1947).

Thus far, the argument in favor of a clear-and-convincing standard in university sexual misconduct proceedings is restricted to law review articles and notes.  See Michelle J. Harnik, Note, University Title IX Compliance: A Work in Progress in the Wake of Reform, 19 Nev. L.J. at 685 (2018); Jed Rubenfeld, Privatization and State Action: Do Campus Sexual Assault Hearings Violate Due Process?, 96 Tex. L. Rev. 15 (2017); Tamara Rice Lave, Ready, Fire, Aim: How Universities Are Failing the Constitution in Sexual Assault Cases, 48 Ariz. St. L.J. 637 (2016); Nicholas Trott Long, The Standard of Proof in Student Disciplinary Cases, 12 J. Coll. & Univ. L. 71 (1985).  But see Plummer v. Univ. of Houston, 860 F.3d at 780 (Jones, J., dissenting)("Elevating the standard of proof to clear and convincing, a rung below the criminal burden, would maximize the accuracy of factfinding.").  While a few federal courts have addressed this issue, none have concluded that students accused of sexual assault are entitled to a higher standard of proof in disciplinary proceedings.  In Doe v. Brandeis University, the Honorable Dennis Saylor, IV, United States District Judge for the United States District Court for the District of Massachusetts, concluded that Brandeis University's preponderance-of-the-evidence standard for a sexual assault disciplinary proceeding "is not problematic, standing alone."  177 F. Supp. at 607.  Judge Saylor, concluded that the standard was among the reasons Brandeis University's procedures violated the Due Process Clause, but only because it applied a clear-and-convincing standard for "virtually all other forms of student conduct."  177 F. Supp. at 607.  Several other courts have also recently rejected plaintiffs' arguments against a preponderance standard of proof. See Doe v. Va. Polytechnic Inst. & State Univ., 400 F. Supp. 3d 479, 501 (W.D. Va. 2019)(Dillon, J.)(rejecting plaintiff's argument that he was entitled to a more protective standard, because the United States Court of Appeals for the Fourth Circuit has held that trial-like procedures are not required to satisfy the constitution); Doe v. Univ. of Ark-Fayetteville, No. 5:18-cv-05182, 2019

WL 1493701, at *10 (April 3, 2019)(Holmes, J.)("Doe fails to argue how the preponderance of the evidence standard, utilized in similar sexual misconduct civil actions, denies due process. School disciplinary proceedings are not criminal trials.  Standards such a clear and convincing evidence and beyond reasonable doubt are not required in such a civil proceeding.").  See also Ramya Sekaran, Note, The Preponderance of the Evidence Standard and Realizing Title IX's Promise: An Educational Environment Free from Sexual Violence, 19 Geo. J. Gender & L. 643, 655 (2018); Sidney E. McCoy, Note, The Safe Campus Act: Safe for Whom? An Analysis of Title IX and Conservative Efforts to Roll Back Progressive Campus Sexual Misconduct Reform, 122 Penn St. L. Rev. 763, 785 (2018).

In evaluating an evidentiary burden of proof, the Tenth Circuit weighs the three factors that the Supreme Court set forth in Mathews v. Eldridge.  See United States v. Weed, 389 F.3d 1060, 1068 (10th Cir. 2004)(concluding that requiring a defendant found not guilty by reason of insanity to prove by clear-and-convincing evidence that his release would not create a substantial risk of harm satisfies due process).  Lee's private liberty interest is, as discussed above, moderate.  Lee's risk of erroneous deprivation is also moderate; heightening the standard of evidence will make it less likely that UNM erroneously sanctions Lee or others similarly situated.  See Michael S. Pardo, Second-Order Proof Rules, 61 Fla. L. Rev. 1083, 1085 (2009). The state's interest in a lower burden of proof, however, is stronger than its interest in foregoing other procedural safeguards.  If UNM had to use a clear-and-convincing standard to satisfy due process, it would require UNM to expend more resources investigating and adjudicating cases to satisfy the clear-and-convincing threshold.  The heightened standard may also prove difficult and confusing for UNM's administration to apply.  See William C. Kidder, (En)forcing A Foolish Consistency?: A Critique and Comparative Analysis of the Trump Administration's Proposed Standard of Evidence

Regulation for Campus Title IX Proceedings, 45 J.C. & U.L. 1, 16 (2020).  In addition to these efficiency concerns, the higher evidentiary standard also will make it more likely that UNM reaches the wrong outcome.[17]  As a lower evidentiary standard increases the likelihood of accurate outcomes, retaining it implicates UNM's "strong interest in the 'educational process,' including maintaining a safe learning environment for all its students."  Plummer v. Univ. of Houston, 860 F.3d at 773 (quoting Goss v. Lopez, 419 U.S. at 580).

Balancing these interests, the Court concludes that due process permits state education institutions such as UNM to adjudicate sexual misconduct disciplinary proceedings according to a preponderance-of-the-evidence standard.  In addition to its legitimate efficiency concerns, see Gorman v. Univ. of R.I., 837 F.2d at 14-15 (discussing administrative burdens on universities), UNM has a very strong interest in reaching the correct conclusion as it reviews sexual misconduct allegations.  Lee's interests in avoiding expulsion or sanction based on a sexual misconduct allegation are significant, but they do not overcome UNM's interests.  This conclusion accords with the balance other courts have struck.  See Doe v. Va. Polytechnic Inst. & State Univ., 400 F. Supp. 3d at 501; Doe v. Univ. of Ark-Fayetteville, 2019 WL 1493701, at *10; Doe v. Brandeis University, 177 F. Supp. 3d at 607.  Expelling students from a state university for sexual

---

[17]"[T]here exists a consensus among evidence law scholars . . . that increasing the stringency of the standard of evidence . . . will tend to shift the expected ratio of false negative errors versus false positive errors and thereby *lower the overall accuracy* of outcomes in the system."  William C. Kidder, (En)forcing A Foolish Consistency?: A Critique and Comparative Analysis of the Trump Administration's Proposed Standard of Evidence Regulation for Campus Title IX Proceedings, 45 J.C. & U.L. at 12 (emphasis in original)(collecting research).  Reviewing the academic articles Kidder cites reveals that this research presumes unbiased factfinders.  See 45 J.C. & U.L. at 12.  Where, as here, a plaintiff alleges both discrimination and due process violations, the preponderance-of-the-evidence standard can provide cover to biased rulings rather than facilitate accurate proceedings.  The constitutional violation in this scenario is, however, the factfinder's impartiality and not the evidentiary standard.

misconduct also has fewer long-term consequences and is less stigmatizing than other circumstances in which courts have required clear-and-convincing evidence.  See, e.g., E.B. v. Verniero, 119 F.3d 1077, 1110 (3d Cir. 1997)(concluding that, in light of registration's consequences, New Jersey prosecutors must justify a particular sex offender's registration requirement with clear-and-convincing evidence).  A preponderance-of-the-evidence standard is sufficient to satisfy due process.

The Court also concludes that UNM's strict limits on Lee's defense presentation and preparation violate Due Process.  UNM was required to provide Lee with notes, transcripts, or recordings from witness interviews if any were generated, and an oral report if they were not.  See Doe v. Rector & Visitors of George Mason Univ., 149 F. Supp. 3d 602, 619 (E.D. Va. 2016)(Ellis, J.)(concluding that an administrator's off-the-record meetings with a sexual assault accuser is a "glaring procedural deficienc[y]" and that, "where an accused student is not present during proceedings against him, he should be 'given . . . an oral or written report on the facts to which each witness testifies.'" (quoting Dixon v. Ala. State Bd. of Educ., 294 F.2d at 159)).  The Supreme Court of the United States afforded even the high school students suspended for ten days in Goss v. Lopez more process.  See 419 U.S. at 574 (stating that the students were entitled to notice of the charges against them, and, if denied, "an explanation of the evidence the authorities have and an opportunity to present [their] side of the story").  See also Brock v. Roadway Exp., Inc., 481 U.S. 252, 257 (1987)(concluding that failing to provide the accused party in an administrative proceeding with witnesses' names and the substance of their statements deprived the accused of procedural due process); Doe v. Purdue Univ., 928 F.3d at 663 ("[W]ithholding the evidence on which it relied in adjudicating his guilt was itself sufficient to render the process fundamentally unfair").  Further, viewed in light of the Mathews v. Eldridge balancing test, UNM's limitations

on Lee's ability to contest the PLD also violated Due Process.  Lee's interest in his education is substantial, the risks of erroneous deprivation are also great, and any burden on UNM in permitting Lee to argue against the PLD appears slight at this stage of the proceedings.  Due Process required, therefore, that UNM permit Lee to present his full argument against the PLD based on any evidence he deemed relevant and unconstrained by a "bullet point" requirement.  See Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. at 90 ("All that Goss required was an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" (quoting Goss v. Lopez, 419 U.S. at 584)).  As the Supreme Court explained forty-five years ago,

> Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed.  The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process.

Goss v. Lopez, 419 U.S. at 580.

### 3.     Taking Lee's Alleged Facts As True, UNM Provided Lee Inadequate Notice.

Regarding his alleged lack of notice, Lee argues that he "never received adequate, meaningful notice of the allegations or the alleged violation of policy, the severity of the sanction he faced, the policies or procedures that would be followed, or any limitations placed on sexual misconduct findings and hearings."  Due Process Response at 19.  At the July 3, 2018, hearing before the Court, Lee cited three specific notice failings: (i) failure to inform him that he faced expulsion for the charges; (ii) raising underage drinking at the sanctions hearing; and (iii) erroneously informing him that he could not bring in any new evidence at the sanctions hearing.  See Tr. at 42:15-45:17 (Crow, Court).  Lee's and UNM's interests are the same as those

discussed above.  Lee has a "substantial" interest in his education, Due Process Memo. at 16; Due Process Reply at 4; Tr. at 56:11 (Smith), and UNM appears to have only a weak interest in not extending procedural safeguards to students accused of sexual misconduct.

