IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

J. LEE,

       Plaintiff,

vs.                                             No. CIV 17-1230 JB/LF

THE UNIVERSITY OF NEW MEXICO,
a public university, THE BOARD OF
REGENTS OF THE UNIVERSITY OF
NEW MEXICO, individually and in their
official capacities, ROBERT G. FRANK,
individually and in his official capacity,
LAURA VELE BUCHS, individually and in
her official capacity, HEATHER COWAN,
individually and in her official capacity,
FRANCIE CORDOVA, individually and in
her official capacity, MEGAN CHIBANGA,
individually and in her official capacity,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

     **THIS MATTER** comes before the Court on the Defendants' Motion for Summary

Judgment, filed February 6, 2020 (Doc. 70).  The Court held a hearing on September 28, 2020.

See Clerk's Minutes at 1, filed September 28, 2020 (Doc. 106).  The primary issues are: (i) whether

Plaintiff J. Lee, a University of New Mexico ("UNM") doctoral student, admitted to the UNM

Police Department ("UNMPD") that he engaged in nonconsensual sexual contact with a UNM

freshman, Jane Roe,[1] while Roe was incapacitated from alcohol; (ii) whether, during UNM's

investigation into the alleged sexual assault, UNM relied on a credibility determination regarding

---

[1]The Defendants refer to this woman as Jane Roe "to protect the privacy of the young
woman who was the victim of an alleged sexual assault."  Memorandum Brief in Support of
Defendants' Motion for Summary Judgment at 2, n.5, filed February 6, 2020 (Doc. 71).  The Court
therefore will refer to the alleged victim as Roe throughout this Memorandum Opinion and Order.

Roe's statements in making its finding that Lee had violated UNM's sexual misconduct policies; (iii) whether the Defendants, UNM, the Board of Regents of UNM, and current UNM President Garnett S. Stokes,[2] violated Lee's due process rights by expelling him from UNM without providing him with a hearing; (iv) whether the Defendants violated Lee's due process rights by prohibiting Lee from cross-examining witnesses; (v) whether the Defendants violated Lee's due process rights by failing to provide him with access to evidence considered during the investigation; (vi) whether the Defendants violated Lee's due process rights by employing an inquisitorial model of factfinding, where the investigator, Ms. Laura Vele Buchs, both presided over the investigation and determined that Lee violated UNM's sexual misconduct policies; (vii) whether the Defendants violated Lee's due process rights, because Buchs held actual bias against Lee; (viii) whether the Defendants violated Lee's due process rights, because Buchs applied a preponderance-of-the-evidence standard when she decided that Lee violated UNM's sexual misconduct policies; and (ix) whether the Defendants violated Lee's due process rights ,because they did not notify him that the UNM Dean of Students ("DOS") would consider his provision of alcohol to minors when it decided that expulsion from UNM was an appropriate sanction.  The Court concludes that the Defendants have not violated Lee's due process rights, because: (i) Lee's statements to the UNMPD constitute admissions to having nonconsensual sexual contact with Roe while she was incapacitated; (ii) Roe's credibility was not at issue, because the UNM Office of Equal Opportunity ("OEO") relied almost exclusively on Lee's admissions to the UNMPD that he

---

[2]The Court previously dismissed Laura Vele Buchs, Heather Cowan, Francie Cordova, and Megan Chibanga, on qualified immunity grounds.  See Lee v. Univ. of New Mexico, 449 F. Supp. 3d 1071, 1080 (D.N.M. 2020)(Browning, J.).  On July 21, 2020, the parties filed a Stipulation of Dismissal of Plaintiff's Title IX Claim, in which they agreed to dismiss Lee's Title IX claim.  See Stipulation of Dismissal of Plaintiff's Title IX Claim, filed July 21, 2020 (Doc. 96).

had engaged in nonconsensual sex with Roe while she was incapacitated in determining that Lee violated UNM policies; (iii) the Defendants provided Lee with at least four in-person opportunities to be heard on the charges against him -- including a hearing with counsel present -- as well as opportunities to provide written statements characterizing his conduct; (iv) the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States of America does not require the Defendants to allow Lee to cross-examine witnesses in any form -- because Roe's credibility is not at issue, this would be a fruitless exercise; (v) the Defendants provided Lee with summaries of all evidence which the OEO considered in its decision that Lee violated UNM policy, including detailed synopses of interviews with witnesses, and allowed Lee to supplement the evidentiary record;  (vi) the inquisitorial model of factfinding satisfies the Due Process Clause in university disciplinary proceedings, because non-adversarial models of truth seeking, coupled with opportunities to challenge a single factfinder's decision, are an appropriate means of deciding critical administrative matters; (vii) Lee has not overcome the Court's presumption that Buchs was fair and impartial during her investigation, and, even if Buchs is biased towards Lee, Lee had a separate administrative hearing with the DOS, as well as opportunities to appeal both Buchs' decision and the DOS' sanctioning decision to UNM's President and Board of Regents; (viii) the preponderance-of-the-evidence standard satisfies the Due Process Clause, because university disciplinary proceedings are not quasi-criminal; and (ix) the Due Process Clause does not require universities to provide students notice of every factor that they consider in determining appropriate sanctions for violations of university policies; regardless, actual notice in advance of Lee's sanctions hearing would have been impracticable because (a) he admitted during the sanctions hearing that he provided alcohol to minors; (b) Lee's previous statements to the OEO and the UNMPD indicated that he had provided alcohol to minors; (c) and the DOS gave Lee constructive

notice that it would consider his provision of alcohol to minors when it informed Lee before the hearing that the hearing officer would consider evidence presented in the hearing, along with evidence collected during the OEO investigation, when setting his sanction.    Accordingly, the Court grants the Defendants' Motion for Summary Judgment.

## FACTUAL BACKGROUND

On February 25, 2016, the OEO found that Lee had violated UNM's sexual misconduct policies.  See Defendants' MSJ Memo ¶ 19, at 9 (asserting this fact); FLOD at 3.  On July 6, 2016, Lee received notice that he has been expelled from UNM because he had violated UNM's sexual misconduct polices.  DOS Sanctions Letter at 22, dated July 6, 2016, filed February 6, 2020 (Doc. 71-3)("DOS Sanctions Letter").  See Defendants' MSJ Memo ¶ 25, at 11 (asserting this fact). Lee's administrative challenges to the OEO's finding and his subsequent expulsion ultimately failed.  See Defendants' MSJ Memo ¶ 20, at 9 (asserting this fact); Minutes of the Regular Meeting of the Board of Regents of UNM at 14 (dated May 13, 2016), filed February 6, 2020 (Doc. 71-3)("Meeting Minutes").

1.      **The "Dear Colleague" Letter.**

On April 4, 2011, the United States Department of Education ("USDOE") issued a letter providing school districts, colleges, and universities ("schools") with guidance on how to meet their obligations under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681 et seq., and its implementing regulations, 34 C.F.R. § 106.[3]  See United States Department

---

[3]Lee attaches a copy of the Dear Colleague Letter to his Response, and includes additional material facts related to the Dear Colleague Letter.  See Response at 11.  The Defendants do not dispute Lee's characterization of the Dear Colleague Letter.  See Reply at 10 (admitting this fact). D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").  The Court, therefore, concludes that the Dear Colleague Letter's contents are not in dispute, and summarizes the Dear Colleague Letter to the extent its contents are relevant to the Court's analysis.

of Education Office of Civil Rights Letter at 1 (dated April 4, 2011), filed March 23, 2020 (Doc. 76-6)("Dear Colleague Letter"); id. at 1 n.1 (identifying the Dear Colleague Letter as a significant guidance document).  The Dear Colleague Letter advises that Title IX prohibits sex discrimination in education programs, and that sexual harassment -- including sexual violence -- is a form of sex discrimination.  See Dear Colleague Letter at 1.  Sexual violence, the Dear Colleague Letter states, includes "physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol," or where a person cannot consent "due to an intellectual or other disability."  Dear Colleague Letter at 1.  The Dear Colleague Letter next lists acts of sexual violence, including "rape, sexual assault, sexual battery, and sexual coercion."  Dear Colleague Letter at 1-2.

The Dear Colleague Letter advises schools regarding grievance procedures for sex discrimination complaints.  See Dear Colleague Letter at 8 (citing 34 C.F.R. § 106.8(b)).  The Dear Colleague Letter instructs schools that Title IX permits, but does not require, schools to utilize separate grievance procedures for sex discrimination complaints and other student disciplinary complaints.  See Dear Colleague Letter at 8.  The Dear Colleague Letter continues that, although grievance procedures "may include voluntary informal mechanisms (e.g., mediation) for resolving some types of sexual harassment complaints, . . . it is improper for a student who complains of harassment to be required to work out the problem directly with the alleged perpetrator . . . ."  Dear Colleague Letter at 8; id. ("[I]n cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis.").  The Dear Colleague letter accordingly urges schools to state in their grievance procedures that the school will not employ mediation to resolve sexual assault complaints.  See Dear Colleague Letter at 8; Student Handbook at 8 ("The options of

mediation and informal disposition . . . are not available when the accused student has been found

to have engaged in prohibited discrimination . . . ."); OEO Discrimination Claims Procedure at 3.

The Dear Colleague Letter emphasizes that schools must provide "a complainant a prompt

and equitable resolution" under Title IX.  Dear Colleague Letter at 8.  The Dear Colleague Letter

lists "elements that are critical to achieve compliance" with Title IX's requirements:

> Notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;

> Application of the procedures to complaints alleging harassment carried out by employees, other students, or third parties;

> Adequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence;

> Designated and reasonably prompt time frames for the major stages of the complaint process;

> Notice to parties of the outcome of the complaint; and

> An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

Dear Colleague Letter at 9.

Subsequently, the Dear Colleague Letter expands on several of these elements.  See Dear

Colleague Letter at 9-14.  First, student grievance procedures for resolving sex discrimination

claims "should be . . . easily understood, easily located, and widely distributed" as well as

"prominently posted on school Web sites" and "sent electronically to all members of the school

community . . . ."  Dear Colleague Letter at 9.  See Student Handbook at 7; OEO Discrimination

Claims Procedure at 4.

Second, the Dear Colleague Letter discusses how schools should ensure "adequate,

reliable, and impartial investigation of complaints."  Dear Colleague Letter at 9.  The Dear

Colleague Letter notes that although sexual misconduct under Title IX may constitute a criminal violation, standards for criminal violations differ from sex discrimination claims; thus, an activity may still violate Title IX even if it is not criminal.  See Dear Colleague Letter at 9.  Furthermore, the Dear Colleague Letter insists that schools still must investigate sex discrimination claims under Title IX even if a criminal investigation is underway.  See Dear Colleague Letter at 10.  The Dear Colleague Letter continues that schools should inform complainants of their right to file a criminal complaint, and advises schools not to discourage complainants from filing criminal complaints.  See Dear Colleague Letter at 10.

The Dear Colleague Letter counsels schools that a "clear and convincing" evidentiary standard is "inconsistent with the standard of proof established for violations of the civil rights laws, and [is] thus not equitable under Title IX."  Dear Colleague Letter at 11.  Consequently, the Dear Colleague Letter instructs schools to apply a preponderance-of-the-evidence standard when investigating sex discrimination claims.  See Response at 11 (asserting this fact); Reply at 10 (admitting this fact);  Dear Colleague Letter at 10-11 (citing Desert Palace, Inc. v. Costa, 539 U.S. 90, 99 (2003); Steadman v. SEC, 450 U.S. 91, 98-102 (1981); Price Waterhouse v. Hopkins, 490 U.S. 228, 252-55 (1989); Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007)).  See also Deborah L. Brake, Fighting the Rape Culture Wars Through the Preponderance-of-the-evidence Standard, 78 Mont. L. Rev. at 128 (concluding that "most universities were already using this standard of proof" in 2011 and "citing multiple studies showing that well over half of American colleges and universities used a preponderance-of-the-evidence standard for sexual assault adjudications).

Next, the Dear Colleague Letter urges schools to provide the parties "an equal opportunity to present relevant witnesses and other evidence" throughout the investigation.  Dear Colleague

Letter at 11.  For example, "if a school chooses to allow parties to have their lawyers participate in the proceedings, it must do so equally for both parties."  Dear Colleague Letter at 12.  Moreover, the Dear Colleague Letter "strongly discourages schools from allowing the parties personally to question or examine each other during the hearing" because such questioning "may be traumatic or intimidating, thereby possibly escalating or perpetuation a hostile environment."   Dear Colleague Letter at 12.  See MOO, 449 F. Supp. at 1071 ("[T]he Dear Colleague letter encourages colleges and universities to limit cross-examination in . . . circumstances[]" involving "sexual assault" accusations.); Bd. of Regents Admissions at 5 (quoting the same passage in the Dear Colleague Letter).  Further, the Dear Colleague Letter encourages schools to provide an appeals process.  See Dear Colleague Letter at 12; OEO Discrimination Claims Procedure at 4.  If schools provide an appeals process, they "must do so for both parties," and "must maintain documentation of all proceedings."  Dear Colleague Letter at 12.  See OEO Discrimination Claims Procedure at 4.

        The Dear Colleague Letter next delineates qualifications for persons involved in a school's grievance procedures.  See Dear Colleague Letter at 12.  First, they should have "training or experience in handling complaints of sexual harassment and sexual violence" including "applicable confidentiality requirements."  Dear Colleague Letter at 12.  Further, in sexual violence cases, the factfinder should have specific training regarding sexual violence -- for example, "if an investigation or hearing involves forensic evidence, that evidence should be reviewed by a trained forensic examiner."  Dear Colleague Letter at 12 n.30.  Finally, all "conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed."  Dear Colleague Letter at 12.  The Dear Colleague Letter insists that schools "must provide due process to the alleged perpetrator[]" but "should ensure that steps taken to accord due process rights to the

alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant." Dear Colleague Letter at 12

Third, the Dear Colleague Letter expands upon its instruction that schools should provide "designated and reasonably prompt time frames." Dear Colleague Letter at 12. The Dear Colleague Letter announces that school grievance procedures should detail time frames for: (i) the school's investigation; (ii) the school will provide the parties with the complaint's outcome; and (iii) when the parties may file an appeal. See Dear Colleague Letter at 12. Although investigations take sixty days on average, the timeline "will vary depending on the complexity of the investigation and the severity and extent of the harassment." Dear Colleague Letter at 12.

Finally, the Dear Colleague Letter discusses its requirement that schools should provide "notice of outcome." Dear Colleague Letter at 13. Schools "must notify parties in writing" regarding the outcome of the complaint and any subsequent appeal. Dear Colleague Letter at 13. Moreover, under the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232(g) ("FERPA"), schools may disclose information about student sanctions where the sanction directly relates to the complainant; for example, if the school orders an accused student to refrain from contacting the complainant. See Dear Colleague Letter at 13. The Dear Colleague Letter also suggests education and prevention tactics schools may employ, including education programs. See Dear Colleague Letter at 14. The USDOE has since rescinded the Dear Colleague Letter. See MOO, 449 F. Supp. at 1129-30.[4]

_____

[4]In the MOO, the Court explained that

In November 2018, the Department of Education's Office of Civil Rights issued a notice of proposed rulemaking on proper evidentiary standards. See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61462-01 (proposed Nov. 29, 2018). While not entirely repudiating the preponderance standard, the Department

2.      **The Alleged Sexual Assault.**

In the fall of 2015, Lee was a thirty-one-year-old graduate student at UNM.  See Defendants'

MSJ Memo ¶ 1, at 2 (asserting this fact)(citing Deposition of Jong Hoon Lee at 14:1-21 (dated

August 30, 2019), filed February 6, 2020 (Doc. 71-1)("Lee Depo"); id. at 15:9 to 17:23).[5]  Lee

lived in student housing at UNM -- Lobo Village -- and had three roommates.  See Defendants'

MSJ Memo ¶ 1, at 2 (asserting this fact)(citing Lee Depo. at 14:1-21; id. at 15:9-17:23).[6]  John

Goodnight, who was nineteen years old, was one of Lee's roommates.  See Defendants' MSJ

Memo ¶ 1, at 2 (asserting this fact)(citing Lee Depo. at 14:1-21; id. at 15:9-17:23).[7]  Lee went with

---

> of Education proposed to limit its application, and suggested that, in reaching a
> determination regarding responsibility, the University must apply either the
> preponderance-of-the-evidence standard or the clear and convincing evidence
> standard.  The recipient may, however, employ the preponderance-of-the-evidence
> standard only if the recipient uses that standard for conduct code violations that do
> not involve sexual harassment but carry the same maximum disciplinary sanction.
> The recipient must also apply the same standard of evidence for complaints against
> students as it does for complaints against employees, including faculty.  83 Fed.
> Reg. 61462-01, 61477.

MOO, 449 F. Supp. at 1129-30.

[5]Lee, as he does with nearly all facts in the Defendants' MSJ Memo, purports to dispute the facts detailed in Defendants' MSJ Memo ¶ 1, at 2, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff."  Response to Defendants' Motion for Summary Judgment at 2-3, filed March 23, 2020 (Doc. 76)(citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)).  Rule 401 of the Federal Rules of Evidence states that evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and that fact "is of consequence in determining the action."  Fed. R. Evid. 401(a)-(b).  "Irrelevant evidence is not admissible."  Fed. R. Evid. 402.  The Court has previously held, however, that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis section" of the opinion.  SEC v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).  Further, Lee's background at UNM is relevant, because he argues that UNM violated his due process rights in a myriad of ways when UNM expelled him. See Response at 15-30.

[6]For the reasons stated in n.5, supra, the Court considers this fact.

Goodnight to an event at UNM's anthropology museum, Maxwell Museum, on the evening of September 18, 2015.  See Defendants' MSJ Memo ¶ 2, at 2 (asserting this fact)(citing Lee Depo. at 23:19-24:25; id. at 27:1-17).[8]  Goodnight planned to meet Roe, a nineteen-year-old freshman at UNM, at the event.  See Defendants' MSJ Memo ¶ 2, at 2 (asserting this fact)(citing Lee Depo. at 23:19-24:25; id. at 27:1-17).  After the event, Lee, Goodnight, and Roe returned to Lobo Village together.  See Defendants' MSJ Memo ¶ 2, at 2 (asserting this fact)(citing Lee Depo. at 23:19-24:25; id. at 27:1-17).  Later that evening, the UNMPD received a 911 call from Roe, who had locked herself in her car.  See Defendants' MSJ Memo ¶ 3, at 2 (asserting this fact)(citing State of New Mexico Supplemental Report at 1 (dated September 18, 2015), filed February 6, 2020, (Doc. 70-1)("Fisher Supp. Rpt.")).[9]  UNMPD Officer Michael Fisher arrived at Lobo Village at 10:21

---

[7]For the reasons stated in n.5, supra, the Court considers this fact.

[8]Lee again, as he does with nearly all facts laid out in the Defendants' MSJ Memo, disputes the facts described in Defendants' MSJ Memo ¶ 1, at 2, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff."  Response at 3 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)).  The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra.  Further, Lee's initial meeting with Roe is relevant to Lee's claim that he did not know the identity of witnesses interviewed during the OEO investigation.  See Response at 14.

[9]Lee contends that there are disputed facts "whether Plaintiff was locked in her car or if she locked herself in the car."  Response at 3 (citing Jong Hoon Lee OEO Statement at 13 (no date), filed February 6, 2020 (Doc. 71-2)).  The Lee OEO Statement does not dispute whether Roe locked herself in her car.  See Lee OEO Statement at 13.  The Court, therefore, finds this fact admitted.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Lee also disputes these facts as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff."  Response at 3 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)).  The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra.  That Roe locked herself in her car and called the police is relevant, because it was included in the police reports upon which the OEO relied in making its sexual misconduct finding.  See Preliminary Letter of Determination at 27, filed February 6, 2020 (Doc. 71-2)("PLOD")(explaining that the police report states that "upon arrival Complainant was locked in her vehicle, 'intoxicated and not able to stand up,''[Roe's] speech was

p.m., where he interviewed both Goodnight and Lee.  See Defendants' MSJ Memo ¶ 3, at 2 (asserting this fact); Response at 3 (admitting this fact).  Fisher interviewed Goodnight and Lee, recorded those interviews, and documented them in a written report.  See Defendants' MSJ Memo ¶ 3, at 2 (asserting this fact)(citing Fisher Supp. Rpt. at 1).[10]  After the interview, the UNMPD transported Lee to the police station, where Lee participated in another interview that was audio-recorded and documented in a written police report.  See Defendants' MSJ Memo ¶ 3, at 2 (asserting this fact); UNMPD Felony Supplemental Report at 36 (dated Oct. 5, 2015), filed Feb. 6, 2020 (Doc. 71-1)("UNMPD Felony Supplemental Report").[11]

---

slurred and there was an odor of alcoholic beverage coming from inside the vehicle'")(quoting Fisher. Supp. Rpt.).

   [10]Lee purports to dispute whether "Office Fisher documented any taped interviews with Plaintiff and Mr. Goodnight in a police report."  Response at 3.  Lee continues that "Defendants cite no evidence demonstrating Officer Fisher's police report is a transcription of his taped interviews with Plaintiff and Mr. Goodnight . . . ."  Response at 3.  Lee acknowledges that Fisher interviewed Goodnight and Lee on September 18, 2015 after the alleged sexual assault.  See Lee Depo. at 705:5-24; id. at 74:10-77:19.  Moreover, Fisher's report indicates that his "contact with Lee and Goodnight was recorded on my department voice recorder."  Fisher Supp. Rpt. at 2.  The Defendants aver that Fisher "recorded" his interviews with Lee and Goodnight, and subsequently "documented" them in the report.  Defendants' MSJ Memo MSJ ¶ 3, at 2.  The Defendants do not allege that Officer Fisher's report is a transcription of his interviews with Lee and Goodnight.  Defendants' MSJ Memo MSJ ¶ 3, at 2.  The Defendants, however, provided an audio recording and transcript of Fisher's interview with Lee.  See Transcript of Audio Recording Labeled: Ex. C-1 -- Audio Recording of Lobo Village Interview of Jong Lee at 31 (undated), filed February 6, 2020 (Doc. 71-1)(certifying the audio quality as "fair").  Lee cites to no evidence demonstrating that Fisher's report does not "document[]" his conversations with Lee and Goodnight.  Defendants' MSJ Memo ¶ 3, at 2.  See Response at 3; Fisher Supp. Rpt. at 2.  The Court, therefore, concludes that there is no dispute whether Fisher's report documented his interviews with Lee and Goodnight.  See Fisher Supp. Rpt. at 2; D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

   [11] Lee again, as he does with nearly all facts in the Defendants' MSJ Memo, disputes the facts in the Defendants' MSJ Memo ¶ 3, at 2, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff."  Response at 3 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)).  The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra.  Lee notes that this fact "references evidence not considered by the OEO," including "the

### 3. **Lee's Conversations with the Police.**[12]

---

UNMPD Felony Supplemental Report, and therefore should not be considered by this Court." Response at 3.  First, the PLOD notes that Lee "went to the police station in a police vehicle, on [his] own accord to make [a] statement[]" after his interview with Fisher. PLOD at 22, 28.  The PLOD also states that "a [UNMPD] Significant Events Form (dated September 18, 2015), a State of New Mexico Uniform Incident Report (dated September 18, 2015), and a State of New Mexico Supplemental Report (dated September 18, 2015) are of record."  PLOD at 16.  It is unclear whether the OEO specifically considered Lee's police station interview; the UNMPD summarizes this interview in a police report titled "University of New Mexico Police Department Felony Supplemental Record."  UNMPD Felony Supplemental Report at 36.  "In a civil case, police reports may be admissible as public records under rule 803(8)(a)(ii) of the Federal Rules of Evidence."  Dorato v. Smith, 108 F. Supp. 3d 1064, 1071 n. 6 (D.N.M. 2015)(Browning, J.).  Here, the Court discusses only the portions of the UNMPD Felony Supplemental Report that include the officer, Detective R. Duren's first-hand observations, as well his interviews with Lee.  See Dorato v. Smith, 108 F. Supp. 3d at 1071 n.6; Walker v. Spina, 2018 WL 6519133, at *15 (D.N.M. Dec. 11, 2018)(Browning, J.)(admitting a police report under rules 803(8)(a)(iii) and 801(d)(2)).  Lee does not raise hearsay objections about the Court's consideration of the UNMPD Felony Supplemental Report.  See Response at 4-5.  Lee also argues that the Court should not consider statements from his deposition because he argues this deposition is "evidence not considered by the OEO . . . and, therefore, should not be considered by this Court."  Response at 4 (citing Argo v. Blue Cross and Blue Shield of Kansas, 452 F.3d 1193, 1199 (10th Cir. 2006).  The case Lee cites is not directly applicable here, as it only discusses the general standard for considering evidence at the summary judgment stage.  See Argo v. Blue Cross and Blue Shield of Kansas, 452 F.3d 1193, 1199 (10th Cir. 2006).  The fact at issue also has ample support elsewhere in the record. See UNMPD Felony Supplemental Report  at 36.  The Defendants can rely on Lee's statements as the statements of a party opponent; they are non-hearsay.  See Rawers v. United States, No. CIV 19-0034 JB\CG, 2020 WL 5663427, at *1 n.2 (D.N.M. Sept. 23, 2020)(Browning, J.)(admitting a defendant's statements regarding the car accident at issue to a police officer as statements of a party opponent).  Lee cannot offer his own statements if he is offering them for the truth of the matter asserted.  See Rawers v. United States, 2020 WL 5663427, at *1 n.2 (holding that a plaintiff's own statements, "when she offers them herself, are hearsay without any exception to save their admissibility").