Some of Lee's alleged notice violations do not, however, implicate a serious risk of erroneous deprivation.  For example, Lee alleged that UNM failed to inform him that he faced expulsion.  See Complaint ¶¶ 116, at 19 ("Defendant Chibanga never advised Plaintiff whether he was facing a possible expulsion, but merely pointed Plaintiff to the possible sanctions, which included everything from a verbal warning to expulsion, dismissal and barring from campus."); id. ¶ 154a, at 25.  UNM had already informed Lee that he was banned from campus, see Complaint ¶ 63, at 11, and Lee knew enough about the charges against him to know he potentially faced significant disciplinary action.  It is also doubtful that, before holding the sanctioning hearing and reviewing the evidence, Chibanga could provide Lee with more specific information about which sanction he was likely to receive -- let alone which sanction he would receive.  Lee also appears to have received adequate notice of the procedures that UNM would follow in its investigation.  See Complaint ¶ 65, at 12 (alleging that Cowan met with Lee on September 24, 2015 to discuss the investigation's processes and procedures, confidentiality, and Lee's rights and responsibilities).  With no risk of erroneous deprivation, the Court concludes that these allegations do not state a claim for violations of Due Process.  See Watson ex rel. Watson v. Beckel, 242 F.3d at 1241 (concluding that there was no Due Process violation for an alleged lack of notice where the student would not have benefited from more notice and the burden on the school was "slight").

Two alleged notice failures, however, raise significant risks of erroneous deprivation.  The Defendants' failure to provide Lee notice that they would raise underage drinking claims at his sanctions hearing prevented him from getting a "'meaningful opportunity to present'" his case.

Watson ex rel. Watson v. Beckel, 242 F.3d at 1241 (quoting Mathews v. Eldridge, 424 U.S. at 349).  See Complaint ¶¶ 120-21, at 20.  The Defendants also heightened the risk of erroneous deprivation by informing Lee that he could not bring in any new evidence at the sanctions hearing. See Complaint ¶¶ 118-19, at 19.  This statement appears to conflict with UNM's procedures.  See Handbook at 5 (stating that Administrative Hearings "allow[] the accused student to present evidence to the Student Conduct Officer for consideration"); id. at 8 (stating that in sexual misconduct proceedings, hearings "will be modified as appropriate so as to focus solely on determining what sanction(s) to impose").  Lee's expulsion letter states that UNM determined its sanction was "based on the questions asked of Plaintiff related to drinking and the PLF and FLD." Complaint ¶ 123, at 20.

        The Court concludes that the notice UNM provided at the sanctions hearing violates Lee's Due Process rights.  UNM has provided no interest in either disregarding its own procedures allowing additional evidence related to sanctioning or in not disclosing the conduct on which it intends to base its sanctioning decision.  Given Lee's substantial interest in avoiding expulsion, UNM was required to provide Lee advance notice of all conduct on which it reasonably expected to base its sanctioning decision.  See Staples v. City of Milwaukee, 142 F.3d 383, 385-87 (7th Cir. 1998).  The hearing's circumstances do not suggest the exigency was so important or the hearing so informal that UNM could dispense with notice in the name of administrative efficiency.  See Goss v. Lopez, 419 U.S. at 582 ("There need be no delay between the time 'notice' is given and the time of the hearing.  In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred."); Edwards For & in Behalf of Edwards v. Rees, 883 F.2d at 885 (holding that removing a student from class to interrogate him regarding a bomb threat did not offend Due Process).  Due Process also required UNM to

allow Lee to fully argue any new issues, such as underaged drinking, that were raised at his sanctioning hearing and later constituted part of his expulsion's justification. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 543 (1985)("[S]ome opportunity for the employee to present his side of the case is recurringly of obvious value in reaching an accurate decision. Even where the facts are clear, the appropriateness or necessity of the discharge may not be." (citation omitted)).

C.   **LEE CANNOT SUCCESSFULLY SUE THE DEFENDANTS FOR DAMAGES, BECAUSE VARIOUS IMMUNITIES PROTECT THEM.**

Although Lee has stated a claim for relief under the Due Process Clause, Lee cannot successfully sue the Defendants for damages, because several different immunities protect them. The individual Defendants are entitled to qualified immunity, because Lee's Due Process rights were not clearly established at the time they were violated. UNM is immunized from suit under § 1983, because it is not a "person" as that statute defines it, and the Defendants are entitled to governmental immunity under the New Mexico Tort Claims Act for claims Lee brings under the Constitution of the State of New Mexico.

1.   **The Individual Defendants Are Entitled to Qualified Immunity, Because Lee's Due Process Rights Were Not Clearly Established.**

Qualified immunity protects government officials from personal liability so long as they have not violated a "clearly established" right. Harlow v. Fitzgerald, 457 U.S. at 18. Qualified immunity shields officers who have "reasonable, but mistaken beliefs" and operates to protect them from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205. When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d at 1107;

Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1079.  The Court has already concluded that Lee has stated a plausible claim that the Defendants violated his constitutional rights.  The Court now concludes, however, that Lee's constitutional rights were not clearly established at the time.

Proving that the law was clearly established is a high burden for a plaintiff.  See Ashcroft v. al-Kidd, 563 U.S. at 741 ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.").  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  There are no Supreme Court or Tenth Circuit opinions clearly delineating the appropriate level of procedural safeguards for students accused of sexual misconduct.

The Supreme Court has, however, addressed due process afforded students in disciplinary proceedings in Goss v. Lopez; in that case, students were suspended from Columbus, Ohio public schools without hearings and argued that this procedure violated due process.  See 419 U.S. at 567. The Supreme Court agreed with the students, concluding that "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."  419 U.S. at 581.  The Supreme Court noted that "[t]here need be no delay between the time 'notice' is given and the time of the hearing," and that, although there are exceptions, "as a general rule, notice and hearing should precede removal of the student from school."  419 U.S. at 582.  The Supreme Court also observed that the administrative

burden of affording students maximum process in all circumstances prevented it from holding that "hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." 419 U.S. at 583. Finally, the Supreme Court emphasized its holding's narrowness, stating that "we have addressed ourselves solely to the short suspension, not exceeding 10 days," and that longer suspensions "may require more formal procedures," while shorter suspensions may require less. 419 U.S. at 584.

The Supreme Court addressed a tangential issue in Board of Curators of University of Missouri v. Horowitz, in which it reviewed the procedural safeguards to which students facing academic dismissal are entitled. The Supreme Court distinguished disciplinary dismissals from academic dismissals, and noted that the Constitution "may call for hearings in connection with the former but not the latter." 435 U.S. at 87. See id. at 88-89. It observed that even Goss v. Lopez "stopped short of requiring a *formal* hearing" in a disciplinary setting, 435 U.S. at 89 (emphasis in original), and that whether to dismiss a student for academic reasons was not "readily adapted" to determination via hearing, 435 U.S. at 90. The Supreme Court also noted that Goss v. Lopez concluded that "the value of some form of hearing in a disciplinary context outweighs any harm to the academic environment." 435 U.S. at 90.

The Tenth Circuit has addressed the procedural safeguards to which students are entitled on several occasions, most notably and thoroughly in Watson ex rel. Watson v. Beckel. See also Gossett v. Okla. Ex rel. Bd. of Regents for Langston Univ., 245 F.3d at 1181-82; West v. Derby Unified Sch. Dist. No. 260, 206 F.3d at 1363-65; Edwards For and in Behalf of Edwards v. Rees, 883 F.2d at 885; Harris v. Blake, 798 F.2d 419, 422-24. In Watson ex rel. Watson v. Beckel, the New Mexico Military Institute ("NMMI") expelled a student after NMMI's investigation revealed

that the student had assaulted his roommate, in part because the roommate was Hispanic.  See 242

F.3d at 1238-39.  The Tenth Circuit noted that, while the Supreme Court has not answered what

sort of additional processes long-term suspensions or expulsions require, it had given some

guidance in Goss v. Lopez.  See 242 F.3d at 1240.  The Tenth Circuit then held that the Mathews

v. Eldridge balancing test "is appropriate for determining when additional procedure is due." 242

F.3d at 1240.  Applying this test, the Tenth Circuit concluded that NMMI's failure to provide

written notice specifically listing the charges against the student did not violate due process.  See

242 F.3d at 1240-41.  Even though the burden of providing greater notice was "slight," the Tenth

Circuit stated that written notice was unnecessary where the student had already received oral and

constructive notice.  242 F.3d at 1241.  It further concluded that NMMI did not need to notify the

student that it suspected that the assault was racially motivated, because it could not find "any

precedent for the proposition that notice must include all suspected motives for a student's

actions," 242 F.3d at 1241, and the burden of providing such notice would be great, see 242 F.3d

at 1242.  Finally, the Court rejected the student's request that, for the "'proposed expulsion or

long-term suspension of any student attending a state-supported educational institution,' the

student must be afforded written notice specifying the charges, legal counsel, the presentation of

evidence, the right to cross-examine witnesses, an impartial board, a transcript of the hearing, and

independent review of the decision."  242 F.3d at 1242-43.  The Tenth Circuit concluded that

"precedent indicates that due process does not require all of these rights," and the student lacked

standing to request them, "because he has not demonstrated that he will be subject to future

disciplinary procedures."  242 F.3d at 1243 (citing Gorman v. Rhode Island, 837 F.2d at 16;

Newsome v. Batavia Local Sch. Dist., 842 F.2d at 924).

To support his contention that the Defendants violated his clearly established rights, Lee largely relies on the strength of his arguments that the Defendants violated his constitutional rights under qualified immunity's first prong.  See Due Process Response at 22; Tr. at 79:7-10 (Court, Crow)("Do you want to discuss the [clearly] established prong?"  "That actually was it, your Honor.").  Lee cites Lee v. Kan. State Univ., 2013 WL 2476702, at *7, in his Due Process Response to bolster the clearly established element, but the case is limited support.  See Due Process Response at 22.  Writing before the Supreme Court's decision in White v. Pauly, the Honorable Julie Robinson, United States District Judge for the District of Kansas, defined the right at issue with a high level of generality as "the constitutional right to due process before a student can be deprived of her property interest in her continued graduate education."  2013 WL 2476702, at *7. That Lee is entitled to due process before UNM can expel him is clearly established, see Harris v. Blake, 798 F.2d at 422, but "the clearly established law must be 'particularized' to the facts of the case."  White v. Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. at 640).