    [12]At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party when there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c). In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States of America stated that:

> "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.  That was the case here

Lee informed Officer Fisher that Roe and Goodnight were "playing Blackjack and taking shots" and "that at first everything seemed fine but then [Roe] became very intoxicated." Fisher Supp. Rpt. at 1. See Defendants' MSJ Memo ¶ 5, at 3 (asserting this fact).[13] Lee informed the UNMPD that he observed Roe "drink three shots of whiskey." UNMPD Felony Supplemental Report at 39 (dated Oct. 5, 2015), filed Feb. 6, 2020 (Doc. 71-1)("UNMPD Felony Supplemental

---

with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape

Scott v. Harris, 550 U.S. at 380-81 (emphases in original). In Scott v. Harris, the video record clearly contradicted the plaintiff's version of events. See 550 U.S. at 380-81. The Supreme Court, therefore, concluded that a court may not adopt a "blatantly contradicted" version of the facts at the summary judgment stage. 550 U.S. at 380-81. The United State Court of Appeals for the Tenth Circuit also has concluded that, where an audio recording of an event "'blatantly contradicts'" a plaintiff's version of the facts at the summary judgment stage, the court should not adopt the plaintiff's version of the facts to the extent that the audio recording "'blatantly contradicted'" them. York v. City of Las Cruces, 523 F.3d 1205, 1210-11 (10th Cir. 2008)(concluding that a tape recording which only captured part of the events and was often unintelligible did not blatantly contradict the plaintiff's version of the evidence)(quoting Scott v. Harris, 550 U.S. at 380). See Cordero v. Froats, 613 F. App'x 768, 769 (10th Cir. 2015)(explaining that, in a police shooting case, although evidence -- including a video, audio recordings, and physical evidence -- undermined the plaintiff's witnesses, the video did not contradict blatantly the plaintiff's version of events, because the video did not show clearly the plaintiff holding a gun)(citing Scott v. Harris, 550 U.S. at 380). Here, as in Scott v. Harris, Lee denies some of the police reports' contents, but clear, intelligible audio recordings support the police reports. To the extent that Lee purports that he did not provide a particular statement to the police, the Court will not credit Lee's testimony where the audio recordings of his police interviews "blatantly contradict" his statements. See Scott v. Harris, 550 U.S. at 380.

[13]Lee disputes whether Roe was "very intoxicated." Response at 4. Lee cites his deposition, which indicates that Roe did not appear intoxicated. See Lee Depo. at 282:12-286:23. Nonetheless, Lee does not dispute that he advised the police that Roe was intoxicated; he acknowledges that it was "possible" he made the statement though he "did not recall." Response at 4. See Lee Depo. at 282:12-286:23. Because Lee does not dispute with . . . that he told the police that Roe was very intoxicated, the Court will deem this fact in the text undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Report").  See Defendants' MSJ Memo ¶ 5, at 3 (asserting this fact).[14]  "Lee advised that he purchased the alcohol that was consumed by Goodnight and Roe, both of whom he knew to under the legal drinking age of 21."  UNMPD Felony Supplemental Report Supplemental at 42.  See Defendants' MSJ Memo ¶ 8, at 4-5 (asserting this fact).[15]  Lee, Roe, and Goodnight began to play strip blackjack.  See UNMPD Felony Supplemental Report at 41.[16]  After Roe consumed the alcohol, Lee informed the UNMPD that Roe was a "6 or 7" on a 1-10 scale with "1 not being intoxicated and 10 being highly intoxicated."  UNMPD Felony Supplemental Report at 41.  See Defendants' MSJ Memo at 4 n.5 (asserting this fact); Fisher Supp. Rpt. at 1.[17]  Lee informed Fisher that Roe "was really drunk and staggering" on the way into the bedroom, and that Goodnight "was holding her so she didn't fall over."  Fisher Supp. Rpt. at 1.  See Defendants' MSJ Memo ¶ 7, at 4 (asserting this fact).[18]

Thereafter, Lee told Fisher that he saw Roe and Goodnight have sex.  See Defendants' MSJ Memo ¶ 5, at 3 (asserting this fact); Fisher Supp. Rpt. at 1; id. (Lee "saw Goodnight take off a condom from his penis and throw it into the toilet[]"); id. (Lee "heard moaning and the sounds of

---

[14]Lee purports to dispute this fact, contending that "there are disputed factual issues about whether Ms. Roe became 'very intoxicated' and was 'really drunk and staggering;' Mr. Goodnight was 'holding her so that she didn't fall over;' and Ms. Roe was 'very incoherent of what was happening' and unable to consent to sexual contact."  For the reasons stated in n.12, supra, the Court examines Lee's recorded statements to the UNMPD, and concludes there is no dispute surrounding whether Lee told the UNMPD officers that Roe was very intoxicated.  See e.g., Transcript of Audio Recording Labeled: Ex. C-1 -- Audio Recording of Lobo Village Interview of Jong Lee at 17:11-20 (Lee)(Roe "was stumbling. . . she was buzzed and drunk yeah . . . she was intoxicated").

[15]For the reasons stated in n.12, supra, the Court considers this fact.

[16]For the reasons stated in n.12 and n.14, supra, the Court considers this fact.

[17]For the reasons stated in n.12 and n.14, supra, the Court considers this fact.

[18]For the reasons stated in n.12 and n.14, supra, the Court considers this fact.

Goodnight having what he believed was an orgasm").[19]  Lee advised Fisher that "he was . . . in the bedroom the whole time that Goodnight was having sex with [Roe]."  Fisher Supp. Rpt. at 2.  See Defendants' MSJ Memo ¶ 6, at 3 (asserting this fact).[20]  Officer Fisher asked Lee if he had sex with Roe, and Lee "looked away for a few seconds and said 'well I tried to get a blow-job.'"  Fisher Supp. Rpt. at 2 (quoting Lee).  See Defendants' MSJ Memo ¶ 5, at 3 (asserting this fact).[21]  Lee informed Fisher that "Goodnight was having vaginal sex with Roe while he was trying to insert his penis into her mouth."  Fisher Supp. Rpt. at 2.  See Defendants' MSJ Memo ¶ 5, at 3 (asserting this fact).[22]  Lee told Fisher that that "he never succeeded in this act because Roe would not open her mouth and let him."  Fisher Supp. Rpt. at 2.  See Defendants' MSJ Memo ¶ 5, at 3 (asserting this fact).[23]  Afterwards, Lee told Fisher that Roe "ha[d] trouble breathing."  Fisher Supp. Rpt. at 1.  See Defendants' MSJ Memo ¶ 5, at 3 (asserting this fact).  She was "naked on the floor" in Goodnight's bedroom, "very incoherent of what was happening" and Lee "dressed her and held her up."  Fisher Supp. Rpt. at 1.  See Defendants' MSJ Memo ¶ 8, at 4 (asserting this fact).  When officers arrived at Lobo Village, Roe "appeared intoxicated and was unable to stand."  UNMPD Felony Supplemental Report at 39.  See Defendants' MSJ Memo ¶ 8, at 4-5 (asserting this fact).[24]  Fisher indicated that his "contact with Lee and Goodnight was recorded" and filed.  Fisher Supp. Rpt. at 2.  See Defendants' MSJ Memo ¶ 8, at 4-5 (asserting this fact); Response at 4

---

[19]For the reasons stated in n.12 and n.14, supra, the Court considers this fact.

[20] For the reasons stated in n.12 and n.14, supra, the Court considers this fact.

[21]For the reasons stated in n.12 and n.14, supra, the Court considers this fact.

[22]For the reasons stated in n.12 and n.14, supra, the Court considers this fact.

[23]For the reasons stated in n.12 and n.14, supra, the Court considers this fact.

[24]For the reasons stated in n.12 and n.14, supra, the Court considers this fact.

(admitting this fact).

### 4.        UNM's Misconduct Policies.

UNM provides students charged with violations of most UNM policies with options, including: (i) an administrative hearing where the student may participate, question individuals, and present evidence; or (ii) a formal hearing where the student may present witnesses, question witnesses, and respond to charges.  See Response at 11 (asserting this fact); Reply at 10 (noting that the "UNM Policies described by Plaintiff speak for themselves");[25] UNM Student Handbook: Student Grievance Procedure at 5-6, filed March 23, 2020 (Doc. 76-3)("Student Handbook");[26] Responses to Plaintiff's First Set or Requests for Admission to Defendant Board of Regents of the University of New Mexico at 7-8, 10, filed March 3, 2020 (Doc. 76-5)("Bd. of Regents Admissions")[27].

By contrast, the OEO investigates allegations of "discrimination."[28]  Student Handbook at

---

[25]UNM does not dispute specifically the fact in the text that Lee proposes, which has ample support in the record. Accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[26]The charges may also be resolved via mediation or an informal dispute conference.  See UNM Student Handbook at 5.  Students receive and may select from "one of more of the . . . options" to resolve the charges -- mediation, an informal dispute conference, an administrative hearing, or a formal hearing -- although "the Student Conduct Officer is authorized to refer the charges for a formal hearing before the Student Conduct Committee even if the student does not elect a formal hearing."  Student Handbook at 5.

[27]UNM Board of Regents admits that "UNM's Student Grievance Procedure in effect during UNM's investigation into the allegations against Plaintiff provides students who are not accused of sexual misconduct the option of an administrative hearing with the Student Conduct Officer and/or a formal hearing with the Student Conduct Committee prior to UNM's determination that a policy violation has occurred."  Bd. of Regents Admissions at 6-7

[28]Although the Defendants accept these facts, they insist

the distinctions between how UNM investigates and resolves charges of non-sexual

- 17 -

7.[29]  See Response at 12 (asserting that the OEO investigates allegations of sexual misconduct);

Reply at 10 (noting that the "UNM Policies described by Plaintiff speak for themselves").

"Discrimination" includes sexual misconduct allegations.  Student Handbook at 7.  See Response

at 12 (asserting that the OEO investigates allegations of sexual misconduct); Reply at 10 (noting

that the "UNM Policies described by Plaintiff speak for themselves").

OEO investigations typically take between two weeks and four months, "depending on the

complexity of a particular claim."  OEO Discrimination Claims Procedure at 4, filed March 23,

2020 (Doc. 76-4). [30]  After an investigation, the OEO provides both the accused student and the

---

misconduct versus charges of sexual misconduct are only pertinent in assessing
whether it would impose a "substantial fiscal and administrative burden" on UNM
to provide a student accused of sexual misconduct with the procedural safeguards
associated with an adversarial hearing.

Reply at 10 (quoting Lee v. Univ. of New Mexico, 449 F. Supp. 3d 1071, 1125 (D.N.M.
2020)(Browning, J.)).  The Court notes that the Defendants mischaracterize the MOO, which in
this section rejects the Defendants' evidentiary burden arguments.  See MOO, 449 F. Supp at 1125.
Further, the Court notes that the quote which the Defendants extract from the MOO is a quote from
the Defendants' briefing.  See MOO, 449 F. Supp at 1125.

[29]The Student Handbook defines "discrimination" as

all forms of unlawful discrimination based on an individual's or group's
protected class(es), including age (40 and over), ancestry/national origin,
color/race, gender identity, medical condition, mental/physical disability, religion,
sex/gender, sexual orientation, spousal affiliation, veteran status, and any other
protected class . . . acts of sexual harassment as described in University
Administrative Policy #2730; and acts of sexual harassment, sexual misconduct,
and sexual violence as described in University Administrative Policy
#2740 . . . . "[D]iscrimination" also includes retaliation for having made allegations
of discrimination, having participated in an investigation into allegations of
discrimination, or otherwise having engaged in opposition to unlawful
discrimination.

Student Handbook at 7.

[30]Neither party has included this fact in their briefing.  Lee, however, has attached a copy
of the OEO Discrimination Claims Procedure to his Response and cites it in his Response.  See
Response at 12 (citing OEO Discrimination Claims Procedure at 4). The Defendants have accepted

complainant with a Preliminary Letter of Determination ("PLOD") that describes the investigator's preliminary findings. See OEO Discrimination Claims Procedure at 4. Then, the accused student and the complainant both have at least two weeks -- which the OEO may extend for "good cause" -- to respond to the PLOD. See OEO Discrimination Claims Procedure at 4. After the response period, the OEO issues a Final Letter of Determination ("FLOD") which finds either probable cause or no probable cause[31] that the accused student has violated UNM policy. See Response at 12 (asserting this fact); Reply at 10 (noting that the "UNM Policies described by Plaintiff speak for themselves"); Student Handbook at 7. The OEO investigator controls the investigation; the Student Handbook does not provide the accused student with the right to participate directly in the investigation. See Response at 12 (asserting this fact); Reply at 10 (noting that the "UNM Policies described by Plaintiff speak for themselves"); Student Handbook at 7.[32]

If the OEO investigator finds probable cause that a student engaged in sexual misconduct,

_____

Lee's facts about UNM's policies and procedures, affirming that "UNM policies described by Plaintiff speak for themselves." Reply at 10. The Court, therefore, concludes that UNM's official policies and procedures are not in dispute, and thus includes additional detail from the OEO Discrimination Claims Procedure that are relevant in this opinion. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[31]"'Probable Cause' means that the evidence submitted during the OEO investigation supports a finding that it is more likely than not that the acts alleged are in violation of University policy prohibiting discrimination." Student Handbook at 7. Likewise, "'No Probable Cause' means that the evidence submitted during the OEO investigation does not support a finding that it is more likely than not that the acts alleged are in violation of University policy prohibiting discrimination." Student Handbook at 7.

[32]Lee notes, and the Defendants do not dispute, that "the OEO investigator determines which witnesses are credible, and the charged student is not able to question his accuser or any other witnesses, weigh in on the investigation; to attend witness examinations; or take any actions to test the credibility or weight of any evidence reviewed by the UNM OEO investigator." Response at 12 (citing Student Handbook at 7). See Reply at 10. The Court, therefore, deems this fact admitted. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

the OEO then refers the case to the DOS to impose sanctions. <u>See</u> Response at 12 (asserting this fact); Reply at 10 (noting that the "UNM Policies described by Plaintiff speak for themselves"); Student Handbook at 7. The accused student may choose between an administrative hearing and a formal hearing on sanctions. <u>See</u> Response at 12 (asserting this fact); Reply at 10 (noting that the "UNM Policies described by Plaintiff speak for themselves"); Student Handbook at 7. Either the accused student or the complainant may appeal a sanctions decision if "there was a significant procedural error in the sanctioning process of a nature sufficient to have materially affected the outcome of the sanction decision, and/or the severity of the sanction is grossly disproportionate to the violations of the university policy that OEO found to have been committed." Student Handbook at 8. <u>See</u> Response at 12 (asserting this fact); Reply at 10 (noting that the "UNM Policies described by Plaintiff speak for themselves").

After the OEO investigator issues the FLOD, the accused student and the complainant both may appeal the decision to the UNM President and Board of Regents. <u>See</u> Response at 12 (asserting this fact); Reply at 10 (noting that the "UNM Policies described by Plaintiff speak for themselves"); Student Handbook at 7. The UNM President and Board of Regents will "normally accept review only in extraordinary cases, such as those where proper procedure has apparently not been followed, where the decision appears to be unsupported by the facts, and/or where the decision appears to violate University policy." OEO Discrimination Claims Procedure at 4. <u>See</u> Response at 12 (asserting this fact); Reply at 10 (noting that the "UNM Policies described by Plaintiff speak for themselves"). The President receives an appeal first. <u>See</u> OEO Discrimination Claims Procedure at 4.[33] The Board of Regents then has discretion whether to review the

---

[33]Neither party has included this fact in their briefing. As discussed in n.30, <u>supra</u>, the Court will consider relevant facts from the OEO Claims Procedure.

President's decision.  See OEO Discrimination Claims Procedure at 4.[34]

      **5.**       **The Lee Investigation.**

On September 21, 2015, a Student Conduct Officer from the DOS, Lydia Wolberg, sent Lee an email "emergency banning" Lee from UNM's campus.  Emergency Campus Ban Letter at 1 (dated September 21, 2015), filed February 6, 2020 (Doc. 71-2)("Emergency Campus Ban Letter").  See Defendants' MSJ Memo ¶ 9, at 5 (asserting this fact); Response at 5 (stating that the Emergency Campus ban Letter "speaks for itself").[35] [36]  Wolberg also informed Lee that the OEO "will investigate the actual incident that occurred on campus and they will be in contact with you regarding the investigation."  Emergency Campus Ban Letter at 1.  See Defendants' MSJ Memo ¶ 9, at 5 (asserting this fact); Response at 5 (stating that the Emergency Campus ban Letter "speaks for itself").[37]  Wolberg provided Lee with a link to "information regarding the emergency ban and disciplinary process of the University."  Emergency Campus Ban Letter at 1.  See Defendants' MSJ Memo ¶ 9, at 5 (asserting this fact); Response at 5 (stating that the Emergency Campus ban Letter "speaks for itself").[38]

---

[34]Neither party has included this fact in their briefing.  As discussed in n.30, supra, the Court will consider relevant facts from the OEO Claims Procedure.

[35]Lee does not specifically controvert this fact, so the Court deems it admitted.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[36]Although neither party has included this fact in their briefing, neither disputes this fact.  The Defendants attach the Emergency Campus Ban Letter to the Defendants' MSJ Memo.  The Court, therefore, deems this fact admitted.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[37]Lee does not specifically controvert this fact, so the Court deems it admitted.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

The following day, Wolberg emailed Lee lifting his campus ban, but informing him that he would "only [be] allowed to attend classes and class related activities" on campus.  Update on Campus Ban at 2 (dated September 22, 2015), filed February 6, 2020 (Doc. 71-2)("Update on Campus Ban").[39]  The email reminded Lee that the OEO would investigate the incident.  See Update on Campus Ban at 2.

On September 24, 2015, Lee met with Heather Cowan, UNM's Title IX Coordinator, and Francie Cordova, the OEO Director.  See Defendants' MSJ Memo ¶ 11, at 5-6 (asserting this fact); UNM OEO Handout Acknowledgement at 3 (dated September 24, 2015), filed February 6, 2020 (Doc. 71-2)("Handout Acknowledgement"); Email to Heather Cowan from Lee at 4 (dated September 25, 2015), filed February 6, 2020 (Doc. 71-2)("Sept. 25 Cowan Email").[40]  Lee received copies of the "OEO Claims Procedure" and "Analysis of Claims" handouts.     Handout

_____

[38]Lee does not specifically controvert this fact, so the Court deems it admitted.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[39]Lee again, as he does with nearly all facts laid out in the Defendants' MSJ Memo, disputes the facts described in Defendants' MSJ Memo ¶ 10, at 5, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff."  Response at 3 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986). The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra.  Further, whether Lee was able to remain on campus during the investigation is relevant to his contention that the OEO predetermined his guilt.  See Response at 27-28.

[40]Lee again, as he does with nearly all facts laid out in the Defendants' MSJ Memo, disputes the facts described in Defendants' MSJ Memo ¶ 11, at 5-6, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff."  Response at 3 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986). The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra.  Further, it is relevant that Lee met with Cowan and Cordova because it is relevant to Lee's contention that he did not receive appropriate notice and an opportunity to be heard.  See Response at 17.

Acknowledgement at 3.  <u>See</u> Defendants' MSJ Memo ¶ 11, at 5-6 (asserting this fact).[41]  After the meeting, Lee emailed Cowan to "express my gratitude to you for showing me kindness and professionalism during yesterday's meeting.  It did not take long for you to convince me that you would be neutral and fair to me throughout this whole process."  Sept. 25 Cowan Email at 4.  <u>See</u> Defendants' MSJ Memo ¶ 11, at 5-6 (asserting this fact).[42]

The OEO conducted its investigation into Lee pursuant to its procedures for allegations of discrimination.  <u>See</u> Response at 12 (asserting this fact); Reply at 10 (noting that "UNM policies described by Plaintiff speak for themselves"); Bd. of Regents Admissions at 2-4.[43]  Buchs was the OEO investigator into Lee's case.  <u>See</u> Response at 12 (asserting this fact); Reply at 10 (not addressing this fact); PLOD at 33; Final Letter of Determination at 3, filed February 6, 2020 (Doc. 71-3)("FLOD").[44]  Buchs signed both the PLOD and FLOD in Lee's case.  <u>See</u> Response at 12 (asserting this fact); Reply at 10 (not addressing this fact); PLOD at 33; FLOD at 3.[45]

On October 16, 2015, Buchs hand-delivered a letter to Lee notifying him that that Roe "has raised issues and concerns of possible sexual violence and misconduct . . . Complainant has elected to pursue a formal investigation of her concerns and has named you as a Respondent in

---

[41]The Court considers this fact for the reasons stated in n.40, <u>supra</u>.

[42]The Court considers this fact for the reasons stated in n.40, <u>supra</u>.

[43] The Defendants do not dispute specifically the fact in the text that Lee proposes, which has ample support in the record.  Accordingly, the Court deems the fact in the text undisputed.  <u>See</u> D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[44]The Defendants do not specifically controvert this fact, <u>see</u> Reply at 10, so the Court deems this fact admitted, <u>see</u> D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[45]The Court considers this fact for the reasons stated in n.44, <u>supra</u>.

this claim." Letter Re: Investigative Issues at 4 (dated October 16, 2015), filed February 6, 2020 (Doc. 71-2)("Oct. 16 Letter"). See Defendants' MSJ Memo ¶ 12, at 6 (asserting this fact).[46] The letter stated that Roe had asserted Lee "subjected her to this non-consensual sexual activity" in "violation of UNM Policy." Oct. 16 Letter at 4. See Defendants' MSJ Memo ¶ 12, at 6 (asserting this fact).[47] The Letter asked Lee to respond to Roe's allegations within seven business days. See Defendants' MSJ Memo ¶ 12, at 6 (asserting this fact); Oct. 16 Letter at 4.[48] The Letter then provided the text of Roe's statement. See Oct. 16 Letter at 4-5. Lee responded to the allegations in Roe's statement by reading a written statement to Buchs on October 27, 2015. See Defendants' MSJ Memo ¶ 13, at 6 (asserting this fact); Written Statement of Jong Hoon Lee at 8-14 (undated), filed February 6, 2020 (Doc. 71-2)("Lee Statement"); PLOD at 16.[49] Lee also provided Buchs with photographs. See PLOD at 16; id. at 26 (noting that Lee "provided photographs of furniture,

---

[46]Lee again, as he does with nearly all facts laid out in the Defendants' MSJ Memo, disputes the facts described in Defendants' MSJ Memo ¶ 12, at 6, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff." Response at 6 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)). The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra. Further, it is relevant that Buchs provided Lee with a letter stating that he had been accused of sexual assault, because Lee contends that he did not receive appropriate notice. See Response at 17.

[47] The Court considers this fact for the reasons stated in n.46, supra.

[48] The Court considers this fact for the reasons stated in n.46, supra.

[49]Lee again, as he does with nearly all facts laid out in the Defendants' MSJ Memo, disputes the facts described in Defendants' MSJ Memo ¶ 13, at 6, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff." Response at 6 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)). The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra. Further, it is relevant that Lee had an opportunity to respond to Roe's statement in writing because it relates to whether UNM gave Lee a chance to "characterize his conduct and put it in what he deems the proper context." Goss v. Lopez, 419 U.S. 565, 584 (1975).

stairways, and areas around Lobo Village that were found irrelevant to the investigation . . .").[50]

Buchs interviewed Roe, Goodnight, Lee, and two other witnesses during the investigation. See PLOD at 16.[51]  The PLOD did not provide the names of the other witnesses, but described "Witness 1" as a person with "a close, personal relationship with [Goodnight]" to whom Goodnight had described the evening of the alleged sexual assault, and who had "met all of [Goodnight's] roommates, but not having spent any significant time with [Lee] or Witness 2." PLOD at 26.  See Response at 13 (asserting that Lee did not receive witnesses' names).[52]  The PLOD described "Witness 2" as Lee and Goodnight's roommate, who was present in the apartment on the evening of the alleged sexual assault.  PLOD at 26.[53]  In addition to the witness interviews, Buchs also reviewed the following evidence: (i) a "UNM Police Department Significant Event Form"; (ii) "a State of New Mexico Uniform Incident Report"; (iii) "a State of New Mexico Supplemental Report"; (iv) text messages and Facebook messages between Goodnight and Roe; and (v) photographs of "the exterior of Lobo Village and a nightstand within the apartment where the

_____

[50]Neither party asserts this fact.  The Defendants, however, attach the PLOD to the MSJ Memo.  Lee does not dispute that this is an accurate copy of the PLOD.  This information is relevant because Lee's opportunity to supplement the record Buchs considered relates to whether UNM gave Lee a chance to "characterize his conduct and put it in what he deems the proper context." Goss v. Lopez, 419 U.S. 565, 584 (1975).  See Response at 15.

[51]Neither party asserts this fact.  The Defendants, however, attach the PLOD to the MSJ Memo.  Lee does not dispute that this is an accurate copy of the PLOD.  This information is relevant because it relates to whether Lee knew the witnesses' identities, which he avers he did not.  See Response at 15.

[52]The Defendants do not dispute specifically the fact in the text that Lee proposes, which has ample support in the record.  Accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[53]The Court considers this fact for the reasons stated in n.52, supra.

alleged incident took place."  PLOD at 16.[54]  During the investigation, Lee did not (i) receive a

hearing; (ii) have the opportunity to cross-examine or question Roe or any of the other witnesses;

or (iii) have the opportunity to be present during the OEO's witness interviews.  See Response at

13 (asserting this fact); Bd. of Regents Admissions at 5-6.[55]

The OEO issued the PLOD on January 20, 2016, over four months after the alleged sexual

assault occurred.  See Defendants' MSJ Memo ¶ 16, at 7 (providing the investigation's timeline);

PLOD at 15.[56]  The PLOD provided edited witness statements and summarized the evidence the

OEO considered.  See Defendants' MSJ Memo ¶ 16, at 7;  PLOD at 16-29.[57]  The PLOD described

two UNM policies that Lee allegedly violated.  See PLOD at 29.[58]  The PLOD noted that Lee

> admits to kissing Complainant and trying to engage in oral sex with her.  Therefore,
> the remaining analysis seeks to determine whether the sexual activity was
> unwelcome and/or non-consensual, and if unwelcome or non-consensual, whether
> a reasonable person in the same or similar circumstances would have been aware
> the sexual activity was unwelcomed by and/or without consent from the

---

[54]Neither party asserts this fact.  The Defendants, however, attach the PLOD to the MSJ Memo.  Lee does not dispute that this is an accurate copy of the PLOD.  This information is relevant because it details what evidence Buchs reviewed during her investigation.  See Response at 18.