Here, the precise contours of Lee's due process rights are not clearly established.  The Tenth Circuit has prescribed Mathews v. Eldridge's balancing test to determine whether procedural safeguards are constitutionally adequate.  See Watson ex rel. Watson v. Beckel, 242 F.3d at 1240. This mandate necessarily requires an intensely fact-specific analysis, which limits predictability and doctrinal development.   See Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 987 (9th Cir. 1998)(O'Scannlain, J.)("Justice Brennan lamented the proliferation of so-called 'balancing tests' in constitutional jurisprudence, warning that the freewheeling multifactor inquiries would pave the road to 'doctrinally destructive nihilism.'  Nowhere is Justice Brennan's observation more apropos than in the realm of qualified immunity, in which 'clearly established' law reigns supreme.").  The Tenth Circuit's one case thoroughly discussing this area of law,

Watson ex rel. Watson v. Beckel, is not sufficiently "particularized," Anderson v. Creighton, 483 U.S. at 640, to Lee's facts for the Court to conclude that it clearly established rights for Lee.  That case rejects some of his alleged due process violations based on its own unique facts, see Watson ex rel. Watson v. Beckel, 242 F.3d at 1242 (rejecting the student's right to counsel and to cross-examine witnesses), but does not address others, such as his claim that he was not notified that he faced expulsion, and his claim that he was told erroneously that he could not present other evidence at his sanctions hearing.  Without clear precedent suggesting that any of Lee's specific procedural due process rights were clearly established, qualified immunity operates here to protect the individual defendants from the "hazy border[s]" in this area of law.  Saucier v. Katz, 533 U.S. at 205.

### 2. Lee Cannot Successfully Sue UNM for Damages, Because it is Not a "Person" Under § 1983.

The Court also concludes that Lee cannot successfully sue UNM for damages, because it is not a "person" under § 1983.  To assert a claim under § 1983, a plaintiff must prove that a "person" violated their constitutionally protected rights.  Summum v. City of Ogden, 297 F.3d at 1000.  A "State agency is not a 'person' within the meaning of § 1983."  Will v. Mich. Dep't of State Police, 491 U.S. at 65.  Further, § 1983 does not extend to actions against state officials acting in their official capacities.  See Will v. Mich. Dep't of State Police, 491 U.S. at 71; Garcia-Montoya v. State Treasurer's Office, 2001-NMSC-003, ¶ 8, 16 P.3d 1084, 1088.  The Defendants agree that, if Lee's plead a constitutional rights violation, his "claim for prospective injunctive relief may proceed against the current president of UNM."  Due Process Reply at 12.  See Will v. Mich. Dep't of State Police, 491 U.S. at 71 n.10.  Unlike the other individual defendants, UNM's current president "has the power to provide [Lee] with the relief he seeks."  Klein v. Univ. of Kan. Med. Ctr., 975 F. Supp. 1408, 1417 (D. Kan. 1997)(Van Bebber, J.).

3.      **The Defendants Are Entitled to Governmental Immunity Under the NMTCA For Violations of the Constitution of the State of New Mexico.**

The Court concludes that the Defendants are entitled to governmental immunity under the NMTCA.  The NMTCA declares that, "governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act."  N.M. Stat. Ann. § 41-4-2(A).  The NMTCA defines "governmental entity" as "the state or any local public body as defined in Subsections C and H of this Section," N.M. Stat. Ann. § 41-4-3(B), and defines "state" or "state agency" to include the State of New Mexico and its "institutions," N.M. Stat. Ann. § 41-4-3(H).  The Constitution of the State of New Mexico, Article XII, Section 11, establishes UNM as a "state educational institution."  Further, the NMTCA defines "public employee" to mean any "officer, employee or servant of a governmental entity." N.M. Stat. Ann. § 41-4-3(F).  Lee alleges that UNM employs each individual Defendant.  See Complaint ¶¶ 11-15, at 3.  "'[A]bsent a waiver of immunity under the Tort Claims Act, a person may not sue the state for damages for violation of a state constitutional right.'"  Valdez v. State, 2002-NMSC-028, ¶ 12, 54 P.3d at 78 (quoting Ford v. Dep't of Pub. Safety, 1994-NMCA-154, ¶ 26, 891 P.2d 546).  No waiver or exclusion applies, because Lee does not allege "bodily injury, wrongful death, or property damage" against any enumerated entity.  N.M. Stat. Ann. §§ 41-4-5 to -12.  Accordingly, the Court concludes that the Defendants are not subject to any claims for money damages against them based on claims brought under the Constitution of New Mexico.

## II.      **LEE'S COMPLAINT STATES A CLAIM FOR RELIEF UNDER TITLE IX.**

Lee conceded his Title IX claim against UNM in the face of the Defendants' argument that the Complaint does not allege facts that establish gender bias.  See Tr. at 2:18-20 (Crow).  Lee did not file a response to the Title IX Motion and made no argument at the hearing.  Cf. Doe v. Brandeis Univ., 177 F. Supp. 3d at 593 n.19.  Although the Defendants cite several district court opinions

dismissing similar claims, see Title IX Memo. at 10 (citing Doe v. Univ. of St. Thomas, 240 F.
Supp. 3d at 991 ("[N]umerous courts have held that 'even if a university treated a female student
more favorably than a plaintiff, during the disciplinary process, the mere fact that plaintiff is male
and the alleged victim is female does not suggest that the disparate treatment was because of
plaintiff's sex'")(quoting Salau v. Denton, 139 F. Supp. 3d 989, 999 (W.D. Mo. 2015)(Bough, J.);
Doe v. Columbia Univ., 101 F. Supp. 3d 356 (S.D.N.Y. 2015)(Furman, J.), overruled by Doe v.
Columbia Univ., 831 F.3d 46 (2d Cir. 2016))), more recent opinions from United States Courts of
Appeals have called the issue into question, and it is becoming more common for courts to permit
these claims.  See Bethany A. Corbin, Riding the Wave or Drowning?: An Analysis of Gender
Bias and Twombly/Iqbal in Title IX Accused Student Lawsuits, 85 Fordham L. Rev. 2665, 2699
(2017).

  In Doe v. Purdue University, the United States Court of Appeals for the Seventh Circuit
reversed a magistrate judge's ruling that the plaintiff had failed to state a claim under Title IX.  See
928 F.3d at 656.  The Seventh Circuit noted that, while the defendant "casts his Title IX claim
against the backdrop of a 2011 'Dear Colleague' letter from the U.S. Department of Education,"
928 F.3d at 668, "the letter, standing alone, is obviously not enough to get [the defendant] over the
plausibility line," 928 F.3d at 669.  Instead, the Seventh Circuit stated that the complaint alleged
"facts raising the inference that Purdue acted at least partly on the basis of sex in his particular
case." 928 F.3d at 669.  The Seventh Circuit said the "strongest" fact alleged is that the Purdue
Title IX coordinator justified her decision by stating that she found the plaintiff's accuser more
credible than the plaintiff -- even though the accuser never spoke with the coordinator and did not
even submit a written statement in her own words.  928 F.3d at 669.  The Seventh Circuit also
noted that the plaintiff alleged that the panel conducting the hearing "appeared to credit [the

accuser] based on her accusation alone, given that they took no other evidence into account." 928 F.3 at 669. Based on these events, the Seventh Circuit concluded that it was plausible that Purdue's Title IX coordinator believed the accuser because she was a woman and disbelieved the plaintiff because he was a man. See 928 F.3d at 669. The fact that a student group who helped the accuser prepare her written statement recently reposted an article from the Washington Post titled "Alcohol isn't the cause of campus sexual assault. Men Are," strengthened this inference. 928 F.3d at 669.

In Doe v. Miami University, 882 F.3d 579 (6th Cir. 2018), the Sixth Circuit reversed a district court's rule 12(b)(6) dismissal of a student's claims against Miami University for violating Title IX. See Doe v. Miami University, 882 F.3d at 584, 593. The Sixth Circuit concluded that the student's claims survived, because his allegations of "statistical evidence" showing "a pattern of gender-based decision-making" and "external pressure" on the university supported a reasonable inference of gender discrimination. 882 F.3d at 593. The student alleged that the ninety percent of students found responsible for sexual misconduct were male and attached an affidavit from an attorney who described "a pattern of the University pursuing investigations concerning male students, but not female students." 882 F.3d at 593. The student also alleged, however, that "pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment -- loss of all federal funds -- if it failed to comply, led Miami University to discriminate against men in its sexual-assault adjudication process" and that a lawsuit "brought by a student who alleged that she would not have been assaulted if the University had expelled her attacker for prior offenses" heightened this pressure. 882 F.3d at 594. In another opinion issued shortly thereafter, the Sixth Circuit noted that the Dear Colleague letter "alone is not enough to state a claim that the university acted with bias in this particular case" but that it still

"provides a backdrop that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim."  Doe v. Baum, 903 F.3d at 586.

The United States Court of Appeals for the Second Circuit reached a similar conclusion in an opinion issued before Lee filed his complaint.  See Doe v. Columbia Univ., 831 F.3d 46.  As it overturned a district court's dismissal of the plaintiff's Title IX claims against Columbia University, the Second Circuit found an inference of sex discrimination in the fact that the university's investigators did not seek to interview witnesses whom the accused student said had information favorable to him, did not follow university procedures, and reached conclusions "that were incorrect and contrary to the weight of the evidence."  831 F.3d at 56-57.  While these facts supported bias, other alleged facts gave plausible support to the student's allegation that the university was biased against him on the basis of his sex:

> As outlined above, the Complaint alleges that during the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students.  It alleges further that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue.  Against this factual background, it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault.

831 F.3d at 57.  In rejecting the district court's conclusion that bias in favor of the female "could equally have been -- and more plausibly was -- prompted by lawful, independent goals," the Second Circuit noted that courts are obliged to "draw reasonable inferences *in favor of* the sufficiency of the complaint."  831 F.3d at 57 (emphasis in original).  The Second Circuit also concluded that the plaintiff's complaint stated a plausible claim of discrimination against Columbia University's Title IX investigator, because the student body had criticized her for past

investigations "in which the University was seen as not taking seriously the complaints of female students" and because she knew Columbia University had previously been criticized for "conducting the investigations in a manner that favored male athletes and that was insufficiently protective of sexually assaulted females."  831 F.3d at 58.