[55]The Defendants do not dispute specifically the fact in the text that Lee proposes, which has ample support in the record.  Accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[56]Lee does not dispute specifically the fact in the text that the Defendants propose, which has ample support in the record.  Accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[57]The Court considers this fact for the reasons stated in n.56, supra.

[58]Neither party asserts this fact.  The Defendants, however, attach the PLOD to the MSJ Memo.  Lee does not dispute that this is an accurate copy of the PLOD.  This information is relevant because it relates to why Lee was expelled from UNM.

Complainant at the time the alleged conduct occurred.

PLOD at 29-30.[59]  The PLOD also provided UNM's definition of consent to sexual activity:

> Consent is an affirmative, informed, and conscious decision to willingly engage in mutually acceptable sexual activity.  Consent requires a clear affirmative act or statement by each participant to each sexual act in a sexual interaction.
>
> Sexual activity will be considered to have occurred "without consent" if no clear act or statement is given.  Consent may not be inferred from silence, passivity, or lack of active response alone.  A person who is asleep, unconscious, or otherwise unaware of what is happening is unable to give consent.  Furthermore . . . consent to one form of sexual activity does not imply consent to other forms of sexual activity.  It is the responsibility of the person initiating the sexual activity to obtain consent from their partner.  Being intoxicated or under the influence of other drugs does not diminish one's responsibility to obtain consent.
>
> The use of alcohol or drugs can limit or prevent a person's ability to freely and clearly give consent.  If a person is under the influence of alcohol or drugs such that they are unable to give meaningful consent or understand the fact, nature or extent of the sexual situation, there is no consent.  Intoxication alone, however, does not mean a person is incapable of consenting to sexual activity. OEO examines the record for other behavior like stumbling or otherwise exhibiting loss of equilibrium; slurred speech or word confusion; bloodshot, glassy or unfocused eyes; vomiting, especially repeatedly; being disoriented or confused as to time or place; or loss of consciousness.
>
> Should the preponderance-of-the-evidence in the record demonstrate that one or more such behaviors were objectively apparent at the time the alleged unconsented-to or unwelcomed sexual activity occurred, that evidence may demonstrate that the Respondent knew or should have known that the Complainant was incapable of giving meaningful consent to sexual activity due to intoxication.

PLOD at 30 (citing UNM Policy # 2740).[60]

The PLOD explained that Lee, Goodnight, and Roe agree that all parties consumed alcohol on the evening of the alleged sexual assault.  See PLOD at 30.[61]  The PLOD continued that Lee

---

[59]The Court considers this fact for the reasons stated in n.58, supra.

[60]The Court considers this fact for the reasons stated in n.58, supra.

[61]The Court considers this fact for the reasons stated in n.58, supra.

and Goodnight did not assert that they were incapacitated because of the alcohol they consumed. See PLOD at 30.[62]  Roe alleged that "she had consumed so much alcohol as to be incapacitated," but Lee and Goodnight denied Roe was incapacitated.  PLOD at 30.[63]  Lee and Goodnight informed the OEO that Roe "did not exhibit any signs of incapacitation"; the OEO found "these statements by Respondents are not supported by witness statements and lack credibility."  PLOD at 30.[64]  In finding that Lee and Goodnight's statements regarding Roe's intoxication lacked credibility, the PLOD discussed: (i) statements by "Witness 2"; (ii) statements by Roe; (iii) statements by Lee and Goodnight; (iv) statements by "Witness 1" describing what Goodnight had told him; (v) UNMPD observations of Roe after she called them on the evening of the alleged incident; and (vi) the fact that an ambulance transported Roe to the hospital shortly after she called the police.  PLOD at 31.[65]

The PLOD continued that the statements Lee and Goodnight "made to the OEO are significantly different from the statements Respondents provided to UNMPD . . . and Respondents' extemporaneous statements to UNMPD confirm or corroborate critical elements of Complainant's account of events."  PLOD at 31.[66]  Furthermore, the PLOD stated that Lee and Goodnight both "confirmed to the UNMPD that Complainant was 'very intoxicated.'"  PLOD at

---

[62]The Court considers this fact for the reasons stated in n.58, supra.

[63]The Court considers this fact for the reasons stated in n.58, supra.

[64]The Court considers this fact for the reasons stated in n.58, supra.

[65]The Court considers this fact for the reasons stated in n.58, supra.

[66] The Court considers this fact for the reasons stated in n.58, supra.

31 (no citation for quotation provided).[67]  After summarizing Lee and Goodnight's descriptions of

Roe's intoxication to the UNMPD, Buchs concluded:

> [Lee and Goodnight's] statements to UNMPD that Complainant was "very intoxicated" and had to be "held up/carried," had "trouble breathing/medical episode," and was dressed by [Lee] demonstrate Complainant was intoxicated to the point of incapacitation, and a reasonable person, in the same or similar circumstances, would understand the Complainant was intoxicated to the point of incapacitation.  OEO finds UNMPD's observation that Complainant was "intoxicated and not able to stand up" when they arrived at the scene as recorded in the Supplemental report, corroborates Respondents' statements made to UNMPD that Complainant was very intoxicated and supports Complainant's allegation sHE was incapacitated.  OEO finds Complainant being taken from Lobo Village to a hospital by ambulance "due to her level of intoxication and incoherent state" further supports Complainant was incapacitated.  OEO also finds both witness statements support Respondents' statements made to UNMPD and further corroborate Complainant's version of events on or about September 18, 2015.  For these reasons, OEO finds Respondents' extemporaneous statements To UNMPD on or about September 18, 2015, are more credible than Respondent's statements made to OEO for the purpose of this investigation.
>
> As such, OEO finds the preponderance of the credible evidence shows Complainant exhibited signs of incapacitation prior to engaging in sexual activities in [Goodnight's] bedroom.  OEO also finds Complainant's confirmed statement, as corroborated by Witness 2, that she wanted to go home demonstrates a lack of consent for sexual activity at the time the statement was made.  OEO further finds there is no credible evidence of a subsequent statement of affirmative consent having been made by Complainant . . . . OEO further finds the preponderance of evidence shows [Lee] knew, or reasonably should have known, Complainant did not consent to him trying to put his penis in her mouth while she laid on [Goodnight's] bed because he confirmed to UNMPD she would not open her mouth for him to do so.
>
> For the reasons above, OEO finds that it is more likely than not that [Lee] engaged in nonconsensual sexual activity with Complainant which is a violation of Policy 11-2740 and Policy #2730.
>
> Based on the information obtained during this investigation, including a thorough review and analysis of the statements provided by the parties and the witnesses, it is determined there is sufficient evidence to show it is more likely than not [Lee]'s behavior constitutes sexual misconduct in violation of University policy.

---

[67] The Court considers this fact for the reasons stated in n.58, supra.

PLOD at 31-32.  Accord Response at 14 (quoting portions of the PLOD); Reply at 11 (confirming these quotation).  Consequently, the PLOD advised Lee that the OEO had found probable cause that Lee violated University Policies # 2740 (Sexual Violence and Sexual Misconduct) and # 2730 (Sexual Harassment).  See PLOD at 31-32.[68]   The PLOD invited Lee to provide new factual information within two weeks to "reveal facts not yet discovered during the course of the investigation" and advised Lee that "any new factual information will be evaluated before a final determination is made."  PLOD at 32. See Defendants' MSJ Memo 18, at 9 (asserting this fact). [69]

Lee responded to the PLOD on February 22, 2016.  See Defendants' MSJ Memo ¶ 18, at 9 (asserting this fact); Response at 8 (admitting this fact); Supplemental Information in Response to the PLOD at 34 (dated February 22, 2016), filed February 6, 2020 (Doc. 71-2)("Feb. 22 Letter"). The Feb. 22 Letter first reiterated some of the information detailed in the PLOD.  See Defendants' MSJ Memo ¶ 18, at 9 (asserting this fact); Feb. 22 Letter at 35. [70]  The Feb. 22 Letter also contained additional information about the strength of the alcohol that Roe consumed, as well as information about alcohol absorption rates.  See Defendants' MSJ Memo ¶ 18, at 9 (asserting this fact); Response at 8 (admitting this fact); Feb. 22 Letter at 35.  The Letter continued that "[g]iven the

---

[68]The Court considers this fact for the reasons stated in n.58, supra.

[69]Lee again, as he does with nearly all facts laid out in the Defendants' MSJ Memo, disputes the facts described in the Defendants' MSJ Memo ¶ 18, at 9, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff."  Response at 8 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)). The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra.  Further, it is relevant that Lee was able to provide additional evidence before the OEO issued the FLOD because it relates to whether UNM gave Lee a chance to "characterize his conduct and put it in what he deems the proper context."  Goss v. Lopez, 419 U.S. 565, 584 (1975).

[70]The Court considers this fact for the reasons stated in n.69, supra.

amount of alcohol consumed and the amount of time that lapsed between he period of drinking and the sexual acts, [Lee] did not think that Complainant was so intoxicated that she could not consent to any sexual contact."  Feb. 22 Letter at 37.  See Defendants' MSJ Memo ¶ 18, at 9 (asserting this fact); Response at 8 (admitting this fact).  The Letter also attached an audio interview with Roe and her mother with a police officer after the incident.  See Defendants' MSJ Memo ¶ 18, at 9 (asserting this fact); Response at 8 (admitting this fact); Feb. 22 Letter at 37.  The Letter continued that Roe was taking two prescription medications at the time of the alleged sexual assault, and described the side effects of these drugs.  See Defendants' MSJ Memo ¶ 18, at 9 (asserting this fact); Response at 8 (admitting this fact); Feb. 22 Letter at 37-38.  The Letter contended that "[t]he above-described description of her condition at the time of the alleged incident is a description of all of the side effects of the anti-depressant medications."  Feb. 22 Letter at 38.  See Defendants' MSJ Memo ¶ 18, at 9 (asserting this fact); Response at 8 (admitting this fact).  Finally, the Letter noted that Lee did not know Roe was taking these medications.  See Feb. 22 Letter at 38; Defendants' MSJ Memo ¶ 18, at 9 (asserting this fact); Response at 8 (admitting this fact).

On February 25, 2016, the OEO issued the FLOD.  See Defendants' MSJ Memo ¶ 19, at 9 (asserting this fact); FLOD at 3.[71]  The OEO described the information Lee provided in the Feb.

---

[71]Lee again, as he does with nearly all facts laid out in the Defendants' MSJ Memo, disputes the facts described in the Defendants' MSJ Memo ¶ 18, at 9, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff."  Response at 8 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)).  The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra.  Further, the contents of the FLOD are relevant to determine whether the OEO relied on Roe's statements when it decided that Lee violated UNM policies.  See Response at 15.

22 Letter.  See FLOD at 3.[72]  Then, it noted that the PLOD concluded "that the preponderance-of-the-evidence supports a finding that it is more likely than not that Lee engaged in non-consensual sexual contact with Complainant in violation of policy."  See Defendants' MSJ Memo ¶ 19, at 9 (asserting this fact); FLOD at 3.[73]  The OEO notes that it based its determination on the following evidence:

> [Lee] admits to kissing Complainant and trying to engage in oral sex with her.

> At the time of the incident, on or about September 18, 2015, [Lee] confirmed to UNMPD that Complainant was "very intoxicated" prior to going into [Goodnight's] bedroom.

> Witness 2 observed Complainant's speech became "slurry" after she arrived at the apartment in Lobo Village and prior to the parties going to [Goodnight's] room (and therefore prior to the sexual contact occurring).  Witness 2 also heard Complainant say, while the parties were in the common room (and therefore prior to the parties going to [Goodnight's] room) in a slurred voice, she "want[ed] to go home."

> [Lee] confirmed [Goodnight] held Complainant up "so she wouldn't fall over when they walked to the bedroom" from the common room.

> [Lee] confirmed to UNMPD that when they were all in [Goodnight's] bedroom, [Lee] tried to get a "blow job" from Complainant, was "trying to insert his penis into Complainant's mouth," but he was not successful because Complainant "would not open her mouth,"

> [Goodnight] confirmed to UNMPD both Respondents "carried Complainant" to her car because she was "unable to walk on her own."

FLOD at 1-2.[74]  The OEO concluded that the evidence Lee provided in the Feb. 22 Letter was "not sufficient to overcome OEO's preliminary determination that the preponderance-of-the-evidence,

---

[72]Neither party asserts this fact.  The Defendants, however, attach the FLOD to the MSJ Memo.  Lee does not dispute that this is an accurate copy of the FLOD.  This information is relevant because it relates to whether the OEO considered Lee's supplemental information.

[73] The Court considers this fact for the reasons stated in n.72, supra.

[74]Neither party asserts this fact.  The Defendants, however, attach the FLOD to the MSJ

as summarized above, demonstrates Lee . . . engaged in non-consensual sexual contact with Complainant in violation of University policy."  FLOD at 2.  See Defendants' MSJ Memo ¶ 19, at 9 (asserting this fact). [75]  The FLOD advised Lee that it would refer its determination to the DOS.  See FLOD at 2.[76]  Finally, the FLOD advised Lee that he had a right to appeal this decision to the President and Board of Regents.  See FLOD at 3.[77]

Lee filed an appeal on March 10, 2016.  See Defendants' MSJ Memo ¶ 20, at 9 (asserting this fact); Notice of Appeal at 12 (dated March 10, 2016), filed February 6, 2016 (Doc. 71-3)("Notice of Appeal").[78]  Lee requested "an opportunity for review based upon the fact that the facts upon which the OEO bases its facts are not supported by the record."  Notice of Appeal at 12.  See Defendants' MSJ Memo ¶ 20, at 9 (asserting this fact).[79]  UNM's President, Robert G.

---

Memo.  Lee does not dispute that this is an accurate copy of the FLOD.  This information is relevant because it relates to why the OEO concluded that Lee had violated UNM's policies.

[75]The Court considers this fact for the reasons stated in n.72, supra.

[76]Neither party asserts this fact.  The Defendants, however, attach the FLOD to the MSJ Memo.  Lee does not dispute that this is an accurate copy of the FLOD.  This information is relevant because the DOS made the subsequent sanctioning decision, which Lee contests.  See Response at 30.

[77]Neither party asserts this fact.  The Defendants, however, attach the FLOD to the MSJ Memo.  Lee does not dispute that this is an accurate copy of the FLOD.  This information is relevant because it discusses whether Lee had the ability to appeal the OEO's decision.  See Response at 27.

[78]Lee again, as he does with nearly all facts laid out in the Defendants' MSJ Memo, disputes the facts described in the Defendants' MSJ Memo ¶ 18, at 9, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff."  Response at 8 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)).  The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra.  Further, Lee's ability to appeal the OEO's decision relates to his allegation that he did not receive an impartial factfinding process.  See Response at 26.

[79]The Court considers this fact for the reasons stated in n.78, supra.

Frank, responded to Lee on March 24, 2016.  See Defendants' MSJ Memo ¶ 20, at 9 (asserting this fact); UNM Office of the President Letter re: Appeal of OEO finding by Jong Hoon Lee at 13 (dated March 24, 2016), filed February 6, 2020 (Doc. 71-3)("UNM President Letter").[80]  Frank advised Lee that he did not "find extraordinary circumstances to support an appeal" because "there are sufficient facts in the record to support OEO's decision that it is more likely than not that Mr. Lee engaged in non-consensual sexual contact with Complainant."  UNM President Letter at 13. See Defendants' MSJ Memo ¶ 20, at 9 (asserting this fact).[81]  On May 13, 2016, the Board of Regents voted unanimously to deny Lee's appeal.  See Defendants' MSJ Memo ¶ 20, at 9 (asserting this fact); Meeting Minutes at 14.[82]

### 6.   The Sanctioning Process.

On April 22, 2016, Megan Chibanga, a Student Conduct Officer with the DOS, contacted Lee to schedule a meeting with him about his "options and possible sanctions."  Email from Megan Chibanga to Jong Lee re: "Sanction Meeting for Policy Violation," (dated April 22, 2016), filed February 6, 2020 (Doc. 71-3)("April 22 Email").  See Defendants' MSJ Memo ¶ 21, at 10 (asserting this fact).[83]  Lee and Chibanga scheduled a hearing regarding Lee's sanctions for June

---

[80]The Court considers this fact for the reasons stated in n.79, supra.

[81]The Court considers this fact for the reasons stated in n.79, supra.

[82]The Court considers this fact for the reasons stated in n.79, supra.

[83]Lee again, as he does with nearly all facts laid out in the Defendants' MSJ Memo, disputes the facts described in the Defendants' MSJ Memo ¶ 21, at 10, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff."  Response at 9 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)).  The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra.  Moreover, Lee's meeting with Chibanga is relevant to Lee's contention that he never received a hearing.  See Response at 27.

15, 2016.  See MSJ Memo ¶ 22, at 10 (asserting this fact); Emails Between Jong Lee and Megan

Chibanga re: "Meeting Schedule/Availability" at 17 (dated May 20, 2016 to June 8, 2016), filed

February 6, 2020 (Doc. 71-3)("May 20 Email").[84]  On June 8, Chibanga contacted Lee to confirm

procedural parameters for the meeting.  See May 20 Email at 16.[85]  Chibanga informed Lee that

the meeting was scheduled for one hour, and:

> Since you selected the administrative hearing, you have the opportunity to present witnesses and evidence, as it relates to the sanctioning of this case.  You will need to bring or be able to electronically provide any evidence you would like me to consider.  Please note that I do not interview witnesses during the hearing itself, so you will need to bring a list, with contact information, of any witnesses and the contributions you expect them to make to the hearing on June 15.  The interviewing of any witnesses is at my discretion as the hearing officer.
>
> As outlined in Section 4.4 of the Student Grievance Procedure, this is not an evidentiary hearing and the outcome determined by OEO is not up for debate in this portion of the process.  However, portions of the Preliminary Letter of Determination and Final Letter of Determination issued by the Office of Equal Opportunity may be discussed as they contribute to the severity of the sanction.  Again, I want to reiterate, the finding by OEO will not be challenged in this hearing.
>
> Lastly, I would like to outline the role that your advisor, Arlyn Crow, can be present during this meeting.  While your advisor may be present, he may not have an active role in the hearing.  The hearing will be a conversation between you and I, and your advisor cannot make arguments on your behalf.  However, notes and whispered conversations are permissible between you and your advisor.

---

[84]Lee does not dispute specifically the fact in the text that the Defendants propose, which has ample support in the record. Accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[85]Neither party asserts this fact.  The Defendants, however, attach the May 22 Email to the MSJ Memo.  Lee does not dispute that this is an accurate copy of the May 22 Email.  This information is relevant because it discusses the procedures followed during Lee's sanctioning hearing before the DOS.  See Response at 27.

May 20 Email at 16.[86]  Later that day, Lee responded advising Chibanga that he was aware of the procedural limitations.  See May 20 Email at 16.[87]  On June 22, after meeting with Chibanga, Lee emailed Chibanga a written statement delineating factors he wished her to consider in making his sanctioning determination letter.  See Defendants' MSJ Memo ¶ 24, at 11 (asserting this fact); Written Statement on Administrative Hearing at 19-20 (dated June 22, 2016), filed February 6, 2020 (Doc. 71-3)("Written Statement on Administrative Hearing").[88]  The statement described Lee's version of the events on the evening of the alleged sexual assault, as well as how the event would impact his future academic career.  See Defendants' MSJ Memo ¶ 24, at 11 (asserting this fact); Written Statement on Administrative Hearing at 19-20.[89]

On July 6, 2016, the DOS sent Lee a letter informing him that "the appropriate level of sanctions for" the OEO's "findings is expulsion."  DOS Sanctions Letter at 22.  See Defendants' MSJ Memo ¶ 25, at 11 (asserting this fact).[90]  The letter noted that the DOS "can only consider

---

[86]The Court considers this fact for the reasons stated in n.85, supra.

[87]The Court considers this fact for the reasons stated in n.85, supra.

[88]Lee again, as he does with nearly all facts laid out in the Defendants' MSJ Memo, disputes the facts described in the Defendants' MSJ Memo ¶ 24, at 11, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff."  Response at 10 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)).  The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra.  Moreover, Lee's meeting with Chibanga is relevant to whether the DOS gave Lee a chance to "characterize his conduct and put it in what he deems the proper context."  Goss v. Lopez, 419 U.S. 565, 584 (1975).

[89]The Court considers this fact for the reasons stated in n.88, supra.

[90]Lee does not dispute specifically the fact in the text that the Defendants propose, which has ample support in the record.  Accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

evidence submitted for the purpose of determining the appropriate level of sanction to impose for the violation."  DOS Sanctions Letter at 22.  See Defendants' MSJ Memo ¶ 25, at 11 (asserting this fact).[91]  The letter continued that the DOS based its sanctions on the following information:

> The information you provided during your Administrative Sanctioning Hearing that took place with me on Wednesday, June 15, 2016, regarding your account of events prior to and since the event and how expulsion would impact your future academic career
>
> Your admission of purchasing alcohol and subsequently providing it to minors on the date of the incident;
>
> The written statement you provided me with via email on Wednesday, June 22, 2016 which outlines your desire to continue with your education and the impact that severe sanctioning would have on you;
>
> The police report regarding this incident;
>
> The Preliminary and Final Probable Cause findings from OEO regarding your case; and
>
> The seriousness of an individual having had a Probable Cause finding that they had nonconsensual sexual activity with another UNM student in violation of UNM policy.

DOS Sanctions Letter at 22-23.  See Defendants' MSJ Memo ¶ 25, at 11 (asserting this fact).[92]

Next, the letter defined expulsion as "losing status for an indefinite period of time" but allowed Lee to reapply to UNM in two years.  DOS Sanctions Letter at 23.  See Defendants' MSJ Memo

---

[91]Lee does not dispute specifically the fact in the text that the Defendants propose, which has ample support in the record. Accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[92]Lee does not dispute specifically the fact in the text that the Defendants propose, which has ample support in the record. Accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

¶ 25, at 11 (asserting this fact).[93]  The DOS Sanctions Letter informed Lee that a "notation will be made on your academic transcript, noting that you have been expelled from the University of New Mexico for disciplinary reasons."  DOS Sanctions Letter at 23.[94]  The letter also banned Lee from the UNM campus, and forbade him from contacting Roe.  See DOS Sanctions Letter at 23.[95]  The letter warned that violating these prohibitions could result in further sanctions, including permanent expulsion from UNM.  See DOS Sanctions Letter at 23.[96]  The letter concluded that Lee could appeal the sanctions decision to the UNM President.  See DOS Sanctions Letter at 22.[97]

Lee appealed the DOS' sanctioning decision on July 15, 2016.  See Defendants' MSJ Memo ¶ 26, at 12 (asserting this fact); Respondent's Appellate Brief at 25, dated July 15, 2016, filed February 6, 2020 (Doc. 71-3)("Appellate Brief").[98]  In the Appellate Brief, Lee argued that expulsion was "too severe and harsh," and that there were "significant procedural errors in the

---

[93]Lee does not dispute specifically the fact in the text that the Defendants propose, which has ample support in the record. Accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[94]Neither party asserts this fact.  The Defendants, however, attach the DOS Sanctions Email to the MSJ Memo.  Lee does not dispute that this is an accurate copy of the DOS Sanctions Email.  This information is relevant because it provides details about Lee's sanctions.  See Response at 27.

[95]The Court considers this fact for the reasons stated in n.94, supra.

[96]The Court considers this fact for the reasons stated in n.94, supra.

[97]The Court considers this fact for the reasons stated in n.94, supra.

[98]Lee again, as he does with nearly all facts laid out in the Defendants' MSJ Memo, disputes the facts described in the Defendants' MSJ Memo ¶ 26, at 12, as "irrelevant and immaterial because [they] do not go to whether Plaintiff's due process rights were violated and whether such violations prejudiced Plaintiff."  Response at 10-11 (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)). The Court reiterates its previous description of the standard it applies to relevance disputes, see n.5, supra.  Moreover, Lee's ability to appeal is relevant to whether the Defendants provided him with a sufficient opportunity to be heard.  See Response at 27.

sanctioning process" because the procedures infringed on Lee's due process rights.   See Defendants' MSJ Memo ¶ 26, at 12 (asserting this fact); Appellate Brief at 33.[99]  Lee concluded that "given the severity of the sanctions involved in this type of matter, it is a violation of Respondent's due process rights to prohibit counsel from representing the Respondent at any hearing, formal or informal."  Appellate Brief at 33.  See Defendants' MSJ Memo ¶ 26, at 12 (asserting this fact).[100]  Frank responded, and informed Lee that the sanctions were "appropriate, proportional, and supported by the facts."  UNM Office of the President Appeal of Sanctions Letter, dated August 23, 2016, filed February 6, 2016 (Doc. 71-3)("Aug. 23 Letter").  See Defendants' MSJ Memo ¶ 26, at 12 (asserting this fact).[101]  Frank continued that "you do not raise any procedural issues that constitute significant error, nor do you identify any procedural issues that materially affected the outcome of the sanction decision."  Aug. 23 Letter at 34.  See Defendants' MSJ Memo ¶ 26, at 12 (asserting this fact).[102]  Frank therefore affirmed the DOS sanctioning decision.  See Defendants' MSJ Memo ¶ 26, at 12 (asserting this fact); Aug. 23 Letter at 34.[103]

## PROCEDURAL BACKGROUND

1.   **The Complaint.**

Lee filed suit in the Second Judicial District Court, County of Bernalillo, State of New Mexico, alleging in Count I that UNM's sexual misconduct investigation procedures violate his

---

[99]The Court considers this fact for the reasons stated in n.98, supra.

[100]The Court considers this fact for the reasons stated in n.98, supra.

[101]The Court considers this fact for the reasons stated in n.98, supra.