Courts of Appeals have not unanimously reversed Title IX dismissals.  In Doe v. Columbia College Chicago, 933 F.3d 849 (7th Cir. 2019), the plaintiff pointed to the Department of Education's "Dear Colleague" letter and other general evidence from Columbia College's campus suggesting that it was an anti-male environment:

> Doe alleges events aimed at raising awareness of sexual assault issues and a screening of "The Hunting Ground," a film about sexual assault, demonstrate an anti-male bias on campus. Doe also points to Columbia sanctioned social media posts titled the "Presence of Yes" which included statements like, "Teach boys that they are not entitled to women's bodies" and "Misogyny kills: the sexual entitlement that many men have and the ways in which they objectify women are behind the high rates of sexual violence, abuse, and harassment that women experience."

933 F.3d at 855.  The Seventh Circuit rejected Doe's argument that this is sufficient evidence to state a Title IX claim for relief, concluding that the "plaintiff cannot rely on these generalized allegations alone, however, but must combine them with facts particular to his case to survive a motion to dismiss."  933 F.3d at 855.  Doe's allegations that the disciplinary board's decision was against the weight of evidence was not enough and that restricting his access to the investigation's documents was similarly insufficient to demonstrate an anti-male bias.  See 933 F.3d at 856.

There is currently a Court of Appeals split regarding the pleading standard for Title IX cases.  See Doe v. Miami Univ., 882 F.3d 579; Doe v. Columbia Univ., 831 F.3d 46.  In Doe v. Columbia University, the Second Circuit used the burden-shifting framework that the Supreme Court first established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)("McDonnell Douglas"), for discrimination cases to refine pleading requirements under rule

12(b)(6) of the Federal Rules of Civil Procedure.  Under the Second Circuit's McDonnell Douglas doctrine, plaintiffs can create a "temporary 'presumption' of discriminatory motivation" that shifts the burden to defendants to justify their actions with only "'minimal evidence suggesting an inference that the employer acted with discriminatory motivation.'"  Doe v. Columbia Univ., 831 F.3d at 54 (quoting Littlejohn v. City of New York, 795 F.3d 297, 310 (2d Cir. 2015)).  The Second Circuit reasoned that "[t]o the same extent that the McDonnell Douglas temporary presumption reduces the facts a plaintiff would need to *show* to defeat a motion for summary judgment prior to the defendant's furnishing of a non-discriminatory motivation, that presumption reduces the facts needed to be *pleaded* under Iqbal.'"  831 F.3d at 54 (quoting Littlejohn v. City of New York, 795 F.3d at 310).  Under this standard, a complaint states a discrimination claim if "it pleads specific facts that support a minimal plausible inference of such discrimination."  831 F.3d at 56.  A Fordham Law Review article argues that the Second Circuit has the correct approach, and that a "complaint that factually details the wrongful conduct and includes an allegation that the defendant's acts were 'because of' the plaintiff's gender states a plausible claim for relief," and the "causation element does not need additional factual support to comply with Swierkiewicz and Federal Rule of Civil Procedure 8."  Bethany A. Corbin, Riding the Wave or Drowning?: An Analysis of Gender Bias and Twombly/Iqbal in Title IX Accused Student Lawsuits, 85 Fordham L. Rev. at 2706-07.  The author notes that imposing a higher pleading standard contravenes Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002), which held that a civil rights plaintiff need not plead specific facts establishing a prima facie discrimination case but need only contain "'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  Swierkiewicz v. Sorema N.A., 534 U.S. at 508 (quoting Fed. R. Civ. P. 8(a)(2)).  See Riding the Wave or Drowning?: An Analysis of Gender Bias and Twombly/Iqbal in Title IX Accused Student

Lawsuits, 85 Fordham L. Rev. at 2706-07; Doe v. Brown Univ., 166 F. Supp. 3d 177, 189 (D.R.I. 2016)(Smith, J.).

The Sixth Circuit, meanwhile, has explicitly rejected a lower pleading standard under Swierkiewicz v. Sorema N.A. or McDonnell Douglas.  See Doe v. Miami Univ., 882 F.3d at 588-89.  The Sixth Circuit declined to alter its Twombly and Ashcroft v. Iqbal-based pleading standard, because its own precedent reconciled Swierkiewicz v. Sorema N.A, 534 U.S. 506 (2002), differently than the Second Circuit.  See Doe v. Miami Univ., 882 F.3d at 589.  In Keys v. Humana, Inc., 684 F.3d 605 (6th Cir. 2012), the Sixth Circuit ruled that that Twombly and Ashcroft v. Iqbal still apply to a court's assessment of whether "a complaint's factual allegations support its legal conclusion," which is a standard that still "applies to causation in discrimination claims."  Keys v. Humana, Inc., 684 F.3d at 609-10.  The United States Court of Appeals for the Ninth Circuit has rejected the Second Circuit's reasoning in Doe v. Columbia University.  See Austin v. Univ. of Or., 925 F.3d 1133, 1137 (9th Cir. 2019)("We read the Second Circuit's application of the *McDonnell Douglas* presumption at the pleading stage as contrary to Supreme Court precedent, and we decline to embrace that approach.").  See also Doe v. Princeton Univ., 2019 WL 5491561, at *2 n.3 (3d Cir. Oct. 25, 2019)(unpublished); Doe v. Columbia Coll., Chi., 933 F.3d at 856 ("Doe does not allege the particularized 'something more' that is required to survive a motion to dismiss."); Doe v. Trs. of Bos. Coll., 892 F.3d 67, 90 n.13 (1st Cir. 2018)("We take no position as to whether such a presumption applies to Title IX claims because even if it did, it would not affect the outcome of this case."); Doe v. Marymount Univ., 297 F. Supp. 3d 573, 581 (E.D. Va. 2018)(Ellis, J.)(predicting that the Fourth Circuit would also agree with the Sixth Circuit).

The Tenth Circuit applies the McDonnell Douglas burden-shifting framework to Title IX claims at the summary judgment stage, see Hiatt v. Colo. Seminary, 858 F.3d 1307, 1315 n.8 (10th

Cir. 2017)("The *McDonnell Douglas* framework applies both to the Title IX and Title VII sex discrimination claims."); Gossett v. Okla. Ex rel. Bd. of Regents for Langston Univ., 245 F.3d at 1176, but it has not explicitly chosen a side on the Court of Appeals split, see Norris v. Univ. of Colo., Boulder, 362 F. Supp. 3d 1001, 1010 (D. Colo. 2019)(Babcock, J.).  Nothing suggests that the Tenth Circuit would follow the Second Circuit rather than the majority of the Courts of Appeals.  The Tenth Circuit has addressed several Title VII cases in the last decade and never suggested that a plaintiff faces a lighter burden in proving causation.  In Khalik v. United Air Lines, 671 F.3d 1188 (10th Cir. 2012), for example, the Tenth Circuit stated that the plaintiff's allegation the she was targeted because of her race, religion, national origin and ethnic heritage was "not entitled to the assumption of truth because [it is] entirely conclusory."  671 F.3d at 1193. It further concluded that the "*Twombly/Iqbal* standard recognizes a plaintiff should have at least some relevant information to make the claims plausible on their face."  671 F.3d at 1193.  The Tenth Circuit has also affirmed two district courts' dismissals under rule 12(b)(6) for claims that "alleged no facts suggesting a causal connection" between complaints and a retaliatory action. Johnston v. Hunter Douglas Window Fashions, Inc., 715 F. App'x 827, 830 (10th Cir. 2017)(unpublished).   See Asebedo v. Kan. State Univ., 559 F. App'x 668, 673 (10th Cir. 2014)(unpublished).  In another instance, it affirmed, without extensive comment, a district court's use of Twombly and Ashcroft v. Iqbal to dismiss a Title XI claim. See Doe No. 1 v. Boulder Valley Sch. Dist. No. RE-2, 523 F. App'x 514, 515 (10th Cir. 2013)(unpublished).  Given that no Tenth Circuit case has adopted the burden-shifting presumption of Doe v. Columbia University, the Court concludes that Lee's claims are subject to an ordinary pleading standard.[18]  See Norris v. Univ. of Colo., Boulder, 362 F. Supp. 3d at 1011.

---

[18]The Court agrees with the Honorable Harris Hartz, United States Circuit Judge for the

UNM has already faced a similar lawsuit in the District of New Mexico.  Chief Judge

Armijo dismissed plaintiffs' Title IX claim against UNM that arose out of UNM's sexual assault

disciplinary proceedings.  See Ruff v. Bd. of Regents of Univ. of N.M., 272 F. Supp. 3d at 1290.

Chief Judge Armijo recognized a "split in authority" regarding the weight to assign pressure from

students or the federal government to better prosecute sexual assault cases.  272 F. Supp. 3d at

1299 (citing Doe v. Columbia Univ., 831 F.3d at 56, and Wells v. Xavier Univ., 7 F. Supp. 3d 746,

747-51 (S.D. Ohio 2014)(Spiegel, J.), as assigning heavy weight to these allegations, and Doe v.

Cummins, 662 F. App'x 437, 452 (6th Cir. 2016)(unpublished), and Doe v. Univ. of Colo.,

Boulder, 255 F. Supp. 3d at 1074, as concluding that such pressure is insufficient to show an

inference of bias).  She concluded that the "Plaintiffs must allege some fact or facts demonstrating

that outside pressure actually influenced UNM, not just to aggressively pursue sexual assault cases,

but to do so in a manner biased against males."  272 F. Supp. 3d at 1302.  Because the plaintiffs

had not alleged facts demonstrating the pressure influenced UNM to aggressively prosecute males,

Chief Judge Armijo dismissed their claims, noting that "these allegations may support an inference

of a lawful pro-victim bias, but they do not support an inference of unlawful gender bias."  272 F.

Supp. 3d at 1302.