[102]The Court considers this fact for the reasons stated in n.98, supra.

[103]The Court considers this fact for the reasons stated in n.98, supra.

federal and state constitutional rights to due process as protected by the Fourteenth Amendment to and Article II, § 18 of the Constitution of the State of New Mexico.  See Complaint ¶¶ 146-171, at 24-28.  Lee alleges that he "has a protected liberty interest in his good name, reputation, honor, and integrity," and "a protected property interest in continuing his education at the University of New Mexico."  Complaint ¶¶ 150-52, at 25.  He alleges that the Defendants deprived him of those interests by expelling him from UNM without providing him certain procedural safeguards, including adequate notice of the allegations, an opportunity to respond, the opportunity to cross-examine his accuser, the identification of all of the evidence and witnesses on which UNM relied during the investigation, a thorough and impartial investigation, and the active participation of legal counsel during the disciplinary proceedings.  See Complaint ¶ 154, at 25-26.  Because of these alleged constitutional violations, Lee seeks monetary relief for damages.  See Complaint ¶¶ 170-71, at 28.  In Count II, Lee argues that the Defendants' Due Process violations entitle him to injunctive relief, specifically

> a reversal of the outcome and findings of the UNM investigation, expungement of [his] educational records reflecting the improper discipline/sanction and production of verification of such expungement . . . , prohibiting UNM from disclosing [Lee's] education records reflecting discipline during the pendency of this action, and readmittance to UNM to complete his graduate program.

Complaint ¶ 174, at 28-29.  In Count III, Lee requests a determination pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the New Mexico Declaratory Judgment Act, N.M. Stat. Ann. § 44-6-1 to -15 that "the investigative and sanctioning processes utilized by Defendants are unconstitutional, improper, and violative of [his] rights, and, as such, inadequate and invalid as a matter of law."  Complaint ¶ 178, at 29.

In Count IV, Lee pleads a claim for violation of Title IX, 20 U.S.C. § 1681(a).  See Complaint ¶¶ 183-212, at 30-33.  Lee alleges that the "Defendants failed to provide [him with] the

full benefits and services of and excluded him from participation in and discriminated against him with regards to programs, services and/or activities at the University of New Mexico because of his sex."  Complaint ¶ 189, at 30.  He alleges that the "Defendants treated [him] differently and less favorably on the basis of his sex with regard to the 'Probable Cause' finding made by UNM OEO."  Complaint ¶ 204, at 32.  He further alleges that the "Defendants intentionally treated Complainant preferentially on the basis of her sex by adopting her statements as true, even though the statements were illogical, inconsistent, or contrary to other witnesses, and ignoring all evidence exculpatory to Plaintiff."  Complaint ¶ 207, at 33.  Finally, Lee alleges that the "Defendants were motivated by gender bias in initiating, adjudicating, and implementing the disciplinary proceeding and sanctions against [him] based upon his sex as a male student accused of sexual misconduct because of the increasing public attention and controversy of sexual assault on campuses and at UNM specifically."  Complaint ¶ 209, at 33.

In Count V, Lee pleads a claim against UNM for breach of contract.  See Complaint ¶¶ 213-217, at 33-34.  Lee alleges that he had "the reasonable expectation[] that UNM would fairly and without bias implement and enforce the provisions and [policies] set forth in its official publications."  Complaint ¶ 214, at 34.  Lee then alleges that UNM breached its agreements by "failing to abide by its policies and procedures," "failing to conduct a fair and impartial investigation and hearing," "failing to provide [a] fair and impartial sanctioning process," "failing to provide adequate due process, to include the right to confront witnesses and one's accuser," "failing to adequately and properly consider and weigh evidence," and "failing to allow adequate representation during the investigative and sanctioning processes."  Complaint ¶ 215, at 34.  In Count VI, Lee pleads a claim for breach of the implied covenant of good faith and fair dealing. See Complaint ¶¶ 218-222, at 34-35.  Lee alleges that his contracts with UNM "implicitly

guaranteed that any investigatory and disciplinary proceedings would be conducted with basic fairness."  Complaint ¶ 219, at 35.  He further alleges that "UNM acted in bad faith when it failed to provide adequate due process to safeguard [his] interests in his education."  Complaint ¶ 220, at 35.  The Defendants removed the case to federal court based on federal question jurisdiction.  See Notice of Removal ¶ 4, at 2, filed December 14, 2016 (Doc. 1)("Notice of Removal").

### 2.    The Sept. 2018 Order.

The Court issued an Order disposing of the Due Process Motion, the Title IX Motion and the Contract Motion.  See Order, filed September 20, 2018 (Doc. 36)("Sept. 2018 Order").  In the Order, the Court concluded that Lee "alleged facts sufficient to state a plausible Fourteenth Amendment procedural due process claim for injunctive and declaratory relief against the Board of Regents of UNM and Frank in his official capacity as president of UNM."  Sept. 2018 Order at 2.  The Court concluded that Lee has a protected property interest in continued enrollment at UNM and a protected property interest in "his good reputation."  Sept. 2018 Order at 2.  The Court further held

> that preponderance-of-the-evidence is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion, given the significant consequences of having a permanent notation such as the one UNM placed on Lee's transcript.  That UNM provides an evidentiary hearing in cases of alleged non-sexual misconduct but not in cases of alleged sexual misconduct supports Lee's claim that the process he received was constitutionally inadequate.  In addition, Lee did not receive notice that he faced sanctions for allegations related to underage drinking until his sanctions hearing, when it was too late to prepare an adequate defense.    The Court concludes, however, that Lee cannot successfully sue Defendants for damages pursuant to § 1983, because (i) UNM is not a "person" under § 1983; and (ii) given that the contours of Lee's due process rights were not clearly established, the Individual Defendants are entitled to qualified immunity.  The Court also concludes that the Defendants are entitled to governmental immunity under the New Mexico Tort Claims Act, NMSA 1978, § 41-4, so Lee cannot properly sue the Defendants for damages for violation of the Constitution of the State of New Mexico.  The Court concludes that the UNM policies and procedures for students accused of sexual misconduct are guidelines for operation and lack specific promissory language necessary to create contractual obligations, so Lee cannot properly sue Defendants for breach of contract or breach of the

> implied covenant of good faith and fair dealing.  At the hearing, Lee conceded his claims pursuant to Title IX, and the Court dismissed them at the time. The Court nevertheless finds that Lee's Title IX claims are not pled with sufficient specificity to infer that UNM treated Lee differently on account of his gender.

Sept. 2018 Order at 3.  The Court dismissed Lee's claims for damages against UNM, the Board of Regents of UNM, Frank, Buchs, Cowan, Cordova, and Chibanga.  See Sept. 2018 Order at 4.  The Court also granted the Title IX Motion and the Contract Motion.  See Sept. 2018 Order at 4.  The Court also dismissed with prejudice the Complaint's Counts I and II as pled against Buchs, Cowan, Cordova, and Chibanga.  See Sept. 2018 Order at 4.  Finally, the Court dismissed with prejudice the Complaint's Counts IV, V, and VI.  See Sept. 2018 Order at 4.

### 3.    **The May 2019 Order**.

The Court amended its Sept. 2018 Order in May 2019.  See Amended Order, filed May 30, 2019 ("Amended Order").   The only change the Court made was to remove the sentence: "Moreover, the Court concludes that preponderance-of-the-evidence is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion, given the significant consequences of having a permanent notation such as the one UNM placed on Lee's transcript." Amended Order n.1 at 1.

### 4.    **The August 13, 2019 Email**.

The Court received an email on August 13, 2019, from William Kidder, a research associate at UCLA's Civil Rights Project.  See Email from William Kidder to Judge Browning (dated Aug. 13, 2019), filed August 27, 2019 (Doc. 59)("Kidder Email").  The email read, in its entirety:

> I noticed Judge Browning's unpublished ruling in Lee v. University of New Mexico (Sept. 2018) in which he concluded "that preponderance-of-the-evidence is not the proper standard for disciplinary investigations" such as campus Title IX matters.  I have had no contact with either party in this case, and my intent in this email is to simply to share my new research article in the peer-reviewed Journal of College and University Law that looks broadly at the standard of evidence in Title

IX campus proceedings as well as other civil rights and administrative contexts including physician misconduct license cases and research misconduct cases linked to federal grants: https://jcul.law.rutgers.edu/category//journal-articles/  Thank you for your consideration.

Kidder Email at 1.

### 5.      The Defendants' Motion for Summary Judgment.

The Defendants filed a Motion for Summary Judgment on February 6, 2020.  *See* Defendants' Motion for Summary Judgment, filed February 6, 2020 (Doc. 70)("Defendants' MSJ").  The Defendants argue that Lee "cannot raise any genuine issue of material fact" related to his federal constitutional due process claim.  Defendants' MSJ at 1. The Defendants note that Lee opposes the Defendants' MSJ. <u>See</u> Defendants' MSJ at 1.  The Defendants ask the Court to dismiss Lee's "remaining claims for injunctive and declaratory relief for alleged violations of his federal constitutional right to due process and enter final judgment in their favor."  Defendants' MSJ at 2.

### 6.      The Memorandum Brief in Support of Defendants' Motion for Summary Judgment.

The Defendants filed a Memorandum Brief in Support of their Motion for Summary Judgment on February 6, 2020.  <u>See</u> Memorandum Brief in Support of Defendants' Motion for Summary Judgment, filed February 6, 2020 (Doc. 71)("Defendants' MSJ Memo").   The Defendants note that the Court has dismissed all of Lee's claims, except his due process claim "arising from the investigative and sanctioning process that resulted in his expulsion from UNM for sexual misconduct."  Defendants' MSJ Memo at 1.

First, the Defendants contend that UNM's failure to provide Lee with an adversarial hearing with an opportunity to cross-examine witnesses does not violate his due process rights. <u>See</u> Defendants' MSJ Memo at 17.  The Defendants assert that Lee contends that, before his expulsion from UNM for sexual misconduct, UNM should have provided Lee with an adversarial hearing where he could (i) cross-examine witnesses, including his accuser; (ii) present evidence;

and (iii) have active representation of counsel.  See Defendants' MSJ Memo at 17.  The Defendants

argue that universities are not courtrooms, and that students facing expulsion need not always

receive an adversarial hearing with the features Lee requests.  See Defendants' MSJ Memo at 17-

18 (citing Watson ex rel. Watson v. Beckel, 242 F.3d 1237, 1242-43 (10th Cir. 2001)("Watson")).

Further, the Defendants note that, in Haidak v. University of Massachusetts-Amherst, 933 F.3d 56

(1st Cir. 2019)("Haidak"), the United States Court of Appeals for the First Circuit held that

universities need not provide students with adversarial hearings.  See Defendants' MSJ Memo at

18.  The Defendants maintain that the Court, when determining whether due process requires a

particular procedural safeguards, should evaluate "the extent to which that procedural safeguard

would result in a more accurate finding," and "the extent to which it would 'decrease the risk of

an erroneous deprivation.'"  Defendants' MSJ Memo at 19 (quoting Haidak, 933 F.3d at 69-70.)

The Defendants assert that, here, the OEO investigator already questioned the accuser "at

length . . . both in writing and orally," and, therefore, cross examination would not have generated

a more accurate result.  Defendants' MSJ Memo at 19-20.  The Defendants also raise concerns

about "the questioning of the accuser by her alleged assailant."  Defendants' MSJ Memo at 20.

The Defendants argue that UNM's "inquisitorial process" satisfies "the minimum requirements of

due process for student discipline."  Defendants' MSJ Memo at 20-21.  Consequently, the

Defendants avow that Lee received sufficient due process, because Lee received notice and a

meaningful opportunity to be heard.  See Defendants' MSJ Memo at 20.

 Second, the Defendants argue in the alternative that Lee did not have a right to an

adversarial hearing, because his accuser's credibility is not at issue.  See Defendants' MSJ Memo

at 21.  The Defendants maintain that the United States Court of Appeals for the Sixth Circuit has

held that, where witness credibility is at issue, a student may be entitled to cross-examination in

non-consensual sexual misconduct cases.  See Defendants' MSJ Memo at 21.  The Defendants also assert that the United States Court of Appeals for the Tenth Circuit has found that where a student "'candidly admitted his guilt," he "was not prejudiced by a lack of notice.'"  Defendants' MSJ Memo at 21 n.9 (citing Watson, 242 F.3d at 1242).  Here, the Defendants contend that the OEO's finding that Lee had engaged in sexual misconduct did not turn on Roe's credibility.  See Defendants' MSJ Memo at 22.  Instead, the Defendants argue that the OEO based its sexual misconduct finding primarily on Lee's "incriminating admissions" to the UNMPD.  Defendants' MSJ Memo at 22.  The Defendants acknowledge that the OEO considered one other witness's statement -- Lee's roommate's statement -- when it determined Lee had engaged in sexual misconduct.  See Defendants' MSJ Memo at 23.  Nonetheless, the Defendants aver that "the damning admissions and statements made by Plaintiff himself were more than sufficient to establish that Plaintiff had engaged in the sexual misconduct for which he was expelled from UNM."  Defendants' MSJ Memo at 23.  The Defendants also emphasize that UNM had an interest in both protecting the accuser's safety and emotional well-being, and in preserving its administrative resources.  See Defendants' MSJ Memo at 23.

Third, the Defendants contend that the OEO's sexual misconduct investigation was not biased.  See Defendants' MSJ Memo at 24.  The Defendants maintain that the Court should apply a rebuttable presumption that the decision-making process was fair and impartial.  See Defendants' MSJ Memo at 24.  Lee alleges that the investigator, Buchs, held actual bias against him.  See Defendants' MSJ Memo at 24.  The Defendants assert that Lee fails to provide any concrete examples of Vele Buchs' alleged bias.  See Defendants' MSJ Memo at 25.  Further, the Defendants note that Lee has not indicated that Buchs "knew him before the investigation or that she had any bias against him."  Defendants' MSJ Memo at 25.  The Defendants also note that an appeal board,

consisting of the UNM President and UNM Board of Regents, approved Buchs' sexual misconduct finding.  See Defendants' MSJ Memo at 25.

Fourth, the Defendants argue that UNM properly applied a preponderance-of-the-evidence standard.  See Defendants' MSJ Memo at 26.  They allege that the OEO need not have applied a higher evidentiary standard when it found that Lee engaged in sexual misconduct.  See Defendants' MSJ Memo at 26.  The Defendants have not "found a single federal case that has found that the use of the preponderance standard in school disciplinary proceedings -- even those involving sexual misconduct -- is violative of due process."  Defendants' MSJ Memo at 26.  The Defendants argue, therefore, that the preponderance-of-the-evidence standard satisfies Lee's due process rights.  See Defendants' MSJ Memo at 26-28.

Finally, the Defendants maintain that the DOS did not violate Lee's due process rights when it considered his provision of alcohol to minors as a factor in his sanctions for sexual misconduct.  See Defendants' MSJ Memo at 28.  The Defendants argue that "there is no evidence that Plaintiff was sanctioned by UNM for an alcohol violation . . . ."  Defendants' MSJ Memo at 27-28 (emphasis in original).  The Defendants continue that the alcohol provision was "at most, an aggravating factor . . . when determining the appropriate level of sanctioning . . . ."  Defendant's MSJ at 29. Next, the Defendants aver that Lee received constitutionally adequate notice of the charges against him, including: (i) notification from a Student Conduct Officer that the OEO would investigate Lee's "alleged sexual assault"; (ii) a meeting with the OEO Director and Title IX Coordinator, where he received information on the upcoming investigation; (iii) a document with allegations of sexual misconduct from his accuser; and (iv) a document with charges against him and evidence gathered during the investigation.  Defendants' MSJ Memo at 29-30.  The Defendants argue that this notice was sufficient, and that Lee was not entitled to receive notice of

- 47 -

all factors that UNM would consider in setting his sanction for sexual misconduct.   See Defendants' MSJ Memo at 30.   Moreover, the Defendants contend that Lee was not prejudiced by a lack of notice, because he admitted to the UNMPD that he provided alcohol to minors.   See Defendants' MSJ Memo at 31.   The Defendants therefore conclude that "[a]dditional notice would not have allowed [Lee] to better defend the charges of sexual misconduct against him . . . ."

> **7.      The Response to Defendants' Motion for Summary Judgment.**

Lee filed a Response to Defendants' Motion for Summary Judgment on March 23, 2020. See Response to Defendants' Motion for Summary Judgment at 1, filed March 23, 2020 (Doc. 76)("Response").   Lee argues that a genuine issue of material fact exists: whether Lee received sufficient process during the OEO's investigation and his expulsion from UNM.   See Response at 1.

Lee insists that he has a property interest in his enrollment at UNM, and a liberty interest in his reputation.   See Response at 15-16 (citing Amended Order at 3, filed May 30, 2019 (Doc. 53)).   Lee also argues that "case law confirms" Lee's liberty interest in his "reputation and good name."   Response at 16 (collecting cases).   Lee therefore asserts that he "was entitled to due process before UNM deprived him of his property interest in his continued enrollment at UNM and his liberty interest in his good name and reputation."   Response at 16.   Lee avers that the Court should apply the Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976), test to determine what due process is required here.   See Response at 17.   Consequently, Lee contends that the Court should balance: (i) the private interest affected -- here Lee's "property interest in his continued enrollment at UNM and liberty interest in his good name and reputation"; (ii) "the value of additional procedural safeguards in preventing an erroneous finding"; and (iii) "the additional burdens that UNM would suffer from implementing the additional safeguards."   Response at 17 (citing

Mathews v. Eldridge, 424 U.S. at 334-35).   Moreover, Lee alleges that because his sexual misconduct investigation is a fact intensive inquiry, there is a high risk of error.   See Response at 17.   Accordingly, Lee maintains that additional procedural safeguards would reduce the risk of error in his case.   See Response at 18.

Further, Lee contends that the Defendants violated his due process rights, because the OEO did not hold a hearing or allow Lee to cross-examine witnesses.   See Response at 18.   Lee avers that Roe's credibility is a key issue, because the OEO had to determine whether to believe Lee or Roe.   See Response at 18.

Next, Lee turns to the procedural safeguards to which he argues he was entitled.   See Response at 18.   First, Lee argues that due process requires the OEO to hold a hearing to determine whether Lee engaged in sexual misconduct.   See Response at 19.   Lee maintains that "'students facing suspension [or expulsion] and the consequent interference with a protected property interest must be . . . afforded some kind of hearing.'"   Response at 19 (quoting Goss, 419 U.S. at 579).   Further, Lee argues that hearings are necessary where a student faces expulsion to allow an impartial factfinder to hear both sides of a case.   See Response at 19.   Lee alleges that he was not able to cross-examine any witnesses, nor did he receive the names of the witnesses whom the OEO interviewed during its investigation.   See Response at 19.   Additionally, he contends that a single person should not investigate and decide whether a student has committed sexual misconduct.   See Response at 20, 26-27 (arguing that the OEO process is inherently biased because "a single party is investigator, prosecutor, judge, and jury").   Further, Lee alleges that "there is no indication [Roe] was effectively questioned during the OEO investigation."   Response at 20.   Lee asserts that "a hearing before an impartial factfinder allows the factfinder to hear testimony at the same time, allow for cross-examination, evaluate witness's demeanor, and address conflicting testimony

between witnesses in real time."  Response at 23.  Further, Lee contends that Vele Buchs was biased because she was "hostile and aggressive" towards Lee, and "did not trust" Lee or Goodnight.  Response at 27-28.

Lee then avers that Roe could consent to sexual contact despite "the fact that alcohol was involved and there were discussions of Ms. Roe's level of intoxication."  Response at 24.  Lee asserts that Buchs had to consider the following factors to determine whether Roe was too incapacitated to consent to sexual contact: (i) "behavior like stumbling or otherwise exhibiting loss of equilibrium"; (ii) "slurred speech or word confusion"; (iii) "bloodshot, glassy or unfocused eyes"; (iv) "vomiting, especially repeatedly"; (v) "being disoriented, or confused as to time or place"; and (vi) "loss of consciousness."  Response at 25 (citing UNM Policy # 2740, § 3).  Because the OEO examined the aforementioned factors, Lee contends that the OEO "made a factual determination after evaluating the credibility of witnesses," and therefore, Lee "was prejudiced by not receiving an opportunity to cross-examine witnesses."  Response at 25.  Lee insists that these inadequate procedures substantially prejudiced him.  See Response at 25.

Next, Lee argues that the OEO's use of the preponderance-of-the-evidence standard violates Lee's due process rights.  See Response at 29.  Lee asserts that a university sexual misconduct finding's consequences are similar to criminal consequences, particularly regarding reputational injury.  See Response at 29.  Lee declares, therefore, that a clear-and-convincing evidence standard is appropriate in "quasi-criminal proceeding[s]" like his expulsion from UNM.  Response at 29-30.

Finally, Lee contends that the OEO violated his due process rights by considering his provision of alcohol to minors as a factor when determining his sanctions.  See Response at 30.  Lee alleges that he never received "notice and an opportunity to be heard on the charge related to

underage drinking because that was addressed at the sanction hearing." Response at 30-31. Lee distinguishes Watson, 242 F.3d at 1240-42, from his own case, because the OEO's finding on provision of alcohol to minors "did not go to the underlying motive of the case," as in Watson, but instead "was a completely separate charge against" Lee. Response at 31. Lee avers that notice that the OEO would consider his provision of alcohol to minors would have given him "the opportunity to defend against the allegations and explain the circumstances." Response at 31.

**8.    The Memorandum Opinion and Second Amended Order.**

The Court issued a Memorandum Opinion and Order ("MOO") on March 30, 2020. See Lee v. Univ. of New Mexico, 449 F. Supp. 3d 1071 (D.N.M. 2020)(Browning, J.). In the MOO, the Court first explained that Lee cannot sue UNM for damages under § 1983, because UNM is not a "person" under the statute. See MOO, 449 F. Supp. 3d at 1080. Next, the Court concluded that Lee cannot sue Frank, Buchs, Cowan, Cordova, and Chibanga (the "Individual Defendants") under § 1983, because the Individual Defendants are entitled to qualified immunity. See MOO, 449 F. Supp. 3d at 1080. The Court then concluded that Lee pled facts sufficient to show that the Defendants violated his constitutional right to due process of law. See MOO, 449 F. Supp. 3d at 1080. Additionally, the Court held that the Defendants are entitled to immunity under the New Mexico Tort Claims Act, N.M. Stat. Ann. § 41-4-1 to -30, and therefore Lee cannot sue the Defendants for violating the Constitution of the State of New Mexico. See MOO, 449 F. Supp. 3d at 1080. Next, the Court concluded that UNM's procedures and policies "do not create contractual obligations." MOO, 449 F. Supp. 3d at 1080. The Court then held that the Individual Defendants are not liable under Title IX, because individuals cannot be liable for Title IX violations. See MOO, 449 F. Supp. 3d at 1080. Finally, the Court concluded that Lee has not alleged sufficient facts to create an inference of gender bias. See MOO, 449 F. Supp. 3d at 1081. Accordingly, the

Court dismissed most of Lee's claims, but did not dismiss Lee's (i) Title IX claim against UNM; (ii) Due Process claims against UNM; or (iii) Due Process claim against UNM's current president. See MOO, 449 F. Supp. 3d at 1155.

      **9.**      **<u>The Reply Brief in Support of Defendants' Motion for Summary Judgment</u>.**

      On May 18, 2020, the Defendants filed a Reply Brief in Support of Defendants' Motion for Summary Judgment.  See Reply Brief in Support of Defendants' Motion for Summary Judgment at 1, filed May 18, 2020 (Doc. 87)("Reply").  The Defendants insist that Lee does not have a right to an adversarial hearing with cross-examination before expulsion from UNM.  See Reply at 1.  They assert that "such a right only arises where there is a credibility determination to be made."  Reply at 1.  Here, the Defendants contend, the OEO did not need to make a credibility determination, because Lee admitted to sexual misconduct.  See Reply at 1-2.  The Defendants maintain that there are no "'competing narratives'" about Lee's alleged misconduct, which would require cross-examination.  See Reply at 12 (citing <u>Doe v. Baum</u>, 903 F.3d 575, 581 (6th Cir. 2018)("<u>Baum</u>")).  Further, the Defendants aver that all cases which Lee cites in support of the proposition that "a student accused of sexual misconduct has a due process right to an adversarial hearing with the opportunity to cross-examine his accuser" limit their holdings to proceedings where "there is an actual credibility determination to be made."  Reply at 12.

      The Defendants insist that this matter is not a he said/she said dispute.  See Reply at 12. Here, the Defendants contend that because the outcome does not depend on whether the factfinder believes Roe, UNM's "significant interest in encouraging student victims of sexual assault to report and stand by their accusations outweighs the accused student's interest in being deprived of his continued education."  Reply at 12-13 (citing MOO, 449 F. Supp. 3d at 1125).  The Defendant's maintain that UNM based its sexual misconduct finding on Lee's admissions to the UNMPD.  See

Defendant's Reply at 13. The Defendants observe that Lee told the UNMPD that Roe was extremely intoxicated and that he repeatedly tried to insert his penis into her mouth, but "never succeeded in this act because Roe would not open her mouth and let him." Reply at 13. The Defendants argue that the OEO found Lee had engaged in sexual misconduct based on these admissions. See Reply at 14. Accordingly, they insist that, because of the "damning nature of Plaintiff's own admissions, it is implausible that an adversarial hearing with its attendant procedural safeguards would have reduced the risk of error or changed the outcome." Reply at 14.

Next, the Defendants argue that Lee has not demonstrated that the OEO investigation was biased. See Reply at 14-15. The Defendants argue that an inquisitorial adjudication is fair in important administrative decisions like the one here. See Reply at 14 (citing Haidak, 933 F.3d at 68). Further, the Defendants argue that Buchs did not have conflicting roles in the investigation and that she never acted as Roe's advocate. See Reply at 14. The Defendants further contend that Buchs did not predetermine the claim against Lee. See Reply at 16.