The Court agrees that, standing alone, the "Dear Colleague" letter is insufficient to

demonstrate that UNM adopted anti-male bias in its disciplinary proceedings.  Ruff v. Bd. of

Regents of Univ. of N.M., 272 F. Supp. 3d at 1302.  It is, nevertheless, "one piece of the puzzle,"

that can help state a claim.  Doe v. Loyola Univ. Chi., No. 18 CV 7335, 2020 WL 406771, at *4

_____

Tenth Circuit, that McDonnell Douglas's framework is an "artificial, often confusing, framework,"
that courts should abandon.  Wells v. Colorado Dep't of Transp., 325 F.3d 1205, 1226 (10th Cir.
2003)(Hartz, J., concurring).  The Court would not extend its influence to motions to dismiss when
it arguably should play no role in deciding motions for summary judgment.  See 325 F.3d at 1226-
28.

(N.D. Ill. Jan. 24, 2020)(Gilbert, M.J.).  See Doe v. Purdue Univ., 928 F.3d at 669 ("[T]he letter, standing alone, is obviously not enough to get John over the plausibility line.").  This accords with the Tenth Circuit's recent case addressing the issue, Doe v. University of Denver, 2020 WL 1126638, __ F.3d __ (10th Cir. 2020), which agreed with other Courts of Appeal around the country that have concluded that

> although evidence of the [Dear Colleague Letter] and external pressure placed on the school to conform with its guidance may provide the plaintiff with "a story about why [the school] might have been motivated to discriminate against males accused of sexual assault," such evidence is insufficient in itself to support any inference that the school's actions in a particular case were motivated at least in part by gender bias.

2020 WL 1126638, at * 6,

Lee's Complaint alleges more than just the "Dear Colleague" letter contributed to UNM's anti-male motivations.  In Paragraph 140, Lee states:

> Upon information and belief, during the period preceding the actions taken against Plaintiff stated herein, there was substantial criticism that Defendants failed to take seriously complaints of female students alleging sexual assault by male students.  In fact, the Department of Justice launched an investigation on December 4, 2014, based on multiple complaints about Defendants' handling of reports of students of sexual harassment and sexual assault.

Complaint ¶ 140, at 23.  Lee specifically alleges here that UNM faced pressure to better respond to female complaints against male students, and not all sexual misconduct complaints against all students.  These are similar allegations to those that the Doe v. Columbia University plaintiff made, 831 F.3d at 50-51, and which the Second Circuit held were adequate support for concluding that Columbia's administrators were biased, 831 F.3d at 56.  Further, unlike in Ruff v. Board of Regents of University of New Mexico, UNM's investigation and disciplinary process occurred after the Department of Justice had launched its own investigation into UNM's handling of sexual misconduct claims.  See 272 F. Supp. 3d at 1297.  Taken together, Lee's Complaint suggests non-

trivial reasons why UNM and its employees handling his disciplinary proceeding may have adopted an anti-male bias.

Lee has also made several factual allegations that indicate the Defendants allowed gender bias to affect Lee's disciplinary proceedings. For example, he alleges that UNM failed to follow its own procedures as it adjudicated his case. See Complaint ¶¶ 118-19, at 19; Handbook at 5, 8. Several courts have concluded that failing to follow procedures supports an inference of bias. See Doe v. Columbia Univ., 831 F.3d at 56-57 (identifying failing "to act in accordance with University procedures designed to protect accused students" as an allegation supporting the inference of sex discrimination); Doe v. Salisbury Univ., 123 F. Supp. 3d 748, 766 (D. Md. 2015)(Bredar, J.); Doe v. Loyola Univ. Chi., 2020 WL 406771, at *5. Lee also alleges that the Defendants adopted the Complainants statements as true, "even though the statements were illogical, inconsistent, or contrary to other witnesses," and ignored "all evidence exculpatory to Plaintiff." Complaint ¶ 207, at 33. See id. ¶ 75, at 13 ("Plaintiff pointed out a number of inconsistencies between Complainant's statement and the events of that evening, denied any allegation that any physical contact between Plaintiff and Complainant was non-consensual, and presented documents, to include screen shots of text messages from Complainant, that contradicted Complainant's purported claims."). Again, Courts have found that similar allegations permit an inference of bias:

> The alleged fact that Sessions-Stackhouse, and the panel and the Dean, chose to accept an unsupported accusatory version over Plaintiff's, and declined even to explore the testimony of Plaintiff's witnesses, if true, gives plausible support to the proposition that they were motivated by bias in discharging their responsibilities to fairly investigate and adjudicate the dispute.

Doe v. Columbia Univ., 831 F.3d at 57. Lee alleges that Buchs was also "accusatory and hostile towards Plaintiff" in the October 27, 2015, interview, another allegation suggesting that the

Defendants were biased against him.  Complaint ¶ 73, at 13.  See Doe v. Purdue Univ., 928 F.3d at 669 ("And the panel members' hostility toward John from the start of the brief meeting despite their lack of familiarity with the details of the case . . . further supports the conclusion that Jane's allegation was all they needed to hear to make the decision.").

Drawing all "reasonable inferences *in favor of* the sufficiency of the complaint," the Court concludes that Lee's Complaint states a claim for relief under Title IX.  Doe v. Columbia Univ., 831 F.3d at 57 (emphasis in original).  Lee's allegations regarding the Defendants' hostile attitude towards him, the Defendants' disregard of UNM disciplinary procedures, and their adoption of the Complainant's allegedly illogical, contradictory, and inconsistent account while ignoring evidence exculpating Lee are sufficient to support an inference of bias.  Lee alleges that the Defendants were criticized for not responding to female complaints against male students and felt pressure from both the Department of Justice investigation and the Department of Education's "Dear Colleague" letter to "crackdown on" sexual misconduct allegations against male students.  Complaint ¶¶ 140, 191, at 23, 31.  It is not unreasonable to infer that the Defendants reacted to this pressure by adopting a biased stance against Lee on the basis of his sex.  See Doe v. Lynn Univ., Inc., 235 F. Supp. 3d 1336, 1341–42 (S.D. Fla. 2017)(Rosenberg, J.)("Plaintiff, having alleged that Defendant's representatives were cognizant of criticism levied at Defendant's handling of sexual assault complaints by female students against males and having coupled those allegations with (albeit more general) assertions about similar nationwide pressure, has done enough.").

III.   **LEE CANNOT PROPERLY SUE THE DEFENDANTS FOR BREACH-OF-CONTRACT CLAIMS, BECAUSE UNM'S POLICIES AND PROCEDURES ARE GUIDELINES AND LACK SPECIFIC PROMISSORY LANGUAGE NECESSARY TO CREATE CONTRACTUAL OBLIGATIONS; BECAUSE UNM FOLLOWED ITS PROCEDURES IN HANDLING LEE'S DISPUTE; AND BECAUSE SOVEREIGN IMMUNITY BARS THE CLAIMS.**

Lee accuses UNM of breaching an express agreement in six ways.  See Complaint ¶ 215,

at 34.  He alleges that UNM failed "to abide by its policies and procedures," "conduct a fair and impartial investigation and hearing," "provide [a] fair and impartial sanctioning process," "provide adequate due process," "adequately and properly consider and weigh evidence," and "to allow adequate representation during the investigative and sanctioning processes."  Complaint ¶ 215, at 34.  In his Contract Response, Lee states that the Defendants breached their contract, because they applied "the wrong procedure to the alleged non-sexual misconduct claims," and because they "failed to properly train and conduct a fair and unbiased investigation."  Contract Response at 3-4.  The Court concludes that no contract exists between Lee and UNM, and that, even if there is a contract, UNM did not breach it; moreover, the Court concludes that sovereign immunity bars Lee's claims.  The Court, therefore, dismisses Lee's contractual claims.

###     A.     UNM'S POLICIES AND PROCEDURES LACK SPECIFIC PROMISSORY LANGUAGE NECESSARY TO CREATE CONTRACTUAL OBLIGATIONS.

UNM's student grievance policies and procedures, The Pathfinder -- UNM's Student Handbook, filed December 21, 2017 (Doc. 11-1)("Handbook"), do not create a contract with Lee or any other student.  Lee argues that, because he "signed a document that referenced UNM's policies and procedures, those policies and procedures become incorporated into the agreement between the parties.  Therefore, the disciplinary procedures become part of the entire valid, written agreement between Plaintiff and Defendants."  Contract Response at 6.  Lee also argues that, even if there is not an express contract, he "reasonably expected Defendant to comply with the policies and procedures and would have expected that such policies and procedure related to discipline would be followed by UNM."  Contract Response at 7.  In contrast to other New Mexico cases dismissing implied-contract claims, Lee argues that UNM's "policies and procedures are very

specific as to the type of procedures that will be instituted against a student for disciplinary misconduct." Contract Response at 8.

### 1.     No Express Contract Exists Between Lee and UNM.

First, the Court disagrees with Lee that his Application to UNM creates an express contract binding UNM to follow its Handbook's policies and procedures. The Complaint alleges that the Application "identified and explained the agreement between UNM and Plaintiff and included the policies and procedures the parties shall follow in disciplinary actions." Complaint ¶ 25, at 4. The Application's Question 27 states, however, that, "[i]f I am accepted as a student at the University of New Mexico, I agree to conform and abide by the letter and spirit of all rules, regulations, and procedures of the University." Application at 15. Lee marked "Yes" in response. Application at 14. The Application therefore purports to bind Lee to UNM's policies and procedures, but it does not purport to bind UNM and "lack[s] specific contractual terms" suggesting that the parties entered into an express agreement. Sanchez v. The New Mexican, 1987-NMSC-059, ¶ 12, 738 P.2d at 1324. See Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 7, 857 P.2d at 780 ("Ordinarily, to be legally enforceable, a contract must be factually supported by an offer, an acceptance, consideration, and mutual assent."). In these circumstances, "federal courts have almost uniformly held that, in the absence of any formal agreement between the student and the college, the terms of the contract are implied." Kashmiri v. Regents of Univ. of Cal., 67 Cal. Rptr. 3d 635, 649 (Ct. App. 2007)(citing Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998); Ross v. Creighton Univ., 957 F.2d 410, 417 (7th Cir. 1992); Lyons v. Salve Regina Coll., 565 F.2d 200, 202 (1st Cir. 1977); Johnson v. Schmitz, 119 F. Supp. 2d 90, 93 (D. Conn. 2000)(Arterton, J.)). See also Harwood v. Johns Hopkins Univ., 747 A.2d 205, 209 (Md. 2000)("When a student is duly admitted by a private university . . . there is an implied contract between the student and the

university"); Yu v. Idaho State Univ., 165 Idaho 313, 444 P.3d 885, 890 (2019)("Because a formal contract is rarely prepared [between students and universities], "the general nature and terms of the agreement are usually implied, with specific terms to be found in the university bulletin and other publications.").