Finally, the Defendants aver that UNM properly considered Lee's provision of alcohol to minors as a factor in determining his sexual misconduct sanction. See Reply at 16. The Defendants maintain that UNM needs to provide Lee notice of the "charges" against him, and that the only charge against Lee is sexual misconduct. See Reply at 16-17. Consequently, the Defendants contend that a student need not receive "advance notice of every possible factor that may be considered in setting the level of sanction," because this requirement would be "unworkable and does not appear to be supported by" any precedent. Defendants Reply at 17 (emphasis in original). Further, the Defendants assert that Watson, 242 F.3d at 1237, indicates that the Tenth Circuit would not adopt Lee's proposed notice standard. See Reply at 17. The Defendants also purport to distinguish Greenhill v. Bailey, 519 F.2d 5 (8th Cir. 1975)("Greenhill"),

from the present case.  See Reply at 17-18.  Additionally, the Defendants note that Lee admitted -
- and has never denied -- that he provided alcohol to Roe and Goodnight.  See Reply at 17-18.  The
Defendants conclude, therefore, that additional notice would not have allowed Lee to better defend
against the assertion that he provided alcohol to minors.  See Reply at 19.

### 10.   Stipulation of Dismissal of Plaintiff's Title IX Claim.

On July 21, 2020, the parties filed a Stipulation of Dismissal of Plaintiff's Title IX Claim.
See Stipulation of Dismissal of Plaintiff's Title IX Claim at 1, filed July 21, 2020 (Doc.
96)("Voluntary Dismissal").  In the Voluntary Dismissal, the parties "stipulate to the dismissal,
without prejudice, of Count IV ('Violation of Title IX') of the" Complaint.  Voluntary Dismissal
at 1.

### 11.   The Hearing.

The Court held a hearing on the Defendants' MSJ on September 28, 2020.  See Clerk's
Minutes at 1, filed September 28, 2020 (Doc. 106).  The Court first asked the parties how things
differed at the hearing from the motion to dismiss stage.  See Draft Transcript of Hearing at 5:18-
23 (taken September 28, 2020)(Court)("Tr.").[104]  The Defendants argued that things were different
from the motion to dismiss stage, because "credibility of the accuser is not at stake here," thus
there is no "determination on the credibility of the accuser as such that due process would require
there to be an availability of cross-examination."  Tr. at 6:18-23 (Smith).  The Court asked how
someone would determine in advance whether credibility was at issue.  See Tr. at 7:12-21 (Court).
The Defendants compared the present case to Plummer v. University of Houston, 860 F.3d 767
(5th Cir. 2017)("Plummer").  See Tr. at 8:9-10 (Smith).  The Defendants insisted that, as in

---

[104]The Court's citations to the transcript of the hearing refer to the court reporter's original,
unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Plummer -- where a university factfinder relied on video evidence from a sexual assault rather than an accuser's testimony -- here, due process does not require cross-examination, because the OEO investigator based her finding on Lee's admissions to the UNMPD.  See Tr. at 8:13-9:13 (Smith).

Next, the Court noted that it was not ready to classify this case as a quasi-criminal proceeding.  See Tr. at 9:16-18 (Court).  The Court explained that, during criminal cases, defendants will often contest confessions by saying the confessions were coerced or inaccurate.  See Tr. at 9:20-25 (Court).  In such cases, the Court continued, the Court will still have a criminal trial with cross-examination available to the defendant.  See Tr. at 10:1-2 (Court).  The Court asked the Defendants how it is different "where a student is drug in rather quickly by the police after an incident," as here, "and gives some statements -- whether we call them a confession or not" -- from the criminal trial scenario that the Court had described.  Tr. at 10:2-8 (Court).  The Defendants responded that different constitutional rights and interests are at issue, because the constitutional right to confrontation arises under the Sixth Amendment of the Constitution of the United States of America, rather than the Due Process Clause.  See Tr. at 10:11-20 (Smith).  Here, the Defendants urged the Court to apply the Mathews v. Eldridge, 424 U.S. at 334-35, balancing test.  See Tr. at 11:11 (Smith). The Defendants insisted that there will be no added benefit to the factfinding process by allowing cross-examination in this case.  See Tr. at 14:1-3 (Smith).  The Defendants directed the Court to examine the FLOD.  Tr. at 14:17 (Smith). The Defendants insisted that the FLOD indicates that the OEO based its decision entirely on Lee's admissions rather than on Roe's allegations.  See Tr. at 14:11-16 (Smith).

The Defendants acknowledged that "being very intoxicated is not necessarily admission to sexual misconduct."  Tr. at 16:18-19 (Smith).  Nonetheless, the Defendants stated that, here, Lee made

an admission that not only was she very intoxicated, she had to be carried to the room, he tried to insert his penis into her mouth and that he was unsuccessful in those efforts because she wouldn't open her mouth, and those were the statements that were relied upon by the OEO investigator to establish indicia of non-consent such that there was a violation of UNM policy.

Tr. at 16:20-17:2 (Smith).   The Court asked whether Roe was having consensual sex with Goodnight at the same time she refused to have sex with Lee.  See Tr. at 17:9-12 (Court).  The Defendants stated that UNM has found that Goodnight engaged in nonconsensual sex with Roe, and that UNM expelled Goodnight as a result.  See Tr. at 17:15-21 (Smith).  The Court expressed doubt that UNM could have made a sexual misconduct finding on the basis of Lee's statements alone, without considering Roe's statements.  See Tr. at 18:23-19:7 (Court).  The Defendants insisted that the Court should focus on whether the OEO investigator made a credibility determination regarding Roe.  See Tr. at 19:21-21:21 (Smith).  The Court stated that, to make the sexual misconduct finding, it seems that UNM "had to have credited Roe's testimony."  Tr. at 23:18-19 (Court).  The Defendants asserted that, here, it does not matter what Roe said, and that therefore cross-examination is unnecessary, because it would not help the factfinder reach the truth.  See Tr. at 24:21-25:1 (Smith).

Next, the Defendants noted that UNM's policy states that "initiating sexual contact with somebody who is too incapacitated to consent" is sexual misconduct and violates UNM policy. Tr. at 27:3-9 (Smith).  The Defendants argue, therefore, that Lee's admissions to the UNMPD are sufficient to establish a violation of UNM policy, because he admitted that Roe was very intoxicated and that he attempted to initiate sexual contact with her.  See Tr. at 27:1-28:24 (Smith).

Lee argued that he lacked notice of the evidence that would be presented against him.  See Tr. at 33:17-25 (Crow).  Lee contended that he is entitled to see a comprehensive list of all witnesses against him to prepare for a hearing.  See Tr. at 35:1-7 (Crow).  Lee cited Flaim v. Med.

Coll. of Ohio, 418 F.3d 629 (6th Cir. 2005)("Flaim"), where Lee contends that the accused student was able to present his own version of events at a hearing and had the opportunity to note inconsistences in the officer's testimony.  See Tr. at 35:22-36:7 (Crow).  Lee noted that, here, the interviewing officer was never called to testify at Lee's hearing.  See Tr. at 36:8-12 (Crow).  Lee contended that "the only thing relied upon" in the OEO's sexual misconduct determination "was the police officer's report . . . hearsay, essentially."  Tr. at 36:11-13 (Crow).  Lee emphasized that "the problem is that we're not given an opportunity to prepare for a hearing, we're not given the opportunity to present testimony when it is to contradict the testimony of an officer or anything in the report, nothing to that effect."  Tr. at 36:20-24 (Crow).  The Court asked whether UNM's sexual misconduct policy is similar to California's rape statute, which considers sex with an intoxicated person to be rape.  See Tr. at 37:4-37:12 (Court).[105]  The Court continued: "once Lee spits out several times that Roe was heavily intoxicated, isn't he in trouble trying to establish any sort of consent?"  Tr. at 37:14-17 (Court).  The Court stated that Lee may need to demonstrate that

---

[105]Cal. Penal Code § 261(a) provides:

(a)     Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances . . .

(3)     Where a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused.

Cal. Penal Code § 261(a) (West 2013). See People v. Braslaw, 233 Cal. App. 4th 1239, 1245, 183 Cal. Rptr. 3d 575, 580 (2015), as modified (Feb. 17, 2015)(concluding that a person was too intoxicated to consent to sex where the person was vomiting and had been put in the shower by her friends to clean up).

Roe consented.  See Tr. at 37:18-20 (Court).  Lee responded that this problem is "even more in favor of having a hearing."  Tr. at 37:21-22 (Crow).

Next, Lee argued that the largest risk in university sexual misconduct cases is "potentially coming up with an erroneous result.  See Tr. at 39:23-40:3 (Crow).  Lee also noted that the factual record indicates that Lee further explained why he made "some of those statements . . . to the police officer."  Tr. at 40:11-12.  Lee therefore insisted that cross-examination is necessary in every university sexual misconduct proceeding.  See Tr. at 40:20-31:3 (Crow).  Nonetheless, Lee admitted that no other court had "gone that far."  Tr. at 41:2-7 (Court, Crow).

The Court noted that Lee may have admitted the encounter was nonconsensual, because Lee (i) stated that Roe was heavily intoxicated; (ii) provided nothing to indicate that she was consenting; and (iii) from "the fact that she was closing her mouth to him inserting the penis is an inference you could draw that she's refusing consent."  Tr. at 42:2-10 (Court).  Lee avowed that any sexual contact with Roe was consensual.  See Tr. at 42:15-25 (Crow).  Lee disputed the Defendants' characterization of Plummer, noting that in Plummer the university relied upon a video, rather than a police report, the video "wasn't hearsay," and the victim had no memory of the event at issue.  Tr. at 43:13 (Crow).  Here, by contrast, Lee argued that Roe "testified that she was well aware of the situation."  Tr. at 44:1-1 (Crow).  Further, Lee argued that he would have presented recordings during a hearing that would "support that issue of consent."  Tr. at 45:5-6 (Crow).  Lee conceded that he "didn't know" if those recordings are part of the record before the Court.  Tr. at 45:15-17 (Court, Crow).

The Court asked Lee how he would "write his due process right" if the Court does not agree that accused students should have the ability to cross-examine their accusers.  See Tr. at 46:12-16 (Court).  Lee responded that

> to the extent that there has been no affirmative admission by the accused that he
> has admitted some form of policy violation, then the university must provide some
> form of procedural safeguard to make sure that the accused has an opportunity to
> confirm or in some cases not confirm that there was a policy violation.

Tr. at 46:17-23 (Crow).  The Court asked why a procedure such as interrogatories would not

provide sufficient due process rather than live cross-examination, given that "the university has an

interest in encouraging women to come forward" and it is "not unheard of that we conduct some

investigations" without live testimony.  Tr. at 41:18-48:12 (Court).[106]  Lee argued that there is

"nothing like live cross-examination."  Tr. at 41:21-22 (Crow).  The Defendants countered that

Lee's admissions to the UNMPD that Roe consented to sexual contact with Lee.  See Tr. at 54:17-

25 (Smith).  The Defendants, therefore, contended that cross-examination would achieve no

benefit, but would embarrass or humiliate Roe.  See Tr. at 55:7-17 (Smith).

The Defendants next compared this case to the hypothetical case of a student being

expelled for cheating.  See Tr. at 59:10-12 (Smith).  The Defendants described a situation where a

teacher sees a person cheating during a test, and the student "says yes, I admit I was looking over

the shoulder and copying answers, but I don't think that was cheating."  Tr. at 59:16-18 (Smith).

The Defendants continued that, in such a situation, the student has "admitted to the critical facts,"

and there would be no benefit to cross-examining the teacher.  Tr. at 59:19-22 (Smith).  Similarly,

here, the Defendants argued that Lee has admitted to the important facts, and cross-examining Roe

would produce no further benefit.  See Tr. at 59:22-60:4 (Smith).

---

[106]As an example, the Court noted that recent investigations into the president have utilized
interrogatories rather than live cross-examination.  See Tr. at 41:18-48:12 (Court); Full Text of
Mueller's Questions and Trump's Answers, Associated Press (April 18, 2019),
https://apnews.com/article/98f22511be924ced895ce5c0bfedfe37 (providing the text of Special
Counsel Robert Mueller's questions to President Donald Trump, and President Trump's answers).

Next, the parties addressed the bias issue.  See Tr. at 61:14 (Court, Smith).  The Defendants argued that Lee has not presented evidence that would lead a reasonable factfinder to conclude that the OEO investigation was "infected by actual bias."  Tr. at 62:1-3 (Smith).  The Defendants contended that the Tenth Circuit has held that, "because honesty and integrity are presumed on the part of a tribunal, there must be some countervailing reason to conclude that the decision maker is actually biased with respect for the factual issues being adjudicated."  Tr. at 62:9-13 (Smith). Accord Mangels v. Pena, 789 F.2d 836, 838 (10th Cir. 1986)("Because honesty and integrity are presumed on the part of a tribunal, there must be some substantial countervailing reason to conclude that the decision maker is actually biased with respect for the factual issues being adjudicated . . . .").   Although the presumption against bias is rebuttable, the Defendants continued, the burden to rebut the presumption is "heavy indeed."  Tr. at 62:19-25 (Smith)(quoting Hess v. Bd. of Trs. Of S. Ill. Univ, 839 F.3d 668, 675 (7th Cir. 2016)("Hess")).  The Defendants noted that Lee provided evidence only of his subjective feelings of bias "based on his perception of nonverbal cues or facial expression from Ms. Vele Buchs."  Tr. at 62:20-25 (Smith).  Next, the Defendants argued that the Supreme Court has held that the government may use a single governmental administrator to make initial determinations, as it does in Social Security disability claims.  See Tr. at 68:2-19 (Smith); Sims v. Apfel, 530 U.S. 103 (2000).  The Defendants then argued that Buchs did not act as Roe's advocate at any point in the proceedings.  See Tr. at 68:20-69:24 (Smith)(citing UNM Policy # 2740).  Finally, the Defendants noted that Goodnight tried to connect with Buchs on LinkedIn.  See Tr. at 70:1-9 (Smith).  The Defendants maintained that the LinkedIn request does not relate to Lee and, moreover, that it occurred over a month after Buchs issued her final determination that Lee had engaged in sexual misconduct.  See Tr. at 71:9-20 (Smith).

Lee argued that the inquisitorial model is inherently biased, because it relies on a single investigator to make a sexual misconduct determination.  See Tr. at 74:20-75:6 (Crow).  Lee did not "have any other argument as it relates to the bias issue."  Tr. at 79:3-4 (Crow). The Court asked Lee whether any other court has found that the inquisitorial model is inherently biased.  See Tr. at 79:5-13 (Court).  Lee was unable to cite any cases that had found that the inquisitorial model is inherently biased.  See Tr. at 79:14-15 (Crow).  Lee then noted that Buchs stated at some point that she does not believe Goodnight.  See Tr. at 82:2-4 (Crow).  The Court said factfinders must decide who they believe during the decision-making process, and that does not make the factfinder's decision inherently biased.  See Tr. at 82:11-20 (Court).  Lee responded that any one-party investigation system is inevitably biased.  See Tr. at 83:1-18 (Crow).  The Defendants countered that Lee had two levels of appeal if he was dissatisfied with Buchs' determination. See Tr. at 85:1-2 (Smith).  Further, the Defendants noted that in Haidak, 933 F.3d at 69-70, the First Circuit found that the inquisitorial model of truth seeking is sufficient for critical administrative decisions.  See Tr. at 86:11-24 (Smith).

The Defendants moved to the final issue: whether Lee was prejudiced, because he did not receive adequate notice that the fact that he purchased alcohol for minors would be considered in the sanctioning decision.  See Tr. at 91:24-92:4 (Smith).  The Defendants noted that, at UNM, the sexual misconduct determination process is bifurcated from the sanctioning process -- the OEO investigator determines whether a student has engaged in sexual misconduct, and then the DOS applies a sanction.  See Tr. at 92:5-17 (Smith).  The Defendants contended that Lee was not expelled because he alcohol to minors.  See Tr. at 93:1-14 (Smith).  The Defendants avowed that the provision of alcohol is merely an "aggravating factor" in the sanctioning decision.  See Tr. at 94:25-95:4 (Smith).  The Defendants continued that, as in Watson, the provision of alcohol to

- 61 -

minors was not an independent charge against Lee, and thus the Defendants are not required to provide notice that they would consider it in their sanctioning decision.   Tr. at 96:1-23 (Smith)(citing <u>Watson</u>, 242 F.3d at 1241).[107]   The Defendants argued that no cases exist requiring "that in order to provide adequate notice for due process, I have to tell you: here's the twelve things that I might consider as factors in setting my hearing for your violation of policy."  Tr. at 100:14-19 (Smith).  Further, the Defendants noted that Lee admitted to the UNMPD that he purchased alcohol for minors, and under <u>Watson</u>, "a student is not credited by a lack of notice, when he candidly admits his guilt because additional notice would not have allowed the student to better defend the allegations."   Tr. at 101:12-16 (Smith).[108]   Next, the Defendants asserted that

---

[107]The Defendants read the following quote from <u>Watson</u>:

> The board's finding that the motive for the assault was racism does not constitute an independent charge against Mr. Watson. The record does not indicate that the board expelled Mr. Watson because he was racist, but that he was expelled for the assault. Mr. Watson does not cite, and this court does not find, any precedent for the proposition that notice must include all suspected motives for a student's actions. Such extensive notice is not even due in a criminal trial.

<u>Watson</u>, 242 F.3d at 1241.

[108]The Court asked the Defendants to provide an exact quote from <u>Watson</u>, which is as follows:

> In order to establish a denial of due process, a student must show substantial prejudice from the allegedly inadequate procedure.  <u>See</u>, <u>e.g.</u>, <u>United States v. Kennedy</u>, 64 F.3d 1465, 1473 (10th Cir. 1995); <u>Moore v. Reynolds</u>, 153 F.3d 1086, 1111 (10th Cir. 1998); <u>Keough v. Tate Cty. Bd. of Ed.</u>, 748 F.2d 1077 (5th Cir. 1984).  Mr. Watson admitted to the board that he assaulted his roommate and that he did so because his roommate was Hispanic and Catholic. <u>See</u> <u>Goss</u>, 419 U.S. at 581. Because Mr. Watson candidly admitted his guilt, Mr. Watson was not prejudiced by a lack of notice.

<u>Watson</u>, 242 F.3d at 1242.

Goodnight, who was nineteen years old at the time of the alleged sexual assault, was also expelled for violating UNM's sexual misconduct policy.  See Tr at 103:9-17 (Smith).  The Defendants argued, therefore, that Lee's purchase of alcohol for minors was not determinative in UNM's decision to expel him.  See Tr. at 103:9-17 (Smith).  Lee responded that provision of alcohol to minors does not indicate a predisposition to commit sexual assault, as racism did in Watson.  See Tr. at 105:7-18 (Crow).  The Court stated that, at the sentencing phase, courts have broad discretion and can "consider just about anything."  Tr. at 106:4-18 (Court).  Lee replied that his "problem with the way the hearing happened" was that the hearing officer specifically asked Lee whether he purchased alcohol for the minors.  Tr. at 106:22-107:7 (Crow).  The Court responded that requiring the notice that Lee is proposing would overcomplicate sentencing.  See Tr. at 108:3-5 (Court).  The Defendants added that, although Lee did not have advance notice that the hearing officer would consider the provision of alcohol as a factor in his sanction, Lee had an opportunity to respond to the provision of alcohol issue at the sanctioning hearing.  See Tr. at 109:20-110:2 (Smith).

The Court advised counsel that it thought "some process for questioning the victim is necessary here."  Tr. at 113:7-9 (Court).  The Court continued that it was not "convinced that there is any right to confrontation."  Tr. at 113:14-15 (Court).  Further, the Court stated that it is unlikely that "unitary models are inherently biased."  Tr. at 113:21-24 (Court).  Consequently, the Court noted that the primary question remains about Lee's right to cross-examine Roe and whether Roe's credibility is at issue.  See Tr. at 113:13-19 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's

case.'"   Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M.

2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th

Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Sch.)).   See Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving
> party must satisfy its burden of production in one of two ways: by putting evidence
> into the record that affirmatively disproves an element of the nonmoving party's
> case, or by directing the court's attention to the fact that the non-moving party lacks
> evidence on an element of its claim, "since a complete failure of proof concerning
> an essential element of the nonmoving party's case necessarily renders all other
> facts immaterial."  *Celotex*, 477 U.S. at 323-25.  On those issues for which it bears
> the burden of proof at trial, the nonmovant "must go beyond the pleadings and
> designate specific facts to make a showing sufficient to establish the existence of
> an element essential to his case in order to survive summary judgment."  *Cardoso
> v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets
> omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9,

2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial,

that party must support its motion with credible evidence -- using any of the materials specified in

Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex, 477

U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[109]  Once the movant meets this burden,

rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine

issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184

---

[109]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme
Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the
law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727,
at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent
both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how
the standard was applied to the facts of the case.").

F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. See 184 F. Supp. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).  Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack of competent evidence, and secure summary judgment.  See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).  See

also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue

Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary

judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction;

it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation,
> a plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the
> facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting
> *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511
> F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)] explained that the blatant contradictions of the record must

be supported by more than other witnesses' testimony."  Lymon v. Aramark Corp., 728 F. Supp.

2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

To allege a claim for relief, rule 8 of the Federal Rules of Civil Procedure requires a

pleading to contain

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the
> court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to
> relief; and
>
> (3) a demand for the relief sought, which may include relief in the alternative or
> different types of relief.

Fed. R. Civ. P. 8.  Parties may allege new claims in motions for summary judgment.  Evans v.

McDonald's Corp., 936 F.2d at 1090-91.  When this occurs, courts treat the motion for summary

judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil

Procedure.  See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998).  The Tenth

Circuit has stated that "[a]s a general rule, a plaintiff should not be prevented from pursuing a valid

claim just because she did not set forth in the complaint a theory on which she could recover,

provided always that a late shift in the thrust of the case will not prejudice the other party in

maintaining his defense upon the merits."   Evans v. McDonald's Corp., 936 F.2d at 1090-91

(quotation marks omitted).  While the purpose of "fact pleading" is to give defendants fair notice

of claims against them "without requiring the plaintiff to have every legal theory or fact developed

in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs

may not "wait until the last minute to ascertain and refine the theories on which they intend to

build their case."  Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible."  United States v. Christy, No. CR 10-1534

JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802).

Rule 801(c) of the Federal Rules of Evidence defines hearsay: "a statement that: (1) the declarant

does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to

prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  Courts deem hearsay

generally unreliable and untrustworthy.   See Chambers v. Mississippi, 410 U.S. 284, 298

(1973)(noting that hearsay is generally untrustworthy and lacks traditional indicia of reliability);

United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)("Hearsay is generally inadmissible

as evidence because it is considered unreliable." (citing Williamson v. United States, 512 U.S.

594, 598 (1994))); United States v. Console, 13 F.3d 641, 656 (3d. Cir. 1993)(stating hearsay is

"'inherently untrustworthy'" because of the lack of an oath, presence in court, and cross

examination quoting United States v. Pelullo, 964 F.2d 193, 203 (3rd Cir. 1992))).  Testimonial

proof is necessarily based upon the human senses, which can be unreliable. See 5 Jack Weinstein & Margaret Berger, Weinstein's Federal Evidence § 802.02[1][b], at 802-5 (Joseph McLaughlin ed., 2d ed. 2017)("Weinstein's Federal Evidence").  The Anglo-American tradition uses three devices to illuminate inaccuracies in the testimonial proof: (i) the oath; (ii) personal presence at trial; (iii) and cross examination.  See Weinstein's Federal Evidence § 802.02[2][a], at 802-5. Courts view hearsay evidence as unreliable because it is not subject to an oath, personal presence in court, or cross examination, see, e.g., United States v. Console, 13 F.3d at 656; it is difficult to evaluate the credibility of out-of-court statements when the three safeguards mentioned above are unavailable, see Weinstein's Federal Evidence § 802.02[3], at 802-6 to -7.

"Hearsay within hearsay" is admissible only "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.  See, e.g., United States v. DeLeon, 316 F. Supp. 3d 1303, 1306 (D.N.M. 2018)(Browning, J.)(noting, after concluding that rule 803(8) provides an exception for law enforcement reports, that a hearsay issue remains regarding the statements within the reports); Wood v. Millar, No. CIV 13-0923 RB/CG, 2015 WL 12661926, at *4 (D.N.M. Feb. 19, 2015)(Brack, J.)(stating that witness statements in police reports, to which rule 803(8) applies, may be admissible under hearsay exclusions other than rule 803(8)); Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 6632524, at *7 (D.N.M. Oct. 31, 2012)(Browning, J.)(excluding medical records, which themselves were inadmissible hearsay, although the statements within the medical records were opposing party statements).  A statement that is otherwise hearsay, however, may be admissible for a purpose, such as impeachment, other than to prove the truth of the matter asserted. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay.  If admitted for impeachment purposes, however, it

is not hearsay.").  Likewise, "'[i]f the significance of an offered statement lies solely in the fact

that it was made, no issue is raised as to the truth of anything asserted, and the statement is not

hearsay.'"  Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th

Cir. 2001)(quoting Fed. R. Evid. 801 advisory committee's note).  Statements in the latter category

include verbal acts --

> "statement[s] offered to prove the words themselves because of their legal effect
> (e.g., the terms of a will)."  Black's Law Dictionary (10th ed. 2014).  "A contract,
> for example, is a form of verbal act to which the law attaches duties and liabilities
> and therefore is not hearsay." *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992).
> *See also Cagle v. The James St. Grp.*, 400 F. App'x 348, 356 (10th Cir. 2010).

Farley v. Stacy, No. 14-CV-0008-JHP-PJC, 2015 WL 3866836, at *5 (N.D. Okla. June 23,

2015)(Payne, J.), aff'd, 645 F. App'x 684 (10th Cir. 2016)(unpublished).