### 2.    No Implied Contract Exists Between Lee and UNM.

While the Supreme Court of New Mexico has not addressed the question, see Ruegsegger v. W.N.M. Univ. Bd. of Regents, 2007-NMCA-030, ¶ 23, 154 P.3d at 686-87, courts in numerous states hold that implied contracts exist between universities and their students, and student handbooks and other published policies -- if specific -- help define these implied contracts.  See e.g., Andersen v. Regents of Univ. of Cal., 99 Cal. Rptr. 531, 535 (Ct. App. 1972); Alden v. Georgetown Univ., 734 A.2d 1103, 1111 n.11 (D.C. 1999); John B. Stetson Univ. v. Hunt, 102 So. 637, 640 (Fla. 1924); Sharick v. Se. Univ. of Health Scis., Inc., 780 So. 2d 136, 138 (Fla. Dist. Ct. App. 2000); Yu v. Idaho State Univ., 165 Idaho 313, 444 P.3d at 890; Brody v. Finch Univ. of Health Scis./The Chi. Med. Sch., 698 N.E.2d 257, 265 (Ill. 1998); Amaya v. Brater, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013); Ctr. Coll. v. Trzop, 127 S.W.3d 562, 568 (Ky. 2003); Harwood v. Johns Hopkins Univ., 747 A.2d at 209; Schaer v. Brandeis Univ., 735 N.E.2d 373, 378 (Mass. 2000); Univ. of Miss. Med. Ctr. v. Hughes, 765 So. 2d 528, 535 (Miss. 2000); Behrend v. State, 379 N.E.2d 617, 620 (Ohio Ct. App. 1977); Aase v. S.D. Bd. of Regents, 400 N.W. 2d 269, 270 (S.D. 1987); Reynolds v. Sterling Coll., Inc., 750 A.2d 1020, 1022 (Vt. 2000); Marquez v. Univ. of Wash., 648 P.2d 94, 96 (Wash. Ct. App. 1982).  But see Montany v. Univ. of New England, 858 F.3d 34, 44 (1st Cir. 2017)(noting an absence of authority under Maine law for a contractual relationship between students and universities); Shaw v. Elon Univ., 400 F. Supp. 3d 360, 366 (M.D.N.C. 2019)(Osteen, Jr.); Doe v. Marymount Univ., 297 F. Supp. 3d at 587-88 ("Under

Virginia law, a University's student conduct policies are not binding, enforceable contracts; rather, they are behavior guidelines that may be unilaterally revised by [a University] at any time."); Nickel v. Stephens Coll., 480 S.W.3d 390, 397 (Mo. Ct. App. 2015)("The parties and the Court have not found a case in Missouri that has held that an implied contract for educational services arises between a student and University."); Tedeschi v. Wagner Coll., 49 N.Y. 2d 652 (N.Y. 1980). Given the large number of states whose courts recognize that implied contracts arise from student handbooks, and the limited reasoning of cases taking a contrary position, the Court concludes that the Supreme Court of New Mexico would consider the relationship between universities and their students to be contractual in nature.

Even where the relationship is contractual, however, "a student asserting a breach of contract claim must identify specific terms of the implied contract that were allegedly violated by the college (such as an internal rule, regulation, or code), and failure to do so is fatal to the claim." Rolph v. Hobart and William Smith Colls., 271 F. Supp. 3d 386, 405-06 (W.D.N.Y. 2017)(Wolford, J.). "Not all terms in a student handbook are enforceable contractual obligations . . . and courts will only enforce terms that are 'specific and concrete.'" Knelman v. Middlebury Coll., 898 F. Supp. 697, 709 (D. Vt. 2012)(Reiss, J.)(quoting Reynolds v. Sterling Coll., Inc., 750 A.2d at 1022). "To create contractual rights, however, the terms of the representation must be sufficiently explicit to create a reasonable expectation of an implied contract." Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 2002-NMSC-004, ¶ 22, 41 P.3d 333, 341-42.

Several New Mexico cases inform the Court's analysis whether UNM's Handbook creates a sufficiently specific implied contract. In the first, Ruegsegger v. Western New Mexico Board of Regents, 2007-NMCA-030, 154 P.3d 681 (Pickard, J., joined by Fry and Kennedy, JJ.), the Court of Appeals of New Mexico affirmed a district court's dismissal of breach-of-contract and breach-

of-the-implied-covenant-of-good-faith-and-fair-dealing claims against Western New Mexico University.  See 2007-NMCA-030, ¶ 14, 154 P.3d at 685.  It concluded, after reviewing Western New Mexico's student handbook, that the school was not "contractually obligated to provide investigatory and support services after Plaintiff was sexually assaulted."  2007-NMCA-030, ¶ 16, 154 P.3d at 685.  The Western New Mexico student handbook contained a student code of conduct with sanctions, a description of academic standards and enforcement mechanisms, a provision regarding Western New Mexico's disciplinary committee, a drug and alcohol policy, a nondiscrimination policy, and a section on the Student Appeals Committee that conferred various procedural rights to students.  See 2007-NMCA-030, ¶¶ 25-26, 154 P.3d at 685.  The handbook's sexual harassment policy statement meanwhile "consist[ed] of a general statement of WNMU's commitment to maintaining an environment free of sexual discrimination" and encouraged students to report sexual misconduct.  See 2007-NMCA-030, ¶¶ 27, 154 P.3d at 685.  It also stated that Western New Mexico "'has established the following Crisis Intervention Team to respond to any emergencies concerning sexual assaults.'"  2007-NMCA-030, ¶ 28, 154 P.3d at 687 (quoting the NMSU student handbook).  Last, the handbook noted that "its provisions 'are not to be regarded as a contract' and WNMU specifically reserves the right to amend the handbook at any time."  2007-NMCA-030, ¶ 29, 154 P.3d at 687-88 (quoting the Western New Mexico student handbook).

The Court of Appeals of New Mexico's review of these provisions led it to conclude that the plaintiff "could not reasonably expect, as a matter of law, that Defendants were contractually obligated to perform the investigatory and support services claimed by Plaintiff in her complaint."  2007-NMCA-030, ¶ 36, 154 P.3d at 689.  "[I]nstead of contractually guaranteeing a right to specific types of investigation, support and sanctions," the Court of Appeals of New Mexico concluded that the handbook's provisions "merely provide guidelines for the operation of

WNMU."  2007-NMCA-030, ¶ 30, 154 P.3d at 688.  It also noted that the plaintiff's allegation that Western New Mexico failed to convene a "crisis intervention team" does not state a claim, because the handbook "never requires that such a team be 'convened' nor does it require any specific responsive action by such a 'team.'"  2007-NMCA-030, ¶ 31, 154. P3d at 688.

The Court of Appeals of New Mexico's holding in <u>Ruegsegger v. Western New Mexico Board of Regents</u> is a straightforward application of the Supreme Court of New Mexico's caselaw and is therefore a strong indicator of how the Supreme Court of New Mexico would rule on a similar issue.  The Supreme Court of New Mexico has, for example, stated that a manual's written disclaimers that it is not a contract strongly suggest that reliance on the manual is not reasonable.  <u>See</u> <u>Lukoski v. Sandia Indian Mgmt.</u>, 1988-NMSC-002, ¶ 7, 748 P.2d 507, 509-10 (quoting <u>Leikvold v. Valley View Cmty. Hosp.</u>, 688 P.2d at 174).  Manuals must also be reasonably specific before they are considered as part of an implied contract.  In <u>Hartbarger v. Frank Paxton Co.</u>, for example, the Supreme Court of New Mexico concluded that an employee manual that set forth a list of reasons an employee could be fired did not contractually preclude the employer for firing an employee for a different reason or for any reason at all.  <u>See</u> 1993-NMSC-029, ¶ 18, 857 P.2d 776, 784.  In supporting this conclusion, the Supreme Court of New Mexico noted that there was no statement in the handbook that its policies reflected established procedure, its policies were consistent with at-will employment, and there was no language suggesting either "directly or indirectly" that employees could not be fired at will.  1993-NMSC-029, ¶ 18,  857 P.2d at 784.  Likewise, in <u>Trujillo v. Northern Rio Arriba Electric Cooperative, Inc.</u>, the Supreme Court of New Mexico declined to find an that implied employment contract existed where a handbook delegated choice of discipline to the company's manager, and provided that discipline "may or may not be progressive in terms of one sanction preceding or following another."  2002-NMSC-004, ¶ 23, 41

P.3d 333, 342.  The Supreme Court of New Mexico also concluded that no implied contract based

on an employee handbook existed in Sanchez v. The New Mexican.  See 1987-NMSC-059, ¶ 1,

738 P.2d at 1322.  The newspaper's personnel director had testified that the handbook provided

suggested guidelines and that managers retained complete discretion in every case, see 1987-

NMSC-059, ¶ 7, 738 P.2d at 1323, but the plaintiff argued that the handbook stated "that the

Employer would attempt to give an employee who is in danger of discharge 'repeated warnings,'

and that the Employer would fire an employee without having given such warnings only 'for

cause,'" 1987-NMSC-059, ¶ 7, 738 P.2d at 1323.  On these limited facts -- the opinion does not

quote from the handbook itself -- the Supreme Court of New Mexico concluded that the

handbook's "language is of a non-promissory nature and merely a declaration of defendant's

general approach to the subject matter discussed."  1987-NMSC-059, ¶ 12, 738 P.2d at 1324.