### 1.    Rule 801(d)(2).

An opposing party's statement is not hearsay.  See Fed. R. Evid. 801(d)(2).  Rule 801(d)(2)

specifically excludes from hearsay a statement that is offered against an opposing party and:

> (A)    was made by the party in an individual or representative capacity;
>
> (B)    is one the party manifested that it adopted or believed to be true;
>
> (C)    was made by a person whom the party authorized to make a
> statement on the subject;
>
> (D)    was made by the party's agent or employee on a matter within the
> scope of that relationship and while it existed; or
>
> (E)    was made by the party's coconspirator during and in furtherance of
> the conspiracy.

> The statement must be considered but does not by itself establish the declarant's
> authority under (C); the existence or scope of the relationship under (D); or the
> existence of the conspiracy or participation in it under (E).

Fed. R. Evid. 801(d)(2).  "The admissibility of opposing-party statements 'is not based on

reliability; rather, they are admitted as part of the adversary system'; they are admitted, in short,

because the party said the words and should be stuck with them, regardless of their accuracy." United States v. Ballou, 59 F. Supp. 3d 1038, 1074 (D.N.M. 2014)(Browning, J.)(quoting Stephen A. Saltzburg et. al, Federal Rules of Evidence Manual § 801.02[b], at 801-13 (2011)).  "[T]he Tenth Circuit has stated that proponents of such evidence 'need only show by a preponderance of the evidence that the opposing party had made the statement.'"  United States v. Shirley, No. CR 15-1285 JB, 2016 WL 9021832, at *7 (D.N.M. Dec. 21, 2016)(Browning, J.)(citing United States v. Brinson, 772 F.3d 1314, 1320 (10th Cir. 2014)).

"Rule 801(d)(2)(A) does not . . . permit such a statement to be used against anyone other than the party who made the statement, such as codefendants."  United States v. DeLeon, 287 F. Supp. 3d 1187, 1256 (D.N.M. 2018)(Browning, J.)(citing United States v. Wolf, 839 F.2d 1387, 1393 & n.4 (10th Cir. 1988); Stephen A. Saltzburg, et al., Federal Rules of Evidence Manual § 801.02(6)(c) (11th ed. 2017)).  Statements made during closing argument by an attorney qualify as an admission by a party opponent under rule 801(d)(2)(A).  See United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1121 & 1121 n.11 (D.N.M. 2012)(Browning, J.)(citing United States v. McElhiney, 85 F. App'x 112, 115 (10th Cir. 2003)(unpublished)).  The Court has determined that rule 806 of the Federal Rules of Evidence, which permits attacking hearsay statements with "any evidence that would be admissible for those purposes if the declarant had testified as a witness," Fed. R. Evid. 806, "does not apply to rule 801(d)(2)(A) statements," United States v. DeLeon, No. CR 15-4268 JB, 2018 WL 878121, at *2 n.1 (D.N.M. Feb. 12, 2018)(Browning, J.).  "Party opponents can, however, impeach their own admissions, i.e., rule 801(d)(2)(A) statements, even though rule 806 does not apply.  If a party opponent admission is relevant, then anything that impeaches such a statement is also relevant."  United States v. DeLeon, 2018 WL 878121, at *2 n.1.

## LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972).  "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)).  The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money.  By the same token,

the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72.  "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men.  In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property interests, as the Court has already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)].  See Flemming v. Nestor, 363 U.S. 603, 611 . . . [(1960)].  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews

v. Eldridge, 424 U.S. at 334. The Supreme Court has explained that

> the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted).

> The United States Court of Appeals for the Second Circuit has stated:
>
> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335. . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. See Mathews v. Eldridge, 424 U.S. at 335. For example, "[w]here . . . the state must act quickly, a meaningful post-deprivation hearing is adequate." Clark v. City of Draper, 168 F.3d at 1189. See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires pre-deprivation hearing "except for

extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has previously considered procedural due process violations several times.  See A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.)("Youngers").  For example, in Youngers, the Court concluded that the New Mexico Department of Health violated due process when it afforded a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no process for deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court has also concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d at 1215 (denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers."); Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), aff'd, Camuglia v. City of Albuquerque, 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

## **ANALYSIS**

"The Fourteenth Amendment [of the United States Constitution] provides that a state shall 'not deprive any person of life, liberty, or property, without due process of law.'"  Lauck v.

Campbell Cty., 627 F.3d 805, 811 (10th Cir. 2010)(quoting the Fourteenth Amendment).  "Once it is determined that due process applies, the question remains what process is due."  Morrissey v. Brewer, 408 U.S. 471, 481 (1972).  Students, like Lee, facing "interference with a protected property interest" in their education "must be given some kind of notice and afforded some kind of hearing."  Goss v. Lopez, 419 U.S. 565, 579 (1975)("Goss").

The Court applies Mathews v. Eldridge to determine what process the Defendants owed Lee when he was expelled from UNM.  See Watson, 242 F.3d at 1240.  The Court evaluates: (i) the private interest at stake; (ii) the effect on the private interest in the event of an erroneous determination as well as the value of any additional procedural safeguards; and (iii) the government's interest, including the potential administrative burden of additional procedural safeguards.  See Watson, 242 F.3d at 1240 (applying Mathews v. Eldridge, 424 U.S. at 334-35).  "The three-factor test from the Mathews decision, decided one year after Goss, is appropriate for determining when additional procedure is due because the test crystallizes the balancing of student interests against school interests suggested in the Goss decision."  Watson, 242 F.3d at 1240.

As to the first Mathews v. Eldridge factor, Lee has a significant property interest in his education at UNM and in his reputation.  See Goss, 419 U.S. at 576 (explaining that students have a property interest in educational benefits).  As the Court acknowledges in the MOO, "[t]he stakes of Lee's interest are high."  MOO, 449 F. Supp. at 1124.  The permanent notation on Lee's transcript indicating that he was expelled from UNM for disciplinary reason likely will make it difficult for Lee to apply for admission at another university.  See DOS Sanctions Letter at 23.  Lee is currently eligible to re-apply to UNM, however, although he is not guaranteed re-admission.  See DOS Sanctions Letter at 23.[110]

_____

[110]Lee has been eligible to re-apply for admission to UNM as a doctoral student since 2018.

With respect to the second Mathews v. Eldridge factor, the Court conducts below an individualized analysis of the risk of erroneous deprivation created by each of Lee's alleged procedural deficiencies.  See infra Analysis §§ III-VII.  The Court concludes that none of Lee's alleged procedural deficiencies created a risk of erroneous deprivation of his interest in his education or reputation.  See Mathews v. Eldridge, 424 U.S. at 334-35.

Applying the third Mathews v. Eldridge factor, the Court recognizes that UNM also "has a strong interest in the 'educational process,' including maintaining a safe learning environment for all of its students, while preserving its limited administrative resources."  Plummer, 860 F.3d at 773 (citing Goss, 419 U.S. at 583).  See Gorman v. Univ. of R.I., 837 F.2d 7, 14-15 (1st Cir. 1988)("Although the protection of such a vital interest would require all possible safeguards, it must be balanced against the need to promote and protect the primary function of institutions that exist to provide education.").  Notably, in this case, UNM has a significant interest in encouraging students who experience sexual assault or sexual violence to come forward.  See Newsome v. Batavia Local Sch. Dist., 842 F.2d 920, 925-26 (6th Cir. 1988)(concluding that exposing student witnesses to cross-examination would deter students from coming forward about student misconduct).  To that end, UNM has an interest in creating procedures that prevent additional trauma to potential victims of sexual assault or sexual violence.  See Butler v. Rio Rancho Pub. Sch. Bd., 341 F.3d 1197, 1201 (10th Cir. 2003)("There is no doubt the School has a legitimate interest in providing a safe environment for students and staff."); West v. Derby Unified Sch. Dist., 206 F.3d 1358, 1364 (10th Cir. 2000)("[M]aintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures.").  Further, increasing "procedural

---

See DOS Sanctions Letter at 23.  The Court's record does not indicate whether Lee has re-applied to UNM.

safeguards" in university disciplinary proceedings "will impose significant costs on universities." Marie T. Reilly, <u>Due Process in Public University Discipline Cases</u>, 120 Penn. St. L. Rev. 1001, 1025 (citing <u>Osteen v. Henley</u>, 13 F.3d 221 (7th Cir. 1993)(Posner, J.)).  Requiring UNM to impose heightened procedural safeguards in student disciplinary proceedings, therefore, could hamper UNM's efforts to protect its students' well-being and drain its limited administrative resources. <u>See</u> <u>Plummer</u>, 860 F.3d at 773.

The Court concludes that, under the three <u>Mathews v. Eldridge</u> factors, none of Lee's alleged procedural deficiencies substantially prejudice him, and the Defendants have satisfied their obligations under the Due Process Clause to afford Lee notice and an opportunity to be heard.  <u>See</u> <u>Mathews v. Eldridge</u>, 424 U.S. at 334-35.

## I.     LEE ADMITTED TO THE UNMPD THAT HE HAD NONCONSENSUAL SEXUAL CONTACT WITH ROE WHILE SHE WAS INCAPACITATED, AND THE OEO THEREFORE DID NOT NEED TO MAKE A CREDIBILITY DETERMINATION ABOUT ROE TO FIND THAT LEE VIOLATED UNM'S SEXUAL MISCONDUCT POLICES.

Lee's statements to the UNMPD indicate that he "knew or should have known" that Roe was too intoxicated to "give[] meaningful consent to sexual activity."  PLOD at 30 (citing UNM Policy # 2740).  <u>See</u> Fisher Supp. Rpt. at 1-2; UNMPD Supplemental Felony Report at 41-42. Consequently, Lee's statements alone are sufficient to allow Buchs to determine that Lee violated UNM policy.  <u>See</u> PLOD at 30; FLOD at 1-2.  The OEO found that Lee's "statements to UNMPD . . . demonstrate Complainant was intoxicated to the point of incapacitation, and a reasonable person, in the same or similar circumstances, would understand that Complainant was intoxicated to the point of incapacitation."  PLOD at 31.  Further, the OEO concluded that "Lee knew or reasonably should have known, Complainant did not consent to him trying to put his penis

in her mouth while she laid on [Goodnight's] bed because he confirmed to UNMPD she would not open her mouth for him to do so."  PLOD at 32.

A.    LEE ADMITTED TO THE UNMPD THAT ROE WAS INCAPACITATED AND THAT HE HAD NONCONSENSUAL SEXUAL CONTACT WITH ROE.

Lee argues that he "never admitted he had non-consensual contact with Ms. Roe or that Ms. Roe was too intoxicated to consent to sexual contact."  Response at 25.  Lee avers that although he "may have made statements regarding Ms. Roe's level of intoxication . . . he never indicated that she did not consent to sexual contact or that he she was too intoxicated to consent to sexual contact."  Lee compares his case to Doe v. University of Mississippi, 361 F. Supp. 3d 597, 603 (S.D. Miss. 2019)(Jordan, C.J.).  See Response at 24-25.  Doe v. University of Mississippi, however, is distinguishable.  See 361 F. Supp. 3d at 603.  In Doe v. University of Mississippi, the defendant university found that the plaintiff had nonconsensual sex with the complainant in the case, and suspended him from the university for three years.  See 361 F. Supp. 3d at 603.  There, the university's sexual misconduct policy stated that "an incapacitated person is not able to give consent."  361 F. Supp. 3d at 611.  Although both the plaintiff and the complainant were intoxicated on the night of the alleged sexual assault, and the plaintiff admitted that the complainant was intoxicated when they had sex, the Honorable Daniel P. Jordan, III, Chief United States District Judge for the Southern District of Mississippi, concludes that the plaintiff's "admission does not necessarily indicate" that the complainant "was incapacitated under the policy."  361 F. Supp. 3d at 612.  Judge Jordan continues that the plaintiff's admission "falls short of the proof in Plummer," because it was "plausible in this he said/she said case, that giving" the plaintiff an opportunity to cross-examine the complainant "could have added some value to the hearing under the second Mathews factor."  361 F. Supp. 3d at 612-13.  Judge Jordan, therefore,

denied the defendant's motion to dismiss the plaintiff's procedural due process claims.  See 361 F. Supp. 3d at 598.   Here, by contrast, Lee's admissions to the UNMPD go far beyond acknowledging that Roe was intoxicated.  See Fisher Supp. Rpt. at 1-2; Lobo Village Tr. at 17:11-20 (Lee)(transcript of Lee's interview with Fisher); UNMPD Felony Supplemental Report at 41-42; UNMPD Station Tr. at 32:4-11 (Lee)(transcript of Lee's interview at the police station).[111]

Based on Lee's admissions to the UNMPD alone, the OEO reasonably could have found that Lee "knew or should have known" that Roe was "incapacitated" and, therefore, incapable of providing meaningful consent.[112]   UNM Policy # 2740.   Lee informed the UNMPD that Roe "started freaking out after . . . three or four shots . . . [of] Jack Daniels, whiskey."  Lobo Village Tr. at 17:11-20 (Lee).   Although Lee told the UNMPD that he witnessed only Roe "pour[ing] herself" shots "at least three times on her own," he acknowledged that she may have drunk more.  UNMPD Station Tr. at 15:1-3 (Lee, Duren).  Lee also advised the UNMPD that, before the sexual encounter, Roe "was stumbling[113] . . . she was buzzed and drunk yeah . . . she was intoxicated," Lobo Village Tr. at 17:11-20 (Lee), and he and Goodnight had to "guide her" to the sofa, Lobo Village Tr. at 20:12-20 (Lee).[114]  Lee stated that at the sofa, where "we all got naked . . . she was

---

[111]Here, for the reasons stated in n.12, supra, and because Lee avers that he "never indicated that she did not consent to sexual contact or that she was too intoxicated to consent to sexual contact," Response at 25, the Court will rely on transcripts of Lee's conversations with the UNMPD.

[112]"'Should have known' is an objective, reasonable person standard which assumes that a reasonable person is both sober and exercising sound judgment. Incapacitation occurs when someone cannot make rational, reasonable decisions because they lack the capacity to give knowing/informed consent.'"  UNM Policy # 2740 (referring to a prior sentence).

[113]The OEO considers whether a complainant is "stumbling" when evaluating whether "the Complainant was incapable of giving meaningful consent to sexual activity due to intoxication." UNM Policy # 2740.  Accord Response at 25 (quoting this portion of the Policy).

[114]The OEO considers whether a complainant is "disoriented or confused as to time or

intoxicated."  UNMPD Station Tr. at 21:12-20 (Lee).  Although Lee told the UNMPD that Roe

"may have" been speaking during the encounter on the sofa, Lee "d[id] not know what she was

saying."  UNMPD Station Tr. at 22:16-18 (Lee).[115]  Specifically, Lee estimated that on a scale of

"one through ten" Roe was a "six or seven" with ten being "completely" drunk.  UNMPD Station

Tr. at 22:2-12 (Lee).  Lee advised the UNMPD that, once in the bedroom, he and Goodnight "put

her on the bed, [Goodnight's] bed."  UNMPD at 25:25-26:1 (Lee).[116]  During the encounter in the

bedroom, Lee told the UNMPD that he noticed Roe was "extremely buzzed," and Lee agreed he

would "call her drunk."  UNMPD Station Tr. at 29:2-7 (Lee, Duren).  Immediately after the

encounter, Lee told the UNMPD that he asked Roe: "'Do you want to throw up, you know, to

make you feel better?'"[117]  Lobo Village Tr. at 21:20-24 (Lee), and "dressed her," id. at 22:12-13

(Lee).  Lee explained to the UNMPD that Roe was laying "on the floor, so we picked her up."[118]

----

place" when evaluating whether "the Complainant was incapable of giving meaningful consent to sexual activity due to intoxication."  UNM Policy # 2740.  Accord Response at 25 (quoting this portion of the Policy).

[115]It is unclear to the Court based on Lee's statement whether Lee was implying that Roe's speech was unintelligible or whether he could not remember whether she had spoken.  The OEO considers whether a complainant had "slurred speech or word confusion" when evaluating whether "the Complainant was incapable of giving meaningful consent to sexual activity due to intoxication."  UNM Policy # 2740.  Accord Response at 25 (quoting this portion of the Policy).

[116]The Court notes that the OEO considers whether a complainant is "exhibiting loss of equilibrium" when evaluating whether "the Complainant was incapable of giving meaningful consent to sexual activity due to intoxication."  UNM Policy # 2740.  Accord Response at 25 (quoting this portion of the policy).

[117]The OEO considers whether a complainant is "vomiting" when evaluating whether "the Complainant was incapable of giving meaningful consent to sexual activity due to intoxication." UNM Policy # 2740.  Accord Response at 25 (quoting this portion of the Policy).

[118]The OEO considers whether a complainant is "exhibiting loss of equilibrium" when evaluating whether "the Complainant was incapable of giving meaningful consent to sexual activity due to intoxication."  UNM Policy # 2740.  Accord Response at 25 (quoting this portion of the Policy)

UNMPD Station Tr. at 37:8-9 (Lee).    Thereafter, Lee said, Roe "started freaking out . . . screaming . . . . [S]he was like 'I need to walk to my car right now.'"  Lobo Village Tr. at 14:5-10 (Lee).  Lee explained that he and Goodnight "were going to take [Roe] to the hospital if she wanted to . . . . I was helping [Goodnight] because he needed help . . . to carry her."  Lobo Village Tr. at 14:16-22 (Lee).

Further, even if Lee did not know that Roe was incapacitated, his statements to the UNMPD alone are enough to demonstrate that he knew or should have known that Roe did not consent to sexual contact.  See UNM Policy # 2740.  Throughout his conversations with UNMPD, Lee stated multiple times that Roe was "resisting" his attempts to put his penis in her mouth.  See, e.g., Lobo Village Tr. at 29:21-30:3 (Lee); id. at 28:6-8 (Lee).    Moreover, Lee stated that, while he, Goodnight, and Roe were near the sofa, Lee "tried to go for the blow job too, but, like she -- her mouth wasn't opening wide enough for me."  Lobo Village Tr. at 23:19-21 (Lee).  Lee said that, once all three arrived in the bedroom, as Goodnight had vaginal sex with Roe, Lee "thought she was going to give me oral too," although Roe had refused to open her mouth to "give" Lee "oral" several minutes earlier.  Lobo Village Tr. at 25:18-19 (Lee).  Lee also stated that Roe said "'oh, no'" when he "tried to" put his penis into Roe's mouth.  Lobo Village Tr. at 29:22-30:5 (Lee).  Although Roe's mouth was closed and she had told him "no," Lee "attempted" to put his penis in her mouth for "maybe a minute, and might be longer," during which he "may have touched her lips or cheeks, but no deep throat action."  UNMPD Station Tr. at 32:4-11 (Lee).  Lee explained, however, that he "didn't get to put it in her," because, once again, Roe "wasn't opening her mouth." Lobo Village Tr. at 28:2-4 (Lee).

Lee's statements to the UNMPD, therefore, exceed the Doe v. Mississippi plaintiff's statement to police.  See 361 F. Supp. 3d at 611.  The Court concludes that Lee admitted to the

UNMPD that he had nonconsensual sexual contact with Roe and that she was incapacitated.  See, e.g., Fisher Supp. Rpt. at 1-2; Lobo Village Tr. 29:21-30:3 (Lee); UNMPD Felony Supplemental Report at 41-42; UNMPD Station Tr. at 32:4-11 (Lee).  This case, therefore, is more similar to Flaim, 418 F.3d at 641.  In Flaim, the defendant medical school expelled the plaintiff medical student after he was convicted of a felony drug crime.  See 418 F.3d at 631.  The Honorable Boyce F. Martin Jr., United States Circuit Judge for the United States Court of Appeals for the Sixth Circuit, authored an opinion that affirms the dismissal of the plaintiff's due process claims, because the defendant's "procedural approach was consistent with the bare-minimum requirements of due process, though perhaps less-than-desirable for an institution of higher learning."  418 F.3d at 632. The plaintiff argued that he should have been allowed to cross-examine his arresting officer, who testified at his disciplinary hearing.  See 418 F.3d at 641.  Judge Martin explains that, as in Winnick v. Manning, "the 'critical fact' in Winnick[v. Manning] was admitted by Winnick, see id., just as Flaim does not deny his felony conviction."  418 F.3d at 641 (quoting Winnick v. Manning, 460 F.2d at 550).  Similarly, Lee admitted to the UNMPD the "critical fact[s]" which indicate that Roe was incapacitated and that he had nonconsensual contact with her.  Winnick v. Manning, 460 F.2d at 550.  See Flaim, 418 F.3d at 641.  Lee argues that, in Flaim, "the plaintiff did not deny his felony conviction, for which he was expelled."  Response at 26 (citing Flaim, 418 F.3d at 641).  True, Lee now denies many of the initial statements that he made to the UNMPD.  See, e.g., PLOD at 8-14.  Yet this implicates Lee's own credibility -- not Roe's.  Compare Lobo Village Tr. at 22:12-13 (Lee)(stating that he "dressed her"); id. at 29:22-30:5 (Lee)(informing police that Roe said "oh no" when he "tried to" put his penis in her mouth), with PLOD at 10 (insisting that Roe "got dressed by herself"); id. (stating that Roe "never said no once").  See also PLOD at 31 ("OEO also finds [Lee and Goodnight's] statements made to OEO are significantly different from the

statements [Lee and Goodnight] provided to UNMPD."). The Court, therefore, like Judge Martin, "assume[s] that any discrepancies" in Roe's testimony, "to the extent they might have existed, would not have been sufficient to convince" the OEO that Lee had not violated UNM policy. Flaim, 418 F.3d at 641. Judge Martin notes that the plaintiff "was able to listen to and observe the officer's testimony," and "then had the opportunity to present his version of events, during which he had the opportunity to point out inconsistencies or contradictions in the officer's testimony." 418 F.3d at 641. Similarly, Lee had the opportunity to read Roe's statement to Buchs and then to provide a written statement contradicting much of that testimony. See PLOD at 8-14. For example, in Lee's written statement to Buchs, he contends that Roe's statement "leaves out" "the most important part," PLOD at 13, and that her statement is a "strange story," PLOD at 12. Like the plaintiff in Flaim, Lee received "adequate opportunity to address any discrepancies in" Roe's statement, and therefore "'cross-examination would have been a fruitless exercise.'" 418 F.3d at 641 (quoting Winnick v. Manning, 460 F.2d at 550). See PLOD at 8-14.

**B.    ROE'S CREDIBILITY WAS NOT AT ISSUE IN THE OEO'S FINAL DETERMINATION THAT LEE VIOLATED UNM POLICY, BECAUSE OF LEE'S ADMISSIONS TO THE UNMPD.**

In the FLOD, the OEO determined that "it is more likely than not that Lee engaged in non-consensual sexual contact with Complainant in violation of policy." FLOD at 2. The OEO based its final decision on the following factors: (i) Lee "admits to kissing Complainant and trying to engage in oral sex with her"; (ii) Lee "confirmed to UNMPD that Complainant was 'very intoxicated,' prior to going into [Goodnight's] bedroom"; (iii) Lee's roommate, Aaron, "observed Complainant's speech became 'slurry' . . . prior to the parties going to [Goodnight's] room (and therefore prior to the sexual contact occurring). [Aaron] also heard Complainant say . . . prior to the parties going to [Goodnight's] room, in a slurred voice, she '[w]anted to go home'"; (iv) Lee

"confirmed [Goodnight] held Complainant up 'so she wouldn't fall over when they walked to the bedroom' from the common room"; (v) Lee "confirmed to UNMPD that when they were all in [Goodnight's] bedroom, Lee tried to get a 'blow job' from Complainant, was 'trying to insert his penis into Complainant's mouth,' but he was not successful because Complainant 'would not open her mouth'"; (vi) Goodnight "confirmed to UNMPD both [Lee and himself] 'carried Complainant' to her car because she was 'unable to walk on her own.'"  FLOD at 1-2 (no citation for quotations). The FLOD does not mention Roe's statement.  See FLOD at 1-2.  The Court, therefore, concludes that the OEO did not rely on Roe's statement in making its final determination that Lee had violated UNM policy.[119]  See FLOD at 1-2.

## II.   THE DEFENDANTS PROVIDED LEE WITH SUFFICIENT OPPORTUNITIES TO BE HEARD BEFORE HIS EXPULSION FROM UNM.

Lee argues that the OEO did not afford him a hearing and thereby violated his due process rights.  See Response at 18-19.  Lee avers that, as the Honorable Amul L. Thapar, United States Circuit Judge for the United States Court of Appeals for the Sixth Circuit, concludes, UNM "must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension." Baum, 903 F.3d at 575.  As the Supreme Court explained in Goss, due process requires UNM to provide Lee with "at least an informal give-and-take between student and disciplinarian, preferably prior to the" expulsion, to allow Lee "to characterize his conduct and put it in what he deems the

---

[119]The FLOD indicates that the OEO relied upon Aaron's statement that Roe's speech was slurred, and Goodnight's statement that Lee and Goodnight carried Roe to her car because she could not walk.  See FLOD at 2.  Both statements indicate that Roe was incapacitated.  See FLOD at 2.  Lee's statements to the UNMPD, however, provide ample evidence of Roe's incapacitation. See Fisher Supp. Rpt. at 1-2; Lobo Village Tr. at 17:11-20 (Lee); UNMPD Station Tr. at 21:12-20 (Lee); UNMPD Felony Supplemental Report at 41-42.  Aaron does not say anything that Lee does not say; his statements confirm Lee's statements to the UNMPD about Roe's incapacitation.  See FLOD at 2.  The Court concludes, therefore, that while these statements confirmed Lee's admissions regarding Roe's incapacitation, they were not dispositive; the OEO would have reached the same conclusion even without this evidence.  See FLOD at 2.

proper context." 419 U.S. at 584. The Supreme Court notes, however, that "expulsions . . . may require more formal procedures." Goss, 419 U.S. at 584. "The timing and content of . . . the nature of the hearing will depend on appropriate accommodation of the competing interests involved." Goss, 419 U.S. at 579-80.