In contrast, the Supreme Court of New Mexico has found implied employment contracts

in cases where manuals contained extensive specific language.  In Newberry v. Allied Stores, Inc.,

1989-NMSC-024, 773 P.2d 1231, it stated that, although an employment manual

> covered a variety of personnel-type matters, it also included a section on
> termination, as well as one on rules and regulation, a violation of which was
> "sufficient grounds for disciplinary actions ranging from a warning to immediate
> dismissal."  The section on involuntary termination states: "To be discharged as the
> result of rule infractions, poor performance, or other 'cause' is a situation you and
> only you, control."  This statement suggests that it was T-Bird's policy not to
> terminate employment except for a good reason.  Based on the totality of the parties'
> relationship and surrounding circumstances, it is clear that the manual controlled
> the employee-employer relationship and that Newberry could expect T–Bird to
> conform to the procedures in the policy guide.

Newberry v. Allied Stores, Inc., 1989-NMSC-024, ¶ 10, 773 P.2d at 1235 (quoting the defendant's

policy manual).  The Supreme Court of New Mexico also found an implied employment contract

in Garcia v. Middle Rio Grande Conservancy District, where the employee handbook "contains

provisions relating to most every aspect of an employment relationship, including job description,

compensation (including salary on promotion, demotion, or transfer), overtime, compensatory time, time clock violations, tardiness, sick leave and annual leave, and holidays," and described specific termination and demotion procedures.  1996-NMSC-029, ¶ 12, 918 P.2d at 11.

The Court has also addressed a similar issue.  In Gerald v. Locksley, the Court dismissed an implied contract claim under rule 12(b)(6).  See 785 F. Supp. 2d at 1140.  The plaintiff, an assistant UNM football coach, argued that his employment contract incorporated UNM's Athletics Policies and Procedures.  See 785 F. Supp. 2d at 1140.  The Court reviewed UNM's whistleblower and campus violence provisions, which, at the time, "'strongly encourage[d]'" reporting misconduct, expressed a commitment to protecting whistleblowers, and told employees what they "'should'" do when faced with misconduct.  Gerald v. Locksley, 785 F. Supp. 2d at 1143.  In comparison to the policies at issue in Ruegsegger v. Western New Mexico University Board of Regents, the Court concluded that UNM's policies were "similarly broad, suggestive, and 'of a non-promissory nature and merely a declaration of defendant's general approach.'"  Gerald v. Locksley, 785 F. Supp. 2d at 1143 (quoting Sanchez v. The New Mexican, 1987-NMSC-059, ¶ 12, 738 P.2d at 1324).  While UNM required some employees to report their supervisors' violent actions, UNM's procedures detailing what was to occur after these reports were vague.  See Gerald v. Locksley, 785 F. Supp. 2d at 1144-45 (discussing Incident Assessment Team procedures).

The Court concludes that UNM's Handbook is not "sufficiently specific, explicit, or mandatory to create a reasonable expectation that UNM would provide a particular response."  Gerald v. Locksley, 785 F. Supp. 2d at 1145 (citing Hartbarger v. Frank Paxton Co., 1993-NMSC-029, 857 P.2d at 783).  First, the Handbook's preliminary sections suggest that, like the Handbook in Ruegsegger v. Western New Mexico University Board of Regents, the disciplinary procedures are guidelines rather than guarantees to specific rights.  For example, in § 1.10, the Handbook

states that "[r]easonable deviations from these procedures by UNM will not invalidate a decision or proceeding unless significant prejudice results."   Nothing in the Handbook limits UNM's discretion in deviating from its procedures.   See Handbook 1-9; Fellheimer v. Middlebury Coll., 869 F. Supp. 238, 244 (D. Vt. 1994)(Parker, C.J.)(concluding that, where a handbook explicitly permitted reasonable deviations from its procedures, "the College can breach its obligation to students only by deviating from its own procedures in such a way that the disciplinary action at issue is fundamentally unfair, arbitrary or capricious.").

Section 4.1 also states that UNM "may take disciplinary action against a student for a violation of the Student Code of Conduct," appearing to leave this discretion in UNM's hands. Handbook § 4.1, at 4.  See Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 2002-NMSC-004, ¶ 23, 41 P.3d at 342 (noting, in concluding that no implied contract existed, that an employee manual's language reserved the right to impose discipline within the employer's discretion).  The Handbook further states that its policies are "Subject to Change Without Notice," Handbook at 1.  Courts reviewing similar language have concluded that a disclaimer such as this one means that it is not reasonable for a student to believe that a handbook represents a contractual agreement, see, e.g., Doe v. Rider Univ., No. 3:16-cv-4882-BRM-TJB, 2020 WL 634172, at *16 (D.N.J. Feb. 4, 2020)(Martinotti, J.); Huang v. Univ. of Pikeville, No. 7:18-CV-11-REW, 2019 WL 5929260, at *11 (E.D. Ky. Nov. 12, 2019)(Wier, J.); George v. Averett Univ. of Danville, Va., No. 4:19-CV-00008, 2019 WL 3310517, at *3 (W.D. Va. July 23, 2019)(Kiser, J.)("Student Handbooks that permit the school to make unilateral changes at any given time are not binding contractual agreements"); Doe v. Univ. of Chi., No. 16 C 08298, 2017 WL 4163960, at *10 (N.D. Ill. Sept. 20, 2017)(Chang, J.); Doe v. Wash. and Lee Univ., 2015 WL 4647996, at *11 (W.D. Va. Aug. 5, 2015)(Moon, J.); Cook v. Talladega Coll., 908 F. Supp. 2d 1214, 1224 (N.D. Ala. 2012)(Hopkins,

J.); Torrespico v. Columbia Coll., No. 97 C 8881, 1999 WL 1144915, at *4 (N.D. Ill. Dec. 9,

1999)(Hibbler, J.); Easley v. Univ. of Mich. Bd. of Regents, 627 F Supp. 580, 586 (E.D. Mich.

1986)(Feikens, C.J.).  See also Garrity v. Overland Sheepskin Co. of Taos, 1996-NMSC-032, ¶ 12,

917 P.2d 1382, 1386 ("Given the express reservation of the right to terminate an employee for any

reason, Overland Outfitters' written personnel policy cannot be said to have created any reasonable

expectation of an implied contract.").

       In light of the vast number of courts that have ruled that similar language that it is not

specific enough to create a contract between students and universities, the Court concludes that the

Supreme Court of New Mexico would not hold that UNM's Handbook represents a contract.

While UNM Handbook's procedures thus provide more rigorous guidance for sexual assault

proceedings than the guidelines at issue in Gerald v. Locksley, see Handbook at 7-8, UNM has

still reserved considerable flexibility.  The Handbook alerts students that UNM may alter its

procedures for sexual misconduct sanctions hearings, but it leaves unspecified the modification's

extent.  See Handbook at 8.  Section 4.4(C) states that sexual misconduct hearings "will be

modified as appropriate" to focus on determining what sanctions to impose.  Handbook at 8.

Nothing in the Handbook suggests a limit on UNM's ability to modify the hearing.  See Handbook

at 7-8.  See Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 13, 918 P.2d at

11 ("The Personnel Policy is so specific so that employees may reasonably rely on its provisions

and may expect that the MRGCD will conform as well.").  Where UNM has not said explicitly it

may not always follow disciplinary procedures, suggests that it will make reasonable deviations

from these procedures, told students that any procedures can be changed without notice, and

reserved the power to modify hearing procedures as it sees fit, students cannot "reasonably expect"

that UNM is promising to comply with the Handbook's procedures.  Newberry v. Allied Stores,

Inc., 1989-NMSC-024, ¶ 7, 773 P.2d at 1234.

> ### 3.      The Court Will Dismiss Lee's Claims for Breach of the Implied-Covenant-of-Good-Faith-and-Fair Dealing.

The Court will dismiss Lee's claim for breach of the implied-covenant-of-good-faith-and-

fair-dealing.  See Complaint ¶¶ 218-22, at 34-35.  As just discussed, Lee fails to allege a contract

between himself and UNM.  Without a contract, there is no cause of action for breach of the

implied-covenant-of-good-faith-and-fair-dealing.  See Sanders v. FedEx Ground Package Sys.,

Inc., 2008-NMSC-040, ¶¶ 7-9, 188 P.3d 1200, 1203; Azar v. Prudential Ins. Co. of Am., 2003-

NMCA-062, ¶ 53, 68 P.3d 909; Rolph v. Hobart & William Smith Colls., 271 F. Supp. 3d at 406.

> ### B.     EVEN IF THERE IS A WRITTEN CONTRACT, LEE'S ALLEGED FACTS DO NOT SUPPORT A CONCLUSION THAT UNM BREACHED THE CONTRACT.

UNM's policies for sexual misconduct disciplinary proceedings are in § 4.4 of the

Handbook.  Section 4.4(B) states that sexual misconduct allegations "will be referred to the OEO

for investigation pursuant to OEO's Discrimination[19] Claims" and that the OEO will issue a Final

Letter of Determination at the end of its investigation.  Handbook § 4.4(B), at 7.  Section 4.4(B)

also grants students the right to appeal "as provided for in OEO's Discrimination Claims

Procedure."  Handbook § 4.4(B), at 7.  The Handbook states that, after the OEO issues its Final

Letter, the OEO "will refer the matter to the Dean of Students Office to determine the sanction."

Handbook § 4.4(C), at 7.  The Student Conduct Officer then decides which hearing to conduct

under §§ 4.2(B)(iii) and (iv), in consultation with the accused, and these hearings are "modified as

---

[19]The Handbook defines "discrimination" to include "acts of sexual harassment, sexual misconduct, and sexual violence as described in University Administrative Policy #2740." Handbook § 4.4(A)(i) at 7.

appropriate as to focus solely on determining what sanction(s) to impose." Handbook § 4.4(C), at 8. The Handbook states that accused students have the right to appeal their sanction if "there was significant procedural error in the sanctioning process" and/or if "the severity of the sanction is grossly disproportionate to the violation(s)." Handbook § 4.4(D), at 8.