The Court concludes that UNM afforded Lee "some kind of hearing." Goss, 419 U.S. at 584. First, the DOS held an administrative hearing when it decided whether to expel Lee. See May 20 Email at 16. At the administrative hearing, Lee had "the opportunity to present witnesses and evidence," and have counsel present. May 20 Email at 16. Chibanga also allowed Lee's counsel to pass "notes" and have "whispered conversations" with Lee during the hearing, although she did not permit Lee's counsel to "make arguments on [Lee's] behalf." May 20 Email at 16. See Osteen v. Henley, 13 F.3d at 225 (A student "is not entitled to be represented" at a disciplinary hearing "in the sense of having a lawyer who is permitted to examine or cross-examine witnesses . . . [or] to address the tribunal . . . ."). Because the DOS held a hearing before expelling Lee, UNM satisfied its baseline obligation to provide Lee with a hearing. See Goss, 419 U.S. at 584; Baum, 903 F.3d at 575. Further, Lee was able to meet with Buchs and to provide a written statement before she issued the PLOD. See Lee's Typewritten Statement at 4. Lee also met with Cowan and Cordova, see Handout Acknowledgement at 3, after which Lee remarked that they "show[ed] me kindness and professionalism," and noted that "[i]t did not take long for you to convince me that you would be neutral and fair to me throughout this whole process" Sept. 25 Cowan Email at 4. Lee also met with Wolberg, another DOS officer, about his initial campus ban. See Emergency Campus Ban Letter at 1; Update on Campus Ban at 2. All told, the record indicates that Lee had at least four meetings with persons from UNM's Title IX Office, the OEO, and the DOS. See, e.g., Lee Typewritten Statement at 4; Emergency Campus Ban Letter at 1; Update on

Campus Ban at 2; May 20 Email at 16.  Accordingly, the Court concludes that UNM satisfied its obligations under the Due Process Clause to provide Lee with an opportunity to be heard.  See Goss, 419 U.S. at 579-80.

### III.   LEE DOES NOT HAVE A DUE PROCESS RIGHT TO CROSS-EXAMINE WITNESSES BECAUSE CREDIBILITY IS NOT AT ISSUE.

Students accused of violating university policy do not have an unfettered due process right to cross-examination in all disciplinary proceedings.  See Bd. of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78, 86 n.3 (1978)(declining to recognize a right to cross-examination during student disciplinary proceedings); Watson, 242 F.3d at 1242-43 (10th Cir. 2001)(holding that, where a state military academy expelled a student, "precedent indicate[s] that due process does not require all of the rights" that the student requested, including "the right to cross-examine witnesses"); Gorman v. Univ. of R.I., 837 F.2d at 16 ("[T]he right to unlimited cross-examination has not been deemed an essential requirement of due process in school disciplinary cases."); Flor v. Univ. of N.M., No. CIV 20-0027 JAP/LF, 2020 WL 3410823, at *6 (D.N.M. June 20, 2020)(Parker, J.)(concluding that, where the "OEO's policy violation finding was divorced from any statements made by" a student accusing a university a professor of sexual harassment, "due process would not require cross-examination"); Pacheco v. St. Mary's Univ., 2017 WL 2670758, at *17 (W.D. Tex. June 20, 2017)(Lamberth, J.)("[I]t is clear that the right of cross-examination and confrontation as it exists in criminal settings is not a requirement of due process in school disciplinary proceedings.").  Even in student disciplinary proceedings where credibility is at issue, the Due Process Clause does not require that universities allow accused students personally to confront complainants.  See Haidak, 933 F.3d at 69-70 ("If we were to insist on a right to party-conducted cross-examination . . . the mandated mimicry of a jury-waived trial would be near complete."); Doe v. Cummins, 662 F. App'x 437, 448 (6th Cir. 2016)(concluding that the

defendants had not violated accused students' due process rights in a case where credibility was at issue, and the defendants allowed modified "cross-examination where the plaintiffs submitted written questions to the school investigation panel, were allowed to submit only written questions to the ARC panel, the panel did not ask all of the questions they submitted, and they were not allowed to submit follow-up questions"); MOO, 449 F. Supp at 1128-29.  A modified version of cross-examination -- for example, where the "factfinder ask[s] the complaining student questions in person that the accused student or his counsel has submitted" -- may be necessary to determine credibility.  MOO, 449 F. Supp at 1129.  Compare Baum, 903 F.3d at 581-85 (concluding that universities should allow cross-examination in student disciplinary proceedings where credibility is at issue), with UC Boulder, 2019 WL 4597875, at *17 (explaining that although "some form of process that allowed Plaintiff to question Jane Doe's credibility . . . given the scant evidence and the 'he said, she said' nature of the incident," defendants were not on notice of a right to cross-examination)(citing MOO, 449 F. Supp. at 1116).  By contrast, where credibility is not at issue, a university need not allow cross-examination, because it would "be[] a fruitless exercise."  Winnick v. Manning, 450 F.2d at 550.  See Plummer, 860 F.3d at 775-76 (holding that accused students had no right to cross-examination where the defendant university did not rely on testimonial evidence from the alleged victim); Flaim, 418 F.3d at 641 (holding that cross-examination was unnecessary where the expelled student plaintiff was able to listen to and to observe the witness's testimony and point out inconsistencies, and the plaintiff had admitted the critical fact that caused his expulsion).

Despite Lee's substantial interest in his education, denying him the right to cross-examine Roe creates little risk of erroneous deprivation.  See Baum, 903 F.3d at 581.  "[C]ross-examination is unnecessary if a student admits to engaging in misconduct," because "there is a little to be gained

by subjecting witnesses to adversarial questioning when the accused student has already confessed." Baum, 903 F.3d at 581.  See Doe v. N. Michigan Univ., 393 F. Supp. 3d 683, 694 (W.D. Mich. 2019)(Quist, J.)("Cross-examination is essential to due process only where the finder of fact must choose between believing an accuser and an accused, but the panel need not make this choice if the accused student admits the critical fact against him.")(internal quotations omitted). Here, after being Mirandized[120] and agreeing to speak with police, Lee confirmed that he had violated UNM's sexual misconduct policies.  See Fisher Supp. Rpt. at 1-2; UNMPD Supplemental Felony Report.  Roe's credibility, therefore, was not at issue.[121]  Accordingly, allowing Lee to

---

[120]Miranda v. Arizona, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"  United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444). The Supreme Court of the United States provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.  If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.  Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

[121]If UNM routinely does not afford respondents an opportunity to engage in cross-examination, it runs a risk of error, i.e., not relying exclusively on the respondents' testimony to find him guilty.  If it prejudges the case, and also assumes that it will rely exclusively on the respondents' testimony, it runs the risk of being biased and prejudice. The facts of this case may be unique, in that UNM could expel Lee solely on his words.  UNM may escape liability never giving the respondent an opportunity for cross-examination, but they run a risk that every case will not be like Lee's.  If Roe's credibility had been important, due process would some form of the right of cross-examination, although submitting questions to a university hearing officer, who then asks questions of the complainant, will usually satisfy due process.  See Haidak, 933 F.2d at 69 (noting that, where an accuser's credibility is at issue, a university should provide "some opportunity for real-time cross-examination, even if only through a hearing panel.").  See also

cross-examine Roe when he had already admitted to having non-consensual sexual contact with her while she was incapacitated would be a "fruitless exercise."  Winnick v. Manning, 450 F.2d at 550.

## IV.   THE OEO PROVIDED LEE WITH SUFFICIENT ACCESS TO THE EVIDENCE ITS INVESTIGATION UNCOVERED, INCLUDING WITNESSES' IDENTITIES.

Lee contends that he "was entitled to . . . access to the evidence uncovered in the OEO investigation, including the names of all witnesses interviewed."  Response at 18.  First, due process does not necessarily entitle Lee to the witnesses' identities; a university may withhold witness identities based, for example, on concerns that "[w]ithout the cloak of anonymity, students who witness criminal activity . . . will be much less likely to notify school authorities, and those who do will be faced with ostracism at best and perhaps physical reprisals."  Newsome v. Batavia Local Sch. Dist., 842 F.2d at 924.  Moreover, even if due process entitles Lee to all witnesses' identities, Lee's unawareness of the identity of a single witness -- who gave a statement that discussed Goodnight and not Lee -- does not prejudice him unfairly because that statement had virtually no impact on the OEO's decision.  See PLOD at 27.  The OEO also provides Lee with sufficient summaries of the evidence it considered during the investigation, and allowed him to supplement the evidentiary record.  See PLOD at 17-29.  The Defendants, therefore, did not violate Lee's due process rights by failing to provide him with access to evidence considered during the investigation.  See PLOD at 17-29.

---

Walsh v. Hodge, 975 F.3d 475, 485 (5th Cir. 2020)("'[W]e have no reason to believe that questioning . . . by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation.'")(quoting Haidak, 933 F.2d at 69).

A.   **LEE KNEW FOUR OF THE FIVE WITNESSES' IDENTITIES, AND THE FIFTH WITNESS' STATEMENT RELATED PRIMARILY TO GOODNIGHT.**

Throughout the investigation, the OEO spoke with five witnesses: Roe; Goodnight; Lee; Lee and Goodnight's roommate, Aaron; and a fifth witness ("Witness 1") that Goodnight identified.  PLOD at 16.  Lee never "identified any witnesses or requested OEO interview any witnesses."  PLOD at 16.  The Court addresses each of the OEO's witnesses in turn.  First, Lee is and was aware of Goodnight and Roe's identities.  See Oct. 16 Letter at 4 (identifying Roe by name, name redacted in the Court record for privacy); Bd. of Regents Admissions at 6 ("UNM affirmatively states that, by letter dated October 16, 2015, the UNM OEO disclosed to Plaintiff the identities of [Roe], [Goodnight], and [Lee].").  Although the Defendants admit that the "OEO did not disclose to Plaintiff the identities of Witness 1 and Witness 2,"  Bd. of Regents Admissions at 6, the PLOD identifies "Witness 2" as an individual who was "in his room, of the apartment he shared with [Lee and Goodnight], with his bedroom door locked" on the evening of the alleged sexual assault.  PLOD at 27.  Lee also informed the UNMPD that "one of my roommates, his name is Aaron," was at home during the alleged sexual assault.  UNMPD Tr. at 12:9-13 (Duren, Lee). See id. at 12:15-13:10 (Duren, Lee)(discussing Aaron).  The Court, therefore, concludes that Lee knew Witness 2's identity.  See UNMPD Tr. at 12:9-13:10 (Duren, Lee).

The only remaining unidentified Witness is "Witness 1."  PLOD at 27.  The PLOD does not provide Witness 1's name, but describes him as a person with a "close, personal relationship" with Goodnight.  PLOD at 27.  The PLOD explains that Witness 1 had met Lee and Aaron, but had not "spent any significant time with" Lee.  PLOD at 27.  The OEO relied on the following statement from Witness 1:

Witness 1 reported [Goodnight] told Witness l he and [Roe] were drinking and [Goodnight] had sexual intercourse with [Roe]. Witness 1 also reported [that

> Goodnight] told Witness 1, he and [Roe] only had sex for "a little bit"' because "the
> girl was too drunk."   Witness 1 further reported [Goodnight] told Witness 1 that
> after [Goodnight] started having sexual intercourse with [Roe], he decided, "She's
> drunk. She can't do this."

PLOD at 27.  The PLOD's analysis section refers only to Witness 1's statement once, concluding

that "OEO finds Witness 1's report that [Goodnight] reported identifying at the time he engaged

in sexual activity with [Roe] that [Roe] was 'too drunk' to have sex, further shows [Lee and

Goodnight's] statements to OEO lack credibility."  PLOD at 31.  In the FLOD, however, the OEO

does not rely on Witness 1's statements to determine that Lee violated UNM policy.  See FLOD

at 1-2.  Viewing the facts in the light most favorable to Lee, the Court concludes that it is plausible

that Lee did not know Witness 1's identity.  See PLOD at 27; Response at 18.  Nonetheless, this

lack of awareness does not prejudice Lee, because Witness 1's statement played a marginal role

in the OEO's investigation.  See Plummer, 860 F.3d at 776.

Due process does not necessarily require universities to disclose witnesses' identities in

student disciplinary proceedings.  See Newsome v. Batavia Local Sch. Dist., 842 F.2d at 924

(disagreeing with the plaintiff's contention that he had a due process right to know the identities

of and cross-examine his accusers in an expulsion hearing); Nash v. Auburn Univ., 812 F.2d 655,

662-63 (11th Cir. 1987)("[W]e did not require in Dixon that students facing a hearing on charges

of misconduct be given the names of witnesses against them . . . ."); Keough v. Tate Cty. Bd. of

Educ., 748 F.2d 1077, 1082 (5th Cir. 1984)(holding that a suspended student "suffered no material

prejudice by proceeding to hearing before the school board without a witness list"); Smith ex rel.

Smith v. Seligman Unified Sch. Dist., 664 F. Supp. 2d 1070, 1076 (D. Ariz. 2009)(Teilborg,

J.)(holding that a suspended student did not have the right to know her accusers' identity, nor

cross-examine witnesses at her expulsion hearing); Gomes v. Univ. of Maine Sys., 304 F. Supp.

2d 117, 128-129 (D. Me. 2004)(Woodcock, J.)("[D]ue process in the context of academic

discipline does not necessarily require students be given a list of witnesses . . . ."); Wagner ex rel.
Wagner-Garay v. Fort Wayne Cmty. Schs, 255 F. Supp. 2d 915, 926 (N.D. Ind. 2003)(Cosbey,
M.J.)("[T]he clear weight of authority holds that a student facing an expulsion hearing does not
have the right to cross-examine witnesses or even learn their identities."); Coplin v. Conejo Valley
Unified Sch. Dist., 903 F. Supp. 1377, 1381-82 (C.D. Cal. 1995)(Rafeedie, J.)(holding that the
student expelled for sexual harassment did not have a due process right to know identity of his
accusers), aff'd, 116 F.3d 483 (9th Cir. 1997).  In Plummer, The Honorable Stephen A. Higginson,
United States Circuit Judge for the United States Court of Appeals for the Fifth Circuit, explained
that, "even if the University could have provided notice further in advance of the hearings of the
identities of relevant witnesses . . . the ultimate disciplinary decisions were conclusively supported
by the videos and photo, about which" the plaintiffs "had full knowledge."  Plummer, 860 F.3d at
776.  Likewise, here, even if UNM had told Lee Witness 1's name, the OEO based its ultimate
decision on Lee's statements to the UNMPD.  See FLOD at 1-2; DOS Sanctions Letter at 22-24.
Witness 1's statement relates primarily to Goodnight, and not to Lee.  See PLOD at 27.  Further,
the OEO's reliance on Witness 1's statement was minimal -- the PLOD contains approximately
four single-spaced pages of analysis, and its analysis section devotes only one sentence to Witness
1's statement.  See PLOD at 29-32.  Witness 1's statement is relevant to Lee only as it relates to
Roes' level of intoxication.  See PLOD at 27.  Yet, as the Court explained in § I, supra, Lee
repeatedly admitted to the UNMPD that Roe was intoxicated to the point of incapacitation.  See,
e.g., Lobo Village Tr. at 17:11-20 (Lee); id. at 20:12-20 (Lee); UNMPD Station Tr. at 21:12-20
(Lee); id. at 25:25-61; id. at 29:2-7 (Lee, Duren).  Moreover, before discussing Witness 1's
statement, the PLOD explains that Lee's and Goodnight's statements to the UNMPD indicate that
Roe "was intoxicated to the point of incapacitation, and a reasonable person" would understand

that she was incapacitated.  PLOD at 31.  Finally, the FLOD never mentions Witness 1's statement when it lists the evidence upon which its "determination was based . . . ."  FLOD at 1-2. Accordingly, the Court concludes that Witness 1's statement did not cause the OEO to find Lee violated UNM policy.  See PLOD at 27; FLOD at 1-2.  UNM's failure to disclose explicitly Witness 1's identity, therefore, did not prejudice Lee.  See FLOD at 1-2.

### B.   LEE RECEIVED ADEQUATE SUMMARIES OF EVIDENCE THAT THE OEO AND THE DOS CONSIDERED.

Lee's argument regarding his lack of access to evidence similarly lacks a sound basis.  See Plummer, 860 F.3d at 776.  True, Lee was not privy to all questions that Buchs asked Roe and the other witnesses.  See PLOD at 17-38.  He received, however, detailed summaries of Buchs' interviews with Roe, see PLOD at 17-20, Goodnight, see id. at 20-23, Lee, see id. at 23-26, Aaron, see id. at 27; and Witness 1, see id. at 27, as well as a summary of the Fisher Supp. Rpt., see id. at 27-38, and texts and Facebook messages between Goodnight and Roe, see id. at 28-29.  Lee also had the opportunity to read Roe's statement before his meeting with Buchs, and to provide a written response to her statement indicating where he disagreed.  See Oct. 16 Letter at 5-7 (providing Lee with a copy of Roe's statement and giving him seven working days to respond to the allegations therein); Lee's Typewritten Statement at 8-14; Response at 21 (acknowledging that Lee had the opportunity to "respond in writing to point out inconsistencies" in Roe's statement). After the OEO issued the PLOD, Lee was able to respond -- via counsel -- to the evidence summarized in the PLOD and to provide additional evidence.  See Feb. 22 Letter at 34-39. Notably, in the Feb. 22 Letter, Lee does not raise concerns about the OEO's failure to provide evidence or witnesses' identities.  See Feb. 22 Letter at 34-39.  Further, both the OEO and DOS provide a list of evidence which they relied upon at the conclusion of their letters -- finding, respectively, that Lee had violated UNM policy and that Lee's actions merit expulsion from UNM.

See FLOD at 1-2; DOS Sanctions Letter at 23-24.  In the Response, Lee does not develop this withheld-evidence argument, nor indicate which evidence OEO did not provide him.  See Response at 21-24.  Lee notes that he did not receive recordings of Buchs' witness interviews, but there is no evidence that Buchs recorded any witness interviews.  See Response at 19; Bd. of Regents Admissions at 6.  Because Lee does not explain what evidence the OEO did not provide, and because it is undisputed that the OEO gave Lee summaries of the relevant evidence before it issued the FLOD, the OEO did not violate Lee's due process rights by failing to provide evidence. See FLOD at 1-2.

## V.   THE DEFENDANTS' DECISION-MAKING PROCESS DOES NOT VIOLATE LEE'S DUE PROCESS RIGHTS, BECAUSE THE DECISION-MAKING PROCESS WAS NOT BIASED.

"An impartial tribunal is an essential element of a due process hearing."  Miller v. City of Mission, 705 F.2d 368, 372 (10th Cir. 1983).  The Court, however, "presumes" "honesty and integrity . . . on the part of" the OEO.  Mangels v. Pena, 789 F.2d at 838.  The Court holds that UNM's inquisitorial model of factfinding is not inherently biased, nor did Buchs demonstrate actual bias towards Lee.  See Withrow v. Larkin, 421 U.S. 35, 47 (1975).  Moreover, Lee's appeals to UNM's President and Board of Regents on both the FLOD and the DOS' sanctioning decision provided Lee additional procedural safeguards.  See Aug. 23 Letter at 34; UNM President Letter at 13; Meeting Minutes at 14.  Consequently, no genuine issue of material fact remains whether a biased decision-making process violates Lee's due process rights.

A.     THE "INQUISITORIAL MODEL" OF INVESTIGATION DOES NOT VIOLATE STUDENTS' DUE PROCESS RIGHTS.

Lee argues that the inquisitorial model[122] is inherently biased, because it relies on a single investigator to make a sexual misconduct determination.  See Response at 20; Tr. at 74:20-75:6 (Crow).  He contends that Buchs' role as "investigator, judge, and jury" violates his due process rights.  Response at 28.  Lee admits, however that no federal court has found the inquisitorial model is inherently biased.  See Tr. at 79:14-15 (Crow).  As Justice Harry Blackmun, Associate Justice of the Supreme Court, noted in Richardson v. Perales, 402 U.S. 389, 410 (1971), "the advocate-judge-multiple-hat suggestion . . . assumes too much and would bring down too many procedures designed, and working well . . . ."  402 U.S. at 410.

The Court concludes that Buchs' dual roles as factfinder and decisionmaker does not mean the OEO's process is inherently biased.  See Gorman v. Univ. of R.I., 837 F.2d at 15 (explaining that a factfinder's "multiple roles" did not "necessarily violate the requirements of fairness).  "The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a . . . difficult burden of persuasion to carry."  Withrow v. Larkin, 421 U.S. at 47.   Although the inquisitorial model is not appropriate in criminal cases, see Crawford v. Washington, 541 U.S. 36, 61 (2004), it satisfies procedural due process for important administrative decisions, including student disciplinary proceedings, see, e.g., Sims v. Apfel, 530 U.S. at 110-11 (holding that the inquisitorial model is appropriate in Social Security proceedings); Haidak, 933 F.3d at 71 (holding that a university's use of the inquisitorial model, which resulted in the student plaintiff's expulsion, satisfied due process); Hess, 839 F.3d

---

[122]The "inquisitorial system" is a "system of proof-taking used in civil law, whereby the judge conducts the trial, determines what questions to ask, and defines the scope and the extent of the inquiry."  Inquisitorial System, Black's Law Dictionary (11th ed. 2019).

at 675 ("[T]he combination of investigative and adjudicative function s into a single administrator doe s not, in itself, demonstrate . . . bias."). See also Messeri v. Univ. of Colorado, Boulder, No. 18-CV-2658-WJM-SKC, 2019 WL 4597875, at *18 (D. Colo. Sept. 23, 2019)(Martinez, J.)(concluding that investigators' roles in Title IX coordination and compliance did not violate due process).   UNM supplied notice and provided Lee with the opportunity to meet with UNM officials, including Buchs, on at least four separate occasions.   See, e.g., Lee Typewritten Statement at 4; Emergency Campus Ban Letter at 1; Update on Campus Ban at 2; May 20 Email at 16.   It may not be the process that Lee wants, but without some evidence that "under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on" Buchs "poses such a risk of actual bias or prejudgment that the practice must be forbidden," the fact that one person conducts the investigation is not so unfair that it is inherently unconstitutional.   Withrow v. Larkin, 421 U.S. at 47.   See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process" but "is not necessarily guaranteed a win.").   The Court, therefore, concludes that UNM's use of an inquisitorial model of factfinding in student disciplinary proceedings is constitutionally adequate.

### B.   LEE HAS NOT DEMONSTRATED THAT BUCHS, THE OEO INVESTIGATOR, WAS BIASED AGAINST HIM.

The Court "presume[s] that administrators are honest and impartial . . . and therefore 'capable of judging a particular controversy fairly on the basis of its own circumstances.'"   Hess, 839 F.3d at 675 (quoting United States v. Morgan, 313 U.S. 409, 421 (1941)).   See Mangels v. Pena, 789 F.2d at 838 (internal citations omitted).   "Because honesty and integrity are presumed on the part of a tribunal, there must be some countervailing reason to conclude that the decisionmaker is actually biased with respect to the factual issues being adjudicated."   Mangels v.

Pena, 789 F.2d at 838 (internal citations omitted).  Although this presumption is rebuttable, Lee's burden is "heavy indeed"; he must "lay a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable."  Hess, 839 F.3d at 675 (citing Winthrow v. Larkin, 421 U.S. at 47, 55).  Lee avows that Buchs "did not trust" Lee or Goodnight's version of events, and that she was "hostile and aggressive" towards Lee when she interviewed him.   Response at 27.   See Lee Depo. at 142:21-25 (stating that Buchs was "aggressive" and "argumentative" during her meeting with Lee).  Beyond Buchs' "facial expression" and "her tone," however, Lee is "unable to give . . . an example" how Buchs was argumentative.  Lee Depo. at 143:1-11.  Lee contends that he "did not have an opportunity to observe any additional bias f[ro]m" Buchs, "because she conducted her investigation and made her decision behind closed doors."  Response at 27.

The Court concludes that Lee has not demonstrated successfully that Buchs conclusively pre-determined his guilt because he fails to provide any evidence of pre-determination.  See Lee Depo. at 142:21-25.    Similarly, Lee's contention that Buchs had an "aggressive" or "argumentative" "facial expression," Lee Depo. at 142:21-143:11, does not meet his "heavy" burden of rebutting the Court's presumption that Buchs acted impartially, Hess, 839 F.3d at 675; Brown v. Univ. of Kansas, 599 F. App'x 833, 838 (10th Cir. 2015)(rejecting a plaintiff's claim of bias in a university expulsion proceeding, because "there is no evidence of a link between the dean's alleged bias and the decision to expel" the plaintiff).  Lee provides no details about Buchs' tone or facial expression; moreover, facial expression and tone of voice alone are generally insufficient to demonstrate bias.  See Hess, 839 F.3d at 675 (concluding that the plaintiff's assertion that a school administrator smiled when informing the plaintiff that he was suspended did not "overcome the presumption of impartiality," because "one may smile in sympathy, or to

ease the tension of a difficult moment, or simply out of awkwardness").  The Court concludes that Lee's inference of Buchs' bias is speculative, and thus cannot overcome the Court's presumption of impartiality.  See Nash v. Auburn Univ., 812 F.2d at 666 (rejecting a plaintiff's speculative contentions regarding an allegedly biased decisionmaker); Duke v. N. Texas State Univ., 469 F.2d 829, 834 (5th Cir. 1972)("Alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences."); Tr. at 82:11-20 (Court)(explaining that a factfinder must decide who he or she believes during the decision-making process, and that this decision does not give rise to a finding of actual bias).