While the Court concluded <u>supra</u> that UNM's decision to forbid Lee from presenting evidence on the newly raised underage drinking allegations violated Due Process, UNM's Handbook anticipates the decision to modify the sanctioning hearing. The Complaint's alleged facts show that UNM followed its own process, such that even if the Handbook represents a contract with Lee, UNM did not breach it. The OEO "received a report from the University of New Mexico Police Department regarding an alleged sexual incident involving Plaintiff and another person." Complaint ¶ 62, at 11. On February 25, 2016, the OEO "issued a Final Letter of Determination." Complaint ¶ 106, at 17. Lee appealed this decision to UNM's President and Board of Regents. <u>See</u> Complaint ¶ 110, at 18. Lee was then referred to the UNM Dean of Students for sanctions. <u>See</u> Complaint ¶ 114, at 18. A Dean of Students employee contacted Lee to discuss the sanctions process. <u>See</u> Complaint ¶ 115, at 18. UNM afforded Lee the opportunity to appeal his sanction. <u>See</u> Complaint ¶ 124, at 20. In all respects, UNM followed its own procedures. Based on these facts, even assuming UNM and Lee had a contract based on the Handbook, Lee cannot argue justifiably that UNM breached any express provision of that contract.

## C.   SOVEREIGN IMMUNITY BARS LEE'S CONTRACTUAL CLAIMS.

N.M. Stat. Ann. § 37-1-23(A) grants governmental entities "immunity from actions based on contract, except actions based on a valid written contract." The statute is a "prophylactic measure to protect the public treasury," and "requires at a minimum that [the plaintiff] obtain a valid written contract in order to maintain a lawsuit to enforce those promises." <u>Univ. of N.M.</u>

Police Officer's Ass'n v. Univ. of N.M., 2005-NMSC-030, ¶ 21, 120 P.3d 442, 447.  New Mexico courts have recognized, in some instances, an implied written contract satisfies this requirement in the employment context.  See Handmaker v. Henney, 1999-NMSC-043, 992 P.2d 879; Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, 918 P.2d 7.  But see Trujillo v. Gonzalez, 1987-NMSC-119, 747 P.2d 915 (concluding that Taos County was immune from a breach of an oral promise to hire the plaintiff for two years); Campos de Suenos, Ltd. v. Cty. of Bernalillo, 2001-NMCA-043, 28 P.3d 1104 (declining to extend Garcia v. Middle Rio Grande Conservancy Dist. beyond the employment context).  The Honorable Michael D. Bustamante, then-Judge for the Court of Appeals of New Mexico, noted a divide between Campos de Suenos, Ltd. v. Cty. of Bernalillo, 2001-NMCA-043, 28 P.3d 1104, and Trujillo v. Gonzalez, 1987-NMSC-119, 747 P.2d 915 – both of which seemingly recognized sovereign immunity for implied contracts -- and Handmaker v. Henney, 1999-NMSC-043, 992 P.2d 879 and Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, 918 P.2d 7 -- which did not.  See Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M., 2004-NMCA-050, ¶ 31, 92 P.3d 667, 674.  After analyzing these cases' facts, he concluded that New Mexico courts generally upheld sovereign immunity for the state when "address[ing] issues surrounding the creation of new contractual relationships" but that sovereign immunity is likely waived in cases "involv[ing] disagreements about the details of an existing employment relationship evidenced by a writing."  Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M., 2004-NMCA-050, ¶ 37, 92 P.3d at 674 (Bustamante, J., concurring).  See id. at ¶¶ 32-26.

The Supreme Court of New Mexico adopted Judge Bustamante's analysis on appeal -- stating that courts should recognize sovereign immunity where parties dispute whether a contract was formed but not dismiss claims based on sovereign immunity when courts had to perform

contract interpretation.  See Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M., 2005-NMSC-030, ¶ 10, 120 P.3d at 445 (quoting Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M., 2004-NMCA-050, ¶ 37, 92 P.3d at 674 (Bustamante, J., concurring)).  In light of this favorable citation, the Court concludes that the Supreme Court of New Mexico, if it confronted the issue, would limit New Mexico's sovereign immunity waiver for implied-in-fact contracts to instances where there is already an existing contractual relationship, as the Court of Appeals of New Mexico has done to date.  See Quarrie v. N.M. Inst. of Mining & Tech., 2014 WL 11456616, at *2 )("No New Mexico court has allowed an implied contract to override a claim of governmental immunity outside of the employment context.").  Lee does not ask the Court to use UNM's policies and procedures to interpret an already existing, indisputable contract between the two parties; instead, he wants the Court to conclude that UNM's policies and procedures themselves represent the contract.  This area is one area that the Supreme Court of New Mexico has suggested is appropriate for governmental immunity.  See Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M., 2005-NMSC-030, ¶ 18, 120 P.3d at 446 ("Here, we have what no one seriously questions is a 'valid written contract.'  That threshold finding is critical because without it the University is clearly immune from a lawsuit." (quoting Campos de Suenos, Ltd. v. Cty. of Bernalillo, 2001-NMCA-043, ¶ 13)); Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 23, 793 P.2d at 862.  Sovereign immunity therefore bars Lee's contractual claims, because there is no "valid written contract." N.M. Stat. Ann. § 37-1-23(A).

Lee's argument to the contrary is unavailing.  He contends that sovereign immunity does not bar his contractual claims, because there is an "imbalance of power" between UNM and its students, which extending the doctrine could help ameliorate.  Contract Response at 9 (citing Campos de Suenos, Ltd. v. Cty. of Bernalillo, 2001-NMCA-043, ¶ 27, 28 P.3d at 1112).  In

Campos de Suenos, Ltd. v. County of Bernalillo, the Court of Appeals of New Mexico stated that

sovereign immunity is waived for implied-in-fact employment contracts, because doing so

"addresses the imbalance of power between the parties and enforces the reasonable expectations

employers create in their employees."  2001-NMCA-043, ¶ 26, 28 P.3d at 1112.[20]  It stated that

"contracts for employment represent a unique body of law.  They must be considered in light of

the at-will employment rule which allows an employer to terminate an employee 'for good cause,

for no cause or even for cause morally wrong.'"  2001-NMCA-043, ¶ 26, 28 P.3d at 1111 (quoting

Vigil v. Arzola, 1983-NMCA-082, 699 P.2d 613, 617).  Given the public policy concerns behind

New Mexico's statutory sovereign immunity, see, e.g., Univ. of N.M. Police Officer's Ass'n v.

Univ. of N.M., 2005-NMSC-030, ¶ 21, 120 P.3d at 447 ("To protect the taxpayer, the statute puts

the risk of loss on those seeking promises from the government."), the Court of Appeals of New

Mexico concluded that the business entity plaintiff was better able to bear the financial risk of

failing to formalize an agreement in an express written contract, see 2001-NMCA-043, ¶¶ 29-30,

28 P.3d at 1112 (citing Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 23, 793, P.2d at 862).

---

[20]The Court concludes that the Supreme Court of New Mexico would agree with the Court of Appeals from New Mexico.  The Supreme Court of New Mexico abolished common law sovereign immunity in 1975 and denounced its rationalizations.  See Hicks v. State, 1975-NMSC-056, ¶ 8-9, 544 P.2d 1153, 1155-56.  It has recognized that N.M. Stat. Ann. § 37-1-23(A) reinstates the doctrine but declined to specify why unwritten employment contracts are exempt.  See Handmaker v. Henney, 1999-NMSC-043, ¶ 19 n.2, 992 P.2d 879, 886; Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶¶ 13-23, 793 P.2d at 859-62 (discussing N.M. Stat. Ann. § 37-1-23(A)'s legislative history).  It has, however, suggested that it looks especially favorably on government employees under implied contracts, noting that, "[i]n the field of government employee contracts, our courts have been particularly sensitive to an employee's reliance upon extrinsic evidence to aid in interpreting an existing employment relationship evidenced by a writing."  See Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M., 2005-NMSC-30, ¶ 18, 120 P.3d at 446.  In light of this statement, Campos de Suenos, Ltd. v. County of Bernalillo's thorough analysis, and the fact that the Supreme Court of New Mexico's declined to review that analysis, see 27 P.3d 476 (Table), the Court concludes that the Supreme Court of New Mexico would follow the Court of Appeals of New Mexico's reasoning.

No similar imbalance of power exists here.  Due Process protects public university students from deprivation of their educational interests.  See Gaspar v. Bruton, 513 F.2d at 850; Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ., 245 F.3d at 1181.  The Due Process Clause does not, however, protect at-will government employees without "a legitimate expectation of continued employment."  Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir. 1998). Thus, public universities may not summarily expel students, but public employers generally may fire at-will employees without restriction.  See Connick v. Myers, 461 U.S. 138, 147 (1983)("[A]bsent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."); Bishop v. Wood, 426 U.S. 341, 350 ("The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions."); Arnett v. Kennedy, 416 U.S. 134, 168 (1974)(Powell, J., concurring)("[T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.").  There is thus no "practical basis" to extend sovereign immunity waiver to Lee.  Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 19, 918 P.2d at 12.

IT IS ORDERED that: (i) the Defendants' Motion to Dismiss Plaintiff's Due Process Claims, filed December 21, 2017 (Doc. 9), is granted in part and denied in part; (ii) the Defendants' Motion to Dismiss Plaintiff's Title IX Claim, filed December 21, 2017 (Doc. 7), is denied; (iii) the Defendants' Motion to Dismiss Plaintiff's Contract Claims, filed December 21, 2017 (Doc. 8), is granted; (iv) Counts I and II in Lee's Complaint for Injunctive and Declaratory Relief and Damages, filed in federal court on December 14, 2017 (Doc. 1-1)("Complaint"), as pled against Defendants Laura Vele Buchs, Heather Cowan, Francie Cordova, and Megan Chibanga, in their

individual and official capacities, are dismissed with prejudice; (v) Counts IV, V, and VI in Lee's

Complaint are dismissed with prejudice; and (vi) Buchs, Cowan, Cordova, and Chibanga are

terminated as Defendants in this action.  The Court does not dismiss Plaintiff J. Lee's Title IX and

Due Process claims against UNM or his Due Process claim against UNM's president.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Aryln G. Crow
Alana M. De Young
Adams + Crow Law Firm
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Quentin Smith
Leah M. Stevens-Block
Jackson Loman Stanford & Downey, P.C.
Albuquerque, New Mexico

     *Attorneys for the Defendants*