Factfinding is a difficult process.  The factfinder often must investigate all facts at the same time he or she makes a decision.  Often a factfinder can just be intuitive, rather than biased or partial.  A factfinder often engages in aggressive questioning, but, again, that does not mean the factfinder is biased.  See Abdulrahman v. Ashcroft, 330 F.3d 587, 596-97 (3d Cir. 2003)(concluding that a factfinder's vigorous questioning did not demonstrate bias).  To be sure, facial expression, anger, and aggression, can show bias or partiality.  See, e.g., Elias v. Gonzales, 490 F.3d 444, 452 (6th Cir. 2007)(holding that an immigration judge showed bias when the judge "was inappropriately sarcastic" and "appeared at times to badger petitioner" and his "intemperate" conduct had "been noted in at least ten opinions or orders issued by the Second Circuit"); Islam v. Gonzales, 469 F.3d 53, 55 n.1 (2d Cir. 2006)(concluding that an immigration judge was biased where he "repeatedly" addressed the petitioner "in an argumentative, sarcastic, impolite, and overly hostile manner that went beyond fact-finding and questioning," including comparing the petitioner, who sought asylum, to Terry Nichols, the Oklahoma City bomber).  To overcome the presumption of impartiality or fairness, however, more than just citing these factors are needed --

the Court must have concrete examples of bias.  Here, Lee does not give the necessary details

which would help the Court see whether Buchs was biased.

Further, even if Buchs displayed bias, Lee appealed Buchs' decision to both UNM's

President, Frank, and the Board of Regents.  See Aug. 23 Letter at 34; UNM President Letter at

13; Meeting Minutes at 14.  Both Frank and the Board of Regents upheld Buchs' finding that Lee

violated UNM policy.  See Aug. 23 Letter at 34; UNM President Letter at 13; Meeting Minutes at

14.  Further, Frank and the Board of Regents separately affirmed the DOS' expulsion sanction.

See Schacht v. Wis. Dep't of Corr., 175 F.3d 497, 503 (7th Cir. 1999)(concluding that no due

process violation existed where the plaintiff could still obtain administrative remedies from

unbiased decision-makers), overruled on other grounds by Higgins v. Mississippi, 217 F.3d 951

(7th Cir. 2000).  Lee's speculative, thin descriptions of Buchs' demeanor, coupled with additional

procedural safeguards, fail to prove an unacceptably high risk of unfairness exists in UNM's

decision-making process.  See Winthrow, 421 U.S. at 58.  Accordingly, Lee's procedural due

process claims as to Buchs' bias lack a sound basis in the relevant facts and applicable law.

## VI.   UNM'S APPLICATION OF THE "PREPONDERANCE-OF-THE-EVIDENCE STANDARD" IN STUDENT DISCIPLINARY PROCEEDINGS DOES NOT VIOLATE LEE'S DUE PROCESS RIGHTS, BECAUSE THE DUE PROCESS CLAUSE DOES NOT REQUIRE UNIVERSITIES TO APPLY A HIGHER EVIDENTIARY STANDARD IN STUDENT DISCIPLINARY PROCEEDINGS.

"[D]ue process permits state education institutions such as UNM to adjudicate sexual

misconduct disciplinary proceedings according to a preponderance-of-the-evidence standard."

MOO, 449 F. Supp. 3d at 1132.  The clear-and-convincing evidentiary standard applies only "when

the individual interests at stake in a state proceedings are both 'particularly important' and 'more

substantial than mere loss of money."  Santosky v. Kramer, 555 U.S. 745, 756 (1982)(quoting

Addington v. Texas, 441 U.S. 418, 424 (1979)).  This heightened evidentiary burden preserves

fairness in "government-initiated proceedings that threaten the individual involved with 'a significant deprivation of liberty' or 'stigma.'" Santosky v. Kramer, 455 U.S. at 756 (quoting Addington v. Texas, 441 U.S. at 425). Deportation hearings, see Woodby v. INS, 385 U.S. 276 (1966), civil confinement proceedings, see Addington v. Texas, 441 U.S. at 424, parental rights termination proceedings, see Santosky v. Kramer, 555 U.S. at 756, and the withdrawal of life support, see Cruzan v. Director, Mo. Dep't of Health, 479 U.S. 261 (1990), require the clear-and-convincing evidence standard. By contrast, in Cooper v. Oklahoma, the Supreme Court struck down an Oklahoma statute that required a criminal defendant to prove his incompetence to stand trial by clear-and-convincing evidence rather than a preponderance-of-the-evidence. See Cooper v. Oklahoma, 517 U.S. 348, 369 (1996). The Supreme Court reiterated that "the State's power to regulate procedural burdens [is] subject to proscription under the Due Process Clause if it 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" Cooper v. Oklahoma, 517 U.S. at 367 (quoting Patterson v. New York, 432 U.S. 197, 202 (1977)).

The Tenth Circuit has stated that the clear-and-convincing standard "is typically used in civil cases 'involving allegations of fraud or some other quasi-criminal wrongdoing.'" Century Sur. Co. v. Shayona Inv., LLC, 840 F.3d 1175, 1177 (10th Cir. 2016)(quoting Addington v. Texas, 441 U.S. at 424). Thus, for example, the Tenth Circuit requires clear-and-convincing evidence to support a motion under rule 60(b)(3) of the Federal Rules of Civil Procedure,[123] see Anderson v.

---

[123]Rule 60(b)(3) provides in relevant part:

(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

Dep't of Health and Human Servs., 907 F.2d 936, 952 (10th Cir. 1990), and to prove civil contempt

liability, see F.T.C. v. Kuykendall, 371 F.3d 745, 756 (10th Cir. 2004).  See also Assman v.

Fleming, 159 F.2d 332, 336 (8th Cir. 1947)(explaining that plaintiffs must usually prove fraud by

clear-and-convincing evidence).

Unlike civil cases involving allegations of fraud or quasi-criminal wrongdoing, due process

does not require universities evaluating sexual misconduct allegations to apply a clear and

convincing evidentiary standard.[124]  See  Doe v. Cummins, 662 F. App'x at 449 (concluding that

a university's use of the preponderance-of-evidence standard in sexual misconduct disciplinary

proceedings satisfied the Mathews v. Eldridge test). No federal courts have concluded that students

are entitled to anything more than a preponderance-of-the-evidence standard in sexual misconduct

disciplinary proceedings.  See Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 607 (D. Mass.

2016)(Saylor, J.)("Brandeis");  Doe v. Va. Polytechnic Inst. & State Univ., 400 F. Supp. 3d 479,

--------------------------------------

. . .

> (3) fraud (whether previously called intrinsic or extrinsic),
> misrepresentation, or misconduct by an opposing party . . . .

Fed. R. Civ. P. 60(b).

[124]Despite repudiating the Dear Colleague Letter, the Department of Education has not
rejected the preponderance standard as per se unconstitutional, explaining that,

> in reaching a determination regarding responsibility, the [University] must apply
> either the preponderance-of-the-evidence standard or the clear and convincing
> evidence standard.  The recipient may, however, employ the preponderance-of-the-
> evidence standard only if the recipient uses that standard for conduct code
> violations that do not involve sexual harassment but carry the same maximum
> disciplinary sanction.  The recipient must also apply the same standard of evidence
> for complaints against students as it does for complaints against employees,
> including faculty.

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal
Financial Assistance, 83 Fed. Reg. 61462-01 (proposed Nov. 29, 2018).

501 (W.D. Va. 2019)(Dillon, J.)(rejecting the plaintiff's argument that he was entitled to a more protective evidentiary standard, because the United States Court of Appeals for the Fourth Circuit has held that trial-like procedures are not required to satisfy the constitution); Doe v. Univ. of Ark-Fayetteville, No. 5:18-cv-05182, 2019 WL 1493701, at *10 (April 3, 2019)(Holmes, J.)("Doe fails to argue how the preponderance-of-the-evidence standard, utilized in similar sexual misconduct civil actions, denies due process.  School disciplinary proceedings are not criminal trials. Standards such a clear and convincing evidence and beyond reasonable doubt are not required in such a civil proceeding."); Messeri v. Univ. of Colorado, Boulder, No. 18-CV-2658-WJM-SKC, 2019 WL 4597875, at *17 (D. Colo. Sept. 23, 2019)(Martinez, J.)(concluding that a plaintiff in sexual misconduct disciplinary proceedings had not established he had a clearly established right to a standard greater than preponderance-of-the-evidence); Doe v. Haas, 427 F. Supp. 3d 336, 350 (E.D.N.Y. 2019)(Hurley, J.)(holding that, where a university suspended a student and placed a permanent mark on his transcript denoting a sexual misconduct violation, preponderance-of-the-evidence was the proper standard, because "courts have rejected the notion that safeguards applicable to criminal proceedings should be applied in the school disciplinary context"); 83 Fed. Reg. 61462-01 (explaining that the preponderance standard can satisfy due process as long as universities apply it uniformly during disciplinary proceedings).  See also Defendants' MSJ Memo at 26 (explaining that the Defendants had not "found a single federal case that has found that the use of the preponderance standard in school disciplinary proceedings -- even those involving sexual misconduct -- is violative of due process").  But see Plummer, 860 F.3d at 780 (Jones, J., dissenting)("Elevating the standard of proof to clear and convincing, a rung below the criminal burden, would maximize the accuracy of factfinding.").

Lee cites <u>Brandeis</u>, 177 F. Supp. 3d at 602, for the proposition that "being found to have engaged in sexual assault at the university level" is "not as severe as criminal consequences," but "bears some similarities, particularly in terms of reputational injury.'"  Response at 29.  In <u>Brandeis</u>, the Honorable Dennis Saylor, IV, United States District Judge for the United States District Court for the District of Massachusetts, concludes that Brandeis University's preponderance-of-the-evidence standard for sexual assault disciplinary proceedings "is not problematic, standing alone."  177 F. Supp. at 607.  Judge Saylor concludes that the standard was among the reasons Brandeis University's procedures violated the Due Process Clause, but only because it applied a clear-and-convincing standard for "virtually all other forms of student conduct."  177 F. Supp. at 607.  Judge Saylor concludes, therefore, that the preponderance standard "may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."  177 F. Supp. 3d at 607.  Here, by contrast, UNM evaluates all student misconduct – not just sexual misconduct -- using a preponderance-of-the-evidence standard.  <u>See</u> Student Handbook at 6-7.  The concerns that Judge Saylor raised in <u>Brandeis</u>, therefore, are not salient here, because UNM's use of the preponderance-of-the-evidence standard "is not problematic, standing alone."  177 F. Supp. at 607.[125]

The Court also disagrees with Lee's contention that, as the Honorable Judge Edith C. Jones, Circuit Judge for the United States Court of Appeals for the Fifth Circuit, noted in <u>Plummer</u>, "'[e]levating the standard of proof to clear and convincing, a rung below the criminal burden,

---

[125]Because the preponderance-of-the-evidence standard satisfies due process, universities are free to apply this standard or a higher standard.  A university may also apply different standards of proof for different categories of offenses.  Thus, even if UNM had used a preponderance-of-the-evidence standard in sexual misconduct cases and a higher evidentiary standard in other student misconduct cases, it would not have run afoul of the Due Process Clause.

would maximize the accuracy of factfinding.'"  Response at 29 (quoting <u>Plummer</u>, 860 F.3d at 783

(Jones, J., dissenting)).  As the Court explained in its MOO, "'there exists a consensus among

evidence law scholars . . . that increasing the stringency of the standard of evidence . . . will tend

to shift the expected ratio of false negative errors versus false positive errors and thereby *lower the*

*overall accuracy* of outcomes in the system.'"  MOO, 449 F. Supp. at 1132 n.17 (quoting William

C. Kidder, <u>(En)forcing A Foolish Consistency?: A Critique and Comparative Analysis of the</u>

<u>Trump Administration's Proposed Standard of Evidence Regulation for Campus Title IX</u>

<u>Proceedings</u>, 45 J.C. & U.L. at 12 (emphasis in original)). The preponderance-of-the-evidence

standard "allows courts to maximize the total number of correctly decided cases," while other

standards "are not calibrated to achieve this accuracy maximizing and welfare-improving

consequence."  Ronald J. Allen & Alex Stein, <u>Evidence, Probability, and the Burden of Proof</u>, 55

Arizona L. Rev. 557, 591 (2013).

Lee also cites <u>Doe v. University of Colorado, Boulder</u>, 255 F. Supp. 3d 1064, 1082 n.13

(D. Colo. 2017)(Martinez, J.)("<u>UC Boulder</u>"), where a university expelled a student and placed a

permanent notation on his transcript after the student was accused of raping two other students.

<u>UC Boulder</u>, 255 F. Supp. 3d at 1069, 1073.  Lee notes that there, the Honorable William Martinez,

United States District Judge for the District of Colorado, "recognized that 'there is a fair question

whether preponderance-of-the-evidence is the proper standard for disciplinary investigations'

involving sexual misconduct allegations."  Response at 29 (quoting <u>UC Boulder</u>, 255 F. Supp. 3d

at 1082 n.13).  Judge Martinez declined to address the issue, however, because the defendants

failed to raise it until their reply brief, noting only that the preponderance standard's

appropriateness in university disciplinary proceedings for sexual misconduct is "up for debate."

255 F. Supp. 3d at 1082 n.13.  Having evaluated the evidence on both sides of this debate, the

Court concludes -- like every other federal court that has addressed this issue -- that UNM may apply the preponderance of the evidence standard in student disciplinary proceedings.

In the end, the Anglo-American system of civil law relies on the preponderance of evidence burden of proof to make a host of important decisions. Billions of dollars are transferred from one person another on the basis of preponderance of the evidence. That burden has worked for a broad range of important cases for centuries. John Leubsdorf, The Surprising History of the Preponderance Standard of Civil Proof, 67 Fla. L. Rev. 1569, 1601-02 (2015)(explaining that the preponderance-of-the-evidence standard was the default standard for all cases until the mid-nineteenth century, when courts began requiring proof beyond a reasonable doubt in criminal cases). There is no reason to create an exception for college students accused of sexual assault. Moreover, the burden of proof only makes a difference in close cases. Most cases are not that close, as the factfinder does not talk about the burden of proof much. Only when the factfinder is obsessing over the result and is stuck is it a good idea to remind the factfinder of the burden of proof.[126] Most cases are not razor thin, and the burden of proof is inapplicable in the vast majority

---

[126]In the Tenth Circuit in a criminal case, a judge reminds the jury to consider the burden of proof when they reach an impasse:

Members of the jury, I am going to ask that you return to the jury room and deliberate further. I realize that you are having some difficulty reaching a unanimous agreement . . . .

You are reminded that the defendant is presumed innocent, and that the government, not the defendant, has the burden of proof and it must prove the defendant guilty beyond a reasonable doubt. Those of you who believe that the government has proved the defendant guilty beyond a reasonable doubt should stop and ask yourselves if the evidence is really convincing enough, given that other members of the jury are not convinced. And those of you who believe that the government has not proved the defendant guilty beyond a reasonable doubt should stop and ask yourselves if the doubt you have is a reasonable one, given that other members of the jury do not share your doubt. In short, every individual juror should reconsider his or her views.

of cases.  Moreover, the requiring higher evidentiary standard also will make it more likely that UNM reaches the wrong outcome.  See William C. Kidder, (En)forcing A Foolish Consistency?: A Critique and Comparative Analysis of the Trump Administration's Proposed Standard of Evidence Regulation for Campus Title IX Proceedings, 45 J.C. & U.L. at 12.  Because a lower evidentiary standard increases the likelihood of accurate outcomes, retaining it implicates UNM's "strong interest in the 'educational process,' including maintaining a safe learning environment for all its students."  Plummer, 860 F.3d at 773 (quoting Goss, 419 U.S. at 580).  In addition to its legitimate efficiency concerns, see Gorman v. Univ. of R.I., 837 F.2d at 14-15 (discussing administrative burdens on universities), UNM has a very strong interest in reaching the correct conclusion as it reviews sexual misconduct allegations, see Heidi M. Zinzow, A Longitudinal Study of Risk Factors for Repeated Sexual Coercion and Assault in US. College Men, 44 Archives Sexual Behavior 213 (2015)(noting the high recidivism rates in campus sexual assault).  Lee's interests in avoiding expulsion or sanction based on a sexual misconduct allegation are significant, but they do not overcome UNM's interests in accurately determining who has violated its sexual misconduct policies to protect its students.  See Butler v. Rio Rancho Pub. Sch. Bd., 341 F.3d at 1201 (recognizing a school's interest in protecting its students' safety).  This conclusion accords with the balance other courts have struck.  See, e.g., Doe v. Va. Polytechnic Inst. & State Univ., 400 F. Supp. 3d at 501; Doe v. Univ. of Ark-Fayetteville, 2019 WL 1493701, at *10; Brandeis, 177 F. Supp. 3d at 607.  Balancing these interests, the Court affirms that due process permits state education institutions such as UNM to adjudicate sexual misconduct disciplinary proceedings according to a preponderance-of-the-evidence standard.  Accordingly, the Court concludes that

---

Tenth Circuit Pattern Jury Instructions: Criminal 67 (2011).

UNM's application of the preponderance standard was "constitutionally sound and does not give rise to a due-process violation."  Doe v. Cummins, 662 F. App'x at 449.

## VII.    UNM HAS NOT VIOLATED LEE'S DUE PROCESS RIGHTS BY CONSIDERING ALCOHOL AS A FACTOR IN DETERMINING LEE'S SANCTIONS FOR VIOLATING UNM POLICY.

Lee argues that the "OEO violated" his due process rights, because he did not receive "notice or an opportunity to be heard on the charge regarding underage drinking."[127]  Response at 30.  Lee received notice of the "charges" against him before the OEO: "issues and concerns of possible sexual violence and sexual misconduct."  Oct. 16 Letter at 5.  The Court disagrees with Lee's assertion that provision of alcohol to minors was a "charge" against him.  See Response at 30.  His provision of alcohol to minors was, instead, a factor in the DOS' sanctioning decision.  See DOS Sanctions Letter at 23.  As the Court noted at the hearing, the DOS' sanctioning phase -- bifurcated from the OEO's sexual misconduct determination -- is analogous to a court's sentencing phase, during which courts have "broad discretion" and can "consider just about anything."  Tr. at 106:4-18 (Court).  See DOS Sanctions Letter at 22-23.  Moreover, Lee had a sanctioning decision hearing with the DOS, where he had the opportunity to present mitigating information, including that he had "never been in trouble with the law," and that his "only interest is to complete my dissertation and move on."  Written Statement on Administrative Hearing at 19-20.  It was at this hearing, in fact, that Lee admitted to the hearing officer that he provided alcohol to minors.  See DOS Sanctions Letter at 22-23.  Moreover, Chibanga informed Lee before the hearing that he would have "the opportunity to present . . . evidence, as it relates to the sanctioning" that "you would like me to consider."  May 20 Email at16.  Lee, therefore, knew or

---

[127]The DOS, not the OEO, made the sanctioning decision in Lee's case.  See DOS Sanctions Letter at 22-23.

should have known that, if he informed Chibanga at the hearing that he provided alcohol to minors, she might consider this fact in her sanctioning decision. See May 20 Email at 16. Lee also told the OEO that he provided alcohol to Roe and Goodnight, see Lee's Typewritten Statement at 8 ("I got out the cups . . . a 2-liter of Dr. Pepper, alcohol, playing cards, and the fake money."), and Chibanga placed Lee on notice that she would consider evidence from the OEO's investigation, see May 20 Email at 16. The Court, therefore, concludes that due process did not require the DOS to provide Lee with any further notice that it would consider his provision of alcohol to minors. See Watson, 242 F.3d at 1241.

Further, in Watson, the Tenth Circuit indicated that it is unwilling to adopt the notice standard which Lee proposes. See 242 F.3d at 1241. There, the plaintiff was expelled after being "charged" with assaulting his roommate. 242 F.3d at 1241. Like Lee, the plaintiff argued that the school disciplinary board violated his due process rights, because it did not notify him that it would consider that the assault was racially motivated. 242 F.3d at 1241. See Response at 30-31. Judge John W. Lungstrum, United States District Judge for the District Judge, explained that the school disciplinary board's conclusion that "the motive for the assault was racism does not constitute an independent charge." 242 F.3d at 1241. Judge Lungstrum also noted that the plaintiff was not expelled "because he was racist . . . he was expelled for the assault." 242 F.3d at 1241.

As in Watson, the provision of alcohol to minors is not an independent charge against Lee, and thus the Defendants are not required to provide notice that they would consider it in their sanctioning decision. See 242 F.3d at 1241; Oct. 16 Letter at 5. Likewise, Lee was not expelled because he provided alcohol to minors -- he was expelled for nonconsensual sexual contact. See 242 F.3d at 1241; DOS Sanctions Letter at 22-24. Lee's purchase of alcohol for minors was not determinative in UNM's decision to expel him -- it was one of six pieces of evidence upon which

the DOS based its decision for Lee's sanctions.  See DOS Sanctions Letter at 22-23.  Lee also admitted to the hearing officer, Chibanga, that he purchased alcohol for minors; under Watson, "a student is not prejudiced by lack of notice" where he "candidly admits his guilt."  242 F.3d at 1241. See DOS Sanctions Letter at 22-24.  Furthermore, like the plaintiff in Watson, Lee "does not cite, and this court does not find, any precedent for the proposition that notice must include all" factors considered in a sanctioning decision.  242 F.3d at 1241.  See Response at 30.  This "extensive" level of notice "is not even due in a criminal trial," and requiring such extensive notice would overcomplicate sanctioning decisions.  242 F.3d at 1241.  See Tr. at 108:3-5 (Court).

Lee compares this case to Greenhill, 519 F.2d at 6, arguing again that, like the plaintiff in Greenhill, he never received notice of the grounds for his sanction.  See Response at 30-31.  In Greenhill, two committees voted to recommend the plaintiff medical student's suspension, because of his academic performance.  See 519 F.2d at 6.  The plaintiff appealed by letter, because the medical school did not allow in person appearances, but the defendants upheld his suspension.  See 519 F.2d at 6-7.  After the plaintiff's suspension had been finalized, the medical school sent a form to the medical colleges' association explaining that the plaintiff was suspended, because of "poor academic standing" given his "lack of intellectual ability or insufficient preparation."  See 519 F.2d at 6-7.  The Honorable Judge William H. Webster, United States Circuit Judge for the United States Court of the Appeals for the Eighth Circuit, concludes that "at the very least, Greenhill should have been notified in writing of the alleged deficiency in his intellectual ability, since this reason for his dismissal would potentially stigmatize his future as a medical student elsewhere, and should have been accorded an opportunity to appear personally to contest such allegation." 519 F.2d at 9.  Judge Webster continued that the plaintiff was entitled to "an 'informal give-and-take' between the student and the administrative body dismissing him and foreclosing his

opportunity to gain admission at all comparable institutions," which "would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" 519 F.2d at 9 (quoting Goss, 419 U.S. at 584).

Although Judge Webster's concerns were valid, they do not apply here.[128]  See 519 F.2d at 9.  First, as Judge Webster noted, "there has long been a distinction between cases concerning disciplinary dismissals, on the one hand, and academic dismissals, on the other."  519 F.2d at 8.  Lee's case is a disciplinary dismissal, while the Greenhill plaintiff was dismissed on academic grounds.  See 519 F.2d at 8; DOS Sanctions Letter at 23.  Further, unlike in Greenhill, UNM notified Lee of the reason for his expulsion -- his violation of two UNM policies.  See 519 F.2d at 6-8; DOS Sanctions Letter at 23.  Like the plaintiff in Greenhill, Lee's transcript has a notation, indicating the DOS' decision to expel him from UNM.   See 519 F.2d at 7; DOS Sanctions Letter at 23.  This notation, however, states that Lee was "expelled from the University of New Mexico for disciplinary reasons."  DOS Sanctions Letter at 23.  The notation does not specify why Lee was expelled, like the form sent to the medical colleges' association in Greenhill, and does not state that he provided alcohol to minors.  See 519 F.2d at 6-7; DOS Sanctions Letter at 23.  Further, unlike the plaintiff in Greenhill, who was able to respond to the charges against him only by letter, Lee had the opportunity to discuss his provision of alcohol to minors at the hearing, and was thus able to "'characterize his conduct and put it in what he deems the proper context.'"  519 F.2d at 9 (quoting Goss, 419 U.S. at 584).  Last, while the plaintiff in Greenhill did not receive advance notice of the reason for his dismissal, see 519 F.2d at 9, Lee received advance notice of the charges of sexual misconduct against him, see Oct. 16 Letter at 4.  Lee's lack of notice that the DOS would

---

[128]The Court would have cause for concern if UNM had, like the defendant in Greenhill, contacted other universities and notified them of charges against Lee without providing notice to Lee himself.  See 519 F.2d at 6-7.

consider his provision of alcohol to minors, therefore, does not present the same due process

concerns as <u>Greenhill</u>'s situation.  <u>See</u> 519 F.2d at 9; DOS Sanctions Letter at 22-24.

In a criminal case, sentencing can be wild and unstructured, in comparison to the order of

a trial.  At trial, the system works hard to give defendants notice of charges, and keep the trial in

focus and evidence relevant to these charges. When it gets to sentencing, the parties bring the dump

truck, and unload on the Court all sorts of evidence.  <u>United States v. Romero</u>, No. CR 09-1253

JB, 2012 WL 6632493, at *14 (D.N.M. Dec. 6, 2012)(Browning, J.)(discussing courts' broad

discretion to consider evidence at sentencing).  The Supreme Court has said that a trial court can

consider almost anything at a sentencing.  <u>See</u> <u>Williams v. People of State of N.Y.</u>, 337 U.S. 241,

247 (1949)("Highly relevant -- if not essential -- to [a sentencing judge's] selection of an

appropriate sentence is the possession of the fullest information possible concerning the

defendant's life and characteristics.").  Victims and defendants come to court and say all sorts of

things at a sentencing.  It is hard to give advance notice to everything that comes out of a victim's

and defendant's mouths.  The Court, therefore, declines to impose a higher notice requirement on

the sanctioning stage of a university than it imposes at the sentencing phase of a criminal trial.

**IT IS ORDERED** that: (i) the Defendants' Motion for Summary Judgment, filed February

6, 2020 (Doc. 70) is granted; and (ii) the Plaintiffs' due process claims are dismissed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Aryln G. Crow
Alana M. De Young
Adams + Crow Law Firm
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Quentin Smith
Leah M. Stevens-Block
Jackson Loman Stanford & Downey, P.C.
Albuquerque, New Mexico

      *Attorneys for the Defendants*